ROBERT H. ROTSTEIN (SBN 72452), rxr@msk.com
EMILY F. EVITT (SBN 261491), efe@msk.com
JAMES D. BERKLEY (SBN 347919), jdb@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendant
Netflix, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WHYTE MONKEE PRODUCTIONS, LLC, and TIMOTHY SEPI,<br><br>Plaintiffs,<br><br>v.<br><br>NETFLIX, INC.<br><br>Defendant. | CASE NO. 5:23-CV-03438-PCP<br><br>[The Honorable P. Casey Pitts]<br><br>*Removed from Superior Court for Santa Clara County Case No. 23CV413161*<br><br>**DECLARATION OF JAMES D. BERKLEY IN SUPPORT OF DEFENDANT NETFLIX, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**<br><br>Date: Thursday, Dec. 14, 2023<br>Time: 10:00am<br>Courtroom: 8 (4th Floor) |

Mitchell
Silberberg &
Knupp LLP

15918765.2

CASE NO. 5:23-cv-03438-PCP

**DECLARATION OF JAMES D. BERKLEY**

1    I, James D. Berkley, declare as follows:

2        1.     I am an attorney-at-law, duly licensed to practice law in the State of California and

3    before this Court.  I am Special Counsel at the law firm of Mitchell Silberberg & Knupp LLP

4    ("MSK"), and am counsel of record for Defendant Netflix, Inc. ("Netflix") in this action.  Unless

5    otherwise noted, I know the following of my own personal knowledge and, if called as a witness,

6    could and would competently testify thereto.

7        **2.**     Attached hereto as **Exhibit 1** is a true and correct copy of a web page containing a

8    decision of the Paris Court of Appeal dated September 8, 2015, No. 14/06060, in the matter *Cts*

9    *Boquillon Liger-Belair v. SNC Hachette Collections and SA Moulinsart*, which I accessed and

10    caused to be printed on or about October 27, 2023 from a Google-cached web page available at the

11    Uniform Resource Locator ('URL')

12    https://webcache.googleusercontent.com/search?q=cache:1iL1MKoVBaEJ:https://www.doctrine.fr/

13    d/CA/Paris/2021/C9CFC202EC2E0AD3EA656.

14        **3.**     Attached hereto as **Exhibit 2** is a true and correct copy of an automated English

15    translation of the same web page shown in Exhibit 1 created using the Google Chrome browser,

16    which I accessed and caused to be printed from the same URL on or about October 27, 2023.

17        4.     Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the Canadian

18    Copyright Act, which I accessed and caused to be downloaded on or about October 25, 2023 from

19    the URL https://laws-lois.justice.gc.ca/PDF/C-42.pdf.  Among other things, Section 38(1) of the

20    Act provides, in part, that "a copyright owner may elect, at any time before final judgment is

21    rendered, to recover . . .  an award of statutory damages . . . in a sum of not less than $500 and not

22    more than $20,000 that the court considers just, with respect to all infringements involved in the

23    proceedings for each work or other subject-matter, if the infringements are for commercial

24    purposes . . . ."

25        5.     Attached hereto as **Exhibit 4** is a true and correct copy of a page appearing on a

26    Canadian government website, titled "Canadian vs. US Copyright protection," which I accessed

27    and caused to be printed on or about October 25, 2023 from the URL

28

1   https://www.tradecommissioner.gc.ca/united-states-of-america-etats-unis-amerique/copyright-

2   protection-droit-auteur.aspx?lang=eng.

3        6.       Attached hereto as **Exhibit 5** is a true and correct copy of a page appearing on the

4   website of the United States Federal Reserve, showing U.S. foreign exchange rates for the week

5   preceding July 17, 2023, which I accessed and caused to be printed on or about October 25, 2023

6   from the URL https://www.federalreserve.gov/releases/h10/20230717/.

7        7.       Attached hereto as **Exhibit 6** is a true and correct copy of a decision by the Paris

8   Court of Appeal dated February 23, 2021 in the case *Davidovici v. Koons*, identified as No.

9   034/2021, which I accessed and caused to be downloaded on or about October 23, 2023 from the

10  URL https://www.dalloz-actualite.fr/sites/dalloz-

11  actualite.fr/files/resources/2021/03/paris_23_fevr._2021_19-0959_koons_biffe.pdf.  The original

12  document as posted contains certain redactions.

13       8.       Attached hereto as **Exhibit 7** is a true and correct copy of an automated English

14  translation of the above-referenced February 23, 2021 decision in the case *Davidovici v. Koons*,

15  which I accessed via the Google Chrome browser and caused to be printed from the URL

16  https://webcache.googleusercontent.com/search?q=cache:1iL1MKoVBaEJ:https://www.doctrine.fr/

17  d/CA/Paris/2021/C9CFC202EC2E0AD3EA656 on or about November 2, 2023.

18       9.       Attached hereto as **Exhibit 8** is a true and correct copy of a decision issued by the

19  Federal Court of Canada on or about March 7, 2018 in the matter *Collett v. Northland Art Company*

20  *Canada Inc*., 2018 FC 269, which I accessed and caused to be downloaded on or about September

21  30, 2023 from the URL https://decisions.fct-cf.gc.ca/fc-cf/decisions/en/308077/1/document.do.

22       10.      Attached hereto as **Exhibit 9** is a true and correct copy of an article appearing in the

23  online edition of the *U.K. Independent*, titled "Identity theft: Waits wins damages over VW

24  advert," dated January 21, 2006, which I accessed and caused to be printed on or about October 1,

25  2023 from the URL https://www.independent.co.uk/arts-entertainment/music/news/identity-theft-

26  waits-wins-damages-over-vw-advert-6111110.html.

27       11.      Attached hereto as **Exhibit 10** is a true and correct copy of an opinion of the Federal

28  Magistrates Court of Australia, *Perez v Fernandez* [2012] FMCA 2, as made available through a

Mitchell
Silberberg &
Knupp LLP

3                                    CASE NO. 5:23-cv-03438-PCP

**DECLARATION OF JAMES D. BERKLEY**

1   database of the World Intellectual Property Organization (WIPO), which I accessed and caused to

2   be printed from the URL https://www.wipo.int/wipolex/es/text/583744 on or about November 2,

3   2023.

4         12.    Attached hereto as **Exhibit 11** is a true and correct copy of Articles 695 through 700

5   of the French Code of Civil Procedure as made available on a French government website, which I

6   accessed and caused to be printed on or about October 25, 2023 from the URL

7   https://www.legifrance.gouv.fr/codes/section_lc/LEGITEXT000006070716/LEGISCTA000006135

8   902/#LEGISCTA000006135902.

9         13.    Attached hereto as **Exhibit 12** is a true and correct copy of an English translation of

10   Article 700 of the French Code of Civil Procedure, which I accessed and caused to be downloaded

11   from the Westlaw legal research database, available at www.westlaw.com, on or about October 9,

12   2023.

13         14.    Attached hereto as **Exhibit 13** are true and correct copies of excerpts from an

14   English translation of the German Code of Civil Procedure as made available by a German

15   government website, which I accessed and caused to be downloaded on or about October 25, 2023,

16   from the URL https://www.gesetze-im-internet.de/englisch_zpo/englisch_zpo.pdf.

17         15.    Attached hereto as **Exhibit 14** is a true and correct copy of Article 91 of the Italian

18   Code of Civil Procedure as made available by an Italian government website, which I accessed and

19   caused to be printed on or about October 25, 2023 from the URL https://www.normattiva.it/uri-

20   res/N2Ls?urn:nir:stato:regio.decreto:1940-10-28;1443, followed by a true and correct copy of an

21   automated Google translation thereof.

22         16.    Attached hereto as **Exhibit 15** are true and correct copies of excerpts of an English

23   translation of the Spanish Code of Civil Procedure as made available by a Spanish government

24   website, including Articles 394 through 398 thereof, which I accessed and caused to be

25   downloaded on or about November 2, 2023 from the URL

26   https://www.mjusticia.gob.es/es/AreaTematica/DocumentacionPublicaciones/Documents/Law%20

27   1-2000%20of%207%20January.pdf.

28

Mitchell
Silberberg &
Knupp LLP

**DECLARATION OF JAMES D. BERKLEY**

17.    Attached hereto as **Exhibit 16** are true and correct copies of excerpts from the current compilation of Australia's Federal Court Rules 2011, registered February 8, 2023, which I accessed and caused to be downloaded on or about November 1, 2023 from the URL https://www.legislation.gov.au/Details/F2023C00174/Download.

18.    Attached hereto as **Exhibit 17** are true and correct copies of excerpts from the current compilation of Australia's Federal Circuit and Family Court of Australia (Division 2) (General Federal Law) Rules of 2021, registered January 18, 2023, which I accessed and caused to be downloaded on or about November 1, 2023 from the URL https://www.legislation.gov.au/Details/F2023C00085/Download.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of Part 44 of the Civil Procedure Rules of the **United Kingdom**, which I accessed and caused to be printed on or about November 1, 2023 from the URL https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part-44-general-rules-about-costs.

20.    Attached hereto as **Exhibit 19** are true and correct copies of excerpts from the current versions of the High Court Rules 2016 and District Court Rules 2014 of New Zealand as made available on a New Zealand government website, which I accessed and caused to be downloaded on or about November 2, 2023, respectively from the URLs https://legislation.govt.nz/regulation/public/2016/0225/latest/DLM6959801.html  and https://legislation.govt.nz/regulation/public/2014/0179/latest/DLM6129567.html.

21.    Attached hereto as **Exhibit 20** is a true and correct copy of a declaration dated October 8, 2019 submitted by Plaintiffs' counsel Ryan A. Hamilton in an action in the U.S. District Court for the Southern District of California, which was accessed and downloaded via PACER on or about October 26, 2023 from the court's public docket by an employee of MSK working under my supervision and direction.

22.    Attached hereto as **Exhibit 21** is a true and correct copy of a declaration dated January 29, 2023 submitted by Plaintiffs' counsel Andrew Grimm in an action in the U.S. District Court for the Western District of Washington, which was accessed and downloaded via PACER on

Mitchell
Silberberg &
Knupp LLP

1  or about October 26, 2023 from the court's public docket by an employee of MSK working under

2  my supervision and direction.

3      23.     Attached hereto as **Exhibit 22** are true and correct copies of a declaration and

4  selected exhibit pages thereto filed in an action in the U.S. District Court for the Eastern District of

5  Tennessee on or about October 8, 2020, referring to hours billed by Plaintiffs' counsel Philip Free,

6  which was accessed and downloaded via PACER on or about October 26, 2023 from the court's

7  public docket by an employee of MSK working under my supervision and direction.

8      I declare under penalty of perjury under the laws of the United States of America that the

9  foregoing is true and correct.

10      Executed this 9th day of November, 2023, at Los Angeles, California.

11

12              By: _____

13                  James D. Berkley

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

# EXHIBIT 1

This is Google's cache of https://www.doctrine.fr/d/CA/Paris/2015/R848CF58C25722B8B1957. It is a snapshot of the page as it appeared on Oct 19, 2023 02:24:42 GMT. The current page could have changed in the meantime. Learn more.

Full version    Text-only version    View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or ⌘-**F** (Mac) and use the find bar.

Doctrine
MENU

- Plateforme
  Fonctionnalités
      Intelligence juridiqueRechercheVeilleDocument Analyzer
  Pourquoi Doctrine ?
      Qu'est-ce qu'une plateforme d'intelligence juridique ?Couverture
- Pour qui ?
  Solutions
      Cabinets d'avocatsDirections d'entreprisesDirections juridiques du secteur publicDirections sinistres
  Ressources
      WebinarsMini-séries DoctrineBlogCentre d'aide
- Avis clients
- Tarifs
- Connexion

Inscription
7 jours d'essai gratuit.
Inscription en moins d'une minute. Pas de carte de crédit requise.
Cour d'appel de Paris, 8 septembre 2015, n° 14/06060
Copier
Enregistrer
Plan de la décision

# Cour d'appel de Paris, 8 septembre 2015, n° 14/06060

Note
Ajouter une note...

- Dessin·
- Plan·
- Droits d'auteur·
- Consorts·
- Collection·
- Navire·
- Oeuvre·
- Présomption de titularité·
- Secret·
- Licence

TGI Paris
>
TGI Paris
>
CA Paris

## Sur la décision

Référence :          Copier la référence
                     CA Paris, 8 sept. 2015, n° 14/06060

Juridiction :          Cour d'appel de Paris
Numéro(s) :            14/06060
Décision précédente : Tribunal de grande instance de Paris, 29 janvier 2014, N° 12/02063

## Sur les personnes

- Avocat(s) :
  Antoine DIESBECQBasile ADERFlorence WATRINStéphane FERTIERGilles VERCKEN
- Cabinet(s) :
  WATRIN BRAULT ASSOCIESCABINET VERCKEN & GAULLIER
- Parties :
  SA MOULINSART, SNC HACHETTE COLLECTIONS, Société Anonyme de droit Belge

# Texte intégral

Grosses délivrées RÉPUBLIQUE FRANÇAISE

aux parties le : AU NOM DU PEUPLE FRANÇAIS

**COUR** D'APPEL DE PARIS

Pôle 5 – Chambre 1

ARRÊT DU 08 SEPTEMBRE 2015

(n°141/2015, 12 pages)

Numéro d'inscription au répertoire général : 14/06060

Décision déférée à la Cour : Jugement du 30 Janvier 2014 -Tribunal de Grande Instance de Paris – RG n° 12/02063

**APPELANTS**

Monsieur BF AN AL-AM

XXX

Beyrouth

LIBAN

Monsieur BB AN AL-AM

XXX

XXX

(CANADA)

Madame AX AN AL-AM

XXX

XXX

Représentés par Me Basile ADER de l'AARPI ADER, JOLIBOIS, avocat au barreau de PARIS, toque : T11

Assistés de Me Basile ADER de l'AARPI ADER, JOLIBOIS, avocat au barreau de PARIS, toque : T11 et de Me Antoine DIESBECQ de la SELARL RACINE, avocat au barreau de PARIS, toque : L0301

**INTIMÉES**

XXX

prise en la personne de ses représentants légaux domiciliés en cette qualité audit siège

XXX

XXX

Représentée par Me Stéphane FERTIER de l'AARPI JRF AARPI, avocat au barreau de PARIS, toque : L0075

Assistée de Me Gilles VERCKEN de la SELARL CABINET GILLES VERCKEN, avocat au barreau de PARIS, toque : P0414

SA MOULINSART

Société Anonyme de droit Belge

XXX

XXX

XXX

Représentée et assistée de Me Florence WATRIN de l'Association WATRIN BRAULT ASSOCIES, avocat au barreau de PARIS, toque : J046

**COMPOSITION** DE LA COUR :

L'affaire a été débattue le 26 Mai 2015, en audience publique, devant la Cour composée de :

Monsieur Benjamin RAJBAUT, Président de chambre

Madame AX-Marie GABER, Conseillère

Mme M N, Conseillère

qui en ont délibéré.

Un rapport a été présenté à l'audience dans les conditions prévues à l'article 785 du code de procédure civile.

Greffier, lors des débats : Madame Karine ABELKALON

ARRÊT :

Contradictoire

par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.

signé par Monsieur Benjamin RAJBAUT, président et par Madame Karine ABELKALON, greffier présent lors du prononcé.

***

Vu le jugement rendu contradictoirement le 30 janvier 2014 par le tribunal de grande instance de Paris.

Vu l'appel interjeté le 17 mars 2014 par M. AT AN AL-AM, M. BB AN AL-AM et Mme AX AN AL-AM (ci-après les consorts AN AL-AM).

Vu les dernières conclusions récapitulatives n° 3 des consorts AN AL-AM, transmises le XXX.

Vu les dernières conclusions en réplique et récapitulatives de la société de droit belge Moulinsart, transmises le XXX.

Vu les dernières conclusions d'intimée n° 4 de la SNC Hachette Collections, transmises par RPVA le XXX et signifiées le 05 mai 2015.

Vu l'ordonnance de clôture en date du 05 mai 2015.

M O T I F S D E L' A R R Ê T

Considérant que, pour un exposé complet des faits de la cause et de la procédure, il est expressément renvoyé au jugement déféré et aux écritures des parties ;

**Considérant** qu'il suffit de rappeler que le dessinateur de nationalité belge Q R, dit Y, est l'auteur d'une série de bandes dessinées dénommée 'Les Aventures de Tintin' mettant en scène le jeune reporter Tintin et son chien Milou ainsi que différents personnages tels que le capitaine Haddock, le professeur Tournesol ou la Castafiore ;

Qu'Y est décédé en 1983, instituant son épouse, Mme K L, en qualité de légataire universelle ;

Qu'à l'exception des droits de publication de la série 'Les Aventures de Tintin' sous forme d'albums de bandes dessinées cédés par Y à la société Casterman, Mme K L, épouse X, a fait apport à la société de droit belge Moulinsart, pour une durée déterminée, de tous les autres droits d'exploitation de l'oeuvre et de ses éléments ;

Que l'un des albums de la série 'Les Aventures de Tintin' s'intitulant 'Le Secret de la Licorne' publié en 1942, met notamment en scène un navire du XVIIème siècle dénommé La Licorne ;

Que AQ AL-AM, né en 1906 à Bruxelles et décédé le XXX à XXX, était un spécialiste de la marine ancienne et avait un magasin-atelier de modèles réduits à Bruxelles dénommé 'Le Petit Constructeur' et par la suite, jusqu'à sa retraite en 1972, la maison BOKI ;

Que ses ayants droit, les consorts AN AL-AM, exposent avoir découvert la diffusion par la SNC Hachette Collections d'un périodique intitulé 'TINTIN, HADDOCK & La Licorne – Construisez la maquette de La Licorne découverte par Tintin' où il est indiqué qu'il s'agit d'une Création Hachette-Moulinsart Y-Moulinsart 2011", et qui a pour objet principal la construction de la maquette du navire dont les éléments sont fournis au fur et à mesure des 125 numéros de la collection, le premier numéro étant publié le 25 août 2011 ;

Qu'ils exposent avoir également constaté qu'un site Internet à l'adresse www.laLicorne.tintin.com> édité par la SNC Hachette Collections était dédié à cette collection ;

Qu'estimant que AQ AL-AM était l'auteur du dessin de La Licorne tel que publié par Y en 1942 et n'en avait autorisé la reproduction à Y que pour la diffusion des albums 'Le Secret de La Licorne et 'Le Trésor de Rackham Le Rouge', les consorts AN AL-AM ont le 30 septembre 2011, mis en demeure à la SNC Hachette Collections d'interrompre la diffusion de la publication 'Tintin, Haddock & La Licorne – Construisez la maquette de La Licorne', celle-ci ayant été faite selon eux sans leur autorisation ;

Que le 31 janvier 2012 les consorts AN AL-AM ont fait assigner les sociétés Moulinsart et Hachette Collections devant le tribunal de grande instance de Paris en contrefaçon de droits d'auteur sur le dessin de La Licorne et sur le plan de la maquette de ce navire ;

Considérant que le jugement entrepris a, en substance :

déclaré les consorts AN AL-AM irrecevables à agir en contrefaçon de droits d'auteur tant sur le dessin de La Licorne que sur le plan de la maquette de La Licorne,

dit que la demande de garantie de la SNC Hachette Collections est sans objet,

condamné in solidum les consorts AN AL-AM à verser à la société Moulinsart la somme de 10.000 € et à la SNC Hachette Collections la somme de 5.000 € en application de l'article 700 du code de procédure civile ainsi qu'aux dépens,

ordonné l'exécution provisoire de sa décision ;

I : SUR LE DROIT APPLICABLE AU LITIGE :

Considérant que la Convention de Berne du 09 septembre 1886 pour la protection des oeuvres littéraires et artistique dispose en son article 5-1° que 'les auteurs jouissent, en ce qui concerne les oeuvres pour lesquelles ils sont protégés en vertu de la

présente Convention, dans les pays de l'Union autres que le pays d'origine de l'oeuvre, des droits que les lois respectives accordent actuellement ou accorderont par la suite aux nationaux ainsi que des droits spécialement accordés par la présente Convention' et en son article 5-2° que 'la jouissance et l'exercice de ces droits (…) sont indépendants de l'existence de la protection dans le pays d'origine de l'oeuvre' et que 'l'étendue de la protection ainsi que les moyens de recours garantis à l'auteur pour sauvegarder ses droits se règlent exclusivement d'après la législation du pays où la protection est réclamée' ;

Que par ailleurs l'article 5-3° dispose que 'la protection dans le pays d'origine est réglée par la législation nationale' et en son article 5-4° sous a) qu'est considéré comme pays d'origine 'pour les oeuvres publiées pour la première fois dans l'un des pays de l'Union, ce dernier pays' ;

Considérant qu'il s'ensuit qu'en ce qui concerne l'existence et la titularité des droits d'auteur, dans la mesure où le dessin de La Licorne a été publié pour la première fois en 1942 dans le quotidien belge 'Le Soir' et où la maquette de La Licorne a été commercialisée pour la première fois dans le magasin de AQ AL-AM à Bruxelles ainsi que son plan et ce antérieurement à la loi belge du 30 juin 1994 sur le droit d'auteur, les parties conviennent que, conformément à l'article 5-4° sous a) précité, est applicable au litige la loi belge du 22 mars 1886 sur le droit d'auteur ;

Qu'en ce qui concerne l'étendue de la protection des droits d'auteur dans le cadre de la présente action en contrefaçon, dans la mesure où les actes de contrefaçon allégués ont été commis sur le territoire français, les parties conviennent également que la loi française est applicable ;

Considérant d'autre part qu'il ressort des pièces versées aux débats que les consorts AN AL-AM sont les enfants de AQ AL-AM, décédé ab intestat le XXX, postérieurement à son épouse décédée le XXX, et qu'ils sont recevables à revendiquer la qualité d'ayants droit de leur père en leur qualité d'héritiers directs, conformément aux articles 724, 731, 745 et 778 du code civil belge ;

## II : SUR LA TITULARITÉ DES DROITS D'AUTEUR REVENDIQUÉE PAR LES CONSORTS AN AL-AM :

Considérant que les consorts AN AL-AM font valoir que, de son vivant, AQ AL-AM n'a jamais cédé l'ensemble de ses droits d'auteur, notamment sur ses maquettes et plans, à la maison BOKI dont l'exploitation s'est poursuivie après la retraite de celui-ci en 1972 sans qu'il y ait eu aucune cession de biens incorporels ;

Qu'ils invoquent la présomption de titularité de AQ AL-AM sur le plan du navire La Licorne puisque le plan est signé de sa main et contresigné par Y et qu'il a exploité toute sa vie durant des dessins du bateau avec l'indication selon laquelle il est le créateur de la maquette ;

Qu'ils revendiquent également la présomption de titularité de AQ AL-AM sur la maquette de La Licorne qui a été proposée à la vente en kit dès 1944 et qu'il a été le seul à commercialiser jusqu'en 1972 alors qu'avant 2011 la société Moulinsart n'a jamais commercialisé de maquette du vaisseau ;

Qu'ils soutiennent que Y a toujours reconnu que AQ AL-AM était bien l'unique auteur du plan de la maquette ;

Qu'ils précisent que si le plan a été commercialisé par AQ AL-AM après la parution de l'album 'Le Secret de la Licorne', il a été conçu et réalisé avant cette parution puisqu'il fallait un plan pour réaliser la maquette reçue par Y juste avant la dite parution ; qu'il jest en effet selon eux impossible de dessiner la perspective tribord du navire telle que représentée sur la couverture de l'album, sans avoir sous les yeux une maquette au 1/100° et qu'il ne peut pas y avoir de maquette tri-dimensionnelle de La Licorne sans un plan comportant les lignes d'eau de la coque du vaisseau, les dessins publiés ne représentant pas le vaisseau sous sa ligne de flottaison ;

Que selon eux Y et AQ AL-AM ont ainsi travaillé ensemble à la rédaction du dessin définitif de La Licorne et que ce dernier a bien réalisé un dessin à partir duquel la forme définitive de La Licorne telle que publiée dans l'album fut adoptée ;

Qu'en ce qui concerne l'originalité de La Licorne, ils font valoir qu'il s'agit d'un vaisseau imaginaire créé par AQ AL-AM à partir de sa connaissance personnelle des navires de guerre du XVIIème siècle, de sa propre documentation et de ses recherches, son apport créatif personnel venant de ce qu'il a délibérément allégé le château d'arrière et exagéré la forme et la taille des fanaux, conférant au bateau une grande élégance et une certaine 'monumentalité' ;

Qu'en toute hypothèse ils soutiennent qu'à supposer même que le plan de la maquette ait été adapté à partir des dessins d'Y, cela n'aurait pas pour effet d'exclure tout apport créatif de AQ AL-AM, qui est le seul dessinateur du plan de la maquette, mais aurait vocation à entraîner une co-titularité des droits avec Y et, partant, la société Moulinsart ;

Considérant que la SA Moulinsart réplique que ne saurait prétendre au statut de co-auteur d'une oeuvre originale que celui qui justifie d'un apport créatif original à l'oeuvre, marquée de sa propre personnalité ainsi que le précise la jurisprudence

belge (arrêt du 02 octobre 1997 de la cour d'appel de Mons) et qu'en l'espèce il n'est versé aux débats aucunes esquisses, ébauches ou dessins préparatoires qui auraient été réalisées par AQ AL-AM ;

Qu'elle fait valoir que le plan versé aux débats n'est pas daté et n'a pas date certaine et ne saurait attester d'une antériorité des plans du navire La Licorne antérieurement à la création par Y des illustrations mettant en scène ce vaisseau ;

Qu'elle soutient que non seulement il n'est pas établi que ce plan aurait été édité avant la création par Y de ses dessins de La Licorne mais qu'au contraire ce plan est de toute évidence postérieur à cette création et à la divulgation publique des dessins de La Licorne sous le nom d'Y ;

Qu'elle ajoute qu'il n'est pas davantage justifié des prétendues propositions de mises en forme, corrections ou points de détail qui auraient été apportés au dessin d'Y par AQ AL-AM et a fortiori de leur caractère original alors qu'au contraire les esquisses extraites des carnets de note d'Y témoignent de la réalité et de l'évolution du travail créatif préparatoire de celui-ci ;

Qu'elle soutient ainsi que les illustrations représentant La Licorne telles que publiées dans le quotidien Le Soir ou dans l'album 'Le Secret de la Licorne' ont été tracées de la main d'Y et sont le fruit de son seul travail créatif et ne sont pas l'oeuvre de AQ AL-AM qui ne peut alléguer d'une contribution à leur création comme co-auteur ;

Qu'elle ajoute qu'Y avait adressé son projet de couverture pour l'album sans avoir reçu la maquette dont il s'est passé et qu'il ne saurait être sérieusement soutenu que les illustrations d'Y seraient des adaptations de la maquette réalisée par AQ AL-AM ;

Qu'elle fait encore valoir que la commercialisation des plans de La Licorne s'est faite dans un cadre contractuel, un contrat de licence ayant été établi le 23 avril 1943, autorisant AQ AL-AM à fabriquer et à commercialiser les plans et les matières nécessaires pour la construction d'une maquette du vaisseau La Licorne représenté dans les dessins d'Y ;

Qu'en ce qui concerne le plan et la maquette de La Licorne, elle soutient qu'il ne s'agit que d'adaptations (dont l'originalité n'est pas démontrée) de l'oeuvre d'Y, réalisée postérieurement aux dessins de celui-ci ; qu'au surplus AQ AL-AM a indiqué lui-même dans une interview, qu'il avait cédé les droits d'exploitation de ses plans au cessionnaire de son fonds de commerce et qu'il n'est pas justifié d'une rétrocession de ces droits d'exploitation dans le patrimoine de AQ AL-AM ;

Considérant que la SNC Hachette Collection rappelle également la présomption de titularité d'Y et l'absence de présomption de titularité de AQ AL-AM sur le plan et la maquette de La Licorne en faisant valoir que ceux-ci ont été créés postérieurement au dessin de La Licorne, oeuvre divulguée en 1942 dans le journal Le Soir sous le seul nom d'Y ;

Que le plan de la maquette n'est pas daté et n'est pas une oeuvre originale, n'étant que la mise en oeuvre tridimensionnelle du dessin d'Y De La Licorne ;

Qu'à titre subsidiaire elle soutient que AQ AL-AM n'a eu qu'un rôle purement technique de documentaliste et de conseiller technique et que plan de La Licorne réalisé par lui n'est que la transposition du dessin d'Y sous forme de plan technique ; qu'il en est de même de la maquette elle-même ;

Qu'elle conclut ainsi à l'irrecevabilité de l'action des consorts AN AL-AM pour absence de qualité d'auteur ou de co-auteur de AQ AL-AM ;

Considérant ceci exposé, que selon l'article 1er de la loi belge du 22 mars 1886, 'l'auteur d'une oeuvre littéraire ou artistique a seul le droit de la reproduire ou d'en autoriser la reproduction de quelque manière et sous quelque forme que ce soit' ; que selon les pièces versées aux débats (Droit d'auteur et numérique : logiciels, bases de données, multimédia. Droit belge, européen et comparé d'I J et O P), pouvait déjà être invoquée sous l'empire de cette législation une présomption de titularité des droits d'auteur au profit de celui dont un signe d'identification est apposé sur l'oeuvre conformément à l'article 15-1° de la Convention de Berne ; qu'il s'agit d'une présomption simple, la preuve contraire pouvant être apportée par toute voie de droit ;

Considérant qu'en l'espèce il est constant que le dessin du vaisseau La Licorne a été divulgué sous le pseudonyme d'Y en 1942 à l'occasion de la pré-publication de l'album 'Le Secret de La Licorne' (sous le titre initial de 'Les aventures extraordinaires de Tintin et Milou') en strips quotidiens dans le journal belge Le Soir, plus précisément à partir de la troisième vignette du strip du 18 juin 1942 ;

Qu'il s'ensuit que Q R (sous le pseudonyme d'Y) bénéficie de la présomption légale d'auteur sur le dessin de La Licorne et qu'il appartient aux consorts AN AL-AM, en leur qualité d'ayants-droit de AQ AL-AM, de renverser cette présomption en rapportant la preuve contraire de la création par celui-ci du dessin de ce vaisseau ou de son apport créatif antérieur à la première divulgation de ce dessin ;

Considérant que si AQ AL-AM affirme, dans une chronique familiale, avoir, à la demande d'Y, fait dès son retour en Belgique à partir du mois de mars 1942, un premier dessin sommaire du vaisseau qui aurait été reproduit par Y à la quatrième vignette du strip du 26 juin 1942, force est de constater que les consorts AN AL-AM ne produisent aucune ébauche de dessin, esquisse ou dessin préparatoire de La Licorne, de la main de AQ AL-AM ;

Considérant que les extraits des biographies d'Y produites par les consorts AN AL-AM (article de AJ AK dans le n° 41 de la revue Bateau Modèle, ouvrages Y fils de Tintin de C AC, Y de AD AE, Tintin, Haddock et les bateaux d'Yves Horeau, Les sculpteurs de BD de G H) ne sont pas probants car, comme l'ont relevé à juste titre les premiers juges, ceux-ci ne font que recueillir et rapporter les propos de AQ AL-AM sur la chronologie des faits et leur déroulement ;

Qu'il sera au demeurant observé d'une part que AQ AL-AM a tenu ces propos postérieurement au décès d'Y qui ne pouvait donc plus les contredire et d'autre part que ces propos ont varié au gré des entretiens ainsi que le reconnaît AJ AK dans son article ('Cette narration écrite des événements ne correspond sans doute pas à une stricte réalité, ni d'ailleurs à ce qu'il me raconta de vive voix, lors d'une entrevue ultérieure') ;

Considérant qu'au contraire la série d'articles intitulés Les secrets de La Licorne parus dans le journal Le Soir entre les mois de septembre et de novembre 2004 à l'occasion de la reproduction des strips quotidiens, faisant état d'une enquête 'sans tabou pour retracer la genèse controversée du récit', insistent sur le travail personnel d'Y qui, à l'occasion de la parution de l'histoire en album en 1943, a apporté plus de 130 modifications au récit, redessinant le vaisseau dont la première ébauche aurait été inspirée par une maquette présentée dans un numéro de l'organe officiel du ministère de la Marine et de la fédération du yachting belge, l'enrichissant de nouveaux détails historiques ; que selon ces articles les sources d'Y furent multiples, la poupe s'inspirant en particulier des navires Le Brillant et le Soleil Royal, une reproduction de ce dernier figurant d'ailleurs dans le numéro 159 de mars 1936 de la revue maritime belge 'Wandelaer et sur l'eau' retrouvé dans les archives d'Y ;

Considérant que si les consorts AN AL-AM revendiquent à titre subsidiaire une co-titularité des droits d'auteur sur le dessin du navire La Licorne, il apparaît que selon le droit belge applicable à l'époque des faits (ouvrages Le droit d'auteur d'I AG et Précis du droit d'auteur et des droits voisins de Fernand de Visscher et C D), l'oeuvre de collaboration implique une activité créatrice originale, une 'intimité spirituelle' dans l'apport créatif et l'exécutant qui n'effectue qu'un travail purement technique, matériel, non créatif ne peut prétendre à un droit d'auteur ;

Considérant que si AQ AL-AM a pu, grâce à ses archives personnelles, fournir à Y des renseignements et notamment de la documentation graphique relative aux vaisseaux de ligne des XVIIe et XVIIIe siècles, les consorts AN AL-AM ne démontrent pas autrement que par leurs affirmations et celles de leur auteur que celui-ci ait pu, au-delà de ce simple apport technique et matériel, contribuer dans une 'intimité spirituelle' avec Y à la création de l'oeuvre de l'esprit constituée par le dessin du navire La Licorne ;

Considérant qu'Y ne considérait d'ailleurs pas AQ AL-AM comme un collaborateur et le co-auteur du dessin de La Licorne mais plus exactement comme 'le plus sûr et le plus aimable des conseillers techniques' ainsi qu'il l'écrit dans une dédicace du 04 mai 1945 destinée à AQ AL-AM (pièce n° 18 du dossier des consorts AN AL-AM) sans que celui-ci ait jamais contesté du vivant d'Y cette qualification de 'conseiller technique' ;

Considérant que de même il n'est produit par les consorts AN AL-AM aucun document corroborant les affirmations de AQ AL-AM selon lesquelles il aurait dès 1942 créé un plan de La Licorne avec le calcul de ses lignes de forme, construit une première maquette provisoire puis une seconde maquette au 1/100ème afin de permettre à Y de dessiner la perspective tribord du vaisseau telle que représentée sur la couverture de l'album en 1943 ;

Considérant au contraire qu'il ressort de la lettre adressée par AQ AL-AM à Y le 23 septembre 1942, que celui-ci n'a effectué que des 'brouillons' des plans du navire à partir des documents que lui a fait parvenir Y, sans même réaliser le dessin définitif, confié à un autre dessinateur :

'Merci mille fois pour tes reproductions. Avec ces documents, hier soir, j'ai déjà établi le profil de ma coque, orné de sa bouteille. Ce soir, je compte faire le tableau arrière, et je pourrai alors passer mes brouillons à mon dessinateur qui, de son côté, a agrandi la mâture et me l'a montrée aujourd'huy (sic)' et 'Je t'envoie ci-joint le calque de la proue de la LICORNE. Voudrais-tu avoir l'obligeance d'y adapter exactement la figure voulue, et de m'envoyer ton dessin définitif. J'ai pensé qu'il était préférable que tu fasse (sic) celà (sic) d'après mon dessin définitif' ;

Considérant que si Y a pu envisager de s'aider d'une maquette de La Licorne pour réaliser le dessin de couverture de l'album 'Le secret de la Licorne', il ressort des échanges de correspondance avec U V des éditions Casterman qu'il n'a pas reçu à temps cette maquette et qu'il s'en est passé ;

Considérant qu'ainsi Y écrit le 21 novembre 1942 à U V au sujet de la réalisation de la couverture de l'album à paraître : 'Il faut que j'attende la réalisation de la maquette du vaisseau W AA qui porte ce nom. Dès que j'aurai cette maquette, ce qui ne saurait tarder, je me mets au dessin' ; que le 26 janvier 1943, n'ayant toujours rien reçu, il écrit : 'Je suis gêné de devoir te dire que, malgré toutes les promesses qu'on m'avait faites, je n'ai pas encore reçu la maquette. Je l'attends d'un jour à l'autre. Sauf le dessin du bateau correspondant, la couverture est finie. (…) Sauf trois grands dessins pour lesquels la maquette m'est également indispensable, la mise au format est terminée' ;

Que U V lui répond le 28 janvier 1943 en ces termes : 'Ecoute : néglige donc cette maquette. La caravelle figurant sur ton projet de couverture était épatante. Si elle n'est pas exactement conforme à la maquette, quel mal y a-t-il ' Aucun, crois-moi. Tu ne fais pas un concours de reproduction, n'est-ce-pas ' Si tu savais comme nous nous préoccupons ici de ce retard et quelles répercussions il peut avoir sur la marche des travaux.' ;

Qu'enfin le 02 février 1943 Y informe son éditeur qu'il a envoyé son dessin à l'imprimeur en se passant de la maquette, arrivée tardivement : 'La couverture de la Licorne a été remise à Bindels, hier, lundi. J'avais finalement reçu la maquette, au moment où, suivant tes conseils, j'étais décidé à me passer d'elle.', confirmant ainsi les propos qu'il a tenus en 1979 à Numa Sadoul : 'la maquette du bateau n'a cependant été effectuée qu'après coup' (Tintin et moi – Entretiens avec Y de Numa Sadoul) ;

Considérant qu'en tout état de cause il résulte de la comparaison, à laquelle s'est livrée la cour, entre les dessins du vaisseau La Licorne reproduits lors de leur parution en strips dans le journal Le Soir et ceux retouchés par Y pour la publication en album, y compris le dessin de couverture, qu'aucune modification substantielle des dessins aurait pu être apportée par Y sur la base d'une maquette ; qu'ainsi les détails du navire (en particulier le château arrière, les lanternes, les étendards) apparaissaient déjà dans les strips, les corrections ne portant pas sur des éléments originaux du navire (ainsi des rangées de cinq fenêtres au lieu de trois sur le château arrière, une retouche du bastingage, la suppression de la balustrade encerclant la vigie du navire qui en rendait en pratique son accès impossible) ;

Considérant qu'il sera au demeurant relevé qu'il n'est produit aucun document probant pouvant préciser l'apparence de cette maquette, qualifiée par AQ AL-AM lui-même dans une lettre adressée le 12 mars 1986 à S T, de 'maquette simplifiée et non peinte' et qu'il ne peut en particulier pas s'agir de la maquette élaborée reproduite au catalogue de la maison BOKI versé aux débats (pièce n° 7 des appelants), lequel date d'ailleurs de l'année 1951 ainsi que cela ressort des mentions figurant aux pages 10 et 11 de ce catalogue (et non pas 1943 ou 1944 comme l'affirment les consorts AN AL-AM respectivement en pages 27 et 10 de leurs conclusions) ;

Considérant que le plan de La Licorne versé aux débats par les consorts AN AL-AM en pièce n° 6, qui a notamment servi à la réalisation de la maquette commercialisée par AQ AL-AM jusqu'en 1972, ne peut avoir servi de modèle à Y ; qu'il n'a en effet pas de date certaine et qu'à son examen détaillé, il apparaît que ce document est nécessairement postérieur à la parution de l'album 'Le Secret de la Licorne' ;

Qu'en effet en premier lieu sur ce document figure en médaillon le dessin réalisé par Y du vaisseau La Licorne pour la couverture de l'album ; qu'en second lieu sur ce plan cet épisode des aventures de Tintin et Milou est intitulé 'Le Secret de la Licorne' qui est le titre définitif donné à l'album alors qu'au moment de la parution en strips dans le journal Le Soir son titre était 'Les aventures extraordinaires de Tintin et Milou' ; qu'en troisième lieu le numéro de téléphone de la maison BOKI qui y figure comporte neuf chiffres et est donc nécessairement postérieur à 1951 puisque le catalogue précité de cette maison, qui peut être daté de l'année 1951 ainsi qu'analysé précédemment, ne mentionne qu'un numéro de téléphone à six chiffres ;

Considérant enfin et surtout que ce plan mentionne la référence à une 'licence 53.T.B.F. Brux.' qui correspond au contrat de licence signé le 23 avril 1943 entre AH AI, concessionnaire à l'époque des droits de reproduction de l'oeuvre d'Y, et AQ AL-AM, autorisant celui-ci 'à fabriquer et à mettre sur le marché belge les plans et les matières nécessaires à l'assemblage, pour la construction en miniature du Vaisseau LA LICORNE, représenté dans les dessins de Y comme étant commandé par le Chevalier B de Hadoque' en se servant pour cela de 'l'illustration du plan du dessin spécial fait par Y' ; qu'il était en effet stipulé à l'article 3 de ce contrat que cette autorisation était mentionnée sur les boîtes contenant les matières nécessaires à l'assemblage sous la mention 'Lic.53.T.B.F.Bruxelles' ;

Considérant qu'il ne saurait être sérieusement soutenu que ce contrat de licence aurait été établi à l'insu d'Y qui l'aurait détruit lorsqu'il en aurait eu connaissance comme l'a affirmé AQ AL-AM dans ses entretiens, alors qu'il ressort des pièces versées aux débats qu'Y avait été tenu informé des démarches de AH AI par lettres des 17 août 1942 ('AL-AM : Je vous remercie encore de votre coup de téléphone à ce sujet ; je me suis mis en rapport avec l'intéressé avec lequel j'ai eu un entretien assez long. Nous examinons actuellement son projet au sujet duquel nous devrons probablement lui demander quelques renseignements complémentaires encore, et comptons pouvoir lui écrire à ce sujet fin de cette semaine. Dès réception des renseignements à demander, je me mettrai en rapport avec vous' et 08 septembre 1942 ('Il me semble que L. [AL-AM] n'envisage pas une simple cession de licence mais voudrait autre chose, mais cela n'est pas précisé. J'aurai donc

probablement ces renseignements demain et me mettrai en rapport avec vous prochainement à ce sujet') et qu'il a reçu dès le 23 avril 1943 une copie du contrat de licence avec cette précision de la part de AH AI : 'Le tout ayant été mené conformément à notre entretien, je ne doute pas que vous serez entièrement d'accord. Vous remarquerez que le client se propose de se mettre en rapport avec vous pour la question de l'annonce et je vous suppose d'accord ; je pense qu'il vous demanderait éventuellement de faire un petit dessin pour rehausser son texte' ;

Considérant par ailleurs que contrairement à ce qu'affirment sur ce point les biographes d'Y C AC et AD AE (lesquels ne font que reprendre les propos de AQ AL-AM), la rupture des relations d'affaires entre Y et AH AI n'est intervenue qu'en 1947 (lettre d'Y à AH AI du 08 mai 1947 et réponse de ce dernier du 19 mai 1947) pour des faits sans rapport avec ce contrat de licence (contrats 'Coeurs Vaillants' et 'Les beaux films'), lequel en tout état de cause était toujours en vigueur postérieurement aux années 1950 puisqu'il est mentionné au plan précité ;

Considérant qu'il s'ensuit que les consorts AN AL-AM ne peuvent davantage revendiquer une présomption de titularité de droits d'auteur de AQ AL-AM tant sur ce plan de la maquette de La Licorne, réalisé postérieurement à la pré-publication en 1942 puis à l'édition en album en 1943, de l'oeuvre d'Y 'Le secret de la Licorne', et ce dans le cadre d'un contrat de licence de droits de reproduction consenti par Y, que sur la maquette elle-même ;

Qu'en effet ce plan n'est autre que la transposition sous forme de document technique, des dessins originaux d'Y du vaisseau La Licorne (notamment 'du plan du dessin spécial fait par Y' mentionné au contrat de licence), en vue de la réalisation d'une maquette en trois dimensions, ce qui relève de la mise en oeuvre d'un simple savoir-faire technique en l'absence de tout effort personnel de création ;

Que la cour observe par ailleurs que AQ AL-AM avait déjà précédemment commercialisé avec l'accord d'Y, en vue également de la réalisation d'une maquette, les plans de l'avion dessiné entre 1937 et 1939 par Y dans l'album 'Les aventures de Jo, Zette et Z – Le Stratonef H22'' ainsi qu'il le précise lui-même dans l'article précité de AJ AK ;

Considérant en conséquence que les consorts AN AL-AM ne peuvent revendiquer, pour leur auteur AQ AL-AM, de droits d'auteur tant sur le dessin du vaisseau La Licorne que sur le plan et la maquette de ce vaisseau et que dès lors le jugement entrepris sera confirmé en ce qu'il les a déclarés irrecevables à agir en contrefaçon de droits d'auteur pour l'ensemble de leurs demandes à ce titre ;

Considérant que de ce fait, le jugement entrepris sera également confirmé en ce qu'il a déclaré sans objet la demande de garantie de la SNC Hachette Collections ;

**III : SUR LA DEMANDE DE RESTITUTION DU PLAN ORIGINAL :**

Considérant que les consorts AN AL-AM font valoir que AQ AL-AM, alors âgé de 90 ans, a été longuement interviewé le 09 mai 1996 par E F, alors secrétaire général de la Fondation Y, et qu'à cette occasion il a remis à ce dernier, à sa demande, le seul et unique exemplaire original du plan de la maquette en sa possession pour en faire une photocopie, sous promesse d'une restitution rapide qui n'a jamais eu lieu ;

Qu'au dispositif de leurs conclusions ils demandent à la cour que soit ordonnée la restitution de ce plan sous astreinte sans toutefois préciser contre laquelle des deux sociétés intimées cette demande est présentée ;

Considérant que la société Moulinsart soulève l'irrecevabilité de cette demande d'une part parce qu'elle est présentée pour la première fois en cause d'appel et d'autre part qu'elle n'est pas en possession de ce plan, E F n'étant pas son préposé et n'étant pas partie à la présente procédure et qu'elle ne saurait donc être condamnée à une obligation de faire concernant un tiers ;

Considérant que la SNC Hachette Collections demande sa mise hors de cause pour cette demande qui ne la concerne pas ;

Considérant que cette demande de restitution est présentée pour la première fois en cause d'appel par les consorts AN AL-AM et ne peut donc qu'être déclarée irrecevable en application des dispositions de l'article 564 du code de procédure civile, qu'au demeurant cette demande concerne une personne, E F, qui n'est pas partie à l'instance, pas plus que la Fondation Y dont il a été le secrétaire général, et qu'aucun lien de droit ne lie cette personne aux sociétés Moulinsart et Hachette Collections qui ne peuvent donc être tenues d'une obligation de faire imputable à un tiers ;

**IV : SUR LES AUTRES DEMANDES :**

Considérant qu'il est équitable d'allouer à la société Moulinsart la somme complémentaire de 10.000 € et à la SNC Hachette Collections la somme complémentaire de 5.000 € au titre des frais par elles exposés en cause d'appel et non compris dans les dépens, le jugement entrepris étant par ailleurs confirmé en ce qu'il a statué sur les frais irrépétibles de première instance ;

Considérant que les consorts AN AL-AM seront pour leur part, déboutés de leur demande en paiement au titre de l'article [700](#) du code de procédure civile ;

Considérant que les consorts AN AL-AM, parties perdantes en leur appel, seront condamnés in solidum au paiement des dépens d'appel, le jugement entrepris étant par ailleurs confirmé en ce qu'il a statué sur la charge des dépens de la procédure de première instance ;

P A R C E S M O T I F S

La Cour, statuant publiquement et contradictoirement ;

Confirme en toutes ses dispositions le jugement entrepris ;

Y ajoutant :

Déclare irrecevable la demande en restitution du plan original du vaisseau La Licorne présentée pour la première fois devant la cour par M. AT AN AL-AM, M. BB AN AL-AM et Mme AX AN AL-AM ;

Condamne in solidum M. AT AN AL-AM, M. BB AN AL-AM et Mme AX AN AL-AM à payer au titre des frais exposés en cause d'appel et non compris dans les dépens :

à la société Moulinsart, la somme de DIX MILLE EUROS (10.000 €),

à la [SNC Hachette Collections](#), la somme de CINQ MILLE EUROS (5.000 €) ;

Déboute M. AT AN AL-AM, M. BB AN AL-AM et Mme AX AN AL-AM de leur demande en paiement au titre de l'article [700](#) du code de procédure civile ;

Condamne in solidum M. AT AN AL-AM, M. BB AN AL-AM et Mme AX AN AL-AM aux dépens de la procédure d'appel, lesquels seront recouvrés conformément aux dispositions de l'article [699](#) du code de procédure civile.

LE PRÉSIDENT LE GREFFIER

**Citées dans les mêmes commentaires**

Cour d'appel d'Orléans, 16 janvier 2013, n° 12/02640

Confirmation

- Créance
- Plan
- Commission de surendettement
- Tribunal d'instance
- Recommandation
- Trésorerie
- Rééchelonnement
- Bateau
- Contestation
- Surendettement des particuliers

Cour d'appel de Colmar, 1er avril 2016, n° 14/05030

Infirmation partielle

- Syndicat
- Assemblée générale
- Statut
- Election professionnelle
- Intérêt à agir
- Mise sous tutelle
- Dommages et intérêts

- Volonté
- Dommage
- Jugement

Cour d'appel de Toulouse, 1er avril 2015, n° 14/06662

Confirmation

- Récusation
- Expertise
- Principe du contradictoire
- Impartialité
- Respect
- Partie
- Pièces
- Sociétés
- Manquement
- Communication

**De référence sur les mêmes thèmes**

Cour d'appel de Besançon, Deuxieme chambre civile, 11 mai 2011, n° 10/02924

Irrecevabilité

- Loyer
- Apport
- Immeuble
- Nullité
- Sociétés
- Bail
- Locataire
- Séquestre
- Vente
- Procédure

Cour d'appel de Chambéry, 25 juin 2015, n° 14/01048

- Parcelle
- Enclave
- Servitude
- Expertise
- Fond
- Épouse
- Avocat
- Canalisation
- Indemnité
- Profit

Cour d'appel d'Aix-en-Provence, 6 octobre 2015, n° 14/17267

Infirmation

- Ascenseur
- Sociétés civiles immobilières
- Défaut de conformité
- Acquéreur
- Préjudice moral
- Vendeur
- Mise en service
- Action
- Sociétés civiles

- Syndicat de copropriétaires

**Sur les mêmes thèmes**

Cour d'appel d'Amiens, 2 juillet 2013, n° 11/04392

Infirmation partielle

- Donations
- Vente
- Droit de retour
- Agent immobilier
- Révocation
- Immeuble
- Demande
- Père
- Clause
- Promesse synallagmatique

Cour d'appel de Papeete, 7 juin 2012

Confirmation

- Parcelle
- Possession
- Consorts
- Propriété
- Honoraires
- Usucapion
- Preuve
- Acte
- Témoin
- Pacifique

Cour d'appel d'Aix-en-Provence, 18 juin 2015, n° 14/21723

Infirmation

- Belgique
- Sociétés
- Conclusion
- Incident
- Procédure civile
- Intervention forcee
- Ordonnance
- Constitution
- Adresses
- Mise en état

Textes cités dans la décision

1. Code de procédure civile

Retour en haut
Enregistrer
Inscrivez-vous gratuitement pour imprimer votre décision
Cour d'appel de Paris, 8 septembre 2015, n° 14/06060
Jurisprudence fréquemment consultée :

- Cour d'appel de Paris, 28 juin 2013, n° 12/00791
- Cour d'appel de Paris, 25 octobre 2013, n° 12/14338

- [Cour d'appel de Paris, Pôle 5 - chambre 1, 14 septembre 2021, n° 21/00848](#)
- [Cour d'appel de Versailles, 20e chambre, 12 novembre 2020, n° 20/00310](#)
- [Cour d'appel de Paris, Pôle 5 chambre 1, 2 février 2021, n° 17/17688](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 1, 23 février 2021, n° 19/09059](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 2, 19 mars 2021, n° 19/17493](#)
- [Cour d'appel de Paris, Pôle 1 - chambre 3, 21 octobre 2020, n° 20/00978](#)
- [Cour d'appel de Paris, Pôle 5 chambre 2, 16 octobre 2015, n° 14/23953](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 2, 19 février 2021, n° 19/13104](#)
- [Cour d'appel de Paris, Pôle 5, 7 janvier 2011, n° 2009/16251](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 1, 28 janvier 2020, n° 18/02939](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 1, 24 novembre 2010, n° 09/10447](#)
- [Cour d'appel de Paris, 20 décembre 2013, n° 12/20260](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 1, 17 décembre 2019, n° 17/09695](#)
- [Cour d'appel de Paris, Pôle 5 chambre 2, 17 mai 2019, n° 17/21158](#)
- [Cour d'appel de Paris, Pôle 5 chambre 11, 8 novembre 2019, n° 19/02118](#)
- [Cour d'appel de Paris, Pôle 5 - chambre 1, 21 janvier 2020, n° 18/00625](#)
- [Cour d'appel de Paris, Pôle 5, 12 avril 2013, n° 2012/08354](#)
- [Cour d'appel de Paris, Pôle 3 - chambre 1, 30 juin 2021, n° 19/14469](#)

1. [Doctrine](#)
2. [Décisions de justice](#)
3. [2015](#)
4. CA Paris, 8 sept. 2015, n° 14/06038

Contactez notre service commercial au 01 84 80 33 48
[Doctrine](#)
1re plateforme d'intelligence juridique
[linkedin](#)[twitter](#)[facebook](#)[youtube](#)[instgram](#)
[FORSETI SAS](#) - Reproduction interdite - Sources privées, INPI, INSEE, data.gouv.fr
Produit
AccueilFonctionnalitésDocument AnalyzerNouveautésTarifsEnvoyer une décision
Plan du site
DécisionsLois et règlementsRèglements et directives UEDocuments parlementairesConventions collectivesConventions fiscalesAvocatsCabinetsEntreprisesRubriques jurisprudentielles
Communauté
Avis de nos clientsBlog[Podcast Droit Commun](#)Je le jure !Doctrine TV
Assistance
AideMentions légalesCGUDonnées personnellesPolitique de CookiesRefuser les cookiesNous contacter
Doctrine
[À propos](#)Nous recrutonsInside DoctrineCode de bonne conduitePresseDoctrine Lab

# EXHIBIT 2

This is Google's cache of https://www.doctrine.fr/d/CA/Paris/2015/R848CF58C25722B8B1957. It is a snapshot of the page as it appeared on Oct 19, 2023 02:24:42 GMT. The current page could have changed in the meantime. Learn more.

Full version    **Text-only version**    View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.

Doctrine
MENU

- Platform
Features
    Intelligence juridiqueRechercheVeilleDocument Analyzer
    Why Doctrine?
        What is a legal intelligence platform? Blanket
- For who ?
Solutions
    Law firms Company management Public sector legal departmentsClaims departments
    Resources
        WebinarsMini-series DoctrineBlogHelp center
- Avis clients
- Prices
- Connexion

Inscription
7 days free trial.
Registration in less than a minute. No credit card required.
Paris Court of Appeal, September 8, 2015, no. 14/06060
Copier
Save
Decision plan

# Paris Court of Appeal, September 8, 2015, no. 14/06060

Note
Add a note...

- Drawing ·
- Plan·
- Copyright ·
- Consorts·
- Collection·
- Ship ·
- Oeuvre·
- Presumption of ownership ·
- Secret·
- Licence

TGI Paris
>
TGI Paris
>
CA Paris

## On the decision

Reference :    Copy reference
CA Paris, 8 sept. 2015, n° 14/06060

Jurisdiction:     [Paris Court of Appeal](#)
Number(s):        14/06060
Previous decision: Paris High Court, January 29, 2014, No. 12/02063

## On people

- Avocat(s) :
  [Antoine DIESBECQ Basile ADER Florence WATRIN Stéphane FERTIER Gilles VERCKEN](#)
- Cabinet(s) :
  [WATRIN BRAULT ASSOCIES CABINET VERCKEN & GAULLIER](#)
- Parties :
  SA MOULINSART, [SNC HACHETTE COLLECTIONS](#) , Limited Company under Belgian law

# Full Text

Grosses delivered FRENCH REPUBLIC

to the parties on: IN THE NAME OF THE FRENCH PEOPLE

PARIS **COURT OF APPEAL**

Pole 5 – Room 1

JUDGMENT OF SEPTEMBER 8, 2015

(n°141/2015, 12 pages)

Registration number in the general directory: 14/06060

Decision referred to the Court: Judgment of January 30, 2014 - Paris High Court – RG n° 12/02063

**APPELLANTS**

Monsieur BF AN AL-AM

XXX

Beirut

LEBANON

Monsieur BB AN AL-AM

XXX

XXX

(CANADA)

Madame AX AN AL-AM

XXX

XXX

Represented by Me  [Basile ADER](#) of AARPI [ADER](#) , JOLIBOIS, lawyer at the PARIS bar, hat: T11

Assisted by Me  [Basile ADER](#) of AARPI [ADER](#) , JOLIBOIS, lawyer at the PARIS bar, hat: T11 and Me  [Antoine DIESBECQ](#) of SELARL RACINE, lawyer at the PARIS bar, hat: L0301

**RESPONDENTS**

XXX

taken in the person of its legal representatives domiciled in this capacity at said headquarters

XXX

XXX

Represented by Me  Stéphane FERTIER  of AARPI JRF AARPI, lawyer at the PARIS bar, hat: L0075

Assisted by Me  Gilles VERCKEN  of SELARL CABINET GILLES VERCKEN , lawyer at the PARIS bar, hat: P0414

AT MOULINSART

Limited Company under Belgian law

XXX

XXX

XXX

Represented and assisted by Me  Florence WATRIN  of the WATRIN BRAULT ASSOCIES Association , lawyer at the PARIS bar, hat: J046

**COMPOSITION** OF THE COURT:

The case was debated on May 26, 2015, in public hearing, before the Court composed of:

Mr Benjamin RAJBAUT, President of the Chamber

Mrs. AX-Marie GABER, Advisor

Ms. MN, Advisor

who deliberated on it.

A report was presented at the hearing under the conditions provided for in article 785  of the code of civil procedure.

Registrar, during the debates: Ms. Karine ABELKALON

STOP :

Contradictory

by making the judgment available to the Court registry, the parties having been previously notified under the conditions provided for in the second paragraph of Article 450  of the Code of Civil Procedure.

signed by Mr. Benjamin RAJBAUT, president and by Mrs. Karine ABELKALON, clerk present during the delivery.

\*\*\*

Considering the contradictory judgment rendered on January 30, 2014 by the Paris High Court.

Considering the appeal filed on March 17, 2014 by Mr. AT AN AL-AM, Mr. BB AN AL-AM and Ms. AX AN AL-AM (hereinafter the AN AL-AM colleagues).

Considering the latest summary conclusions no. 3 of the AN AL-AM colleagues, transmitted on XXX.

Having regard to the latest reply and summary conclusions of the Belgian company Moulinsart, transmitted on XXX.

Considering the latest conclusions of respondent no. 4 of SNC Hachette Collections , transmitted by RPVA on XXX and served on May 5, 2015.

Considering the closure order dated May 5, 2015.

**M O T I F S D E L' A R R Ê T**

Considering that, for a complete statement of the facts of the case and the procedure, reference is expressly made to the judgment referred and to the pleadings of the parties;

**Considering** that it suffices to recall that the Belgian cartoonist QR, known as Y, is the author of a series of comic strips called 'The Adventures of Tintin' featuring the young reporter Tintin and his dog Snowy as well as various characters such as Captain Haddock, Professor Tournesol or Castafiore;

That Y died in 1983, appointing his wife, Mrs. KL, as universal legatee;

That with the exception of the publication rights of the series 'The Adventures of Tintin' in the form of comic book albums transferred by Y to the Casterman company, Mrs. KL, wife Moulinsart, for a fixed period, of all other exploitation rights of the work and its elements;

That one of the albums of the series 'The Adventures of Tintin' entitled 'The Secret of the Unicorn' published in 1942, notably features a 17th century ship called The Unicorn;

That AQ AL-AM, born in 1906 in Brussels and died on XXX to XXX, was a specialist in old navy and had a shop-workshop for reduced models in Brussels called 'Le Petit Constructeur' and subsequently, until his retirement in 1972, the BOKI house;

That its rights holders, the AN AL-AM consorts, state that they discovered the distribution by SNC Hachette Collections of a periodical entitled 'TINTIN, HADDOCK & La Licorne – Build the model of La Licorne discovered by Tintin' where it is indicated that This is a 'Hachette-Moulinsart Y-Moulinsart Creation 2011', and whose main purpose is the construction of the model of the ship, the elements of which are provided progressively through the 125 issues of the collection, the first issue being published on August 25, 2011;

They state that they also noted that a website at the address www.laLicorne.tintin.com> published by SNC Hachette Collections was dedicated to this collection;

Considering that AQ AL-AM was the author of the drawing of La Licorne as published by Y in 1942 and had only authorized its reproduction to Y for the distribution of the albums 'Le Secret de La Licorne' and 'Le Trésor de Rackham Le Rouge', the AN AL-AM consorts have on September 30, 2011, given notice to SNC Hachette Collections to interrupt the distribution of the publication 'Tintin, Haddock & The Unicorn – Build the model of The Unicorn' , this having been made according to them without their authorization;

That on January 31, 2012, the AN AL-AM consorts summoned the companies Moulinsart and Hachette Collections before the Paris High Court for copyright infringement on the drawing of The Unicorn and on the plan of the model of this ship ;

Considering that the judgment undertaken has, in substance:

declared the AN AL-AM consorts inadmissible to act for copyright infringement both on the drawing of The Unicorn and on the plan of the model of The Unicorn,

says that the guarantee request from SNC Hachette Collections is irrelevant,

ordered in solidum the AN AL-AM partners to pay to the company Moulinsart the sum of €10,000 and to SNC Hachette Collections the sum of €5,000 in application of article 700 of the code of civil procedure as well as costs,

ordered the provisional execution of its decision;

**I** : ON THE LAW APPLICABLE TO THE DISPUTE:

Considering that the Berne Convention of September 9, 1886 for the protection of literary and artistic works provides in its article 5-1° that 'authors enjoy, with regard to the works for which they are protected under this Convention, in countries of the Union other than the country of origin of the work, the rights which the respective laws currently grant or will hereafter grant to nationals as well as the rights specially granted by this Convention' and in Article 5 thereof -2° that 'the enjoyment and exercise of these rights (...) are independent of the existence of protection in the country of origin of the work' and that 'the extent of the protection as well as the means of remedies guaranteed to the author to safeguard his rights are regulated exclusively according to the legislation of the country where protection is claimed;

Furthermore, Article 5-3° provides that 'protection in the country of origin is regulated by national legislation' and in Article 5-4° under a) that is considered a country of origin 'for works published for the first time in one of the countries of the Union, the latter country';

Whereas it follows that with regard to the existence and ownership of copyright, to the extent that the drawing of La Licorne was published for the first time in 1942 in the Belgian daily 'Le Soir ' and where the model of La Licorne was marketed for the first time in the AQ AL-AM store in Brussels as well as its plan and this prior to the Belgian law of June 30, 1994 on copyright, the parties agree that, in accordance with the aforementioned article 5-4° under a), the Belgian law of March 22, 1886 on copyright is applicable to the dispute;

That with regard to the extent of copyright protection in the context of this infringement action, to the extent that the alleged acts of infringement were committed on French territory, the parties also agree that the French law is applicable;

Considering on the other hand that it appears from the documents submitted to the debates that the AN AL-AM consorts are the children of AQ AL-AM, who died intestate on XXX, subsequent to his wife who died on XXX, and that they are admissible to claim the status of beneficiaries of their father in their capacity as direct heirs, in accordance with articles 724, 731, 745 and 778 of the Belgian civil code;

**II**  : ON THE OWNERSHIP OF COPYRIGHTS CLAIMED BY THE AN AL-AM CONSORTS:

Considering that the AN AL-AM colleagues argue that, during its lifetime, AQ AL-AM never transferred all of its copyright, in particular on its models and plans, to the BOKI house whose exploitation continued after his retirement in 1972 without any transfer of intangible property;

That they invoke the presumption of ownership of AQ AL-AM on the plan of the ship La Licorne since the plan is signed by him and countersigned by Y and that he has used drawings of the model of the boat all his life with the indication that he is the creator of the model;

That they also claim the presumption of ownership of AQ AL-AM on the model of La Licorne which was offered for sale in kit form from 1944 and which it was the only one to market until 1972 whereas before 2011 the Moulinsart company has never marketed a model of the vessel;

Let them maintain that Y always recognized that AQ AL-AM was indeed the sole author of the plan of the model;

They should specify that if the plan was marketed by AQ AL-AM after the publication of the album 'Le Secret de la Licorne', it was designed and produced before this publication since a plan was needed to create the model received by Y just before the said publication; that according to them it is in fact impossible to draw the starboard perspective of the ship as represented on the cover of the album, without having before eyes a 1/100° model and that there cannot be a model three-dimensional of The Unicorn without a plan including the water lines of the hull of the vessel, the published drawings not representing the vessel below its waterline;

That according to them Y and AQ AL-AM thus worked together on the drafting of the definitive drawing of The Unicorn and that the latter indeed produced a drawing from which the final form of The Unicorn as published in the album was adopted;

That regarding the originality of The Unicorn, they argue that it is an imaginary vessel created by AQ AL-AM from his personal knowledge of 17th century warships, his own documentation and his research, his personal creative contribution coming from the fact that he deliberately lightened the rear castle and exaggerated the shape and size of the lanterns, giving the boat great elegance and a certain 'monumentality';

That in any event they maintain that even supposing that the plan of the model was adapted from Y's drawings, this would not have the effect of excluding any creative contribution from AQ AL-AM, which is the sole designer of the plan of the model, but would be intended to lead to co-ownership of the rights with Y and, therefore, the Moulinsart company;

Considering that SA Moulinsart replies that only one who can justify an original creative contribution to the work, marked with his own personality as specified by Belgian case law (judgment of October 2, 1997 of the Court of Appeal of Mons) and that in this case no sketches, drafts or preparatory drawings which would have been produced by AQ AL-AM are included in the proceedings;

That she argues that the plan submitted to the debates is not dated and does not have a certain date and cannot attest to an anteriority of the plans of the ship La Licorne prior to the creation by Y of the illustrations featuring this vessel ;

That she maintains that not only has it not been established that this plan would have been published before the creation by Y of his drawings of The Unicorn but that on the contrary this plan is obviously subsequent to this creation and public disclosure drawings of The Unicorn under the name of Y;

That it adds that there is no justification either for the alleged proposals for formatting, corrections or points of detail which would have been made to the drawing of Y by AQ AL-AM and a fortiori for their original character whereas on the contrary, the sketches taken from Y's notebooks bear witness to the reality and evolution of his creative preparatory work;

That she thus maintains that the illustrations representing La Licorne as published in the daily newspaper Le Soir or in the album 'Le Secret de la Licorne' were drawn by Y's hand and are the fruit of his sole creative and are not the work of AQ AL-AM who cannot claim a contribution to their creation as co-author;

That she adds that Y had sent his cover project for the album without having received the model which he did without and that it cannot be seriously maintained that Y's illustrations were adaptations of the model produced by AQ AL-AM;

That it further argues that the marketing of the plans for La Licorne took place within a contractual framework, a license contract having been established on April 23, 1943, authorizing AQ AL-AM to manufacture and market the plans and materials necessary for the construction of a model of the ship La Licorne represented in Y's drawings;

That with regard to the plan and the model of La Licorne, she maintains that they are only adaptations (the originality of which is not demonstrated) of the work of Y, produced after the drawings thereof; that in addition AQ AL-AM itself indicated in an interview that it had transferred the exploitation rights of its plans to the transferee of its business and that there is no justification for a retrocession of these exploitation rights in the assets of AQ AL-AM;

Considering that the SNC Hachette Collection also recalls the presumption of ownership of Y and the absence of presumption of ownership of AQ AL-AM on the plan and model of La Licorne, arguing that these were created after the drawing of La Licorne, work disclosed in 1942 in the newspaper Le Soir under the sole name of Y;

That the plan of the model is not dated and is not an original work, being only the three-dimensional implementation of Y's drawing of The Unicorn;

That, in the alternative, she maintains that AQ AL-AM only had a purely technical role as librarian and technical advisor and that the plan of La Licorne produced by him is only the transposition of Y's drawing in the form technical plan; that it is the same for the model itself;

That it thus concludes that the action of the AN AL-AM colleagues is inadmissible for lack of authorship or co-authorship of AQ AL-AM;

Considering this stated, that according to article 1 of the Belgian law of March 22, 1886, 'the author of a literary or artistic work has the sole right to reproduce it or to authorize its reproduction in any manner and under any form whatever' ; that according to the documents submitted to the debates (Copyright and digital rights: software, databases, multimedia. Belgian, European and comparative law of IJ and OP), a presumption could already be invoked under the influence of this legislation ownership of copyright for the benefit of the person whose identification sign is affixed to the work in accordance with Article 15-1° of the Berne Convention; that it is a simple presumption, proof to the contrary can be provided by any legal means;

Considering that in this case it is common ground that the design of the vessel La Licorne was disclosed under the pseudonym Y in 1942 on the occasion of the pre-publication of the album 'Le Secret de La Licorne' (under the initial title of 'The Extraordinary Adventures of Tintin and Snowy') in daily strips in the Belgian newspaper Le Soir, more precisely from the third vignette of the strip of June 18, 1942;

That it follows that QR (under the pseudonym Y) benefits from the legal presumption of authorship on the drawing of The Unicorn and that it belongs to the AN AL-AM consorts, in their capacity as beneficiaries of AQ AL-AM, to rebut this presumption by providing contrary proof of his creation of the design of this vessel or of his creative contribution prior to the first disclosure of this design;

Considering that if AQ AL-AM claims, in a family chronicle, to have, at the request of Y, made upon his return to Belgium from March 1942, a first summary drawing of the vessel which would have been reproduced by Y in the fourth vignette of the strip of June 26, 1942, it is clear that the AN AL-AM consorts do not produce any draft drawing, sketch or preparatory drawing of The Unicorn, by the hand of AQ AL-AM;

Considering that the extracts from the biographies of Y produced by the AN AL-AM consorts (article by AJ AK in issue 41 of the Bateau Model magazine, works Y fils de Tintin by C AC, Y de AD AE, Tintin, Haddock and the boats of Yves Horeau, Les sculpteurs de BD de GH) are not conclusive because, as the first judges rightly noted, they only collect and report the comments of AQ AL-AM on the chronology of the facts and their development;

That it will moreover be observed on the one hand that AQ AL-AM made these remarks after the death of Y who could therefore no longer contradict them and on the other hand that these remarks varied according to the interviews as well as the recognizes AJ AK in his article ("This written narration of events undoubtedly does not correspond to a strict reality, nor to what he told me orally, during a subsequent interview");

Considering that, on the contrary, the series of articles entitled Les secrets de La Licorne published in the newspaper Le Soir between the months of September and November 2004 on the occasion of the reproduction of the daily strips, reporting an investigation 'without taboo to retrace the controversial genesis of the story', insist on the personal work of Y who, on the occasion of the publication of the story in album in 1943, made more than 130 modifications to the story, redesigning the vessel whose first draft would have been inspired by a model presented in an issue of the official organ of the Ministry of the Navy and the Belgian Yachting Federation, enriching it with new historical details; that according to these articles the sources of Y were multiple, the stern being inspired in particular by the ships Le Brillant and the Soleil Royal, a reproduction of the latter also appearing in number 159 of March 1936 of the Belgian maritime review ' Wandelaer and on the water' found in the archives of Y;

Considering that if the AN AL-AM consorts claim in the alternative co-ownership of the copyright on the design of the ship La Licorne, it appears that according to the Belgian law applicable at the material time (works Le Droit d' author of I AG and Summary of copyright and related rights by Fernand de Visscher and CD), the collaborative work implies an original creative activity, a 'spiritual intimacy' in the creative contribution and the performer who only carries out purely technical, material, non-creative work cannot claim copyright;

Considering that if AQ AL-AM was able, thanks to its personal archives, to provide Y with information and in particular graphic documentation relating to ships of the line from the 17th and 18th centuries, the AN AL-AM consorts do not demonstrate otherwise that through their affirmations and those of their author that the latter was able, beyond this simple technical and material contribution, to contribute in a 'spiritual intimacy' with Y to the creation of the work of the spirit constituted by the drawing of the ship La Licorne;

Considering that Y did not consider AQ AL-AM as a collaborator and co-author of the drawing of The Unicorn but more precisely as 'the most reliable and kindest of technical advisors' as he writes in a dedication dated May 4, 1945 intended for AQ AL-AM (exhibit no. 18 of the AN AL-AM consorts' file) without the latter having ever contested during Y's lifetime this qualification of 'technical advisor';

Considering that similarly no document has been produced by the AN AL-AM consorts corroborating the assertions of AQ AL-AM according to which in 1942 he created a plan of The Unicorn with the calculation of its shape lines, constructed a first provisional model then a second model at 1/100th to allow Y to draw the starboard perspective of the vessel as represented on the cover of the album in 1943;

Considering on the contrary that it appears from the letter sent by AQ AL-AM to Y on September 23, 1942, that the latter only made 'drafts' of the plans of the ship based on the documents sent to him by Y , without even making the final drawing, entrusted to another designer:

'Thank you a thousand times for your reproductions. With these documents, last night, I already established the profile of my hull, decorated with its bottle. This evening, I plan to do the transom, and I will then be able to pass my drafts to my designer who, for his part, enlarged the mast and showed it to me today (sic)' and 'I'm sending you this -attached the layer of the bow of the UNICORN. Would you be kind enough to adapt the desired figure exactly, and send me your final drawing. I thought it was better for you to do (sic) this (sic) according to my final drawing';

Considering that if Y was able to consider using a model of La Licorne to create the cover design for the album 'Le secret de la Licorne', it appears from the exchanges of correspondence with UV of Casterman editions that he did not receive this model in time and did without it;

Considering that Y wrote on November 21, 1942 to UV about the creation of the cover of the album to be published: 'I have to wait for the model of the W AA ship which bears this name to be produced. As soon as I have this model, which won't be long, I'll start drawing; that on January 26, 1943, having still received nothing, he wrote: 'I am embarrassed to have to tell you that, despite all the promises that had been made to me, I have not yet received the model. I'm expecting it any day now.

Except for the drawing of the corresponding boat, the cover is finished. (…) Except for three large drawings for which the model is also essential to me, the formatting is complete;

That UV replied to him on January 28, 1943 in these terms: 'Listen: neglect this model. The caravel featured on your cover project was amazing. If it doesn't exactly match the model, what's the harm? None, believe me. You're not doing a reproduction competition, are you? If you knew how concerned we are here about this delay and what repercussions it could have on the progress of the work.' ;

That finally on February 2, 1943 Y informed his publisher that he had sent his drawing to the printer without the model, which arrived late: 'The cover of the Unicorn was given to Bindels, yesterday, Monday. I had finally received the model, at the time when, following your advice, I had decided to do without it.', thus confirming the words he made in 1979 to Numa Sadoul: 'the model of the boat n 'was, however, carried out only after the fact' (Tintin and I – Interviews with Y by Numa Sadoul);

Considering that in any event it results from the comparison, made by the court, between the drawings of the vessel La Licorne reproduced during their publication in strips in the newspaper Le Soir and those retouched by Y for publication in album, including the cover drawing, that no substantial modification of the drawings could have been made by Y on the basis of a model; that thus the details of the ship (in particular the rear castle, the lanterns, the standards) already appeared in the strips, the corrections not relating to original elements of the ship (thus rows of five windows instead of three on the rear castle, a retouching of the railing, the removal of the balustrade encircling the lookout of the ship which in practice made its access impossible);

Considering that it will moreover be noted that no convincing document has been produced which could specify the appearance of this model, described by AQ AL-AM itself in a letter addressed on March 12, 1986 to ST, as a 'model simplified and unpainted' and that in particular it cannot be the elaborate model reproduced in the catalog of the BOKI house presented in the proceedings (exhibit no. 7 of the appellants), which moreover dates from the year 1951 as is apparent from the mentions appearing on pages 10 and 11 of this catalog (and not 1943 or 1944 as the AN AL-AM colleagues assert respectively on pages 27 and 10 of their conclusions);

Considering that the plan of La Licorne submitted to the debates by the AN AL-AM colleagues in exhibit no. 6, which was notably used in the creation of the model marketed by AQ AL-AM until 1972, cannot have served as a model to Y; that it does not in fact have a certain date and that upon detailed examination, it appears that this document necessarily dates after the publication of the album 'Le Secret de la Licorne';

That in fact first of all on this document appears in a medallion the drawing made by Y of the ship La Licorne for the cover of the album; that secondly on this level this episode of the adventures of Tintin and Snowy is entitled 'The Secret of the Unicorn' which is the definitive title given to the album whereas at the time of the publication in strips in the newspaper Le Soir its title was 'The Extraordinary Adventures of Tintin and Snowy'; that in the third place the telephone number of the BOKI house which appears there has nine digits and is therefore necessarily after 1951 since the aforementioned catalog of this house, which can be dated to the year 1951 as analyzed previously, does not only mentions a six-digit telephone number;

Considering finally and above all that this plan mentions the reference to a '53.TBF Brux license.' which corresponds to the license contract signed on April 23, 1943 between AH AI, concessionaire at the time of the reproduction rights of Y's work, and AQ AL-AM, authorizing the latter 'to manufacture and put on the market Belgian market the plans and materials necessary for the assembly, for the construction in miniature of the Vaisseau LA LICORNE, represented in the drawings of Y as being ordered by Chevalier B de Hadoque' using for this purpose the 'illustration of plan of the special drawing made by Y'; that it was in fact stipulated in article 3 of this contract that this authorization was mentioned on the boxes containing the materials necessary for assembly under the mention 'Lic.53.TBFBruxelles';

Considering that it cannot be seriously maintained that this license contract would have been established without the knowledge of Y who would have destroyed it when he became aware of it as affirmed by AQ AL-AM in his interviews, then that it appears from the documents submitted to the debates that Y had been kept informed of the steps taken by AH AI by letters of August 17, 1942 ('AL-AM: I thank you again for your telephone call on this subject; I started in connection with the person concerned with whom I had a fairly long interview. We are currently examining his project regarding which we will probably have to ask him for some additional information, and hope to be able to write to him on this subject at the end of this week. Upon receipt information to request, I will contact you' and September 8, 1942 ("It seems to me that L. [AL-AM] is not considering a simple transfer of license but would like something else, but that is not specified. I will therefore probably have this information tomorrow and will contact you soon on this subject') and that he received on April 23, 1943 a copy of the license contract with this clarification from AH AI: 'All having been conducted in accordance with our interview, I have no doubt that you will be in complete agreement. You will notice that the client offers to contact you for the question of the advertisement and I assume you agree; I think he would possibly ask you to make a little drawing to enhance his text';

Considering moreover that contrary to what the biographers of Y C AC and AD AE assert on this point (who only repeat the words of AQ AL-AM), the breakdown of business relations between Y and AH AI only intervened in 1947 (letter from Y to AH AI dated May 8, 1947 and response from the latter dated May 19, 1947) for facts unrelated to this licensing contract ('Coeurs Vaillants' and 'Les beaux films'), which in any case was still in force after the 1950s since it is mentioned in the aforementioned plan;

Considering that it follows that the AN AL-AM partners can no longer claim a presumption of ownership of copyright of AQ AL-AM both on this plan of the model of La Licorne, produced after the pre-publication in 1942 then to the album edition in 1943, of the work of Y 'The secret of the Unicorn', and this within the framework of a license contract for reproduction rights granted by Y, only on the model herself ;

That in fact this plan is none other than the transposition in the form of a technical document, of Y's original drawings of the vessel La Licorne (in particular 'the plan of the special drawing made by Y' mentioned in the license contract), with a view to the creation of a three-dimensional model, which involves the implementation of simple technical know-how in the absence of any personal creative effort;

The court also observes that AQ AL-AM had already previously marketed with Y's agreement, also with a view to producing a model, the plans of the aircraft drawn between 1937 and 1939 by Y in the album 'The adventures of Jo, Zette and Z – The Stratonef H22' as he himself specifies in the aforementioned article by AJ AK;

Considering consequently that the AN AL-AM consorts cannot claim, for their author AQ AL-AM, copyright either on the design of the ship La Licorne or on the plan and the model of this ship and that therefore the judgment undertaken will be confirmed in that it declared them inadmissible to act for copyright infringement for all of their requests in this respect;

Considering that as a result, the judgment undertaken will also be confirmed in that it declared the guarantee request from SNC Hachette Collections to be moot  ;

**III**  : ON THE REQUEST FOR RESTITUTION OF THE ORIGINAL PLAN:

Considering that the AN AL-AM colleagues argue that AQ AL-AM, then aged 90, was interviewed at length on May 9, 1996 by EF, then secretary general of the Y Foundation, and that on this occasion he handed over to the latter, at his request, the one and only original copy of the plan of the model in his possession to make a photocopy, under the promise of rapid restitution which never took place;

That in the operative part of their conclusions they ask the court to order the restitution of this plan under penalty without however specifying against which of the two respondent companies this request is presented;

Considering that the Moulinsart company raises the inadmissibility of this request on the one hand because it is presented for the first time in the appeal and on the other hand that it is not in possession of this plan, EF not being his agent and not being a party to the present procedure and that he cannot therefore be ordered to perform an obligation concerning a third party;

Considering that SNC Hachette Collections requests its exoneration for this request which does not concern it;

Considering that this request for restitution is presented for the first time in the cause of appeal by the AN AL-AM colleagues and can therefore only be declared inadmissible in application of the provisions of article 564 of the code of civil procedure , that moreover, this request concerns a person, EF, who is not a party to the proceedings, any more than the Y Foundation of which he was the general secretary, and that no legal relationship binds this person to the companies Moulinsart and Hachette Collections which cannot therefore be held to an obligation to act attributable to a third party;

**IV**  : ON OTHER REQUESTS:

Considering that it is equitable to award to the company Moulinsart the additional sum of €10,000 and to SNC Hachette Collections the additional sum of €5,000 for the costs incurred by them in the appeal and not included in the judgment undertaken being also confirmed in that it ruled on the irrecoverable costs of first instance;

Considering that the AN AL-AM partners will for their part be rejected their request for payment under article 700  of the code of civil procedure;

Considering that the AN AL-AM partners, losing parties in their appeal, will be ordered in solidum to pay the costs of the appeal, the judgment undertaken being also confirmed in that it ruled on the burden of the costs of the procedure of first case ;

P A R   C E S   M O T I F S

The Court, ruling publicly and contradictorily;

Confirms in all its provisions the judgment undertaken;

Adding:

Declares inadmissible the request for restitution of the original plan of the vessel La Licorne presented for the first time before the court by Mr. AT AN AL-AM, Mr. BB AN AL-AM and Ms. AX AN AL-AM;

Orders in solidum Mr AT AN AL-AM, Mr BB AN AL-AM and Ms AX AN AL-AM to pay for the costs incurred in the appeal and not included in the costs:

to the Moulinsart company, the sum of TEN THOUSAND EUROS (€10,000),

to SNC Hachette Collections , the sum of FIVE THOUSAND EUROS (€5,000);

Dismisses Mr. AT AN AL-AM, Mr. BB AN AL-AM and Ms AX AN AL-AM of their request for payment under article 700 of the code of civil procedure;

Orders in solidum Mr AT AN AL-AM, Mr BB AN AL-AM and Ms AX AN AL-AM to pay the costs of the appeal procedure, which will be recovered in accordance with the provisions of article 699 of the code of civil  procedure .

THE PRESIDENT THE REGISTRAR

**Quoted in the same comments**

Orléans Court of Appeal, January 16, 2013, no. 12/02640

Confirmation

- Debt
- Plan
- Over-indebtedness commission
- Tribunal d'instance
- Recommendation
- Treasury
- Rescheduling
- Boat
- Contestation
- Overindebtedness of individuals

Colmar Court of Appeal, April 1, 2016, no. 14/05030

Partial invalidation

- Union
- General assembly
- Status
- Professional election
- Interest in acting
- Placed under guardianship
- Damages and interests
- Will
- Damage
- Judgement

Toulouse Court of Appeal, April 1, 2015, no. 14/06662

Confirmation

- Challenge
- Expertise
- Principle of contradiction
- Impartiality
- Respect
- Part
- Pieces
- Companies
- Breach
- Communication

**Reference on the same themes**

Besançon Court of Appeal, Second Civil Chamber, May 11, 2011, No. 10/02924

Inadmissibility

- Rent
- Bring
- Building
- Nullity
- Companies
- Bail
- Tenant
- Held captive
- Sale
- Procedure

Court of Appeal of Chambéry, June 25, 2015, no. 14/01048

- Plot
- Enclave
- Servitude
- Expertise
- Fond
- Marry
- Lawyer
- Pipeline
- Compensation
- Profit

Court of Appeal of Aix-en-Provence, October 6, 2015, n° 14/17267

Infirmation

- Elevator
- Real estate companies
- Lack of conformity
- Buyer
- Moral harm
- Seller
- Commissioning
- Action
- Civil societies
- Syndicate of co-owners

**On the same themes**

Amiens Court of Appeal, July 2, 2013, no. 11/04392

Partial invalidation

- Donations
- Sale
- Right of return
- Real estate agent
- Revocation
- Building
- Request
- Father
- Clause
- Synallagmatic promise

Papeete Court of Appeal, June 7, 2012

Confirmation

- Plot
- Possession
- Consorts
- Property
- Fees
- Usucapion
- Evidence
- Act
- Witness
- Peaceful

Court of Appeal of Aix-en-Provence, June 18, 2015, n° 14/21723

Infirmation

- Belgium
- Companies
- Conclusion
- Incident
- Civil Procedure
- Intervention force
- Prescription
- Constitution
- Addresses
- Put together

Texts cited in the decision

1. Code of Civil Procedure

Back to top
Save
Register for free to print your decision
Paris Court of Appeal, September 8, 2015, no. 14/06060
Frequently consulted case law:

- Paris Court of Appeal, June 28, 2013, no. 12/00791
- Paris Court of Appeal, October 25, 2013, no. 12/14338
- Paris Court of Appeal, Pôle 5 - chamber 1, September 14, 2021, no. 21/00848
- Versailles Court of Appeal, 20th chamber, November 12, 2020, no. 20/00310
- Paris Court of Appeal, Pôle 5 chamber 1, February 2, 2021, no. 17/17688
- Paris Court of Appeal, Pôle 5 - chamber 1, February 23, 2021, no. 19/09059
- Paris Court of Appeal, Pôle 5 - chamber 2, March 19, 2021, no. 19/17493
- Paris Court of Appeal, Pôle 1 - chamber 3, October 21, 2020, no. 20/00978
- Paris Court of Appeal, Pôle 5 chamber 2, October 16, 2015, no. 14/23953

- [Paris Court of Appeal, Pôle 5 - chamber 2, February 19, 2021, no. 19/13104](#)
- [Paris Court of Appeal, Pôle 5, January 7, 2011, no. 2009/16251](#)
- [Paris Court of Appeal, Pôle 5 - chamber 1, January 28, 2020, no. 18/02939](#)
- [Paris Court of Appeal, Pôle 5 - chamber 1, November 24, 2010, no. 09/10447](#)
- [Paris Court of Appeal, December 20, 2013, no. 12/20260](#)
- [Paris Court of Appeal, Pôle 5 - chamber 1, December 17, 2019, no. 17/09695](#)
- [Paris Court of Appeal, Pôle 5 chamber 2, May 17, 2019, no. 17/21158](#)
- [Paris Court of Appeal, Pôle 5 chamber 11, November 8, 2019, no. 19/02118](#)
- [Paris Court of Appeal, Pôle 5 - chamber 1, January 21, 2020, no. 18/00625](#)
- [Paris Court of Appeal, Pôle 5, April 12, 2013, no. 2012/08354](#)
- [Paris Court of Appeal, Pôle 3 - chamber 1, June 30, 2021, no. 19/14469](#)

1. [Doctrine](#)
2. [Court decisions](#)
3. [2015](#)
4. CA Paris, 8 sept. 2015, n° 14/06060

Contact our sales department on 01 84 80 33 48

[Doctrine](#)
1st legal intelligence platform
[linkedin](#)[twitter](#)[facebook](#)[youtube](#)[instgram](#)
[FORSETI SAS](#) - Reproduction prohibited - Private sources, INPI, INSEE, data.gouv.fr
Product
HomeFeaturesDocument AnalyzerNewsPricesSend a decision
Sitemap
DecisionsLaws and regulationsEU regulations and directivesParliamentary documentsCollective agreementsTax agreementsLawyersFirmsCompaniesJudicial headings
Community
Opinions from our customersBlog [Common Law Podcast](#) I swear! Doctrine TV
Assistance
HelpLegal noticesT&CsPersonal dataCookies policyRefuse cookiesContact us
Doctrine
[About](#) We are recruitingInside DoctrineCode of conductPressDoctrine Lab

# EXHIBIT 3



CANADA

CONSOLIDATION

CODIFICATION

# Copyright Act

# Loi sur le droit d'auteur

R.S.C., 1985, c. C-42

L.R.C. (1985), ch. C-42

Current to October 5, 2023

À jour au 5 octobre 2023

Last amended on April 27, 2023

Dernière modification le 27 avril 2023

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

*Droit d'auteur*
**PARTIE III** Violation du droit d'auteur et des droits moraux, et cas d'exception
Indemnisation pour acte antérieur à la reconnaissance du droit d'auteur ou des droits moraux
**Articles 33.1-34**

parties or, failing agreement, that is determined by the Board in accordance with section 78.

2012, c. 20, s. 41.

#### Certain rights and interests protected

**33.2 (1)** Despite subsections 27(1), (2) and (4) and sections 27.1, 28.1 and 28.2, if a person has, before the later of the day on which this section comes into force and the day on which a country that is not a treaty country becomes a WCT country, incurred an expenditure or a liability in connection with, or in preparation for, the doing of an act that, if that country had been a WCT country, would have infringed copyright in a work or moral rights in respect of a work, any right or interest of that person that arises from, or in connection with, the doing of that act and that is subsisting and valuable on the later of those days is not, except as provided by an order of the Board made under subsection 78(3), prejudiced or diminished by reason only of that country having become a WCT country.

#### Compensation

**(2)** Despite subsection (1), a person's right or interest that is protected by that subsection terminates as against the copyright owner if and when that owner pays the person any compensation that is agreed to between the parties or, failing agreement, that is determined by the Board in accordance with section 78.

2012, c. 20, s. 41.

### PART IV

# Remedies

## Civil Remedies

### Infringement of Copyright and Moral Rights

#### Copyright

**34 (1)** Where copyright has been infringed, the owner of the copyright is, subject to this Act, entitled to all remedies by way of injunction, damages, accounts, delivery up and otherwise that are or may be conferred by law for the infringement of a right.

#### Moral rights

**(2)** In any proceedings for an infringement of moral rights, the court may grant to the holder of those rights

---

parties, laquelle, à défaut d'entente, est déterminée par la Commission conformément à l'article 78.

2012, ch. 20, art. 41.

#### Protection de certains droits et intérêts

**33.2 (1)** Par dérogation aux paragraphes 27(1), (2) et (4) et aux articles 27.1, 28.1 et 28.2, dans le cas où, avant la date d'entrée en vigueur du présent article ou, si elle est postérieure, la date où un pays qui n'est pas un pays signataire devient un pays partie au traité de l'ODA, une personne a fait des dépenses ou contracté d'autres obligations relatives à l'exécution d'un acte qui, accompli après cette date, violerait le droit d'auteur ou les droits moraux sur une œuvre, le seul fait que ce pays soit devenu un pays partie à ce traité ne porte pas atteinte aux droits ou intérêts de cette personne qui, d'une part, sont nés ou résultent de l'exécution de cet acte et, d'autre part, sont appréciables en argent à cette date, sauf dans la mesure prévue par une ordonnance de la Commission rendue en application du paragraphe 78(3).

#### Indemnisation

**(2)** Toutefois, les droits ou intérêts protégés en application du paragraphe (1) s'éteignent à l'égard du titulaire du droit d'auteur lorsque celui-ci verse à la personne visée à ce paragraphe une indemnité convenue par les deux parties, laquelle, à défaut d'entente, est déterminée par la Commission conformément à l'article 78.

2012, ch. 20, art. 41.

### PARTIE IV

# Recours

## Recours civils

### Violation du droit d'auteur et des droits moraux

#### Droit d'auteur

**34 (1)** En cas de violation d'un droit d'auteur, le titulaire du droit est admis, sous réserve des autres dispositions de la présente loi, à exercer tous les recours — en vue notamment d'une injonction, de dommages-intérêts, d'une reddition de compte ou d'une remise — que la loi accorde ou peut accorder pour la violation d'un droit.

#### Droits moraux

**(2)** Le tribunal saisi d'un recours en violation des droits moraux peut accorder au titulaire de ces droits les réparations qu'il pourrait accorder, par voie d'injonction, de dommages-intérêts, de reddition de compte, de remise

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 38 of 297

*Copyright*
**PARTIE IV** Remedies
Civil Remedies
Infringement of Copyright and Moral Rights
**Sections 34-34.1**

*Droit d'auteur*
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Articles 34-34.1**

all remedies by way of injunction, damages, accounts, delivery up and otherwise that are or may be conferred by law for the infringement of a right.

#### Costs

**(3)** The costs of all parties in any proceedings in respect of the infringement of a right conferred by this Act shall be in the discretion of the court.

#### Summary proceedings

**(4)** The following proceedings may be commenced or proceeded with by way of application or action and shall, in the case of an application, be heard and determined without delay and in a summary way:

**(a)** proceedings for infringement of copyright or moral rights;

**(b)** proceedings taken under section 44.12, 44.2 or 44.4; and

**(c)** proceedings taken in respect of

(i) a tariff approved by the Board under Part VII.1 or VIII, or

(ii) agreements referred to in subsection 67(3).

#### Practice and procedure

**(5)** The rules of practice and procedure, in civil matters, of the court in which proceedings are commenced by way of application apply to those proceedings, but where those rules do not provide for the proceedings to be heard and determined without delay and in a summary way, the court may give such directions as it considers necessary in order to so provide.

#### Actions

**(6)** The court in which proceedings are instituted by way of application may, where it considers it appropriate, direct that the proceeding be proceeded with as an action.

#### Meaning of *application*

**(7)** In this section, **application** means a proceeding that is commenced other than by way of a writ or statement of claim.

R.S., 1985, c. C-42, s. 34; R.S., 1985, c. 10 (4th Suppl.), s. 8; 1993, c. 15, s. 3(E), c. 44, s. 65; 1994, c. 47, s. 62; 1997, c. 24, s. 20; 2012, c. 20, s. 43; 2014, c. 32, s. 6; 2018, c. 27, s. 286.

#### Presumptions respecting copyright and ownership

**34.1 (1)** In any civil proceedings taken under this Act in which the defendant puts in issue either the existence of the copyright or the title of the plaintiff to it,

ou autrement, et que la loi prévoit ou peut prévoir pour la violation d'un droit.

#### Frais

**(3)** Les frais de toutes les parties à des procédures relatives à la violation d'un droit prévu par la présente loi sont à la discrétion du tribunal.

#### Requête ou action

**(4)** Les procédures suivantes peuvent être engagées ou continuées par une requête ou une action :

**a)** les procédures pour violation du droit d'auteur ou des droits moraux;

**b)** les procédures visées aux articles 44.12, 44.2 ou 44.4;

**c)** les procédures relatives aux tarifs homologués par la Commission en vertu des parties VII.1 ou VIII ou aux ententes visées au paragraphe 67(3).

Le tribunal statue sur les requêtes sans délai et suivant une procédure sommaire.

#### Règles applicables

**(5)** Les requêtes visées au paragraphe (4) sont, en matière civile, régies par les règles de procédure et de pratique du tribunal saisi des requêtes si ces règles ne prévoient pas que les requêtes doivent être jugées sans délai et suivant une procédure sommaire. Le tribunal peut, dans chaque cas, donner les instructions qu'il estime indiquées à cet effet.

#### Actions

**(6)** Le tribunal devant lequel les procédures sont engagées par requête peut, s'il l'estime indiqué, ordonner que la requête soit instruite comme s'il s'agissait d'une action.

#### Définition de *requête*

**(7)** Au présent article, **requête** s'entend d'une procédure engagée autrement que par un bref ou une déclaration.

L.R. (1985), ch. C-42, art. 34; L.R. (1985), ch. 10 (4ᵉ suppl.), art. 8; 1993, ch. 15, art. 3(A), ch. 44, art. 65; 1994, ch. 47, art. 62; 1997, ch. 24, art. 20; 2012, ch. 20, art. 43; 2014, ch. 32, art. 6; 2018, ch. 27, art. 286.

#### Présomption de propriété

**34.1 (1)** Dans toute procédure civile engagée en vertu de la présente loi où le défendeur conteste l'existence du droit d'auteur ou la qualité du demandeur :

*Copyright*
**PART IV** Remedies
Civil Remedies
Infringement of Copyright and Moral Rights
**Sections 38-38.1**

*Droit d'auteur*
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Articles 38-38.1**

### Notice to interested persons

**(3)** Before making an order under subsection (2), the court shall direct that notice be given to any person who has an interest in the copies or plates in question, unless the court is of the opinion that the interests of justice do not require such notice to be given.

### Circumstances court to consider

**(4)** In making an order under subsection (2), the court shall have regard to all the circumstances, including

    **(a)** the proportion, importance and value of the infringing copy or plate, as compared to the substrate or carrier embodying it; and

    **(b)** the extent to which the infringing copy or plate is severable from, or a distinct part of, the substrate or carrier embodying it.

### Limitation

**(5)** Nothing in this Act entitles the copyright owner to damages in respect of the possession or conversion of the infringing copies or plates.

R.S., 1985, c. C-42, s. 38; 1997, c. 24, s. 20.

### Statutory damages

**38.1 (1)** Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, instead of damages and profits referred to in subsection 35(1), an award of statutory damages for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally,

    **(a)** in a sum of not less than $500 and not more than $20,000 that the court considers just, with respect to all infringements involved in the proceedings for each work or other subject-matter, if the infringements are for commercial purposes; and

    **(b)** in a sum of not less than $100 and not more than $5,000 that the court considers just, with respect to all infringements involved in the proceedings for all works or other subject-matter, if the infringements are for non-commercial purposes.

### Autres personnes intéressées

**(3)** Le tribunal doit, avant de rendre l'ordonnance visée au paragraphe (2), en faire donner préavis aux personnes ayant un intérêt dans les exemplaires ou les planches, sauf s'il estime que l'intérêt de la justice ne l'exige pas.

### Facteurs

**(4)** Le tribunal doit, lorsqu'il rend une ordonnance visée au paragraphe (2), tenir compte notamment des facteurs suivants :

    **a)** la proportion que représente l'exemplaire contrefait ou la planche par rapport au support dans lequel ils sont incorporés, de même que leur valeur et leur importance par rapport à ce support;

    **b)** la mesure dans laquelle cet exemplaire ou cette planche peut être extrait de ce support ou en constitue une partie distincte.

### Limite

**(5)** La présente loi n'a pas pour effet de permettre au titulaire du droit d'auteur de recouvrer des dommages-intérêts en ce qui touche la possession des exemplaires ou des planches visés au paragraphe (1) ou l'usurpation du droit de propriété sur ceux-ci.

L.R. (1985), ch. C-42, art. 38; 1997, ch. 24, art. 20.

### Dommages-intérêts préétablis

**38.1 (1)** Sous réserve des autres dispositions du présent article, le titulaire du droit d'auteur, en sa qualité de demandeur, peut, avant le jugement ou l'ordonnance qui met fin au litige, choisir de recouvrer, au lieu des dommages-intérêts et des profits visés au paragraphe 35(1), les dommages-intérêts préétablis ci-après pour les violations reprochées en l'instance à un même défendeur ou à plusieurs défendeurs solidairement responsables :

    **a)** dans le cas des violations commises à des fins commerciales, pour toutes les violations — relatives à une œuvre donnée ou à un autre objet donné du droit d'auteur —, des dommages-intérêts dont le montant, d'au moins 500 $ et d'au plus 20 000 $, est déterminé selon ce que le tribunal estime équitable en l'occurrence;

    **b)** dans le cas des violations commises à des fins non commerciales, pour toutes les violations — relatives à toutes les œuvres données ou tous les autres objets donnés du droit d'auteur —, des dommages-intérêts, d'au moins 100 $ et d'au plus 5 000 $, dont le montant est déterminé selon ce que le tribunal estime équitable en l'occurrence.

*Copyright*
**PARTIE IV** Remedies
Civil Remedies
Infringement of Copyright and Moral Rights
**Section** 38.1

*Droit d'auteur*
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Article** 38.1

### Infringement of subsection 27(2.3)

**(1.1)** An infringement under subsection 27(2.3) may give rise to an award of statutory damages with respect to a work or other subject-matter only if the copyright in that work or other subject-matter was actually infringed as a result of the use of a service referred to in that subsection.

### Deeming — infringement of subsection 27(2.3)

**(1.11)** For the purpose of subsection (1), an infringement under subsection 27(2.3) is deemed to be for a commercial purpose.

### Infringements not involved in proceedings

**(1.12)** If the copyright owner has made an election under subsection (1) with respect to a defendant's infringements that are for non-commercial purposes, they are barred from recovering statutory damages under this section from that defendant with respect to any other of the defendant's infringements that were done for non-commercial purposes before the institution of the proceedings in which the election was made.

### No other statutory damages

**(1.2)** If a copyright owner has made an election under subsection (1) with respect to a defendant's infringements that are for non-commercial purposes, every other copyright owner is barred from electing to recover statutory damages under this section in respect of that defendant for any of the defendant's infringements that were done for non-commercial purposes before the institution of the proceedings in which the election was made.

### If defendant unaware of infringement

**(2)** If a copyright owner has made an election under subsection (1) and the defendant satisfies the court that the defendant was not aware and had no reasonable grounds to believe that the defendant had infringed copyright, the court may reduce the amount of the award under paragraph (1)(a) to less than $500, but not less than $200.

### Special case

**(3)** In awarding statutory damages under paragraph (1)(a) or subsection (2), the court may award, with respect to each work or other subject-matter, a lower amount than $500 or $200, as the case may be, that the court considers just, if

  **(a)** either

    **(i)** there is more than one work or other subject-matter in a single medium, or

### Violation du paragraphe 27(2.3)

**(1.1)** La violation visée au paragraphe 27(2.3) ne peut donner droit à l'octroi de dommages-intérêts préétablis à l'égard d'une œuvre donnée ou à un autre objet donné du droit d'auteur que si le droit d'auteur de l'une ou de l'autre a été violé par suite de l'utilisation des services mentionnés à ce paragraphe.

### Violation réputée : paragraphe 27(2.3)

**(1.11)** Pour l'application du paragraphe (1), la violation du droit d'auteur visée au paragraphe 27(2.3) est réputée être commise à des fins commerciales.

### Réserve

**(1.12)** Toutefois, le titulaire du droit d'auteur qui a choisi de recouvrer des dommages-intérêts préétablis auprès de la personne visée au paragraphe (1) pour des violations qu'elle a commises à des fins non commerciales ne pourra pas recouvrer auprès d'elle de tels dommages-intérêts au titre du présent article pour les violations commises à ces fins avant la date de l'introduction de l'instance et qu'il ne lui a pas reprochées dans le cadre de celle-ci.

### Réserve

**(1.2)** Si un titulaire du droit d'auteur a choisi de recouvrer des dommages-intérêts préétablis auprès de la personne visée au paragraphe (1) pour des violations qu'elle a commises à des fins non commerciales, aucun autre titulaire du droit d'auteur ne pourra recouvrer auprès d'elle de tels dommages-intérêts au titre du présent article pour les violations commises à ces fins avant la date de l'introduction de l'instance.

### Cas particuliers

**(2)** Dans les cas où le défendeur convainc le tribunal qu'il ne savait pas et n'avait aucun motif raisonnable de croire qu'il avait violé le droit d'auteur, le tribunal peut réduire le montant des dommages-intérêts visés à l'alinéa (1)a) jusqu'à 200 $.

### Cas particuliers

**(3)** Dans les cas où plus d'une œuvre ou d'un autre objet du droit d'auteur sont incorporés dans un même support matériel ou dans le cas où seule la violation visée au paragraphe 27(2.3) donne ouverture aux dommages-intérêts préétablis, le tribunal peut, selon ce qu'il estime équitable en l'occurrence, réduire, à l'égard de chaque œuvre ou autre objet du droit d'auteur, le montant minimal visé à l'alinéa (1)a) ou au paragraphe (2), selon le cas, s'il est d'avis que même s'il accordait le montant minimal de dommages-intérêts préétablis le montant total de ces

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 41 of 297

Copyright
**PARTIE IV** Remedies
Civil Remedies
Infringement of Copyright and Moral Rights
**Section** 38.1

Droit d'auteur
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Article** 38.1

**(ii)** the award relates only to one or more infringements under subsection 27(2.3); and

**(b)** the awarding of even the minimum amount referred to in that paragraph or that subsection would result in a total award that, in the court's opinion, is grossly out of proportion to the infringement.

### Limitation — certain acts

**(4)** A collective society or copyright owner who has authorized a collective society to act on their behalf may make an election under this section with respect to an act set out in subsection (4.1) only if applicable royalties are set out in an approved tariff or fixed under subsection 71(2) and the defendant has not paid them. If they make the election, the collective society or copyright owner may only recover, in lieu of any other remedy of a monetary nature provided by this Act, an award of statutory damages in respect of such acts in a sum of not less than three and not more than ten times the amount of the applicable royalties, as the court considers just.

### Acts for the purposes of subsection (4)

**(4.1)** Subsection (4) applies with respect to the following acts:

**(a)** the performance in public of musical works or dramatico-musical works, of performer's performances of such works, or of sound recordings embodying such works or performances; and

**(b)** the communication to the public by telecommunication of musical works or dramatico-musical works, other than as described in subsection 31(2), of performer's performances of such works, or of sound recordings embodying such works or performances.

### Factors to consider

**(5)** In exercising its discretion under subsections (1) to (4), the court shall consider all relevant factors, including

**(a)** the good faith or bad faith of the defendant;

**(b)** the conduct of the parties before and during the proceedings;

**(c)** the need to deter other infringements of the copyright in question; and

**(d)** in the case of infringements for non-commercial purposes, the need for an award to be proportionate to the infringements, in consideration of the hardship

dommages-intérêts serait extrêmement disproportionné à la violation.

### Réserve : certains actes

**(4)** La société de gestion collective ou le titulaire du droit d'auteur qui a habilité une société de gestion à agir à son profit ne peut, relativement à un acte mentionné au paragraphe (4.1), se prévaloir du présent article que si les redevances applicables en l'espèce figurent dans un tarif homologué ou sont fixées conformément au paragraphe 71(2) et que le défendeur ne les a pas payées. S'ils se prévalent du présent article, la société ou le titulaire ne peut, en lieu et place de tout autre redressement pécuniaire prévu par la présente loi, que recouvrer des dommages-intérêts préétablis relatifs à ces actes dont le montant, de trois à dix fois le montant de ces redevances, est déterminé selon ce que le tribunal estime équitable en l'occurrence.

### Actes pour l'application du paragraphe (4)

**(4.1)** Le paragraphe (4) s'applique aux actes suivants :

**a)** l'exécution en public d'œuvres musicales ou dramatico-musicales, de leurs prestations ou d'enregistrements sonores constitués de ces œuvres ou prestations;

**b)** la communication au public par télécommunication — à l'exclusion de la communication visée au paragraphe 31(2) — d'œuvres musicales ou dramatico-musicales, de leurs prestations ou d'enregistrements sonores constitués de ces œuvres ou prestations.

### Facteurs

**(5)** Lorsqu'il rend une décision relativement aux paragraphes (1) à (4), le tribunal tient compte notamment des facteurs suivants :

**a)** la bonne ou mauvaise foi du défendeur;

**b)** le comportement des parties avant l'instance et au cours de celle-ci;

**c)** la nécessité de créer un effet dissuasif à l'égard de violations éventuelles du droit d'auteur en question;

**d)** dans le cas d'une violation qui est commise à des fins non commerciales, la nécessité d'octroyer des dommages-intérêts dont le montant soit proportionnel à la violation et tienne compte des difficultés qui

Droit d'auteur
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Articles 38.1-38.2**

the award may cause to the defendant, whether the infringement was for private purposes or not, and the impact of the infringements on the plaintiff.

**No award**

**(6)** No statutory damages may be awarded against

**(a)** an educational institution or a person acting under its authority that has committed an act referred to in section 29.6 or 29.7 and has not paid any royalties or complied with any terms and conditions fixed under this Act in relation to the commission of the act;

**(b)** an educational institution, library, archive or museum that is sued in the circumstances referred to in section 38.2;

**(c)** a person who infringes copyright under paragraph 27(2)(e) or section 27.1, where the copy in question was made with the consent of the copyright owner in the country where the copy was made; or

**(d)** an educational institution that is sued in the circumstances referred to in subsection 30.02(7) or a person acting under its authority who is sued in the circumstances referred to in subsection 30.02(8).

**Exemplary or punitive damages not affected**

**(7)** An election under subsection (1) does not affect any right that the copyright owner may have to exemplary or punitive damages.

1997, c. 24, s. 20; 2012, c. 20, s. 46; 2018, c. 27, s. 287.

**Maximum amount that may be recovered**

**38.2 (1)** An owner of copyright in a work who has not authorized a collective society to authorize its reprographic reproduction may recover, in proceedings against an educational institution, library, archive or museum that has reproduced the work, a maximum amount equal to the amount of royalties that would have been payable to the society in respect of the reprographic reproduction, if it were authorized, either

**(a)** under any agreement entered into with the collective society; or

**(b)** under a tariff approved by the Board under section 70.

en résulteront pour le défendeur, du fait que la violation a été commise à des fins privées ou non et de son effet sur le demandeur.

**Cas où les dommages-intérêts préétablis ne peuvent être accordés**

**(6)** Ne peuvent être condamnés aux dommages-intérêts préétablis :

**a)** l'établissement d'enseignement ou la personne agissant sous l'autorité de celui-ci qui a fait les actes visés aux articles 29.6 ou 29.7 sans acquitter les redevances ou sans observer les modalités afférentes fixées sous le régime de la présente loi;

**b)** l'établissement d'enseignement, la bibliothèque, le musée ou le service d'archives, selon le cas, qui est poursuivi dans les circonstances prévues à l'article 38.2;

**c)** la personne qui commet la violation visée à l'alinéa 27(2)e) ou à l'article 27.1 dans les cas où la reproduction en cause a été faite avec le consentement du titulaire du droit d'auteur dans le pays de production;

**d)** l'établissement d'enseignement qui est poursuivi dans les circonstances prévues au paragraphe 30.02(7) et la personne agissant sous son autorité qui est poursuivie dans les circonstances prévues au paragraphe 30.02(8).

**Dommages-intérêts exemplaires**

**(7)** Le choix fait par le demandeur en vertu du paragraphe (1) n'a pas pour effet de supprimer le droit de celui-ci, le cas échéant, à des dommages-intérêts exemplaires ou punitifs.

1997, ch. 24, art. 20; 2012, ch. 20, art. 46; 2018, ch. 27, art. 287.

**Dommages-intérêts maximaux**

**38.2 (1)** Le titulaire du droit d'auteur sur une œuvre qui n'a pas habilité une société de gestion à autoriser la reproduction par reprographie de cette œuvre, ne peut, dans le cas où il poursuit un établissement d'enseignement, une bibliothèque, un musée ou un service d'archives, selon le cas, pour avoir fait une telle reproduction, recouvrer un montant supérieur à celui qui aurait été payable à la société de gestion si, d'une part, il l'avait ainsi habilitée, et si, d'autre part, la partie poursuivie :

**a)** soit avait conclu avec une société de gestion une entente concernant la reprographie;

**b)** soit était assujettie au paiement de redevances pour la reprographie prévu par un tarif homologué au titre de l'article 70.

*Copyright*
**PART IV** Remedies
Civil Remedies
Infringement of Copyright and Moral Rights
**Sections 38.2-39.1**

*Droit d'auteur*
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Articles 38.2-39.1**

**Agreements with more than one collective society**

**(2)** Where agreements respecting reprographic reproduction have been signed with more than one collective society or where more than one tariff applies or where both agreements and tariffs apply, the maximum amount that the copyright owner may recover is the largest amount of the royalties provided for in any of those agreements or tariffs.

**Application**

**(3)** Subsections (1) and (2) apply only where

(a) the collective society is entitled to authorize, or the tariff provides for the payment of royalties in respect of, the reprographic reproduction of that category of work; and

(b) copying of that general nature and extent is covered by the agreement or tariff.

1997, c. 24, s. 20; 2018, c. 27, s. 288.

**Injunction only remedy when defendant not aware of copyright**

**39 (1)** Subject to subsection (2), in any proceedings for infringement of copyright, the plaintiff is not entitled to any remedy other than an injunction in respect of the infringement if the defendant proves that, at the date of the infringement, the defendant was not aware and had no reasonable ground for suspecting that copyright subsisted in the work or other subject-matter in question.

**Exception where copyright registered**

**(2)** Subsection (1) does not apply if, at the date of the infringement, the copyright was duly registered under this Act.

R.S., 1985, c. C-42, s. 39; 1997, c. 24, s. 20.

**Wide injunction**

**39.1 (1)** When granting an injunction in respect of an infringement of copyright in a work or other subject-matter, the court may further enjoin the defendant from infringing the copyright in any other work or subject-matter if

(a) the plaintiff is the owner of the copyright or the person to whom an interest in the copyright has been granted by licence; and

(b) the plaintiff satisfies the court that the defendant will likely infringe the copyright in those other works or subject-matter unless enjoined by the court from doing so.

**Cas de plusieurs ententes ou tarifs**

**(2)** Si l'entente est conclue séparément avec plusieurs sociétés de gestion ou que les redevances sont payables conformément à différents tarifs homologués relatifs à la reprographie, ou les deux à la fois, le montant que le titulaire du droit d'auteur peut recouvrer ne peut excéder le montant le plus élevé de tous ceux que prévoient les ententes ou les tarifs.

**Application**

**(3)** Les paragraphes (1) et (2) ne s'appliquent que si, d'une part, les sociétés de gestion peuvent autoriser la reproduction par reprographie de ce genre d'œuvre ou qu'il existe un tarif homologué à cet égard et si, d'autre part, l'entente ou le tarif traite, dans une certaine mesure, de la nature et de l'étendue de la reproduction.

1997, ch. 24, art. 20; 2018, ch. 27, art. 288.

**Cas où le seul recours est l'injonction**

**39 (1)** Sous réserve du paragraphe (2), dans le cas de procédures engagées pour violation du droit d'auteur, le demandeur ne peut obtenir qu'une injonction à l'égard de cette violation si le défendeur prouve que, au moment de la commettre, il ne savait pas et n'avait aucun motif raisonnable de soupçonner que l'œuvre ou tout autre objet du droit d'auteur était protégé par la présente loi.

**Exception**

**(2)** Le paragraphe (1) ne s'applique pas si, à la date de la violation, le droit d'auteur était dûment enregistré sous le régime de la présente loi.

L.R. (1985), ch. C-42, art. 39; 1997, ch. 24, art. 20.

**Interdiction**

**39.1 (1)** Dans les cas où il accorde une injonction pour violation du droit d'auteur sur une œuvre ou un autre objet, le tribunal peut en outre interdire au défendeur de violer le droit d'auteur sur d'autres œuvres ou d'autres objets dont le demandeur est le titulaire ou sur d'autres œuvres ou d'autres objets dans lesquels il a un intérêt concédé par licence, si le demandeur lui démontre que, en l'absence de cette interdiction, le défendeur violera vraisemblablement le droit d'auteur sur ces autres œuvres ou ces autres objets.

Droit d'auteur
**PARTIE IV** Recours
Recours civils
Violation du droit d'auteur et des droits moraux
**Articles 39.1-41**

**Application of injunction**

**(2)** An injunction granted under subsection (1) may extend to works or other subject-matter

**(a)** in respect of which the plaintiff was not, at the time the proceedings were commenced, the owner of the copyright or the person to whom an interest in the copyright has been granted by licence; or

**(b)** that did not exist at the time the proceedings were commenced.

1997, c. 24, s. 20.

**No injunction in case of a building**

**40 (1)** Where the construction of a building or other structure that infringes or that, if completed, would infringe the copyright in some other work has been commenced, the owner of the copyright is not entitled to obtain an injunction in respect of the construction of that building or structure or to order its demolition.

**Certain remedies inapplicable**

**(2)** Sections 38 and 42 do not apply in any case in respect of which subsection (1) applies.

R.S., 1985, c. C-42, s. 40; 1997, c. 24, s. 21.

## Technological Protection Measures and Rights Management Information

**Definitions**

**41** The following definitions apply in this section and in sections 41.1 to 41.21.

*circumvent* means,

**(a)** in respect of a technological protection measure within the meaning of paragraph (a) of the definition *technological protection measure*, to descramble a scrambled work or decrypt an encrypted work or to otherwise avoid, bypass, remove, deactivate or impair the technological protection measure, unless it is done with the authority of the copyright owner; and

**(b)** in respect of a technological protection measure within the meaning of paragraph (b) of the definition *technological protection measure*, to avoid, bypass, remove, deactivate or impair the technological protection measure. (*contourner*)

*technological protection measure* means any effective technology, device or component that, in the ordinary course of its operation,

**Application de l'injunction**

**(2)** Cette injonction peut viser même les œuvres ou les autres objets sur lesquels le demandeur n'avait pas de droit d'auteur ou à l'égard desquels il n'était pas titulaire d'une licence lui concédant un intérêt sur un droit d'auteur au moment de l'introduction de l'instance, ou qui n'existaient pas à ce moment.

1997, ch. 24, art. 20.

**Pas d'injunction en matière d'œuvres architecturales**

**40 (1)** Lorsque a été commencée la construction d'un bâtiment ou autre édifice qui constitue, ou constituerait lors de l'achèvement, une violation du droit d'auteur sur une autre œuvre, le titulaire de ce droit n'a pas qualité pour obtenir une injonction en vue d'empêcher la construction de ce bâtiment ou édifice ou d'en prescrire la démolition.

**Inapplicabilité des articles 38 et 42**

**(2)** Les articles 38 et 42 ne s'appliquent pas aux cas visés au paragraphe (1).

L.R. (1985), ch. C-42, art. 40; 1997, ch. 24, art. 21.

## Mesures techniques de protection et information sur le régime des droits

**Définitions**

**41** Les définitions qui suivent s'appliquent au présent article et aux articles 41.1 à 41.21.

*contourner*

**a)** S'agissant de la mesure technique de protection au sens de l'alinéa a) de la définition de ce terme, éviter, supprimer, désactiver ou entraver la mesure — notamment décoder ou déchiffrer l'œuvre protégée par la mesure — sans l'autorisation du titulaire du droit d'auteur;

**b)** s'agissant de la mesure technique de protection au sens de l'alinéa b) de la définition de ce terme, éviter, supprimer, désactiver ou entraver la mesure. (*circumvent*)

*mesure technique de protection* Toute technologie ou tout dispositif ou composant qui, dans le cadre normal de son fonctionnement :

# EXHIBIT 4

Government    Gouvernement
of Canada    du Canada

Country and sector information  >  United States of America

> Canadian vs. US Copyright protection

# Canadian vs. US Copyright protection

ℹ **Disclaimer:** The information provided in this factsheet is meant as an educational resource only and should not be construed as legal advice.

1. Registering your Copyright:

   - To register your copyright with the US Copyright Office you need to fill in an application form, pay a filing fee, and send a copy of the work that is to be registered.

   - To register your copyright with the Canadian Intellectual Property Office, you need to create a "My Canada Business Account" to access an online e-filing application, fill out the application and pay a filing fee. The Canadian Copyright Office does not review or assess a copy of your work.

2. In the US there is copyright infringement if a third party uses (i.e. reproduces, distributes, copies, publicly displays, etc.) all or a substantial part of the content protected by copyright in a way that violates rights granted in the Copyright Act.

   - The determination of whether a "substantial part" of the content is infringed on is generally interpreted in a flexible way depending on the circumstance.

3. In Canada, you can sue a third party who infringes your copyright **and** claim statutory damages even if the copyright is not registered.

   - Registration is still recommended in Canada, since it creates a public record and gives a presumption of ownership.

   - According to the Canadian Copyright Act, you are infringing copyright if you are reproducing the work of the copyright owner in its entirety or a "substantial part" thereof.

   - The Canadian Supreme Court noted in the case Cinar Corporation v. Robinson that "substantial" is a "flexible notion", which is "a matter of fact and degree".

   - A qualitative and holistic approach must be adopted to assess this (i.e. all the copied features must be considered cumulatively), and a piecemeal approach should be avoided. However, if the differences are so great that the work viewed as a whole is not an imitation but rather a new and original work, then there is no infringement.

**Example 2:** In 2015 Jacobus Rentmeester filed a lawsuit against Nike for copyright infringement. Rentmeester argued that Nike infringed his copyright in this photograph of Michael Jordan when it commissioned its own photograph of Jordan and then used that photo to create its "Jumpman" logo. According to Rentmeester the distinctions between his and Nike's images were minor, and all the original elements were copied by Nike. Nike argued that Rentmeester "cannot claim copyright over the "idea" of Michael Jordan dunking a basketball." The Appeals court ruled that there is no copyright infringement by Nike – the two photographs are not "substantially similar" since there were objective differences in selection and arrangement of elements between the two photos. Specifically, the court held that the pose itself was not eligible for copyright protection and that protection could only be obtained for the way the pose was expressed, including the camera angle, timing, and shutter speed chosen.

This assessment of "substantial part" in the framework of copyright infringement in Canada seems to be quite different from the one made in the US judgement in the case Nike-Rentmeester. According to this last case you now apparently need to only change a few aspects of a photo to be legally protected as far as copyright goes, while according to Canadian standards a holistic approach is applied to determine whether there is copyright infringement. The chances are therefore rather low that a Canadian court would refrain from applying copyright protection to the "jumpman" pose on the photograph- especially given that the original photographer told Michael Jordan which pose to take.

4. Displaying your copyright ownership:

- We recommend displaying copyright notice when sharing a creative original work with the public. This notifies third parties of your copyright.

- The copyright notice generally consists of three elements:  An indication of copyright (this can be the symbol ©, the word "Copyright", or the abbreviation "Copr."), the year of first publication of the work, and the name of the owner of the copyright.

## Key considerations for Canadian companies:

- Consider obtaining a copyright registration in the US ideally at the same time as you intend to make your work public. This provides you with a public record of ownership and will allow you to sue and obtain statutory damages in case of copyright infringement.

- According to Kim Capiau, Registered Trademark Agent and IP Analytics expert at Stratford Intellectual Property, "A timely copyright registration

before use is a prerequisite for effectively enforcing your copyright in the US."

- Use a proper copyright notice when sharing your work.

- Keep in mind that it is always a good idea to seek legal advice before deciding how to deal with your Intellectual Property (IP). This will help you make an informed decision and know what to expect.

## Additional information:

- For information about IP protection in the US, please see the Canadian Intellectual Property Office's publication on Doing business abroad: Protecting your IP in the United States

- For material relating to the export of goods to the US, please see the Doing Business in the United States webpage

- For more information on going global with your IP, visit ca/export-ip

**Date Modified:**
2023-06-21

# EXHIBIT 5

# Foreign Exchange Rates - H.10

 RSS    📊 Data Download

Effective June 24, 2019, the Federal Reserve Board staff will make a change to the indexation of the daily Broad, AFE, and EME dollar indexes. For more information, see the "Technical Q&As".

**Release Date: July 17, 2023**

## Foreign Exchange Rates -- H.10 Weekly

(Rates in currency units per U.S. dollar except as noted by an asterisk)

| COUNTRY | CURRENCY | Jul. 10 | Jul. 11 | Jul. 12 | Jul. 13 | Jul. 14 |
|---|---|---|---|---|---|---|
| *AUSTRALIA | DOLLAR | 0.6669 | 0.6664 | 0.6782 | 0.6873 | 0.6843 |
| BRAZIL | REAL | 4.8652 | 4.8823 | 4.8148 | 4.8131 | 4.7988 |
| CANADA | DOLLAR | 1.3281 | 1.3249 | 1.3179 | 1.3126 | 1.3204 |
| CHINA, P.R. | YUAN | 7.2315 | 7.2090 | 7.1656 | 7.1500 | 7.1403 |
| DENMARK | KRONE | 6.7793 | 6.7796 | 6.7001 | 6.6565 | 6.6301 |
| *EMU MEMBERS | EURO | 1.0991 | 1.0992 | 1.1123 | 1.1194 | 1.1237 |
| HONG KONG | DOLLAR | 7.8283 | 7.8276 | 7.8268 | 7.8226 | 7.8140 |
| INDIA | RUPEE | 82.5700 | 82.3900 | 82.0300 | 82.0400 | 82.1600 |
| JAPAN | YEN | 141.5600 | 140.5100 | 138.2100 | 138.1400 | 138.7400 |
| MALAYSIA | RINGGIT | 4.6669 | 4.6573 | 4.6500 | 4.5870 | 4.5245 |
| MEXICO | PESO | 17.0485 | 17.0853 | 16.8480 | 16.8998 | 16.8002 |
| *NEW ZEALAND | DOLLAR | 0.6208 | 0.6181 | 0.6294 | 0.6373 | 0.6376 |
| NORWAY | KRONE | 10.5110 | 10.3717 | 10.1108 | 9.9999 | 10.0119 |
| SINGAPORE | DOLLAR | 1.3455 | 1.3420 | 1.3297 | 1.3235 | 1.3200 |
| SOUTH AFRICA | RAND | 18.8343 | 18.5550 | 18.1690 | 17.9797 | 18.0929 |
| SOUTH KOREA | WON | 1306.4500 | 1293.6400 | 1288.1700 | 1273.9900 | 1266.2800 |
| SRI LANKA | RUPEE | 310.0000 | 313.0000 | 314.0000 | 317.0000 | 318.0000 |
| SWEDEN | KRONA | 10.7937 | 10.6731 | 10.4025 | 10.2150 | 10.2318 |
| SWITZERLAND | FRANC | 0.8869 | 0.8805 | 0.8676 | 0.8595 | 0.8616 |
| TAIWAN | DOLLAR | 31.3700 | 31.3000 | 31.2400 | 30.9400 | 30.9000 |
| THAILAND | BAHT | 35.1100 | 34.7800 | 34.6500 | 34.5800 | 34.6700 |
| *UNITED KINGDOM | POUND | 1.2837 | 1.2901 | 1.2993 | 1.3097 | 1.3113 |
| VENEZUELA | BOLIVAR | 28.2340 | 28.1361 | 28.1361 | 28.2820 | 28.3845 |
| Memo: | | | | | | |
| UNITED STATES | DOLLAR | | | | | |
| 1) BROAD | JAN06=100 | 119.4908 | 119.2556 | 118.1838 | 117.7307 | 117.5952 |
| 2) AFE | JAN06=100 | 113.9036 | 113.6034 | 112.4039 | 111.7632 | 111.8465 |
| 3) EME | JAN06=100 | 126.9033 | 126.7299 | 125.7708 | 125.5007 | 125.1419 |

\* U.S. dollars per currency unit.

ND = No data for this date.

Please visit the Currency Weights page (http://www.federalreserve.gov/releases/H10/Weights) for current weights and country composition of the Broad Index.

1) A weighted average of the foreign exchange value of the U.S. dollar against the currencies of a broad group of major U.S. trading partners.
2) A weighted average of the foreign exchange value of the U.S. dollar against a subset of the broad index currencies that are advanced foreign economies.
3) A weighted average of the foreign exchange value of the U.S. dollar against a subset of the broad index currencies that are emerging market economies.

Last Update: July 17, 2023

# EXHIBIT 6

Copies  exécutoires
délivrées aux parties le
:

# RÉPUBLIQUE FRANÇAISE
AU NOM DU PEUPLE FRANÇAIS

## COUR D'APPEL DE PARIS

### Pôle 5 - Chambre 1

### ARRÊT DU 23 FEVRIER 2021

(n° 034/2021, 29 pages)

Numéro d'inscription au répertoire général : **19/09059 - N° Portalis 35L7-V-B7D-B727S**

Décision déférée à la Cour : Jugement  du 08 Novembre 2018 -Tribunal de Grande Instance de PARIS (3ème chambre- 1ère section) - RG n° 15/02536

## APPELANTS

**Monsieur Jeffrey KOONS**
Demeurant ██████████████████████████████

Représenté par Me Anne GRAPPOTTE-BENETREAU de la SCP GRAPPOTTE BENETREAU, avocats associés, avocat au barreau de PARIS, toque : K0111
Assisté de Me Emmanuel BAUD et  Me Philippe MARCHISET du PARTNERSHIPS JONES DAY, avocats au barreau de PARIS, toque : J001

**Société JEFF KOONS LLC**
Société de droit américain
Agissant poursuites et diligences de ses représentants légaux domiciliés ès qualités audit siège
████████████████████████████████

Représentée par Me Anne GRAPPOTTE-BENETREAU de la SCP GRAPPOTTE BENETREAU, avocats associés, avocat au barreau de PARIS, toque : K0111
Assistée de Me Emmanuel BAUD et  Me Philippe MARCHISET du PARTNERSHIPS JONES DAY, avocats au barreau de PARIS, toque : J001

## INTIMÉS

**Monsieur Franck D**████████████
De nationalité française
Directeur artistique
Demeurant ███████████████

Représenté par Me Jean AITTOUARES de la SELARL OX, avocat au barreau de PARIS, toque : A0966
Assisté de Me Jean AITTOUARES et de Me Thibaut DERUDDER tous deux de la SELARL OX, avocats au barreau de PARIS  toque : A0966

**Madame Elisabeth B** ████████
<u>Demeurant</u> ██████

Non représentée,

**Monsieur William KLEIN**
Demeurant 5 rue de Médicis
75006 PARIS

Non représenté,


**CENTRE NATIONAL D'ART ET DE CULTURE GEORGES POMPIDOU**
Etablissement public national à caractère culturel créé par la loi n°75-1 du 03 janvier 1975
Pris en la personne de ses représentants légaux domiciliés ès qualités audit siège
Place Georges Pompidou
75191 PARIS CEDEX 04

Représenté par Me François TEYTAUD de l'AARPI TEYTAUD-SALEH, avocat au barreau de PARIS, toque : J125
Assisté de Me Agnès TRICOIRE, avocat au barreau de PARIS, toque : C1207


**SA FLAMMARION**
Prise en la personne de ses représentants légaux domiciliés ès qualités audit siège
87 Quai Panhard et Levassor
75013 PARIS

Non représentée,


**STITCHING FONDAZIONE PRADA**
Association de droit italien
Prise en la personne de ses représentants légaux domiciliés ès qualités audit siège
Via Spartaco 17
20135 MILAN
ITALIE

Représentée par Me Luca DE MARIA de la SELARL PELLERIN - DE MARIA - GUERRE, avocat au barreau de PARIS, toque : L0018
Assistée de Me Grégoire TRIET de l'AARPI GIDE LOYRETTE NOUEL AARPI, avocat au barreau de PARIS, toque : T03


**PARTIE INTERVENANTE**

**FONDAZIONE PRADA,**
Association de droit italien
prise en la personne de son représentant légal domicilié ès qualités audit siège
Largo Isarco 9, CAP
23139 MILAN - ITALIE

Représentée par Me Luca DE MARIA de la SELARL PELLERIN - DE MARIA - GUERRE, avocat au barreau de PARIS, toque : L0018
Représentée par Me Grégoire TRIET de l'AARPI GIDE LOYRETTE NOUEL AARPI, avocat au barreau de PARIS, toque : T03

---

**COMPOSITION DE LA COUR :**

En application des dispositions de l'article 805 et 907 du code de procédure civile, l'affaire a été débattue le 09 Décembre 2020, en audience publique, les avocats ne s'y étant pas opposés, devant Mme Françoise BARUTEL, Conseillère et Mme Isabelle DOUILLET, Présidente de chambre, chargée du rapport.

Ces magistrats ont rendu compte des plaidoiries dans le délibéré de la Cour, composée de :

>       Mme Isabelle DOUILLET, Présidente de chambre
>       Mme Françoise BARUTEL, Conseillère
>       Mme Déborah BOHÉE, Conseillère

**Greffier,** lors des débats : Mme Karine ABELKALON

**ARRET :**

- Réputé contradictoire
- par mise à disposition de l'arrêt au greffe de la Cour, les parties en ayant été préalablement avisées dans les conditions prévues au deuxième alinéa de l'article 450 du code de procédure civile.
- signé par Isabelle DOUILLET, Présidente de chambre et par Karine ABELKALON, greffier, auquel la minute de la décision a été remise par le magistrat signataire.

***

**EXPOSÉ DU LITIGE**

Monsieur Franck ████████████ se présente comme un directeur artistique dans le domaine des médias et de la publicité et indique avoir commencé, en 1984, à travailler pour la marque "NAF-NAF" en "free lance" et avoir eu l'idée d'introduire, dès cette époque, dans la publicité de la marque, l'image d'un petit cochon, la dénomination de cette marque évoquant le conte pour enfants mettant en scène trois célèbres petits cochons.

Il indique être l'auteur d'un visuel pour une publicité imaginée pour la société NAF-NAF au titre de l'année 1985 et publiée dans différents magazines de la presse féminine tels que "Elle" et "Marie Claire", mettant en scène une jeune femme brune aux cheveux courts, allongée dans la neige, un petit cochon penché au dessus d'elle avec un tonneau de chien Saint Bernard autour du cou, ce visuel étant intitulé "Fait d'hiver", titre que M. D████████████ indique avoir également créé.

Sur la photographie de la publicité, figurent, outre en haut à gauche, tel un titre, les termes "Fait d'hiver", en bas à droite, le logo de la marque "NAF-NAF" et le slogan *"NAF-NAF. Le grand méchant look"*, tous les deux déposés à titre de marque et propriétés de la société NAF-NAF.

---



Le 26 novembre 2014, le Centre national d'art et de culture Georges POMIPIDOU (ci-après, le CENTRE POMPIDOU) a inauguré, à Paris, une exposition rétrospective de l'oeuvre de Jeff KOONS. Parmi les oeuvres exposées figurait une sculpture en faïence intitulée "Fait d'hiver" présentée comme ayant été créée par ce dernier en 1988 et faisant partie de la série "Banality" :



Estimant que cette sculpture contrefaisait le visuel dont il était l'auteur, M. D███████████ a, par requête du 27 novembre 2014, sollicité du président du tribunal de grande instance de Paris l'autorisation de faire procéder par huissier de justice, notamment, à la remise de la sculpture de Jeff KOONS intitulée "Fait d'hiver" entre les mains du CENTRE POMPIDOU afin qu'il la conserve en qualité de séquestre.

Par ordonnance du même jour, le président du tribunal a rejeté cette requête. M. DAV1DOVICI a interjeté appel de cette décision.

Par requête du 9 décembre 2014, M. D███████████ a de nouveau saisi le président du tribunal de grande instance de Paris aux fins d'être autorisé à faire procéder à la "saisie descriptive" de la sculpture par un huissier et y a été autorisé par une ordonnance du même jour. Cette saisie descriptive a été réalisée le 11 décembre 2014.

C'est en cet état que par acte du 9 janvier 2015, M. D███████████ a fait assigner devant le tribunal de grande instance de Paris, en contrefaçon de ses droits d'auteur, M. Jeffrey KOONS, la société de droit américain JEFF KOONS, le CENTRE POMPIDOU, l'association de droit italien STICHTING FONDAZIONE PRADA, propriétaire de la sculpture litigieuse (épreuve d'artiste), et la société FLAMMARION, éditrice d'un ouvrage reproduisant cette sculpture.

Par un arrêt du 23 juin 2015, la cour d'appel de Paris a infirmé l'ordonnance du président du tribunal de grande instance du 27 novembre 2014 et a finalement autorisé M. D███████████ *à faire procéder, par tout huissier (...), dans les locaux du Centre national d'art et de culture Georges Pompidou (...) à la remise de la sculpture de M. Jeff KOONS intitulée "Fait d'Hiver " entre les mains du Centre (...) Pompidou afin qu'il la conserve après la rétrospective en qualité de séquestre"*. Cette saisie s'est toutefois avérée impossible à mettre en oeuvre, la sculpture ayant été retirée du CENTRE POMPIDOU.

M. D███████████ a assigné en intervention forcée Mme Elisabeth B███████, directrice artistique, le 29 novembre 2017, puis M. William K█████, photographe, le 22 juin 2018, ces derniers étant présentés comme les co-auteurs de la photographie revendiquée.

**Par un jugement rendu le 8 novembre 2018, le tribunal de grande instance de Paris a** :

- rejeté les demandes tendant à ce que soient écartées des débats les pièces n° 7.7 à 7.11, et aux fins d'annulation du procès-verbal de saisie-descriptive du 11 décembre 2014 et de l'assignation du 9 janvier 2015 ;
- dit que M. Franck D███████████ est titulaire de droits d'auteur sur la photographie "Fait d'hiver" et, à ce titre, recevable à agir en contrefaçon de ses droits d'auteur ;
- rejeté la fin de non recevoir fondée sur la prescription de l'action en contrefaçon ;
- dit que M. Jeff KOONS, la société Jeff KOONS, le CENTRE POMPIDOU et la société FLAMMARION ont commis des actes de contrefaçon de la photographie "Fait d'hiver" en reproduisant ce visuel sans le cadre de l'exposition rétrospective consacrée à Jeff KOONS et en le diffusant dans le catalogue, l'album et le portfolio de l'exposition, ainsi que dans l'ouvrage *"Entretiens avec Norman Rosenthal"*, et sur le site internet www.jeffkoons.com ;
- rejeté l'exception de parodie et le moyen tiré de la liberté d'expression de M. Jeff KOONS ;
- interdit en tant que de besoin à M. Jeff KOONS et à la société JEFF KOONS la poursuite de ces agissements ;
- dit n'y avoir lieu à astreinte ;
- condamné *in solidum* M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, ce dernier dans la limite de 40 % des sommes, à payer à M. Franck D███████████ :
      - 110 000 euros en réparation des atteintes à son droit de représentation ainsi qu'à son droit de paternité sur la photographie "Fait d'hiver", causées par l'exposition rétrospective de l'oeuvre de Jeff KOONS,
      - 25 000 euros en réparation des atteintes à son droit de reproduction ainsi qu'à son droit de paternité sur la photographie "Fait d'hiver", causées par l'édition du catalogue, de l'album et du portfolio de l'exposition rétrospective ;
- condamné la société FLAMMARION à payer à M. Franck D███████████ 2 000 euros en réparation des atteintes à son droit de reproduction ainsi qu'à son droit de paternité sur la photographie "Fait d'hiver", causées par l'édition de l'ouvrage *"Entretiens avec Norman Rosenthal"* ;
- condamné la société JEFF KOONS à payer à M. Franck D███████████ 11 000 euros en réparation des atteintes à son droit de reproduction ainsi qu'à son droit de paternité sur la photographie "Fait d'hiver", causées par la reproduction de la sculpture contrefaisante sur le site internet www.jeffkoons.com ;
- rejeté les demandes de confiscations et de publications ;

- condamné *in solidum* M. Jeff KOONS, la société JEFF KOONS, la STICHTING FONDAZIONE PRADA, le CENTRE POMPIDOU et la société FLAMMARION, à payer à M. Franck D█████████, 70 000 euros sur le fondement de l'article 700 du code de procédure civile, cette somme se répartissant entre les parties perdantes à concurrence d'un cinquième chacune dans leurs rapports entre elles ;
- condamné *in solidum* M. Jeff KOONS, la société JEFF KOONS, la STICHTING FONDAZIONE PRADA, le CENTRE POMPIDOU et la société FLAMMARION aux dépens dont distraction au profit de Me AITTOUARES conformément aux dispositions de l'article 699 du code de procédure civile ;
- ordonné l'exécution provisoire du jugement.

Par déclaration du 24 avril 2019, M. Jeff KOONS et la société JEFF KOONS ont interjeté appel de ce jugement.

**Dans leurs dernières conclusions numérotées 3 transmises le 20 octobre 2020, M. KOONS et la société JEFF KOONS demandent à la cour** :

- d'infirmer le jugement en ce qu'il a :
    - déclaré recevable à agir M. D█████████ en contrefaçon de droit d'auteur sur une œuvre dénommée « Fait d'Hiver », en considérant M. D█████████ titulaire de droits et la prétendue œuvre invoquée comme originale,
    - retenu l'application de la loi française pour régir l'entier litige,
    - considéré non prescrites les demandes en contrefaçon de M. D█████████,
    - retenu l'existence d'une contrefaçon, en ce compris l'existence d'une atteinte au droit à la paternité, et condamné M. KOONS et la société KOONS à des dommages et intérêts pour contrefaçon de droits d'auteur sur l'œuvre « Fait d'Hiver », et leur a interdit la poursuite d'actes de contrefaçon,
    - rejeté les moyens tirés de l'exception de parodie et de la liberté d'expression artistique
de Jeff KOONS,
    - condamné M. Jeff KOONS et la société JEFF KOONS au titre de l'article 700 du code
procédure civile et aux dépens,
- en conséquence, statuant à nouveau,
- de déclarer M. D█████████ irrecevable à agir en contrefaçon des éléments qu'il revendique sur la photographie et/ou la mise en scène « Fait d'Hiver » dans la mesure où (i) les éléments invoqués ne sont pas originaux et éligibles à la protection par le Livre I du code de la propriété intellectuelle, (ii) les éventuels droits dont s'agit ne sont pas la propriété de M. D█████████ pour porter sur une œuvre collective et/ou avoir été dévolus à la société NAF-NAF, (iii) M. D█████████ ne dispose pas de la qualité d'auteur,
- de déclarer inopposable aux appelants le protocole d'accord transactionnel et son avenant conclus entre Mme Elisabeth B█████████ et M. Franck D█████████,
- subsidiairement, de juger que la loi américaine est applicable à l'appréciation d'une éventuelle contrefaçon et sa prescription, à l'exclusion de la loi française,
- en conséquence, de déclarer irrecevables comme prescrites les demandes de M. D█████████ à l'encontre de la création de la sculpture et le site Internet www.jeffkoons.com,
- de juger que les actes litigieux soumis à la loi américaine sont éligibles au *fair use*,
- subsidiairement également, de débouter M. D█████████ du surplus de ses demandes en contrefaçon dirigées contre la Sculpture « Fait d'Hiver », sa reproduction et sa diffusion,
- encore plus subsidiairement, de juger que l'œuvre « Fait d'Hiver » de Jeff KOONS constitue une parodie de la photographie « Fait d'Hiver »,
- de juger que l'œuvre « Fait d'Hiver » de Jeff KOONS relève de la liberté d'expression pour être une œuvre d'art à part entière, qui porte l'empreinte de la personnalité de son auteur et porteuse d'un message artistique qui lui est propre et s'inscrit dans un débat d'intérêt général,

---

- de juger en conséquence qu'aucune des valeurs démocratiques dont les juges doivent assurer la préservation n'impose que l'Etat français, par la voie de ses juges, au nom du peuple français, interdise la reproduction, la représentation et plus généralement toute exploitation de cette œuvre sur le territoire français,
- de juger en conséquence non fondées les demandes de M. D███████ et les rejeter dans leur intégralité,
- de débouter M. D███████ de toutes ses demandes,
- <u>à titre infiniment subsidiaire</u>, de constater que le préjudice dont M. D███████ pourrait éventuellement se prévaloir consiste en une perte de chance de ne pas avoir réalisé personnellement une adaptation de la photographie sous forme de sculpture et que le préjudice patrimonial ne peut être supérieur à 430 euros et moral à 1 euro,

- de confirmer le jugement pour le surplus et notamment en ce qu'il a considéré que la sculpture « Fait d'Hiver » était une œuvre originale de l'esprit et débouté M. D███████ de ses demandes :
      - en rejet des pièces n°7.1 à 7.11
      - en atteinte à l'intégrité de l'œuvre,
      - tendant à la publication judiciaire et la confiscation (de la sculpture et des recettes),
- <u>en tout état de cause</u>, de condamner M. D███████ à payer à Jeff KOONS et à la société JEFF KOONS la somme de 50 000 euros sur le fondement de l'article 700 du code de procédure civile, ainsi qu'aux entiers dépens dont distraction au profit de la SCP Grappotte-Benetreau.

**Dans ses dernières conclusions numérotées 4 transmises le 27 novembre 2020, le CENTRE POMPIDOU demande à la cour** :

- de confirmer le jugement en ce qu'il a rejeté les demandes de publications et de confiscations, - de réformer le jugement et de statuer à nouveau :
- <u>à titre principal,</u>
- de dire recevable le CENTRE POMPIDOU en ses demandes,
- d'écarter des débats les attestations des frères P███████ du 27 octobre 2011 (Pièce F. D███████ n°24) et de M. K███████ (Pièce F. D███████ n°6) pour non-respect des prescriptions légales et subsidiairement dire et juger qu'elles sont insincères, de même que l'attestation de M. P███████ du 29 novembre 2017 (Pièce F. D███████ n°25),
- de juger que M. D███████ ne démontre ni sa qualité d'auteur, ni sa qualité de titulaire de droits patrimoniaux et moraux sur le visuel revendiqué ; qu'en conséquence, il ne démontre ni sa qualité ni son intérêt à agir,
- en conséquence, de juger irrecevable l'action de M. D███████, en vertu des dispositions des articles 6, 9, 31, 32, 117 et 122 du code de procédure civile, et de le débouter de toutes ses demandes,
- <u>à titre subsidiaire,</u>
- de juger que le CENTRE POMPIDOU, en organisant une rétrospective des œuvres de l'artiste Jeff KOONS, en exposant l'œuvre litigieuse et en publiant des ouvrages consacrés à cette exposition, a rempli sa mission légale de service public, mission d'intérêt général,
- de juger que la mission du CENTRE POMPIDOU relève de la liberté d'informer protégée par l'article 10 de la Convention européenne de sauvegarde des Droits de l'Homme et des Libertés Fondamentales,
- de juger que le CENTRE POMPIDOU n'avait aucun moyen d'identifier par lui-même la photographie revendiquée dans la sculpture "Fait d'hiver" de KOONS,
- de juger qu'en exposant et reproduisant l'œuvre litigieuse dans le catalogue, le portfolio et l'album de l'exposition consacrée à Jeff KOONS, le CENTRE POMPIDOU accomplissait ses missions légales de bonne foi, ayant été tenu dans l'ignorance de la revendication de M. D███████ par celui-ci comme par Jeff KOONS et son studio,
- en conséquence, d'infirmer le jugement et de débouter M. D███████ de toutes ses demandes à l'encontre du CENTRE POMPIDOU,

---

- à titre infiniment subsidiaire,
- de juger que M. D█████████, qui n'est ni titulaire ni cessionnaire du droit moral, et qui n'a jamais exploité l'œuvre revendiquée, n'a subi aucun préjudice du fait de l'exposition et de la reproduction de l'œuvre « Fait d'hiver » dans le catalogue, le portfolio et l'album de l'exposition coédités par le CENTRE POMPIDOU, et de lui accorder un euro symbolique,
- de juger que Jeff KOONS et la société JEFF KOONS devront seuls indemniser M. D█████████, à l'exclusion du CENTRE POMPIDOU,
- à titre encore plus subsidiaire,
- de juger que le préjudice de M. D█████████ ne saurait être supérieur à la somme forfaitaire de 1180 euros, en application de l'article L.331-1-3 alinéa 2 du code de la propriété intellectuelle,
- de juger que Jeff KOONS et la société JEFF KOONS devront seuls indemniser M. D█████████, à l'exclusion du CENTRE POMPIDOU,
- en tout état de cause,
- de condamner M. D█████████ au paiement :
    - de la somme de 10 000 € au titre de la procédure abusive,
    - de la somme de 87 344, 80 euros au titre de l'article 700 du code de procédure civile
pour la première instance, et 40 000 euros en appel,
    - de tous les dépens d'instance, dont ceux dont distraction au profit de Me TEYTAUD en application de l'article 699 du code de procédure civile.

**Dans des conclusions numérotées 3 transmises le 16 novembre 2020, la STICHTING FONDAZIONE PRADA et la FONDAZIONE PRADA, celle-ci intervenant volontairement à la procédure, demandent à la cour :**

- de mettre hors de cause la STICHTING FONDAZIONE PRADA et de déclarer recevable la FONDAZIONE PRADA en son intervention volontaire,
- de confirmer le jugement en ce qu'il a rejeté les demandes de publications et de confiscation,
- de réformer le jugement, pour le surplus, et statuant à nouveau :
- à titre principal :
- de constater que M. D█████████ n'est pas titulaire des droits d'auteur sur la photographie publicitaire « Fait d'hiver » qui appartiennent à la société NAF-NAF pour le compte de laquelle elle a été créée,
- ou à tout le moins, de constater que M. D█████████ ne rapporte pas la preuve de la titularité des droits d'auteur qu'il invoque sur la photographie publicitaire « Fait d'hiver » et qu'il en serait le seul titulaire,
- en tout état de cause, de constater que M. D█████████ ne démontre pas que la photographie
publicitaire « Fait d'hiver » est originale,
- en conséquence,
- de déclarer M. D█████████ irrecevable en son action en contrefaçon de droit d'auteur,
- de débouter M. D█████████ de l'intégralité de ses demandes,
- à titre subsidiaire :
- de juger qu'au regard du principe de proportionnalité, quand bien même la contrefaçon de droit d'auteur serait matérialisée, le droit à la liberté d'expression artistique de Jeff KOONS doit primer sur le droit de propriété d'auteur de M. D█████████,
- en conséquence, de juger que la sculpture « Fait d'hiver » de Jeff KOONS ne constitue pas une contrefaçon de la photographie publicitaire « Fait d'hiver » et de débouter M. D█████████ de l'intégralité de ses demandes,
- de juger que la sculpture « Fait d'hiver » de Jeff KOONS ne crée aucun risque de confusion avec la photographie publicitaire « Fait d'hiver » en transmettant un message substantiellement différent de telle sorte que la sculpture bénéficie de l'exception de parodie,

---

- en conséquence, de débouter M. D███████ de l'intégralité de ses demandes,
- de constater l'absence de toute opposition par M. D███████ à l'utilisation de la sculpture « Fait d'hiver » de Jeff KOONS durant près de trente ans ainsi que l'absence d'atteinte à l'intégrité de la photographie publicitaire « Fait d'hiver »,
- en conséquence, de juger que la prétendue atteinte au droit moral M. D███████ n'est pas caractérisée et de débouter M. D███████ de l'intégralité de ses demandes,
- en tout état de cause :
- de constater que les seuls actes pouvant être pris en considération au titre de la réparation du prétendu préjudice de M. D███████ se limitent à la représentation de la sculpture « Fait d'hiver » au CENTRE POMPIDOU dans le cadre de l'exposition « Jeff Koons. La Rétrospective », entre le 26 novembre et le 23 décembre 2014, la reproduction de la sculpture « Fait d'hiver » dans les ouvrages édités par le CENTRE POMPIDOU et par FLAMMARION, ainsi que la commercialisation desdits ouvrages,
- de constater l'absence totale de préjudices économique et moral de M. D███████,
- de constater le caractère manifestement disproportionné et injustifié des demandes de confiscation de la sculpture « Fait d'hiver » et des recettes tirées par Jeff KOONS de l'exploitation de cette œuvre,
- de constater le caractère manifestement disproportionné et injustifié des demandes d'interdiction de représentation et de reproduction de la sculpture « Fait d'hiver » ou à tout le moins de la limiter au seul territoire français,
- de constater le caractère non approprié et disproportionné de la mesure de publication,
- de juger que la FONDAZIONE PRADA et/ou la STICHTING FONDAZIONE PRADA ne saurait être solidairement tenues d'indemniser M. D███████ au titre de l'article 700 du code de procédure civile,
- en conséquence, de débouter M. D███████ de l'intégralité de ses demandes,
- de condamner M. D███████ à verser à la FONDAZIONE PRADA la somme 80 000 euros au titre de l'article 700 du code de procédure civile,
- de condamner M. D███████ aux entiers dépens qui seront recouvrés par Me Grégoire TRIET, avocat, conformément aux dispositions de l'article 699 du code de procédure civile.

**Dans ses dernières conclusions numérotées 6 transmises le 20 novembre 2020, M. DAVIDOVICI demande à la cour** :

- de confirmer le jugement du 8 novembre 2018 en ce qu'il a :
    - dit que M. D███████ était titulaire des droits d'auteur sur la photographie « Fait d'hiver » et, à ce titre, recevable à agir en contrefaçon de droits d'auteur sur ladite œuvre,
    - rejeté la fin de non-recevoir tirée de la prescription de l'action en contrefaçon,
    - rejeté l'exception de parodie et le moyen tiré de la liberté d'expression de M. Jeff KOONS,
    - dit que M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU et la société FLAMMARION ont commis des actes de contrefaçon de la photographie « Fait d'hiver » en reproduisant ce visuel dans le cadre de l'exposition rétrospective consacrée à Jeff KOONS et en le diffusant dans le catalogue, l'album et le portfolio de l'exposition ainsi que dans l'ouvrage « Entretien avec Norman Rosenthal », et sur le site Internet www.jeffkoons.com,
    - interdit, en tant que de besoin, à M. KOONS à la société JEFF KOONS la poursuite de ces agissements,
    - condamné *in solidum* M. KOONS, la société JEFF KOONS, la STICHTING FONDAZIONE PRADA, la FONDAZIONE PRADA et le CENTRE POMPIDOU et la société FLAMMARION à payer à M. D███████ 70 000 euros sur le fondement de l'article 700 du code de procédure civile,
 - de l'infirmer pour le surplus et statuant de nouveau :
- de dire irrecevables les prétentions de Jeff KOONS et de la société Jeff KOONS quant au droit applicable et, en tout état de cause, de dire que le droit français est seul applicable à l'espèce,

- de condamner le CENTRE POMPIDOU, la société JEFF KOONS et M. KOONS *in solidum* à payer à M. D█████ :
 - une somme de 150 000 euros en réparation de l'atteinte portée au droit de représentation,
- une somme de 30 000 euros en réparation de l'atteinte portée au droit au respect de l'œuvre du fait de la représentation d'une œuvre contrefaisante portant atteinte à l'intégrité de l'œuvre première,
- une somme de 30 000 euros en réparation de la représentation d'une œuvre contrefaisante en violation du droit à la paternité de l'auteur de l'œuvre première,
- de condamner le CENTRE POMPIDOU, la société JEFF KOONS et M. KOONS *in solidum* à payer à M. D█████ :
 - une somme de 37 000 euros en réparation de l'atteinte portée au droit de reproduction
du fait de l'édition du catalogue, de l'album et du portfolio de l'exposition rétrospective de l'oeuvre de Jeff KOONS,
 - une somme de 12 000 euros en réparation de l'atteinte résultant de la reproduction, dans le catalogue, l'album et le portfolio de l'exposition rétrospective de l'oeuvre de Jeff KOONS, d'une œuvre contrefaisante portant atteinte à l'intégrité de l'œuvre première,
 - une somme de 12 000 euros résultant de la reproduction, dans le catalogue, l'album et le portfolio de l'exposition rétrospective de l'oeuvre de Jeff KOONS, d'une œuvre contrefaisante dans des conditions violant le droit à la paternité de l'auteur de l'œuvre première,
- de condamner M. KOONS et la société JEFF KOONS à payer à M. D█████ :
 - une somme de 8 000 euros au titre de l'atteinte portée aux droits de reproduction et de
représentation du fait de l'exploitation du site Internet www.jeffkoons.com,
 - une somme de 3 000 euros au titre de l'atteinte résultant de la reproduction et représentation sur le site Internet www.jeffkoons.com d'une œuvre contrefaisante au droit à l'intégrité de l'œuvre première,
 - une somme de 3 000 euros résultant de la reproduction et représentation sur le site Internet www.jeffkoons.com d'une œuvre contrefaisante dans des conditions violant le droit à la paternité de l'auteur de l'œuvre première,
 - de faire interdiction, à compter de la décision à intervenir :
 - au CENTRE POMPIDOU, à la société JEFF KOONSet à M. KOONS de procéder à l'exposition de la sculpture intitulée "Fait d'hiver" sous astreinte de 10 000 euros par infraction et par jour,
 - au CENTRE POMPIDOU, à M. KOONS et à la société JEFF KOONS de procéder à quelque reproduction que ce soit de la sculpture intitulée Fait d'hiver sous astreinte de 10 000 euros par infraction constatée,
 - à M. KOONS de reproduire et représenter la sculpture intitulée "Fait d'hiver" sur le site Internet www.jeffkoons.com ou sur tout autre site Internet qu'il éditerait sous astreinte de 10 000 euros par infraction et par jour,
- d'ordonner la confiscation, au profit de M. D█████, de la sculpture "Fait d'hiver", épreuve d'artiste détenue par la STICHTING FONDAZIONE PRADA ou la FONDAZIONE PRADA, étant précisé que celui-ci en fera donation à l'Etat français, si ce dernier l'accepte, et sous réserve que l'œuvre ne puisse être exposée ni exploitée d'une quelconque manière avant l'extinction des droits d'auteur sur l'œuvre première,
- de prononcer la confiscation, entre les mains de la STICHTING FONDAZIONE PRADA et de la FONDAZIONE PRADA, au profit de M. D█████, de l'exemplaire de la sculpture "Fait d'hiver", que l'une et/ou l'autre détient et dont l'une et/ou l'autre est propriétaire, étant précisé que celui-ci en fera donation à l'Etat français, si ce dernier l'accepte, et sous réserve que l'œuvre ne puisse être exposée ni exploitée d'une quelconque manière avant l'extinction des droits d'auteur sur l'œuvre première,
- d'ordonner la confiscation, au profit de M. D█████, de l'intégralité des recettes tirées par M. KOONS du fait de la vente et l'exploitation, sous quelque forme que ce soit, de la sculpture Fait d'hiver,

- d'ordonner la publication de la décision à intervenir, par extraits ou en intégralité, dans deux
journaux ou magazines d'information générale, deux journaux ou magazines du secteur de l'art et deux services de communication électronique au choix du demandeur, aux frais du CENTRE POMPIDOU, de la société JEFF KOONS et de M. KOONS *in solidum*, dans la limite de 35 000 euros hors taxes au total,
- de débouter M. KOONS et la société JEFF KOONS de l'ensemble de leurs demandes,
- de juger la demande en procédure abusive du CENTRE POMPIDOU irrecevable,
- de débouter le CENTRE POMPIDOU de l'ensemble de ses demandes,
- de débouter la STITCHING FONDAZIONE PRADA et la FONDAZIONE PRADA de l'ensemble de leurs demandes,
- de condamner M. KOONS, la société JEFF KOONS, la STICHTING FONDAZIONE PRADA, la FONDAZIONE PRADA et le CENTRE POMPIDOU *in solidum* au paiement d'une somme de 80 000 euros au titre des frais irrépétibles d'appel en application de l'article 700 du code de procédure civile,
- de condamner M. KOONS, la société JEFF KOONS, la STICHTING FONDAZIONE PRADA, la FONDAZIONE PRADA et le CENTRE POMPIDOU *in solidum* aux entiers dépens d'appel dont distraction au profit de Me AITTOUARES, SELARL OX, en application de l'article 699 du code de procédure civile.

Mme B████████, M. K████ et la société FLAMMARION n'ont pas constitué avocat.

L'ordonnance de clôture est du 1er décembre 2020.

## MOTIFS DE L'ARRET

En application des dispositions de l'article 455 du code de procédure civile, il est expressément renvoyé, pour un exposé exhaustif des prétentions et moyens des parties, aux conclusions écrites qu'elles ont transmises, telles que susvisées.

### Sur les chefs du jugement non contestés

La cour constate que le jugement n'est pas contesté en ce qu'il a :
- rejeté la demande de M. D████████ tendant au rejet des pièces n° 7.7 à 7.1 de M. KOONS et de la société JEFF KOONS,
- rejeté la demande du CENTRE POMPIDOU et de la STICHTING FONDAZIONE PRADA de nullité du procès-verbal de saisie-descriptive du 11 décembre 2014,
- rejeté la demande du CENTRE POMPIDOU de nullité de l'assignation du 9 janvier 2015,
- dit que la société FLAMMARION a commis des actes de contrefaçon de la photographie "Fait d'hiver" en reproduisant ce visuel dans l'ouvrage *"Entretiens avec Norman Rosenthal"* qu'elle a édité.

Le jugement sera confirmé de ces chefs pour les justes motifs qu'il contient.

### Sur les demandes relatives à la mise hors de cause de la STICHTING FONDAZIONE PRADA et à l'intervention volontaire de la FONDAZIONE PRADA

L'association STICHTING FONDAZIONE PRADA, partie au présent litige, indique qu'elle est en cours de dissolution et que l'association de droit italien FONDAZIONE PRADA vient désormais à ses droits. Celle-ci intervient volontairement à la procédure.

Il y a lieu, en conséquence, de prononcer la mise hors de cause la STICHTING FONDAZIONE PRADA et de recevoir la FONDAZIONE PRADA en son intervention volontaire.

**Sur la demande du CENTRE POMPIDOU de rejet des pièces 6, 24 et 25 de M. DAVIDOVICI**

Le CENTRE POMPIDOU demande que soient écartées des débats les attestations de MM. P███████ (pièces 24 et 25) et de M. K████ (pièce 6), produites par M. D███████, pour non respect des prescriptions légales et, subsidiairement, de juger qu'elles sont insincères.

La cour rappelle que le fait que des attestations ne répondent pas aux prescriptions de l'article 202 du code de procédure civile ne doit pas conduire à les écarter *a priori*, ces dispositions n'étant pas prescrites à peine de nullité, et qu'il lui appartient d'apprécier le caractère probant des témoignages concernés, au regard notamment de leur sincérité, dans le cadre de l'examen des pièces au fond.

La demande sera donc rejetée.

**Sur la loi applicable**

M. KOONS et la société JEFF KOONS soutiennent, pour la première fois en cause d'appel, au visa de l'article 8.1 du règlement UE 864/2007 (dit Rome II), que la loi américaine est applicable à l'appréciation d'une éventuelle contrefaçon et de sa prescription, à l'exclusion de la loi française. Ils font valoir que les actes de contrefaçon allégués découlent de l'adaptation litigieuse aux Etats-Unis, par un artiste américain, de la photographie "Fait d'hiver", que la sculpture litigieuse a été créée en 1988 aux Etats-Unis et publiée en ce pays, que l'exposition, de nature itinérante, a également été conçue aux Etats-Unis et a connu sa première étape au musée Whitney de New York, que le site Internet www.jeffkoons.com est en langue anglaise exclusivement et s'adresse en priorité au public du lieu de résidence et d'exercice professionnel de l'artiste, à savoir les Etats-Unis.

M. D███████ répond que la demande est irrecevable en application de l'article 564 code de procédure civile, alors que les appelants ont accepté l'application du droit français en première instance. Il objecte, sur le fond, que le pays pour lequel la protection est réclamée, au sens des dispositions invoquées par les appelants, est la France.

*Sur la recevabilité*

Aux termes de l'article 564 code de procédure civile, "*A peine d'irrecevabilité relevée d'office, les parties ne peuvent soumettre à la cour de nouvelles prétentions si ce n'est pour opposer compensation, faire écarter les prétentions adverses ou faire juger les questions nées de l'intervention d'un tiers, ou de la survenance ou de la révélation d'un fait*".

M. KOONS et la société JEFF KOONS soutiennent à juste raison que l'application de la loi américaine étant sollicitée comme moyen de défense, leur demande est recevable même si présentée pour la première fois en cause d'appel.

*Sur le bien fondé*

Le règlement UE 864/2007 du Parlement Européen et du Conseil du 11 juillet 2007 sur la loi applicable aux obligations non contractuelles (dit Rome II) prévoit en son article 8.1 : "*La loi applicable à une obligation non contractuelle résultant d'une atteinte à un droit de propriété intellectuelle est celle du pays pour lequel la protection est revendiquée*".

Il est constant qu'en vertu de cette disposition, la législation applicable est celle de l'Etat sur le territoire duquel se sont produits les agissements litigieux (*lex delicti*).

En l'espèce, les faits de contrefaçon allégués concernent la représentation de la sculpture de Jeff KOONS à l'occasion d'une exposition rétrospective au CENTRE POMPIDOU, à Paris, et la reproduction de cette sculpture dans des ouvrages édités par le CENTRE POMPIDOU et la société FLAMMARION en français et vendus en France, ainsi que sur le site internet de Jeff KOONS à l'adresse www.jeffkoons.com accessible en France, notamment par le public français anglophone.

La France est donc bien le pays où se sont produits les agissements reprochés et, de surcroît, celui où a été subi le dommage, M. D▇▇▇▇▇▇▇, auteur revendiqué de l'oeuvre prétendument contrefaite, étant de nationalité française et résidant en France. Le droit français est en conséquence applicable, à l'exclusion du droit américain, la nationalité de l'auteur de l'oeuvre contrefaisante, comme le lieu de création de celle-ci ou de sa première divulgation, au demeurant non justifié, et la circonstance que la rétrospective au CENTRE POMPIDOU a été précédée d'une exposition dans un musée new-yorkais, étant indifférents. Est également sans emport *la notice of intent a copyright restored* en date du 27 janvier 2015 adressée à M. KOONS et la société JEFF KOONS par un avocat américain pour le compte de M. D▇▇▇▇▇▇, dès lors que cette note est postérieure à l'assignation délivrée en France dans le cadre du présent litige et qu'il est constant que M. D▇▇▇▇▇ n'a engagé aucune action judiciaire aux Etats-Unis.

La demande tendant à voir appliquer la loi américaine aux faits de l'espèce sera, en conséquence, rejetée.

**Sur la recevabilité de l'action en contrefaçon de M. D▇▇▇▇▇▇▇▇**

*Sur la qualité à agir de M. D▇▇▇▇▇▇▇*

M. KOONS et la société JEFF KOONS soutiennent que M. D▇▇▇▇▇▇▇ est irrecevable à agir dès lors, d'une part, que la photographie "Fait d'hiver" prise dans son ensemble constitue une oeuvre collective dont les droits ont été dévolus à la société NAF-NAF sous le nom de laquelle elle a été divulguée, d'autre part, que les cessions de droit produites aux débats sont inopérantes pour établir la preuve de création par M. D▇▇▇▇▇▇▇, la transaction conclue frauduleusement avec Mme B▇▇▇▇ leur étant inopposable.

Le CENTRE POMPIDOU soutient que M. D▇▇▇▇▇▇, qui n'est pas même en possession de la photographie revendiquée et qui n'identifie pas clairement ladite photographie, ne démontre pas qu'il en est l'auteur, les attestations de MM. P▇▇▇▇ et K▇▇▇, mensongères et dictées pour les besoins de la cause, échouant à rapporter cette preuve, que son intervention dans la campagne NAF-NAF se borne à la création du slogan *"Le grand méchant look"* et à une idée, non protégeable, d'utiliser un cochon pour illustrer la marque de l'annonceur. Il ajoute que M. D▇▇▇▇▇▇▇ est intervenu dans la campagne NAF-NAF en tant qu'agent de publicité et qu'il a cédé les droits sur le visuel à son client NAF-NAF, conformément à la loi du 11 mars 1957 alors applicable, les prétendues cessions de droits intervenues *a posteriori* de la part de M. K▇▇▇ et de Mme B▇▇▇▇ ne lui donnant ni qualité ni intérêt à agir.

La FONDAZIONE PRADA fait siennes les conclusions des appelants et du CENTRE POMPIDOU.

M. D▇▇▇▇▇▇ demande la confirmation du jugement qui a reconnu sa qualité à agir en contrefaçon, pour les motifs qu'il contient.

*Sur l'identification de la photographie revendiquée*

M. D█████████ produit (sa pièce 3bis) un tirage d'une photographie représentant le buste d'une femme brune, allongée sur le dos, dans la neige, une mèche de cheveux collés sur la joue gauche, les yeux et la bouche entrouverts, les mains posées à la hauteur de sa tête, paumes vers le haut, un petit cochon penché au dessus d'elle avec un tonneau de chien Saint Bernard autour du cou. Cette photographie comporte la mention *"FAIT D'HIVER"*, en haut et à gauche, et, en bas à droite, le logo de la marque NAF-NAF et la mention *"NAF-NAF. Le grand méchant look"*. Elle est accompagnée d'un document portant les mentions : *"NAF-NAF - Conception : Franck D█████████ - photographie : William KLEIN"*.

Il ressort clairement des écritures de M. D█████████ (notamment, page 7), que c'est ce visuel qui est revendiqué, et non pas les visuels apparaissant dans les articles de presse que l'intimé fournit par ailleurs pour justifier qu'il est l'auteur de la campagne *"Le grand méchant look"* réalisée pour la société NAF-NAF en 1984.

*Sur la qualification de l'oeuvre*



M. D█████████ verse aux débats :
- l'attestation de M. Patrick P█████████, co-fondateur de la société NAF-NAF et son dirigeant à l'époque des faits, qui déclare dès 1984 avoir confié les campagnes de publicité NAF-NAF à M. D█████████ en qualité de créateur indépendant, que ce dernier a créé les slogans *"Le grand méchant look"* et *"Fait d'hiver"*, que pour la photographie en cause, M. D█████████ a proposé la scénographie du cochon en Saint-Bernard et du mannequin allongé dans la neige, que la mise en scène, la création, le choix du mannequin, le choix du photographe, William K████, et des autres collaborateurs, la conception ont été réalisés par M. D█████████ qui a travaillé en toute indépendance, son travail ayant été validé *a posteriori* ;
- l'attestation co-signée le 27 octobre 2011 par M. Patrick P█████████ et M. Gérard P█████████, co-fondateur de la société NAF-NAF et son ancien dirigeant, qui corrobore la teneur de la précédente ;
- celle de M. William K████, photographe, qui déclare que M. D█████████ a conçu la campagne de publicité automne-hiver 1985 pour la marque de vêtements NAF-NAF, en particulier le visuel publicitaire intitulé *"Fait d'Hiver"* mettant en scène une femme brune allongée dans la neige veillée par un cochon portant un tonnelet de Saint-Bernard autour du cou, que c'est M. D█████████ qui a fait le choix de la scène, des différents personnages et éléments y apparaissant, de leur positionnement, etc., que c'est à sa demande et selon ses souhaits que lui-même a photographié cette mise en scène en vue de sa reproduction et de sa diffusion dans le cadre de cette campagne de publicité, qu'afin que M. D█████████ puisse agir sur le terrain du droit patrimonial, il lui a cédé l'ensemble de ses droits d'adaptation, de reproduction et de représentation sur cette photographie dans le monde entier et pour la durée légale des droits d'auteur ;
- l'acte notarié de cession du 10 septembre 2012 de M. K████ à M. D█████████ avec en annexe la photographie revendiquée ;
- le protocole d'accord transactionnel du 14 décembre 2017 (et son avenant du 14 septembre 2018) conclus entre Mme Elisabeth B█████████ et M. D█████████, par lequel Mme B█████████ reconnaît que M. D█████████ est coauteur, avec elle et M. K████, du visuel en litige et lui cède l'intégralité de ses droits patrimoniaux pour le monde entier, pour les besoins et pour le temps du différend l'opposant à M. KOONS, avec, aux termes de l'avenant, effet rétroactif au 31 décembre 2013.

Au vu de ces éléments, la cour estime que c'est pour de justes motifs, qu'elle adopte, que le tribunal a retenu que la présomption de titularité de l'article L.113-1 du code de la propriété intellectuelle, en ce qu'elle bénéficierait à la société NAF-NAF, ne peut être opposée à M. D█████████ compte tenu de sa revendication du visuel, et a jugé que la photographie revendiquée ne pouvait recevoir la qualification d'oeuvre collective,

s'agissant d'une oeuvre de collaboration pour laquelle M. D███████████ était recevable à agir seul dès lors que sa contribution était individualisable et que les autres auteurs - M. K████ et Mme B███████ - avaient été mis en cause et lui avaient cédé leurs droits patrimoniaux.

Les appelants mettent en cause la sincérité des attestations fournies par M. Patrick P████████ en arguant, d'une part, du fait que ce dernier a rédigé en 2013, dans un autre litige opposant M. D███████████ à la société NAF-NAF, une attestation niant tout droit à M. D███████████ sur la photographie et présentant en outre une écriture très différente de celle apparaissant sur l'attestation présentement opposée et, d'autre part, de la circonstance que l'attestant aurait des liens d'amitié avec M. D███████. Cependant, dans le cadre du présent litige, sont fournies deux attestations concordantes émanant de M. Patrick P████████, l'une co-signée avec son frère, également co-fondateur et ancien dirigeant de la société NAF-NAF. Par ailleurs, les liens d'amitié entre M. ████████ et M. P████████ sur un réseau social n'impliquent pas des liens d'amitié réels qui auraient pu être mentionnés sur l'attestation de ce dernier et n'altèrent pas la valeur probante de celle-ci, qui émane du dirigeant de l'époque de la société NAF-NAF, commanditaire de la campagne de publicité pour les besoins de laquelle a été conçue la photographie revendiquée par M. D███████████, et donc particulièrement à même de témoigner des conditions dans lesquelles cette photographie a été réalisée. En outre, les attestations de MM. P████████ sont corroborées par le témoignage de M. K████ et les protocole d'accord et actes de cession de droits précités et également par des articles de presse montrant que M. D███████████ a été présenté dans la presse comme l'auteur ou celui ayant "signé" la campagne de publicité *"Le grand méchant look"*.

Les appelants opposent en outre que l'acte juridique de cession de droits conclue avec Mme B███████ est inopérant pour rapporter la preuve du fait juridique qu'est la création de la photographie et que cette cession, conclue en première instance pour les besoins de la cause, alors que M. D███████████ avait initialement dissimulé puis nié toute contribution de Mme B███████, leur est inopposable. Mais le protocole d'accord transactionnel et son avenant, s'ils ne constituent pas un témoignage direct de Mme B███████ concernant les conditions de création de la photographie, contiennent un article premier par lequel les parties *"conviennent (...) que l'Oeuvre est une oeuvre de collaboration à laquelle ont contribué comme seuls auteurs : Madame Elisabeth B███ et Monsieur Franck D███████ en tant que co-concepteurs du visuel ; et Monsieur William K████, en tant que photographe"*. Par cet accord et son avenant, les parties conviennent que les droits sont cédés *"pour les besoins et pour le temps du différend les opposant à Monsieur Jeff KOONS et les autres défendeurs visés au préambule"* et encore que *"dans le cadre du différend l'opposant à Jeff KOONS, Monsieur D███████ sera seul à pouvoir agir en justice au titre du droit patrimonial d'auteur sur l'œuvre"*. Même s'ils ont été conclus au cours de la première instance, afin, selon M. D███████████, d'éviter *"d'ajouter à la complexité du débat"*, le protocole d'accord transactionnel et son avenant peuvent être pris en considération pour retenir que la photographie revendiquée est une oeuvre de collaboration et que M. D███████████, cessionnaire des droits patrimoniaux de la part des co-auteurs, est recevable à agir seul en contrefaçon dans le cadre du présent litige.

### Sur la cession de droits au profit de la société NAF-NAF

C'est pour de justes motifs, que la cour adopte, que le tribunal a estimé que M. D███████████ avait agi en tant que créateur indépendant pour l'élaboration de la campagne *"Le grand méchant look"* dans le cadre de laquelle a été créé le visuel, et qu'il a écarté l'argumentation selon laquelle il aurait collaboré avec la société NAF-NAF en qualité d'agent de publicité, ce statut, conformément à un contrat-type du 19 septembre 1961, entraînant, en l'absence de convention particulière entre les parties, la cession automatique des droits de M. D███████████ à la société NAF NAF.

---

Le jugement sera, en conséquence, confirmé en ce qu'il a dit que M. D████████ est titulaire de droits d'auteur sur la photographie "Fait d'hiver" et, à ce titre, recevable à agir en contrefaçon de ses droits d'auteur.

### Sur la prescription

Les appelants prétendent que la sculpture avait acquis une importante notoriété dès avant 2010, de sorte que M. D████████ en a nécessairement eu connaissance avant 2011 et que ses demandes concernant les faits de représentation et reproduction de la sculpture litigieuse étaient prescrits au jour de l'assignation (9 janvier 2015). Ils ajoutent que les faits de reproduction sur le site www.jeffkoons.com, que M. D████████ a qualifié d'*"incontournable à quiconque s'intéresse à l'oeuvre de Jeff KOONS"*, étaient nécessairement connus de l'intimé depuis plus de 5 années avant la première demande de ce chef, formulée par conclusions du 25 avril 2017.

M. D████████ sollicite la confirmation du jugement qui a rejeté la fin de non-recevoir.

C'est par des motifs exacts et pertinents, adoptés par la cour, que le tribunal a rejeté la fin de non-recevoir, retenant notamment que les circonstances dans lesquelles a été exposée la sculpture de Jeff KOONS en France, dans une galerie parisienne en 1995, ne permettent pas de tenir pour acquis que M. D████████ a eu ou aurait dû avoir connaissance de son existence dès cette époque, et qu'il ne peut pas être exigé de M. D████████ une veille, notamment sur l'internet, de la diffusion des oeuvres de Jeff KOONS.

Le jugement sera confirmé de ce chef.

### Sur l'originalité de la photographie revendiquée

Les appelants reprochent au tribunal de n'avoir pas déterminé l'œuvre ou les caractéristiques de l'œuvre dont M. D████████ aurait été personnellement auteur, de n'avoir pas décrit ladite œuvre dans ses caractéristiques originales, et d'avoir reconnu l'originalité d'un ensemble indéterminé, constitutif d'une simple juxtaposition imprécise d'idées dont on ne sait de qui elles émanent et dont il n'est pas établi que la composition porte l'empreinte de la personnalité de M. D████████.

Le CENTRE POMPIDOU argue que les éléments revendiqués et retenus par le tribunal au titre de l'originalité de la photographie revendiquée par M. D████████ sont des idées ou des clichés (l'idée du petit cochon étant déjà présente dans la marque NAF-NAF, l'un des trois petits cochons de Walt DISNEY s'appelant ainsi) ou présentent un caractère de banalité (représentation d'une jeune femme pour une publicité de prêt à porter destinée à une clientèle féminine). Il ajoute que l'expression "fait d'hiver" ne peut être considéré comme un titre dès lors qu'il n'est pas systématiquement reproduit avec la photographie.

M. D████████ demande la confirmation du jugement qui a reconnu l'originalité de la photographie. Il expose que l'originalité résulte notamment de la combinaison des éléments suivants, reflets de sa personnalité : représentation d'une jeune femme allongée dans la neige, alors qu'une telle position est *a priori* inconfortable en raison de la sensation de froid qu'elle procure ; représentation d'un cochon dans la neige, alors que cet animal d'élevage est habituellement représenté dans le foin, le purin ou la boue ; ajout d'un tonnelet de Saint-Bernard autour du cou du cochon, alors que cet objet est en principe associé au chien de la race éponyme qui est souvent dressé pour effectuer des opérations de recherches en cas d'avalanche ; positions spécifiques du corps, des mains, du visage et des cheveux de la jeune femme, ainsi que son maquillage qui traduisent, au choix du spectateur, une forme de langueur ou de détresse, faisant de la femme une victime, voire une victime consentante ; titre "Fait d'hiver", original en soi, constitué d'un jeu de mots évoquant à la fois le fait divers que constituerait l'accident survenu à l'occasion d'une

---

avalanche, la saison dudit accident ainsi que celle de la collection vantée par la campagne ; confrontation inhabituelle, particulièrement dans une image publicitaire, entre une élégante jeune femme et un cochon, animal réputé sale et peu connu pour se porter au secours des accidentés.

Il a été dit *supra* que l'oeuvre revendiquée était clairement identifiée dans les écritures de M. D███████████ .

C'est par des motifs exacts et pertinents, que la cour adopte, que le tribunal a retenu que la photographie était originale.

Il sera ajouté que l'expression "Fait d'hiver" n'est pas revendiquée en tant que titre par M. D███████████ , qui ne forme pas de demande particulière à cet égard, mais comme l'un des éléments du visuel qu'il revendique.

**Sur la contrefaçon**

### *Sur l'étendue de la saisine de la cour*

M. KOONS et la société JEFF KOONS observent à juste raison que, nonobstant la présentation que fait M. D███████████ des développements consacrés dans ses écritures à la caractérisation de la contrefaçon - cf. pages 53 et suivantes : atteintes initiales aux droits patrimoniaux et moraux ; puis actes de contrefaçon *"subséquents"* ou *"supplémentaires"* consistant en l'exposition de la sculpture au CENTRE POMPIDOU et sa reproduction dans divers ouvrages ainsi que sur le site www.jeffkoons.com -, ce sont ces seuls actes de représentation de la sculpture au CENTRE POMPIDOU et de reproduction dans les ouvrages et sur le site internet qui sont concernés par le présent litige, à l'exclusion des actes de création de la sculpture.

### *Sur les actes de contrefaçon*

M. KOONS et la société JEFF KOONS reprochent au tribunal d'avoir minoré les différences tangibles pouvant exister entre la sculpture et la photographie, d'avoir en outre comparé la sculpture avec une mise en scène et non avec la photographie elle-même, seule susceptible d'être protégée par le droit d'auteur, et de n'avoir pas pris en compte, au-delà de la description délibérément restreinte effectuée par M. D███████████ des éléments originaux de la photographie, le fait que les différences pouvaient, par leur importance, faire oublier les ressemblances, conduisant à ce que les oeuvres ne présentent pas un même aspect général d'ensemble, et ce alors que le tribunal a reconnu que la sculpture de Jeff KOONS constituait une oeuvre de l'esprit originale, ce qui implique qu'elle se démarque nécessairement de l'art antérieur. Ils ajoutent que le jugement a méconnu les différences de messages et de contexte de la photographie (publicitaire) et de la sculpture, celle-ci véhiculant un message, selon une constante dans l'art contemporain, et notamment les courants du Ready Made, du Pop Art ou de l'art d'appropriation, en l'occurrence, une apologie de la banalité (Banality) par l'utilisation de matériaux, d'images, d'objets, de références ou de personnages empruntés à l'univers, à la culture, aux croyances et réminiscences populaires et hissés au niveau d'œuvre d'art par le travail créatif de Jeff KOONS. Ils contestent toute atteinte aux droits moraux de M. D███████ , faisant valoir que M. K█████ et Mme B███████ ont conservé leurs droits moraux sur la photographie (considérée comme une oeuvre de collaboration).

Le CENTRE POMPIDOU soutient qu'il n'avait aucun moyen de déceler la potentielle contrefaçon en raison de son absence de connaissance de la photographie publicitaire revendiquée qu'il estime en tout état de cause non reconnaissable dans la sculpture de Jeff KOONS en raison de substantielles différences tenant à la forme des deux créations (photo/sculpture), aux sujets (la femme et le cochon étant différents dans chacune des créations), au cadrage (l'angle de la photographie est étroit et focalise sur la tête de sujets /la sculpture représente intégralement les sujets que l'on peut contempler sous des angles infinis), au récit (discours commercial /message artistique complexe renvoyant à l'imaginaire, l'onirique, le conte, et permettant de multiples interprétations).

La FONDAZIONE PRADA soutient que l'oeuvre litigieuse ne reprend pas les caractéristiques protégeables du visuel et se distingue, du fait de sa propre signification, en tant qu'oeuvre indépendante. Elle fait valoir que le tribunal, qui a reconnu la qualification d'oeuvre à la sculpture de Jeff KOONS, aurait dû, tirant les conclusions de son raisonnement, considérer qu'il s'agit d'une oeuvre distincte indépendante non susceptible de constituer une contrefaçon de la photographie.

M. D▒▒▒▒▒▒▒ demande la confirmation du jugement qui a retenu que les éléments originaux de la photographie était reproduits dans la sculpture de sorte que la contrefaçon était constituée portant atteinte tant à ses droits patrimoniaux qu'à ses droits moraux d'auteur.

Ceci étant exposé, l'article L. 122-4 du code de la propriété intellectuelle dispose que *"Toute représentation ou reproduction intégrale ou partielle faite sans le consentement de l'auteur ou de ses ayants droit on ayants cause est illicite. Il en est de même pour la traduction, l'adaptation ou la transformation, l'arrangement ou la reproduction par un art ou un procédé quelconque".*

C'est par des motifs exacts et pertinents, que la cour adopte, que le tribunal, après avoir dûment relevé les différences entre la photographie et la sculpture, tenant à la nature de chacune (photographie/sculpture), à la présence dans la sculpture d'éléments absents du visuel (deux pingouins, collier de fleurs porté par le cochon, lunettes et fleurs posées sur le front de la femme), au fait que la femme porte une veste matelassée sur la photographie et un vêtement en résille laissant apparaître ses seins dans la sculpture, a retenu que les éléments originaux de la photographie (même jeune femme avec la même expression et la même mèche plaquée sur la joue gauche, allongée dans la neige, les bras relevés au niveau de la tête ; cochon portant un tonnelet de Saint-Bernard dans la même position près de la jeune femme) étaient repris dans la sculpture et que la contrefaçon était ainsi constituée.

Il sera ajouté que la contrefaçon de droits d'auteur s'apprécie au regard des ressemblance entre les oeuvres en présence et que les ressemblances sont ici prédominantes par rapport aux différences relevées, la sculpture de Jeff KOONS reprenant la combinaison des caractéristiques originales de la photographie "Fait d'hiver".

Il sera précisé que constituent par conséquent des actes de contrefaçon, la représentation de la sculpture litigieuse lors de l'exposition rétrospective au CENTRE POMPIDOU et sa reproduction dans les ouvrages édités et commercialisés par le CENTRE POMPIDOU et la société FLAMMARION, ainsi que sur le site internet www.jeffkoons.com administré par la société JEFF KOONS.

Il sera également précisé que le seul fait que la sculpture de Jeff KOONS constitue incontestablement elle-même une oeuvre, que le tribunal a justement qualifiée d'oeuvre composite au sens de l'article L. 113-2 alinéa 2 du code de la propriété intellectuelle ( *"Est dite composite l'oeuvre nouvelle à laquelle est incorporée une oeuvre préexistante sans la collaboration de l'auteur de cette dernière"*), et qu'elle transmette un message, fût-il très éloigné de la démarche publicitaire dans laquelle s'inscrit la photographie, sans préjudice de l'exception de parodie et du principe de la liberté d'expression artistique qui seront examinés ci-après, ne fait pas disparaître la contrefaçon dès lors que cette oeuvre repose, au moins en partie, sur une appropriation non autorisée d'une oeuvre première. L'adaptation de la photographie, oeuvre préexistante, ne pouvait se faire qu'avec l'accord de son auteur et à défaut de cet accord, la contrefaçon est constituée.

Il sera encore ajouté que la contrefaçon constatée porte atteinte tant aux droits patrimoniaux de M. D█████████ sur la photographie - la représentation de la sculpture pendant l'exposition du CENTRE POMPIDOU constituant une atteinte au droit de représentation de M. D█████████ et sa reproduction dans les ouvrages et sur le site internet des atteintes à son droit de reproduction -, qu'à ses droits moraux, étant relevé que M. D█████████ n'invoque que ses propres droits moraux, à l'exclusion de ceux conservés par M. K█████ et Mme B█████████, co-auteurs de l'oeuvre de collaboration que constitue la photographie et cessionnaires de leurs droits patrimoniaux à M. D█████████.

### *Sur l'exception de parodie et le bénéfice de la liberté d'expression artistique invoqués par M. KOONS et la société JEFF KOONS*

M. KOONS et la société JEFF KOONS soutiennent que le tribunal a écarté à tort l'exception de parodie dont les conditions sont en l'espèce réunies, alors que ni les textes, ni la jurisprudence ni la doctrine n'exigent que l'oeuvre parodiée soit notoire. Ils revendiquent en tout état de cause le bénéfice de la liberté d'expression de l'artiste, faisant valoir, au visa de l'article 10 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales, que les juges ne peuvent s'ingérer dans cette liberté de création et nier la démarche artistique de Jeff KOONS en retenant, comme l'a fait le tribunal, que la reprise de la photographie repose sur des considérations personnelles ayant permis à Jeff KOONS de réaliser l'économie d'un travail créatif, ou en prenant en considération l'originalité de l'oeuvre première et son caractère connu ou inconnu, à les supposer avérés, et que, conformément à la jurisprudence de la Cour de cassation (arrêt Klasen, Civ. 1ère, 15 mai 2015, n°13-27391), qui applique en droit interne la jurisprudence Ashby Donald de la CEDH, il convient, dans la balance des intérêts en présence, de faire prévaloir la liberté de création de Jeff KOONS dont la sculpture est une oeuvre transformative véhiculant un message différent de celui de la photographie et dont la démarche artistique doit être nécessairement préservée dans l'intérêt du public dans une société démocratique, alors que M. D█████████, dont la photographie publicitaire a connu une exploitation très limitée, ne peut se prévaloir que d'une démarche opportuniste et d'intérêts purement financiers.

La FONDAZIONE PRADA soutient également que l'oeuvre arguée de contrefaçon doit bénéficier de la protection accordée à la liberté d'expression artistique de Jeff KOONS ou, à tout le moins, de l'exception de parodie.

M. D█████████ demande la confirmation du jugement en ce qu'il a écarté la liberté d'expression et l'exception de parodie, faisant valoir que l'invocation de la première n'est pas justifié, tandis que les conditions de la seconde ne sont pas remplies.

---

*Sur l'exception de parodie*

L'article L. 122-5 du code de la propriété intellectuelle prévoit que *"Lorsque l'oeuvre a été divulguée, l'auteur ne peut interdire : (...) 4° La parodie, le pastiche et la caricature, compte tenu des lois du genre (...)"*.

Dans un arrêt du 3 septembre 2014, la CJUE a précisé que *"la parodie a pour caractéristiques essentielles, d'une part, d'évoquer une oeuvre existante, tout en présentant des différences perceptibles par rapport à celle-ci et, d'autre part, de constituer une manifestation d'humour ou une raillerie"* (C6201/13, Deckmyn).

Trois conditions cumulatives se dégagent donc de cette décision : l'oeuvre seconde doit évoquer une oeuvre existante ; l'oeuvre seconde ne doit pas risquer d'être confondue avec l'oeuvre première ; et elle doit constituer une manifestation d'humour ou une raillerie.

A supposer que la sculpture "Fait d'hiver" puisse être regardée comme une *"manifestation d'humour ou une raillerie"*, ce qui ne ressort pas de façon évidente de la description que donne Jeff KOONS de sa sculpture dans une attestation reproduite en pages 38 et 39 de ses écritures [1],

l'appelant ne démontre pas, en l'absence de toute référence ou de tout commentaire de sa part ou de celle de son studio ou des galeries ou musées ayant exposé sa sculpture, son intention, au moment de la création de cette oeuvre ou postérieurement, notamment lors des faits incriminés, d'évoquer la photographie "Fait d'hiver" préexistante. En outre, la photographie "Fait d'hiver", réalisée pour la campagne publicitaire automne-hiver 1985 de la société NAF-NAF, était incontestablement oubliée ou inconnue du public lors de l'exposition Jeff KOONS au CENTRE POMPIDOU à la fin de l'année 2014, de sorte que le public n'a pu, à la vue de la sculpture exposée dans le musée ou reproduite dans des ouvrages ou sur le site internet www.jeffkoons.com, se référer à la photographie diffusée

---

[1] *"La fille allongée dans la neige avait l'air un peu hors de propos. Plutôt que d'être victime d'un accident de ski, je pensais qu'elle avait l'air triste, comme si elle avait eu des problèmes d'amour. Je lui ai mis une robe en résille qui dévoilait ses seins pour la rendre encore plus hors de propos – on ne s'attendait pas à ce que quelqu'un porte une robe en résille dans la neige - et j'ai ajouté des lunettes avec des marguerites pour renforcer la notion de Banalité, mais aussi pour suggérer qu'elle voit le monde à travers des lunettes roses, et pour donner une sensation de printemps. Inspiré par les couronnes placées sur les vaches pendant les défilés des Rites de printemps en Bavière, j'ai ajouté des fleurs autour du cou du cochon comme un symbole de fertilité. J'ai fait le cochon gras et en bonne santé, plutôt qu'un petit porcelet. Les pingouins qui viennent aux côtés du cochon pour sauver la fille sont des témoins. Les pingouins suggèrent au spectateur que la fille est dans un endroit froid, un endroit retiré, éloigné. Il y a une qualité spirituelle d'abstraction et d'intellectualisation. J'ai inclus un pingouin adulte et un jeune pingouin, faisant penser à une famille, ils sont ainsi porteurs de chaleur et de vie. Il y a ces multiples significations et polarités dans la sculpture – le froid et la chaleur, l'hiver et le printemps, la spiritualité et la sexualité – même dans le choix du matériau. Contrairement au bois qui est un matériau vivant et chaud, la porcelaine est froide. Mais en même temps, parce qu'elle rétrécit dans le four et qu'elle a cette tension à la surface, la porcelaine a cet aspect sexuel. La porcelaine était autrefois réservée au roi, mais maintenant elle est démocratisée et utilisée non seulement pour les figurines banales, mais aussi dans les salles de bain pour les baignoires et les toilettes où l'on commence à découvrir son corps. Fait d'hiver joue beaucoup sur les cycles de vie. C'est vraiment un travail sur le renouvellement ; la vie continue, tout va bien se passer. L'histoire culturelle de la jeune fille était parfaite à ce moment-là et tant qu'elle accepte son histoire culturelle, en éliminant la culpabilité et la honte, en éliminant le jugement, tout va être parfait à partir de ce moment. Il s'agit du processus d'acceptation de soi"*.

---

Cour d'Appel de Paris
**Pôle 5 - Chambre 1**

ARRET DU 23 FEVRIER 2021
**N° RG 19/09059 -**
**N° Portalis 35L7-V-B7D-B727S**- 20ème page

près de 30 ans plus tôt pour les besoins d'une campagne publicitaire de quelques mois d'une marque de prêt à porter. M. Koons n'ayant produit aucun élément antérieur à la présente instance de nature à laisser penser que son oeuvre se rattache sous une forme parodique à la photographie litigieuse, comme le souligne M. D██████████, le public n'a pu relever l'évocation de la photographie préexistante dans la sculpture litigieuse et percevoir la dimension parodique de celle-ci.

C'est donc à juste raison qu'en l'absence d'évocation de l'oeuvre initiale, le tribunal a rejeté le moyen de défense tiré de l'exception de parodie.

*Sur la liberté d'expression artistique*

L'article 10 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales énonce que *"1. Toute personne a droit à la liberté d'expression. Ce droit comprend la liberté d'opinion et la liberté de recevoir ou de communiquer des informations ou des idées sans qu'il puisse y avoir ingérence d'autorités publiques et sans considération de frontière.(...)*
*2. L'exercice de ces libertés comportant des devoirs et des responsabilités peut être soumis à certaines formalités, conditions, restrictions ou sanctions, prévues par la loi, qui constituent des mesures nécessaires, dans une société démocratique, à la sécurité nationale, à l'intégrité territoriale ou à la sûreté publique, à la défense de l'ordre et à la prévention du crime, à la protection de la santé ou de la morale, à la protection de la réputation ou des droits d'autrui, pour empêcher la divulgation d'informations confidentielles ou pour garantir l'autorité et l'impartialité du pouvoir judiciaire"*.

Ces dispositions consacrent le droit à l'information du public et la liberté d'expression, notamment artistique, tout en rappelant que ce droit doit s'exercer dans le respect des autres droits fondamentaux tels que le droit de propriété dont découle le droit d'auteur.

La Cour de Strasbourg retient que la liberté d'expression est dotée d'une force plus ou moins grande selon le type de discours en distinguant la situation où est en jeu une expression à des fins strictement commerciale, de celle où est en cause la participation à un débat touchant l'intérêt général : *"L'étendue de la marge d'appréciation dont disposent les Etats contractants en la matière varie en fonction de plusieurs éléments, parmi lesquels le type de 'discours' ou d'information en cause revêt une importance particulière. Ainsi, si l'article l0 § 2 de la Convention ne laisse guère de place pour des restrictions à la liberté d'expression en matière politique par exemple, les Etats contractants disposent d'une large marge d'appréciation lorsqu'ils réglementent la liberté d'expression dans le domaine commercial (Mouvement raëlien c. Suisse [GC], n° 16354/06, § 61), étant entendu que l'ampleur de celle-ci doit être relativisée lorsqu'est en jeu non l'expression strictement 'commerciale' de tel individu mais sa participation à un débat touchant à l'intérêt général (Hertel c. Suisse, 25 août 1998, §47, Recueil des arrêts et décisions 1998-VI)."* (affaire Ashby Donald et autres c/ France, 10 janvier 2013, n°36769/08).

Selon l'article 10 précité, les limitations à la liberté d'expression ne sont admises qu'à la condition qu'elles soient prévues par la loi, justifiées par la poursuite d'un intérêt légitime et proportionnées au but poursuivi, c'est à dire rendues nécessaires dans une société démocratique.

Il est rappelé que l'article 27 de la Déclaration Universelle des droits de l'homme énonce notamment que *"Chacun a droit à la protection des intérêts moraux et matériels découlant de toute production scientifique, littéraire ou artistique dont il est l'auteur"*.

En l'espèce, la limitation à la liberté d'expression de Jeff KOONS est prévue par la loi puisque, comme il a été rappelé, l'article L.122-4 du code de la propriété intellectuelle condamne toute adaptation ou transformation d'une oeuvre sans le consentement de son auteur ou de ses ayant droits.

Par ailleurs, il n'est pas contesté que Jeff KOONS est un artiste majeur, mondialement connu, dont les œuvres portent un message. A cet égard, les appelants exposent que la série "Banality", à laquelle appartient la sculpture litigieuse "Fait d'hiver", entend véhiculer deux idées principales, au cœur de la démarche artistique et intellectuelle de Jeff KOONS : la démocratisation de l'art qui doit être accessible au plus grand nombre (d'où le recours à la porcelaine, *"matériau autrefois réservé à l'aristocratie"* pour mettre en exergue la démocratisation de l'art) et la nécessité de délivrer le plaisir esthétique du spectateur de toute honte et de toute culpabilité par rapport à son histoire culturelle, en recourant à la notion de "banalité", libérée de toute connotation péjorative et érigée en œuvre d'art. M. KOONS explique que sa démarche créatrice *"se caractérise à la fois par le lien avec les œuvres et la méthodologie du passé (via les sources d'inspiration de l'artiste et la reprise de la méthodologie de ses prédécesseurs comme DUCHAMP ou WARHOL) et par le dépassement de ce lien (via la décontextualisation ou recontextualisation de ses sources d'inspiration et les innovations méthodologies que l'artiste met en œuvre)"*, ces caractéristiques particulières servant à l'artiste pour mieux transmettre le discours qu'il a voulu véhiculer par sa série "Banality". Il expose que la sculpture en cause lui permet de construire *"un récit sur la Banalité comme Sauveur"*, la *"banalité étant ici incarnée, en sus d'éléments empruntés à la culture populaire* [fleurs, pingouins faisant référence aux figures kitsch et bon marché en porcelaine]*, par un animal de ferme anodin, réputé sale et sans grâce qui vient au secours de l'humanité représentée par la femme allongée. Cette banalité vient sauver la jeune femme en la conduisant à s'accepter telle qu'elle est, nue et débarrassée de toute culpabilité ou de crainte d'être jugée. Elle vient alors s'offrir aux spectateurs qui, comme les pingouins présents aux côtés de la jeune femme, assistent à cette scène insolite"*. Il en déduit que le message artistique ainsi transmis par sa sculpture est complètement différent de celui exprimé par la photographie publicitaire de M. D███████, ce qui n'est au demeurant pas contesté par ce dernier. Le message de Jeff KOONS ainsi défini, même s'il est porteur d'une réflexion d'ordre social, relève de la liberté d'expression artistique ou de création artistique et non pas de la liberté d'expression dans le domaine du discours politique ou de questions d'intérêt général. En outre, comme le relève à juste raison M. D███████, qui produit un article extrait du site internet du Monde en date du 16 mai 2019 qualifiant l'artiste de *"commercial hors pair"* et faisant état de la vente d'une de ses œuvres, "Rabbit", adjugée au prix record de 91,1 million de dollars, la démarche artistique de Jeff KOONS n'est pas dénuée de caractère commercial.

Il a été vu que, nonobstant le rajout dans la sculpture de deux pingouins, du collier de fleurs porté par le cochon, des lunettes et des fleurs sur le front de la femme, et la nature différente du vêtement porté par celle-ci, la sculpture reprend substantiellement les éléments originaux de la photographie originelle "Fait d'hiver", notamment sa composition, sans y faire aucune référence, alors que, comme l'a pertinemment retenu le tribunal, cette photographie n'est pas familière du public qui ne pourra donc l'identifier et appréhender la création de Jeff KOONS par référence à elle et partant, percevoir le caractère transformatif revendiqué de la démarche créatrice de l'artiste. Il est d'ailleurs souligné que le CENTRE POMPIDOU plaide qu'il n'avait lui-même aucun moyen de déceler la contrefaçon alléguée du fait de l'absence de connaissance de la photographie publicitaire *"indécelable dans la sculpture de Jeff KOONS"*.

Enfin et surtout, aucune circonstance ne justifie que Jeff KOONS, qui occupe lui-même une toute première place sur le marché de l'art, se soit abstenu de rechercher qui était l'auteur de la photographie dont il entendait s'inspirer, afin d'obtenir son autorisation, le cas échéant, en acquérant les droits d'exploitation. Il doit être rappelé que le droit d'auteur a pour finalité de permettre à chaque créateur, quel que soit le mérite de son œuvre dès lors qu'elle est originale, d'obtenir une rémunération en contrepartie de l'autorisation d'exploiter son œuvre, et de faire respecter son droit moral de l'auteur, et notamment son droit à la paternité.

---

Ainsi, eu égard aux circonstances de l'espèce, il y a lieu de considérer que la mise en oeuvre de la protection de la photographie "Fait d'hiver" au titre du droit d'auteur constitue une atteinte proportionnée et nécessaire à la liberté d'expression créatrice de Jeff KOONS.

Le jugement sera en conséquence confirmé en ce qu'il a rejeté le moyen tiré de la liberté d'expression présenté par M. KOONS et la société JEFF KOONS.

### *Sur le devoir d'information et la bonne foi invoqués par le CENTRE POMPIDOU*

Le CENTRE POMPIDOU demande la réformation du jugement qui a retenu sa responsabilité. Il fait valoir, au visa de l'article 10 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales, que l'exposition de l'oeuvre de Jeff KOONS et l'édition des publications y relatives relèvent de sa mission de service public dédiée à l'art moderne et contemporain, de formation, d'information du public et de diffusion de la création artistique dans toutes ses formes. Il argue qu'en l'espèce, la mise en œuvre de la protection au titre du droit d'auteur de M. D███████ ne constitue pas, eu égard à cette mission et à son statut d'établissement public, une atteinte proportionnée et nécessaire, dans une société démocratique, à sa liberté d'expression renforcée par sa mission d'intérêt général et son rôle de diffuseur de l'art du temps, dès lors notamment que M. D███████ pouvait faire reconnaître ses droits d'auteur sans rechercher la responsabilité du musée. Il argue par ailleurs de sa parfaite bonne foi, dont il doit être tenu compte en matière civile comme en matière pénale, affirmant n'avoir eu aucun moyen de savoir que l'œuvre de Jeff KOONS était potentiellement contrefaisante et avoir organisé la rétrospective sous la direction et le contrôle étroits de l'artiste et de son studio, tant pour ce qui concerne l'exposition elle-même que pour l'édition des ouvrages litigieux. Le CENTRE POMPIDOU précise que Jeff KOONS et son studio ont supprimé la clause de garantie de responsabilité contenue dans le projet de contrat qu'il leur avait adressé, relatif à l'édition des ouvrages (catalogue, album, portfolio) et des produits dérivés, tout en lui dissimulant que l'une des oeuvres exposées était potentiellement contrefaisante, manquant ainsi gravement à leur devoir de loyauté à son égard.

M. D███████ oppose que le CENTRE POMPIDOU, qui a admis connaître la réputation sulfureuse de l'artiste Jeff KOONS et ses démêlées judiciaires passés avec des tiers au sujet de ses oeuvres, n'a pourtant réalisé aucune recherche pour s'assurer de l'absence d'actes de contrefaçon, que les missions de service public du musée, dans lesquelles celui-ci a en l'espèce failli par sa négligence, ne sauraient constituer une exception au droit d'auteur et que le CENTRE POMPIDOU a engagé sa responsabilité du fait de l'exposition de la sculpture pendant la rétrospective et de sa reproduction dans les ouvrages qu'il a édités et commercialisés, sa bonne foi étant indifférente.

Les appelants ne présentent pas d'argumentation sur ce point.

Ceci étant exposé, fût-ce sous la direction et le contrôle de l'artiste et de sa société, la rétrospective au cours de laquelle a été exposée la sculpture "Fait d'hiver" de Jeff KOONS a été organisée par le CENTRE POMPIDOU et présentée dans ses locaux, et le catalogue de l'exposition, l'album de la rétrospective et le portfolio reproduisant la sculpture ont été édités par le CENTRE POMPIDOU et commercialisés notamment dans sa librairie.

La contrefaçon est caractérisée, indépendamment de toute faute ou mauvaise foi, par la reproduction, la représentation ou l'exploitation d'une oeuvre de l'esprit en violation des droits de propriété qui y sont attachés. M. D███████ est donc fondé à rechercher la responsabilité du CENTRE POMPIDOU.

---

Celui-ci invoque vainement l'article 10 de la Convention de sauvegarde des droits de l'homme et des libertés fondamentales, la protection de sa liberté d'expression et l'exercice de sa mission de service public. Il n'entre pas, en effet, dans la mission du CENTRE POMPIDOU d'exposer et de reproduire des oeuvres contrefaisantes. En outre, en tant que professionnel, il lui appartenait de s'assurer avant l'exposition et les éditions litigieuses que les oeuvres de Jeff KOONS, notamment la sculpture "Fait d'hiver", n'étaient pas susceptibles de porter atteinte aux droits d'autrui - il n'est justifié d'aucune démarche en ce sens - et en tous cas, d'obtenir une garantie sur ce point de l'artiste et de sa société.

C'est donc à juste raison que le tribunal a rejeté le moyen de défense opposé par le CENTRE POMPIDOU.

De tout ce qui précède, il résulte que le jugement doit être confirmé en ce qu'il a dit que M. Jeff KOONS, la société Jeff KOONS, le CENTRE POMPIDOU et la société FLAMMARION ont commis des actes de contrefaçon de la photographie "Fait d'hiver" en reproduisant ce visuel dans le cadre de l'exposition rétrospective consacrée à Jeff KOONS et en le diffusant dans le catalogue, l'album et le portfolio de l'exposition, ainsi que dans l'ouvrage *"Entretiens avec Norman Rosenthal"* édité par la société FLAMMARION, et sur le site internet www.jeffkoons.com.

**Sur les mesure réparatrices**

Il est relevé à titre préliminaire que M. D███████ demande l'infirmation du jugement dans toutes ces dispositions relatives aux condamnations financières, si ce n'est celles relatives aux dépens et frais irrépétibles de première instance, et qu'il ne présente plus en cause d'appel de demande à l'encontre de la société FLAMAMARION qui n'a pas constitué avocat en appel.

### *Sur les demandes indemnitaires*

Au soutien de ses demandes indemnitaires, M. D███████ fait état de la dépossession qu'il a subie, d'autant plus brutale que la rétrospective a rencontré un très grand succès, permettant à Jeff KOONS de réaliser un important profit en terme d'image et d'accroître sa cote sur le marché de l'art. Il reproche au tribunal de n'avoir pas distingué, pour chaque modalité de diffusion de l'oeuvre contrefaisante, droit patrimonial et droit moral, et au titre du droit moral, d'avoir considéré que des atteintes au droit au respect de l'oeuvre et au droit à la paternité ne pouvaient être simultanément invoquées.

Les appelants font valoir que la sculpture n'a été exposée qu'un mois, le succès de l'exposition ne tenant aucunement à cette seule oeuvre, que le dommage subi du fait de la reproduction de la sculpture sur le site internet en langue anglaise ne peut être que limité, que la sculpture constitue une oeuvre originale dérivée de la photographie dont elle s'inspire, qu'aucun bénéfice n'a été réalisé par Jeff KOONS sur la photographie publicitaire de M. D███████, des investissements très importants ayant été engagés pour réaliser et promouvoir la sculpture, que les visiteurs de l'exposition rétrospective ont pu voir près de 100 oeuvres de Jeff KOONS et pas seulement la sculpture litigieuse, que de même les ouvrages publiés à l'occasion de cette exposition comprenaient de très nombreuses oeuvres de l'artiste, que le préjudice de M. D███████ ne peut s'analyser qu'en une perte de chance d'adaptation de la photographie sous forme de sculpture, nécessairement faible en raison du fait que cette photographie n'a jamais été re-exploitée depuis 1985 et que M. D███████ n'a jamais publié d'ouvrage sur ses créations, que M. D███████ ne peut invoquer cumulativement des atteintes à son droit au respect de son oeuvre et à son droit de paternité sur cette oeuvre. Ils en déduisent que les sommes réclamées ne sont pas justifiées et sont manifestement disproportionnées au regard du préjudice réellement subi.

Le CENTRE POMPIDOU conteste tout préjudice causé par son fait, faisant valoir qu'il ne saurait être condamné *in solidum* avec l'artiste, que dès qu'il a eu connaissance du risque de contrefaçon lié à l'exposition de l'œuvre "Fait d'hiver" et à la demande du prêteur, la Fondation PRADA, il a rapidement effectué toutes les diligences nécessaires à l'enlèvement de la sculpture de l'exposition, qu'il a agi sous la contrainte de Jeff KOONS et de son studio qui ont choisi les oeuvres à exposer et à reproduire. Il plaide qu'en tout état de cause, les condamnations prononcées sont disproportionnées au préjudice réellement subi par M. DAVIDOVICI , celui-ci ne pouvant exploiter le visuel en dehors de la campagne publicitaire NAF-NAF de 1985, et au résultats financiers déficitaires enregistrés autour de la rétrospective Jeff KOONS. Il ajoute que le préjudice de M. DAVIDOVICI ne pourrait être évalué que sur la base des tarifs de deux sociétés de perception et de répartition de droits en matière d'arts visuels, la SAIF et l'ADAGP.

L'article L.331-1-3 du code de la propriété intellectuelle prévoit notamment que *"Pour fixer les dommages et intérêts, la juridiction prend en considération distinctement :*
*1° Les conséquences économiques négatives de l'atteinte aux droits, dont le manque à gagner et la perte subis par la partie lésée ;*
*2° Le préjudice moral causé à cette dernière ;*
*3° Et les bénéfices réalisés par l'auteur de l'atteinte aux droits, y compris les économies d'investissements intellectuels, matériels et promotionnels que celui-ci a retirées de l'atteinte aux droits"*.

*Le préjudice résultant de l'exposition de la sculpture au CENTRE*

*POMPIDOU*

Les premiers juges ont exactement constaté que la sculpture "Fait d'hiver" a été exposée au public du 26 novembre au 23 décembre 2014, date de son retrait de l'exposition rétrospective, soit pendant un peu moins d'un mois et que cette exposition a connu un record de fréquentation, le communiqué de presse du CENTRE POMPIDOU en date du 17 décembre 2014 annonçant en effet 112 844 visiteurs à cette date, ainsi qu'un record du nombre de visiteurs le premier jour de l'exposition. S'il est constant que les visiteurs de l'exposition rétrospective ont pu voir de nombreuses oeuvres de Jeff KOONS autres que la sculpture litigieuse, ces chiffres conduisent à retenir, comme le tribunal, que l'atteinte portée au droit patrimonial de représentation de M. DAVIDOVICI sur la photographie a été massive. M. DAVIDOVICI souligne à juste raison que sa photographie constitue une oeuvre protégeable en tant que telle, indépendamment de son mérite ou sa destination, et justifie que l'image du cochon, créée pour les besoins de la campagne publicitaire NAF-NAF en 1984/1985 a été réutilisée par la marque, certes sous une autre forme (cochon portant un ruban autour du cou et non plus un tonnelet), pour sa collection automne-hiver 2015/2016, ce qui conduit à relativiser l'argumentation adverse selon laquelle la photographie n'a jamais été re-exploitée.  L'atteinte portée au droit patrimonial de représentation sera réparée par l'allocation d'une somme de 110 000 € à titre de dommages et intérêts.

M. DAVIDOVICI a en outre subi un préjudice moral résultant à la fois de l'atteinte au droit du respect de son oeuvre, en raison des modifications apportées par Jeff KOONS à la photographie dont s'inspire largement sa sculpture, et ce quels que soient les mérites de l'oeuvre dérivée et la notoriété de son auteur, et de l'atteinte au droit de paternité qui est constituée dès lors que le nom de M. DAVIDOVICI n'a été à aucun moment cité lors de l'exposition de la sculpture et dans les reproductions litigieuses. Les atteintes au droit moral d'auteur de M. DAVIDOVICI seront réparées par l'allocation d'une somme globale de 40 000 € à titre de dommages et intérêts.

Le CENTRE POMPIDOU qui a contribué avec M. KOONS et la société KOONS à la réalisation du dommage subi par M. DAVIDOVICI doit être condamné *in solidum* avec ces derniers à le réparer. Cependant, il justifie que la société JEFF KOONS a purement et simplement retiré la clause de garantie pour le cas d'atteinte à un droit de propriété intellectuelle que contenait le projet de contrat qu'il lui avait été adressé, et ce peu de temps avant le début de l'exposition ce qui laissait au musée peu de latitude pour renégocier le contrat afin d'y faire figurer une telle clause. Il établit en outre que Jeff KOONS et la société JEFF KOONS se sont largement impliqués dans l'organisation de l'exposition, contrôlant le choix de chaque oeuvre exposée, son emplacement et la scénographie. Enfin, il est constant que le musée n'a à aucun moment été informé du caractère possiblement contrefaisant de la sculpture. Dans ces conditions, la condamnation *in solidum* du CENTRE POMPIDOU sera limitée à 20 % des sommes allouées.

### *Le préjudice résultant de la reproduction de la sculpture dans les ouvrages*

A l'occasion de la rétrospective, trois ouvrages ont été élaborés et édités par le CENTRE POMPIDOU sous le contrôle strict de Jeff KOONS : le catalogue de l'exposition qui reproduit à partir de la page 109 la série "Banality", en particulier la sculpture "Fait d'hiver", et qui a été
vendu à 7 953 exemplaires ; l'album de la rétrospective qui reproduit en page 22 la sculpture "Fait d'hiver", qui a été vendu à 12 624 exemplaires et dont la version éditée à partir de janvier 2015 ne reproduit plus la sculpture litigieuse ; et le portfolio qui reproduit la sculpture et a été vendu à 5 515 exemplaires ; soit au total environ 26 000 ouvrages environ.

L'atteinte au droit patrimonial de reproduction sera indemnisée par une somme de 25 000 € et les atteintes portées au droit du respect de l'oeuvre et au droit de paternité, le nom de M. DAVIDOVICI n'étant pas plus cité dans ces trois ouvrages que lors de l'exposition, par une somme globale de 15 000 €. Le CENTRE POMPIDOU qui a également concouru à la réalisation de ces dommages étant tenu *in solidum* au paiement de ces sommes, dans la limite de 20 % pour les motifs précédemment exposés.

Comme il a été dit, aucune demande indemnitaire n'est formée en appel contre la société FLAMMARION à raison de l'édition de l'ouvrage *"Entretiens avec Norman Rosenthal"* reproduisant la sculpture contrefaisante, alors que M. DAVIDOVICI demande l'infirmation du jugement en toutes ses dispositions relatives aux condamnations pécuniaires. Le jugement ne peut donc qu'être infirmé en ce qu'il a condamné la société FLAMMARION à payer la somme de 2 000 € à M. DAVIDOVICI à titre de dommages et intérêts.

### *Le préjudice résultant de la reproduction de la sculpture sur le site* www.jeffkoons.com

L'oeuvre contrefaisante a été visible jusqu'en août 2017 sur le site internet www.jeffkoons.com, administré par la société JEFF KOONS, soit pendant plus de deux ans après la délivrance de l'assignation. Le procès-verbal d'huissier en date du 23 mars 2020 produit par M. DAVIDOVICI en cause d'appel montre que la sculpture "Fait d'hiver" était encore visible à cette date sur le site internet www.jeffkoons.com malgré la mesure d'interdiction prononcée par le jugement assorti de l'exécution provisoire.

Il convient par conséquent d'allouer à M. DAVIDOVICI en réparation de l'atteinte causée au droit de reproduction la somme de 8 000 € et celle globale de 6 000 € pour les atteintes au droit du respect de l'oeuvre et au droit de paternité.

---

Le jugement sera ainsi réformé quant aux condamnations pécuniaires prononcées.

### *Sur les mesures accessoires*

Les appelants demandent l'infirmation du jugement quant à la mesure d'interdiction ordonnée, au nom de la liberté de création reconnue à l'artiste adaptateur et en faisant valoir que rien ne permet de circonscrire le dommage futur que cette mesure suppose au seul sol français pour lequel la cour a compétence. Ils sollicitent la confirmation du jugement en ce qu'il a rejeté les demandes de confiscation de la sculpture et de publication, et le rejet de la demande de confiscation des recettes liées à l'exploitation et à la vente de la sculpture, toutes qualifiées de disproportionnées.

Le CENTRE POMPIDOU demande la confirmation en ce qui concerne les demandes de confiscations et de publications.

La FONDAZIONE PRADA argue du caractère inadapté et disproportionné des demandes de confiscation de la sculpture et d'interdiction de représentation et de reproduction.

M. DAVIDOVICI demande, outre la confirmation de la mesure d'interdiction ordonnée par le tribunal qu'il souhaite voir assortir d'une astreinte élevée compte tenu notamment de la persistance de la présence de la sculpture sur le site internet au 23 mars 2020, la confiscation de l'oeuvre contrefaisante, nécessaire selon lui pour faire cesser l'atteinte à ses droits d'auteur, à charge pour lui d'en faire donation à l'État français, la confiscation à son profit des recettes générées par la vente et l'exploitation de la sculpture sur le fondement de l'article L. 331-4 du code de la propriété intellectuelle et la publication de cet arrêt dans la presse spécialisée et sur internet.

Il sera fait interdiction au CENTRE POMPIDOU en tant que de besoin, à M. Jeff KOONS et à la société JEFF KOONS de procéder à l'exposition de la sculpture "Fait d'hiver" et à toute reproduction de celle-ci, y compris sur des sites internet, notamment sur le site internet www.jeffkoons.com, qui est accessible au public français, et ce sous astreinte comme il sera précisé au dispositif. Le jugement sera réformé en ces sens.

Le jugement sera en revanche confirmé pour les motifs qu'il comporte en ce qu'il a rejeté les demandes de confiscation de l'oeuvre de Jeff KOONS et de publication.

La demande de confiscation des recettes générées par la vente et l'exploitation de la sculpture "Fait d'hiver" sera rejetée, le préjudice de M. DAVIDOVICI étant suffisamment réparé par les indemnités allouées et la mesure d'interdiction prononcée.

### Sur la demande du CENTRE POMPIDOU pour procédure abusive

Le sens de cet arrêt conduit nécessairement au rejet de la demande formée par le CENTRE POMPIDOU pour procédure abusive.

### Sur les dépens et les frais irrépétibles

M. KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, la FONDAZIONE PRADA et la société FLAMMARION, parties perdantes, seront condamnées aux dépens d'appel et garderont à leur charge les frais non compris dans les dépens qu'ils ont exposés à l'occasion de la présente instance, les dispositions prises sur les dépens et frais irrépétibles de première instance étant confirmées.

La somme qui doit être mise à la charge de M. KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, la FONDAZIONE PRADA et la société FLAMMARION au titre des frais non compris dans les dépens exposés par M. DAVIDOVICI peut être équitablement fixée à 70 000 €, cette somme, qui complétera celle allouée en première instance, se répartissant entre les parties perdantes, dans leurs rapports entre elles, comme suit : 50 000 € à la charge de M. KOONS et la société JEFF KOONS, 10 000 € à la charge du CENTRE POMPIDOU, 5 000 € à la charge de la FONDAZIONE PRADA et 5 000 € à la charge de la société FLAMMARION.

## PAR CES MOTIFS,

LA COUR,

Met hors de cause la STICHTING FONDAZIONE PRADA et reçoit la FONDAZIONE PRADA en son intervention volontaire,

Déboute le CENTRE POMPIDOU de sa demande de rejet des pièces 6, 24 et 25 de M. Franck DAVIDOVICI,

Déboute M. Jeff KOONS et la société JEFF KOONS de leur demande tendant à voir appliquer la loi américaine aux faits de l'espèce,

Dit que la photographie "Fait d'hiver" est originale et éligible à la protection au titre du droit d'auteur,

Confirme le jugement si ce n'est en ses dispositions relatives à la mesure d'interdiction et aux condamnations pécuniaires prononcées à l'encontre de M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU et la société FLAMMARION en réparation des préjudices subis par M. DAVIDOVICI résultant de la contrefaçon de la photographie "Fait d'hiver",

Statuant à nouveau sur ces points,

Fait interdiction au CENTRE POMPIDOU en tant que de besoin, à M. Jeff KOONS et à la société JEFF KOONS de procéder à l'exposition de la sculpture "Fait d'hiver" et à toute reproduction de celle-ci, y compris sur des sites internet, notamment sur le site internet www.jeffkoons.com, et ce sous astreinte de 600 € par infraction et par jour, commençant à courir passé un délai d'un mois à compter de la signification de cet arrêt,

Condamne *in solidum* M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, ce dernier dans la limite de 20 % des sommes allouées, à payer à M. Franck DAVIDOVICI à titre de dommages et intérêts :
            - pour les atteintes causées par l'exposition rétrospective de l'oeuvre de Jeff KOONS au CENTRE POMPIDOU :
            - 110 000 € en réparation de l'atteinte au droit patrimonial de représentation sur la photographie "Fait d'hiver"
                        - 40 000 € en réparation des atteintes au droit moral sur ladite photographie,
            - pour les atteintes causées par l'édition du catalogue, de l'album et du portfolio de l'exposition rétrospective :
            - 25 000 € en réparation de l'atteinte au droit de reproduction sur la photographie "Fait d'hiver"
                        - 15 000 € en réparation des atteintes au droit moral sur ladite photographie,

---

Condamne la société JEFF KOONS à payer à M. Franck DAVIDOVICI, à titre de dommages et intérêts en réparation des atteintes causées par la reproduction de la sculpture contrefaisante sur le site internet www.jeffkoons.com :
- 8 000 € en réparation de l'atteinte au droit de reproduction sur la photographie "Fait d'hiver",
- 6 000 € en réparation des atteintes au droit moral sur ladite photographie,

Déboute M. Franck DAVIDOVICI de ses demande de confiscation des recettes générées par la vente et l'exploitation de la sculpture "Fait d'hiver" et de publication,

Déboute le CENTRE POMPIDOU de sa demande pour procédure abusive,

Condamne *in solidum* M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, la FONDAZIONE PRADA et la société FLAMMARION aux dépens d'appel, dont distraction au profit de Me AITTOUARES, SELARL OX, en application de l'article 699 du code de procédure civile,

Condamne *in solidum* M. Jeff KOONS, la société JEFF KOONS, le CENTRE POMPIDOU, la FONDAZIONE PRADA et la société FLAMMARION au paiement à M. Franck DAVIDOVICI
de la somme de 70 000 € en application de l'article 700 du code de procédure civile, cette somme se répartissant entre les parties perdantes, dans leurs rapports entre elles, comme suit : 50 000 € à la charge de M. KOONS et la société JEFF KOONS, 10 000 € à la charge du CENTRE POMPIDOU, 5 000 € à la charge de la FONDAZIONE PRADA et 5 000 € à la charge de la société FLAMMARION.

LA GREFFIÈRE                                        LA PRÉSIDENTE

# EXHIBIT 7

This is Google's cache of https://www.doctrine.fr/d/CA/Paris/2021/C9CFC202EC2E0AD3EA656 . It is a snapshot of the page as it appeared on Oct 6, 2023 09:30:52 GMT. The current page could have changed in the meantime. Learn more .

Full version    **Text-only version**    View source

Tip: To quickly find your search term on this page, press **Ctrl+F**gold⌘ **-F**(Mac) and use the find bar.

[Doctrine](#)
MENU

- Platform
  Features
  > [Legal Intelligence Research Monitoring Document Analyzer](#)
  Why Doctrine?
  > [What is a legal intelligence platform?](#) Blanket
- For who ?
  Solutions
  > [Law firms Company management](#) Public sector legal departmentsClaims departments
  Resources
  > WebinarsMini-series DoctrineBlogHelp center
- [Customers' opinion](#)
- [Prices](#)
- Connection

Registration
7 days free trial.
Registration in less than a minute. No credit card required.
Paris Court of Appeal, Pôle 5 - chamber 1, February 23, 2021, no. 19/09059
To copy
Save
Decision plan

# Paris Court of Appeal, Pôle 5 - chamber 1, February 23, 2021, no. 19/09059

Note
Add a note...

- Sculpture ·
- Photography ·
- Counterfeit ·
- Work ·
- Reproduction ·
- Copyright ·
- Companies ·
- Freedom of expression ·
- Reach ·
- Parody

TGI Paris

\>
CA Paris

# Comments on this case

- Copyright and freedom of expression
  www.flpavocats.comNovember 23, 2022
- Jeff Koons convicted of counterfeiting by the Paris Court of Appeal, February 23, 2021
  Me Irène Krisconsultation.avocat.frSeptember 21, 2021
- Tintin in Hopper's Land
  Me Philippe Gentilhommeconsultation.avocat.frAugust 19, 2021
- Jeff Koons again convicted of counterfeiting
  Derriennic & AssociésJune 11, 2021
- NICT – Newsletter number 38
  Derriennic & AssociésMay 28, 2021
- The legal adventures of Tintin in the land of the exception of parody - Intellectual property |…
  DallozMay 25, 2021
  Limited access
- Winter fact: conviction of Jeff Koons for counterfeiting
  Derriennic & AssociésMay 7, 2021
- Copyright, parody and freedom of expression
  Stéphanie CarreTHE ESSENTIAL Intellectual property lawMay 1, 2021
  Limited access
- Jeff Koons, at the heart of the news, convicted of counterfeiting by the Paris Court of Appeal
  www.sprockeels-cornevin-avocats.comApril 15, 2021
- Jeff Koons, at the heart of the news, convicted of counterfeiting by the Paris Court of Appeal
  www.sprockeels-cornevin-avocats.comApril 15, 2021
  Show 17 more

Increase the visibility of your legal blog: your judgment comments can very simply appear on all the decisions concerned. Learn more

## On the decision

| Reference : | Copy reference<br>CA Paris, pole 5 - ch. 1, 23 Feb. 2021, n° 19/09059 |
|---|---|
| Jurisdiction: | Paris Court of Appeal |
| Number(s): | 19/09059 |
| Previous decision: | Paris High Court, November 7, 2018, No. 15/02536 |
| Device : | Partially invalidates, reforms or modifies certain provisions of the referred decision |

## On people

- President : , president
- Lawyer(s):
  Luca DE MARIA , Agnès TRICOIRE , Grégoire TRIET , Anne GRAPPOTTE-BENETREAU , Philippe MARCHISET , Thibaut DERUDDER , Emmanuel BAUD , François TEYTAUD , Jean AITTOUARES
- Firm(s):
  SCP GRAPPOTTE BENETREAU , SELARL PELLERIN-DE MARIA-GUERRE , OX
- Parts:
  Company JEFF KOONS LLC c/ SA FLAMMARION , Company NATIONAL CENTER OF ART AND CULTURE OR

# Full Text

**FRENCH REPUBLIC**

IN THE NAME OF THE FRENCH PEOPLE

**PARIS COURT OF APPEAL**

**Pole 5 – Room 1**

**JUDGMENT OF FEBRUARY 23, 2021**

(n° 034/2021, 29 pages)

Registration number in the general directory: **19/09059 – Portalis number 35L7-V-B7D-B727S**

Decision referred to the Court: Judgment of November 8, 2018 - PARIS High Court (3rd chamber - 1st section) – RG n° 15/02536

**APPELLANTS**

**Mr GA**

[…]

UNITED STATES OF AMERICA

Represented by Me Anne GRAPPOTTE-BENETREAU of SCP GRAPPOTTE BENETREAU , associate lawyers, lawyer at the PARIS bar, hat: K0111

Assisted by Me Emmanuel BAUD and Me Philippe MARCHISET of PARTNERSHIPS JONES DAY, lawyers at the PARIS bar, hat: J001

**Company QA LLC**

American law company

Acting in pursuit and diligence of its legal representatives domiciled in their capacity at said headquarters

[…]

UNITED STATES OF AMERICA

Represented by Me Anne GRAPPOTTE-BENETREAU of SCP GRAPPOTTE BENETREAU , associate lawyers, lawyer at the PARIS bar, hat: K0111

Assisted by Me Emmanuel BAUD and Me Philippe MARCHISET of PARTNERSHIPS JONES DAY, lawyers at the PARIS bar, hat: J001

**RESPONDENTS**

**Mr. HY**

Born the at […]

French nationality

Artistic director

[…]

[…]

Represented by Me  Jean AITTOUARES of  SELARL OX , lawyer at the PARIS bar, hat: A0966

Assisted by Me  Jean AITTOUARES and Me  Thibaut DERUDDER both of  SELARL OX , lawyers at the PARIS bar toque: A0966

**Madame ID**

[…]

[…]

Not shown,

**Mr JC**

[…]

[…]

Not shown,

**NATIONAL CENTER OF ART AND CULTURE O POMPIDOU** National public establishment of a cultural nature created by law n°75-1 of January 3, 1975

Taken in the person of its legal representatives domiciled in their capacity at said headquarters

Place O Pompidou

[…]

Represented by Me  François TEYTAUD of AARPI  TEYTAUD -SALEH, lawyer at the PARIS bar, hat: J125

Assisted by Me  Agnès TRICOIRE , lawyer at the PARIS bar, toque: C1207

**HIS FLAMMARION**

Taken in the person of its legal representatives domiciled in their capacity at said headquarters

[…]

[…]

Not shown,

**UKL**

Italian Law Association

Taken in the person of its legal representatives domiciled in their capacity at said headquarters

[…]

[…]

ITALY

Represented by Me  Luca DE MARIA of SELARL PELLERIN –  DE MARIA  – GUERRE, lawyer at the
PARIS bar, hat: L0018

Assisted by Me  Grégoire TRIET of AARPI GIDE LOYRETTE NOUEL AARPI, lawyer at the PARIS bar, hat:
T03

## INTERVENING PARTY

## KL,

Italian Law Association

taken in the person of its legal representative domiciled in capacity at said headquarters

[…]

[…]

Represented by Me  Luca DE MARIA of SELARL PELLERIN –  DE MARIA  – GUERRE, lawyer at the
PARIS bar, hat: L0018

Represented by Me  Grégoire TRIET of AARPI GIDE LOYRETTE NOUEL AARPI, lawyer at the PARIS bar,
hat: T03

## COMPOSITION OF THE COURT:

In application of the provisions of articles 805  and 907  of the code of civil procedure, the case was debated on
December 9, 2020, in public hearing, the lawyers not having objected, before Ms. Françoise BARUTEL,
Advisor and Ms. Isabelle DOUILLET, President of the Chamber, responsible for the report.

These magistrates reported on the pleadings in the deliberations of the Court, composed of:

Ms. Isabelle DOUILLET, President of the Chamber

Ms. Françoise BARUTEL, Advisor

Ms Déborah BOHÉE, Advisor

**Registrar,** during the debates  : Ms. Karine ABELKALON

## STOP :

• Reputed to be contradictory

• by making the judgment available to the Court registry, the parties having been previously notified under the
conditions provided for in the second paragraph of Article 450  of the Code of Civil Procedure.

• signed by Isabelle DOUILLET, President of the Chamber and by Karine ABELKALON, Registrar, to whom
the minute of the decision was given by the signing magistrate.

\*\*\*

## STATEMENT OF THE DISPUTE

Mr. HY presents himself as an artistic director in the field of media and advertising and indicates that he began, in 1984, to work for the brand 'NAF-NAF' on a 'freelance' basis and had the idea of introducing, from that time, in the brand's advertising, the image of a little pig, the name of this brand evoking the children's story featuring three famous little pigs.

He indicates that he is the author of a visual for an advertisement imagined for the company NAF-NAF for the year 1985 and published in various women's press magazines such as 'Elle' and 'M N', featuring a young brunette woman with short hair, lying in the snow, a little pig leaning over her with a barrel of a Saint Bernard dog around her neck, this visual being titled 'Fait d'hiver', a title that Mr. also created.

In the photograph of the advertisement, in addition to the top left, like a title, the terms 'Fait d'hiver' appear, at the bottom right, the logo of the brand 'NAF-NAF' and the slogan 'NAF- *NAF . The big bad look'* , both registered as trademarks and properties of the company NAF-NAF.

On November 26, 2014, the National Center for Art and Culture OP (hereinafter, the CENTER POMPIDOU) inaugurated, in Paris, a retrospective exhibition of the work of Q A. Among the works exhibited was an earthenware sculpture entitled 'Fait d'hiver' presented as having been created by the latter in 1988 and part of the 'Banality' series:

Believing that this sculpture infringed the visual of which he was the author, Mr. Y, by request of November 27, 2014, requested authorization from the president of the Paris High Court to have a bailiff proceed, in particular, to the delivery of the QA sculpture entitled 'Fait d'hiver' into the hands of the CENTER POMPIDOU so that it can keep it as receiver.

By order of the same day, the president of the court rejected this request. Mr. Z appealed this decision.

By request of December 9, 2014, Mr. a prescription of the same day. This descriptive entry was carried out on December 11, 2014.

It is in this state that by act of January 9, 2015, Mr. Y caused summons before the Paris High Court, for infringement of his copyright, Mr. GA, the American law company QA, CENTER POMPIDOU, the Italian law association STICHTING KL, owner of the disputed sculpture (artist's proof), and the company [FLAMMARION](#) , publisher of a work reproducing this sculpture.

By a judgment of June 23, 2015, the Paris Court of Appeal overturned the order of the president of the high court of November 27, 2014 and finally authorized Mr. Y 'to *proceed, through any bailiff (...), in the premises of the National Center for Art and Culture O*

*Pompidou (...) to the delivery of the sculpture by Mr. QA entitled "Fait d'Hiver" into the hands of the Center (...) Pompidou so that it can keep it after the retrospective as receiver. This seizure* was however, proved impossible to implement, the sculpture having been removed from the CENTER POMPIDOU.

Mr. Y summoned Ms. ID, artistic director, for forced intervention on November 29, 2017, then Mr. JC, photographer, on June 22, 2018, the latter being presented as the co-authors of the claimed photograph.

**By a judgment rendered on November 8, 2018, the Paris High Court** :

— rejected the requests for Exhibits No. 7.7 to 7.11 to be excluded from the proceedings, and for the purposes of annulment of the descriptive seizure report of December 11, 2014 and the summons of January 9, 2015;

— states that Mr. HE is the copyright holder of the photograph 'Fait d'hiver' and, as such, is entitled to take action for infringement of his copyright;

— rejected the plea of non-receipt based on the limitation period for the infringement action;

— says that Mr. QA, the QA company, the CENTER POMPIDOU and the FLAMMARION company committed acts of counterfeiting of the photograph 'Fait d'hiver' by reproducing this visual as part of the retrospective exhibition dedicated to QA and in distributing it in the catalog, album and portfolio of the exhibition, as well as in the book *Interviews with Norman Rosenthal'* , and on the website www.jeffkoons.com;

— rejected the exception of parody and the argument based on Mr QA's freedom of expression;

— prohibits, where necessary, Mr. QA and the QA company from continuing these actions;

— says there is no reason for penalty;

— condemned *in solidum* Mr. QA, the company QA, the CENTER POMPIDOU, the latter within the limit of 40% of the sums, to be paid to Mr. HY:

— 110,000 euros in compensation for infringements of his right of representation as well as his right of authorship on the photograph "Fait d'hiver", caused by the retrospective exhibition of QA's work,

— 25,000 euros in compensation for infringements of his right of reproduction as well as his right of paternity on the photograph 'Fait d'hiver', caused by the publication of the catalogue, album and portfolio of the exhibition retrospective;

— ordered the company FLAMMARION to pay Mr. HY 2,000 euros in compensation for infringements of his right of reproduction as well as his right of paternity over the photograph 'Fait d'hiver', caused by the publication of the work ' *Interviews with Norman Rosenthal'* ;

— ordered the company QA to pay Mr. HY 11,000 euros in compensation for infringements of his right of reproduction as well as his right of paternity over the photograph 'Fait d'hiver', caused by the reproduction of the infringing sculpture on the website www.jeffkoons.com;

— rejected the requests for confiscations and publications;

— ordered *in solidum* Mr. QA, the company QA, the STICHTING KL, the CENTER POMPIDOU and the company FLAMMARION , to pay to Mr. HY, 70,000 euros on the basis of article 700 of the code of civil procedure, this sum being distributed among the losing parties to the extent of one fifth each in their relations with each other;

— condemned *in solidum* Mr. QA, the company QA, the STICHTING KL, the CENTER POMPIDOU and the company FLAMMARION to pay costs including distraction for the benefit of Me  AITTOUARES in accordance with the provisions of article 699 of the code of civil procedure;

— ordered the provisional execution of the judgment.

By declaration of April 24, 2019, Mr. QA and the QA company appealed this judgment.

**In their latest conclusions numbered 3 transmitted on October 20, 2020, Mr. A and the company QA ask the court**  :

— to overturn the judgment in that it:

— declared admissible to take action against Mr. Y for copyright infringement on a work called "Fait d'Hiver", considering Mr.

— retained the application of French law to govern the entire dispute,

— considered Mr. Y's infringement claims not time-barred,

— found the existence of an infringement, including the existence of an infringement of the right to authorship, and ordered Mr. A and company A to pay damages for infringement of copyright on the work "Fait d'Hiver", and prohibited them from pursuing acts of counterfeiting,

— rejected the grounds based on the exception of parody and freedom of artistic expression

of QA,

— convicted Mr QA and the QA company under article 700 of the code

civil proceedings and costs,

— consequently, ruling again,

— to declare Mr. Y inadmissible to act for infringement of the elements he claims in the photography and/or staging "Fait d'Hiver" to the extent that (i) the elements invoked are not original and eligible for protection by Book I of the intellectual property code, (ii) any rights in question are not the property of Mr. Y as they relate to a collective work and/or have been vested in the company NAF- NAF, (iii) Mr. Y does not have author status,

— to declare the memorandum of settlement agreement and its amendment concluded between Ms. ID and Mr. HY unenforceable against the appellants,

— alternatively, to judge that American law is applicable to the assessment of a possible

counterfeiting and its prescription, to the exclusion of French law,

— consequently, to declare Mr. Y's requests against the creation of the sculpture and the website www.jeffkoons.com inadmissible as prescribed,

— to judge that the disputed acts subject to American law are eligible for *fair use* ,

— also subsidiarily, to dismiss Mr. Y's remaining claims for infringement directed against the "Fait d'Hiver" Sculpture, its reproduction and distribution,

— even more subsidiarily, to judge that the work "Fait d'Hiver" by QA constitutes a parody of the photograph "Fait d'Hiver",

— to judge that the work "Fait d'Hiver" by QA falls within the scope of freedom of expression to be a work of art in its own right, which bears the imprint of the personality of its author and bearer of an artistic message of its own and part of a debate of general interest,

— to judge consequently that none of the democratic values which judges must ensure the preservation require the French State, through its judges, in the name of the French people, to prohibit reproduction, representation and more generally any exploitation of this work on French territory,

— to therefore judge Mr. Y's requests to be unfounded and reject them in their entirety,

— to dismiss all of Mr. Y's requests,

— in the entirely alternative way, to note that the damage which Mr. 430 euros and morale at 1 euro,

— to confirm the judgment for the remainder and in particular in that it considered that the sculpture "Fait d'Hiver" was an original work of the mind and rejected Mr. Y's requests:

— rejecting parts no. 7.1 to 7.11

— in violation of the integrity of the work,

— tending to judicial publication and confiscation (of the sculpture and receipts),

— in any event, to order Mr Y to pay QA and the QA company the sum of 50,000 euros on the basis of article 700 of the code of civil procedure, as well as all costs including distraction to profit of the SCP Grappotte-Benetreau .

**In its latest conclusions numbered 4 transmitted on November 27, 2020, the CENTER POMPIDOU asks the court** :

- to confirm the judgment in that it rejected the requests for publications and confiscations, - to reform the judgment and to rule again:

— primarily,

— to declare the CENTER POMPIDOU's requests admissible,

— to exclude from the debates the certificates of brothers B of October 27, 2011 (Exhibit F. Y n°24) and of Mr. C (Exhibit F. Y n°6) for non-compliance with legal requirements and subsidiarily to declare and judge that they are disingenuous, as is Mr. B's certificate of November 29, 2017 (Exhibit F. Y n°25),

— to judge that Mr. Y demonstrates neither his status as author, nor his status as holder of economic and moral rights over the claimed visual; that consequently, he demonstrates neither his quality nor his interest in acting,

— consequently, to judge Mr Y's action inadmissible, under the provisions of Articles 6 , 9 , 31 , 32 , 117 and 122 of the Code of Civil Procedure, and to dismiss all his requests,

- in the alternative,

— to judge that the CENTER POMPIDOU, by organizing a retrospective of the works of the artist QA, by exhibiting the disputed work and by publishing works devoted to this exhibition, has fulfilled its legal mission of public service, mission of general interest,

— to judge that the mission of the CENTER POMPIDOU falls within the freedom of information protected by Article 10 of the European Convention for the Protection of Human Rights and Fundamental Freedoms,

— to judge that the CENTER POMPIDOU had no means of identifying for itself the photograph claimed in the sculpture 'Fait d'hiver' by A,

— to judge that by exhibiting and reproducing the disputed work in the catalogue, portfolio and album of the exhibition dedicated to QA, the CENTER POMPIDOU was carrying out its legal missions in good faith, having been kept in the dark of Mr. Y's claim by him as well as by QA and his studio,

— consequently, to overturn the judgment and dismiss all of Mr. Y's claims against the CENTER POMPIDOU,

— on an infinitely subsidiary basis,

— to judge that Mr. Y, who is neither holder nor assignee of moral rights, and who has never exploited the claimed work, has not suffered any damage as a result of the exhibition and reproduction of the work "Fait d'hiver" in the catalogue, portfolio and album of the exhibition co-published by the CENTER POMPIDOU, and to grant it a symbolic euro,

— to judge that QA and the company QA alone will have to compensate Mr. Y, to the exclusion of the CENTER POMPIDOU,

— on an even more subsidiary basis,

— to judge that Mr Y's damage cannot be greater than the lump sum of 1180 euros, in application of article L.331-1-3 paragraph 2 of the intellectual property code,

— to judge that QA and the company QA alone will have to compensate Mr. Y, to the exclusion of the CENTER POMPIDOU,

- in any case,

— to order Mr Y to pay:

— the sum of €10,000 in respect of the abusive procedure,

— the sum of 87,344.80 euros under article 700 of the code of civil procedure

for the first instance, and 40,000 euros on appeal,

— all court costs, including those diverted to Mr. TEYTAUD in accordance with article 699 of the code of civil procedure.

**In conclusions numbered 3 transmitted on November 16, 2020, STICHTING KL and KL, the latter voluntarily intervening in the procedure, ask the court:**

— to exonerate STICHTING KL and declare admissible KL in its voluntary intervention,

— to confirm the judgment in that it rejected the requests for publications and confiscation,

— to reform the judgment, for the remainder, and ruling again:

— mainly:

— to note that Mr. Y is not the owner of the copyright on the advertising photograph "Fait d'hiver" which belongs to the company NAF-NAF on whose behalf it was created,

— or at the very least, to note that Mr. Y does not provide proof of ownership of the copyright that he invokes on the advertising photograph "Fait d'hiver" and that he would be the sole owner,

— in any event, to note that Mr. Y does not demonstrate that the photograph

advertising "Winter fact" is original,

- Consequently,

— to declare Mr. Y inadmissible in his action for copyright infringement,

— to dismiss Mr Y of all of his requests,

- in the alternative :

— to judge that with regard to the principle of proportionality, even if copyright infringement were to materialize, QA's right to freedom of artistic expression must take precedence over Mr. Y's copyright ownership rights ,

— consequently, to judge that the sculpture "Fait d'hiver" by QA does not constitute an infringement of the advertising photograph "Fait d'hiver" and to dismiss Mr. Y's entire claims,

— to judge that the "Fait d'hiver" sculpture by QA does not create any risk of confusion with the advertising photograph "Fait d'hiver" by transmitting a message substantially different from

such that the sculpture benefits from the exception of parody,

— consequently, to dismiss Mr Y of all of his requests,

— to note the absence of any opposition by Mr. Y to the use of QA's "Fait d'hiver" sculpture for nearly thirty years as well as the absence of any attack on the integrity of the advertising photography " Winter fact ",

— consequently, to judge that the alleged infringement of Mr. Y's moral rights is not characterized and to dismiss all of Mr. Y's requests,

- in any case :

— to note that the only acts that can be taken into consideration as compensation for Mr. Y's alleged damage are limited to the representation of the sculpture "Fait d'hiver" at the CENTER POMPIDOU as part of the exhibition "Q A. La Rétrospective", between November 26 and December 23, 2014, the reproduction of the sculpture "Fait d'hiver" in the works published by the CENTER POMPIDOU and by FLAMMARION, as well as the marketing of said works ,

— to note the total absence of economic and moral damage suffered by Mr. Y,

— to note the manifestly disproportionate and unjustified nature of the requests for confiscation of the sculpture "Fait d'hiver" and the revenues obtained by QA from the exploitation of this work,

— to note the manifestly disproportionate and unjustified nature of the requests for a ban on the representation and reproduction of the sculpture "Fait d'hiver" or at the very least to limit it to French territory only,

— to note the inappropriate and disproportionate nature of the publication measure,

— to rule that KL and/or STICHTING KL cannot be jointly and severally required to compensate Mr Y under Article 700 of the Code of Civil Procedure,

— consequently, to dismiss Mr Y of all of his requests,

— to order Mr Y to pay the KL the sum of 80,000 euros under article 700 of the code of civil procedure,

— to order Mr. Y to pay the full costs which will be recovered by Me Grégoire TRIET , lawyer, in accordance with the provisions of article 699 of the code of civil procedure.

**In his latest conclusions numbered 6 transmitted on November 20, 2020, Mr. Y asks the court** :

— to confirm the judgment of November 8, 2018 in that it:

— says that Mr. Y was the copyright holder of the photograph "Fait d'hiver" and, as such, entitled to take action for infringement of copyright on the said work,

— rejected the plea of inadmissibility based on the limitation period for the infringement action,

— rejected the exception of parody and the plea based on Mr QA's freedom of expression,

— says that Mr QA, the QA company, the CENTER POMPIDOU and the FLAMMARION company committed acts of counterfeiting of the photograph "Fait d'hiver" by reproducing this visual as part of the retrospective exhibition dedicated to QA and in distributing it in the catalog, album and portfolio of the exhibition as well as in the book "Interview with Norman Rosenthal", and on the website www.jeffkoons.com,

— prohibits, where necessary, Mr. A from the company QA from continuing these actions,

— ordered *in solidum* Mr A, the company QA, STICHTING KL, KL and the CENTER POMPIDOU and the company FLAMMARION to pay Mr Y 70,000 euros on the basis of article 700 of the code of civil procedure,

— to invalidate the remainder and ruling again:

— to declare inadmissible the claims of QA and the company QA as to the applicable law and, in any event, to declare that French law is the only one applicable to the case,

— to order the CENTER POMPIDOU, the company QA and Mr. A *in solidum* to pay to Mr. Y:

— a sum of 150,000 euros in compensation for the infringement of the right of representation,

— a sum of 30,000 euros in compensation for the infringement of the right to respect for the work due to the representation of an infringing work affecting the integrity of the original work,

— a sum of 30,000 euros in compensation for the representation of an infringing work in violation of the right to paternity of the author of the first work,

— to order the CENTER POMPIDOU, the company QA and Mr. A *in solidum* to pay to Mr. Y:

— a sum of 37,000 euros in compensation for the infringement of the reproduction right

due to the publication of the catalogue, album and portfolio of the retrospective exhibition of QA's work,

— a sum of 12,000 euros in compensation for the infringement resulting from the reproduction, in the catalogue, album and portfolio of the retrospective exhibition of QA's work, of an infringing work infringing the integrity of the first work,

— a sum of 12,000 euros resulting from the reproduction, in the catalogue, album and portfolio of the retrospective exhibition of QA's work, of an infringing work under conditions violating the right to authorship of the author of the first work,

— to order Mr A and the company QA to pay Mr Y:

— a sum of 8,000 euros for the infringement of reproduction and

representation due to the operation of the website www.jeffkoons.com,

— a sum of 3,000 euros for the damage resulting from the reproduction and

representation on the website www.jeffkoons.com of a work infringing the right to integrity of the first work,

— a sum of 3,000 euros resulting from the reproduction and representation on the website www.jeffkoons.com of an infringing work under conditions violating the right to paternity of the author of the first work,

— to prohibit, from the date of the decision to be taken:

— at the CENTER POMPIDOU, to the company Q KOONSand to Mr. A to carry out the exhibition of the sculpture entitled 'Fait d'hiver' under penalty of 10,000 euros per infraction and per day,

— to the CENTER POMPIDOU, to Mr. A and to the company QA to carry out any reproduction whatsoever of the sculpture entitled Fait d'hiver subject to a penalty of 10,000 euros per infringement noted,

— to Mr. A to reproduce and represent the sculpture entitled 'Fait d'hiver' on the website www.jeffkoons.com or on any other website that he publishes under penalty of 10,000 euros per infraction and per day,

— to order the confiscation, for the benefit of Mr. Y, of the sculpture 'Fait d'hiver', an artist's proof held by STICHTING KL or KL, it being specified that he will donate it to the State French, if the latter accepts it, and provided that the work cannot be exhibited or exploited in any way before the extinction of the copyright on the first work,

— to pronounce the confiscation, in the hands of STICHTING KL and KL, for the benefit of Mr. Y, of the copy of the sculpture 'Fait d'hiver', which one and/or the other holds and of which one and/or the other is the owner, it being specified that the latter will make a donation to the French State, if the latter accepts it, and on condition that the work cannot be exhibited or exploited in any way before the extinction of the copyright on the first work,

— to order the confiscation, for the benefit of Mr. Y, of all of the revenue obtained by Mr.

— to order the publication of the decision to be taken, in extracts or in full, within two

newspapers or magazines of general information, two newspapers or magazines from the art sector and two electronic communication services of the applicant's choice, at the expense of the CENTER POMPIDOU, the company QA and Mr. A in solidum, within *the* limit 35,000 euros excluding taxes in total,

— to dismiss all of their requests by Mr. A and the QA company,

— to rule the CENTER POMPIDOU's request for abusive procedure inadmissible,

— to dismiss the CENTER POMPIDOU of all of its requests,

— to dismiss the UKL and KL of all of their requests,

— to order Mr. A, the company QA, STICHTING KL, the

KL and the CENTER POMPIDOU *in solidum* to the payment of a sum of 80,000 euros for irrecoverable appeal costs pursuant to article 700 of the code of civil procedure,

— to order Mr. A, the company QA, the STICHTING KL, the KL and the CENTER POMPIDOU *in solidum* to pay the entire costs of the appeal including distraction for the benefit of Me AITTOUARES , SELARL OX , in application of article 699 of the code of Civil Procedure.

Mrs. D, Mr. C and the FLAMMARION company have not constituted a lawyer.

The closing order is December 1, 2020.

**REASONS FOR JUDGMENT**

Pursuant to the provisions of Article 455 of the Code of Civil Procedure, reference is expressly made, for an exhaustive statement of the parties' claims and means, to the written conclusions that they have transmitted, as mentioned above.

**On the uncontested grounds of the judgment**

The court notes that the judgment is not contested in that it:

— rejected Mr Y's request for the rejection of documents no. 7.7 to 7.1 from Mr A and the company QA,

— rejected the request from the CENTER POMPIDOU and STICHTING KL for the nullity of the descriptive seizure report of December 11, 2014,

— rejected the request from the CENTER POMPIDOU for the annulment of the summons of January 9, 2015,

— says that the FLAMMARION company committed acts of counterfeiting of the photograph 'Fait d'hiver' by reproducing this visual in the work *'Interviews with Norman Rosenthal'* which it published.

The judgment will be confirmed on these counts for the just reasons it contains.

**On the requests relating to the exoneration of STICHTING KL and the voluntary intervention of KL**

The STICHTING KL association, party to this dispute, indicates that it is in the process of being dissolved and that the association under Italian law KL is now taking over its rights. She voluntarily intervenes in the procedure.

It is therefore necessary to pronounce the exoneration of STICHTING KL and to receive the KL in its voluntary intervention.

**On the request of the CENTER POMPIDOU for rejection of documents 6, 24 and 25 of Mr Y**

The CENTER POMPIDOU requests that the certificates of MM. B (exhibits 24 and 25) and Mr. C (exhibit 6), produced by Mr. Y, for non-compliance with legal requirements and, alternatively, to judge that they are disingenuous.

The court recalls that the fact that certificates do not meet the requirements of article 202 of the code of civil procedure should not lead to them being dismissed *a priori* , these provisions not being

prescribed on pain of nullity, and that it is up to him to assess the probative nature of the testimonies concerned, in particular with regard to their sincerity, within the framework of the examination of the documents on the merits.

The request will therefore be rejected.

**On applicable law**

Mr. A and the company QA maintain, for the first time in the appeal, under Article 8.1 of EU Regulation 864/2007 (known as Rome II), that American law is applicable to the assessment of possible counterfeiting and its prescription, to the exclusion of French law. They argue that the alleged acts of infringement arise from the disputed adaptation in the United States, by an American artist, of the photograph 'Fait d'hiver', that the disputed sculpture was created in 1988 in the United States and published in this country, that the exhibition, of a traveling nature, was also designed in the United States and had its first stop at the Whitney Museum in New York, that the website www.jeffkoons.com is in English exclusively and addressed primarily to the public of the artist's place of residence and professional practice, namely the United States.

Mr. Y responds that the request is inadmissible pursuant to article 564 code of civil procedure, while the appellants accepted the application of French law at first instance. He objects, on the merits, that the country for which protection is claimed, within the meaning of the provisions invoked by the appellants, is France.

*On admissibility*

Under the terms of article 564 code of civil procedure, ' *Under penalty of inadmissibility automatically raised, the parties cannot submit new claims to the court except to oppose compensation, have the opposing claims dismissed or make judge questions arising from the intervention of a third party, or from the occurrence or revelation of a fact'.*

Mr. A and the QA company rightly maintain that the application of American law being requested as a means of defense, their request is admissible even if presented for the first time in the appeal.

### On the merits

Regulation EU 864/2007 of the European Parliament and of the Council of July 11, 2007 on the law applicable to non-contractual obligations (known as Rome II) provides in its article 8.1: 'The law applicable to a non-contractual obligation *resulting from a breach of an intellectual property right is that of the country for which protection is claimed* .

It is common ground that by virtue of this provision, the applicable legislation is that of the State in whose territory the disputed acts occurred ( *lex delicti* ).

In this case, the alleged acts of infringement concern the representation of the QA sculpture on the occasion of a retrospective exhibition at the CENTER POMPIDOU, in Paris, and the reproduction of this sculpture in works published by the CENTER POMPIDOU and the FLAMMARION company in French and sold in France, as well as on the QA website at www.jeffkoons.com accessible in France, particularly by the English-speaking French public.

France is therefore the country where the alleged actions took place and, moreover, the country where the damage was suffered, Mr. Y, the claimed author of the allegedly infringing work, being of French nationality and residing in France. French law is therefore applicable, to the exclusion of American law, the nationality of the author of the infringing work, as well as the place of its creation or of its first disclosure, moreover unjustified, and the circumstance that the retrospective at the CENTER POMPIDOU was preceded by an exhibition in a New York museum, being indifferent. Also without effect is *the notice of intent a copyright restored* dated January 27, 2015 addressed to Mr. A and the company QA by an American lawyer on behalf of Mr. Y, since this note is subsequent to the summons issued in France in the context of this dispute and that it is common ground that Mr. Y has not initiated any legal action in the United States.

The request to have American law applied to the facts of this case will, therefore, be rejected.

### On the admissibility of Mr. Y's infringement action

### On Mr. Y's standing to act

Mr. A and the company QA maintain that Mr. Y is inadmissible to act since, on the one hand, the photograph 'Fait d'hiver' taken as a whole constitutes a collective work whose rights have been vested in the company NAF-NAF under the name of which it was disclosed, on the other hand, that the transfers of rights produced in the debates are ineffective to establish proof of creation by Mr. Y, the transaction fraudulently concluded with Mrs. D being unenforceable against them.

The CENTER POMPIDOU maintains that Mr. Y, who is not even in possession of the claimed photograph and who does not clearly identify said photograph, does not demonstrate that he is the author, the attestations of MM. B and C, false and dictated for the needs of the cause, failing to provide this proof, that its intervention in the NAF-NAF campaign is limited to the creation of the slogan 'The big bad look' *and* to an idea, not protectable, to use a pig to illustrate the advertiser's brand. He adds that Mr. Y was involved in the NAF-NAF campaign as an advertising agent and that he assigned the rights to the visual to his client NAF-NAF, in accordance with the law of March 11, 1957 then applicable, the alleged transfers of rights occurring *a posteriori* on the part of Mr. C and Mrs. D giving him neither standing nor interest to act.

The KL endorses the conclusions of the appellants and the CENTER POMPIDOU.

Mr. Y requests confirmation of the judgment which recognized his standing to act for infringement, for the reasons it contains.

*On the identification of the claimed photograph*

Mr. Y produces (his exhibit 3bis) a print of a photograph representing the bust of a brunette woman, lying on her back, in the snow, a lock of hair stuck to her left cheek, her eyes and mouth half open, her hands placed at the height of her head, palms up, a little pig leaning over her with a barrel of a Saint Bernard dog around its neck. This photograph includes the words *'FAIT D'HIVER'* , at the top and left, and, at the bottom right, the NAF-NAF brand logo and the words *'NAF-NAF. The big bad look'* . It is accompanied by a document bearing the words: *'NAF-NAF - Design: HY - photography: J C'* .

It is clear from Mr. the author of the campaign *'The big bad look'* produced for the company NAF-NAF in 1984.

*On the qualification of the work*

Mr. Y adds to the debates:

— the certificate of Mr. SB, co-founder of the company NAF-NAF and its director at the material time, who declared on November 29, 2017, to have entrusted the NAF-NAF advertising campaigns to Mr. Y in 1984 as an independent creator, that the latter created the slogans *'The big bad look'* and *'Fait d'hiver'* , that for the photography in question, Mr. Y proposed the scenography of the pig in Saint-Bernard and the mannequin lying in the snow, that the staging, the creation, the choice of the model, the choice of the photographer, JC, and the other collaborators, the design were carried out by Mr. Y who worked in complete independence, his work having was validated *a posteriori* ;

— the certificate co-signed on October 27, 2011 by Mr. SB and Mr. TB, co-founder of the company NAF-NAF and its former manager, which corroborates the content of the previous one;

— that of Mr. JC, photographer, who declares that Mr. Y designed the fall-winter 1985 advertising campaign for the clothing brand NAF-NAF, in particular the advertising visual entitled 'Fait d'Hiver' *featuring* a dark-haired woman lying in the snow watched over by a pig carrying a barrel of Saint-Bernard around its neck, that it was Mr. Y who made the choice of the scene, of the different characters and elements appearing there, of their positioning, etc. ., that it was at his request and according to his wishes that he himself photographed this staging with a view to its reproduction and distribution as part of this advertising campaign, so that Mr. Y could act in the area of property law, he assigned all of his rights of adaptation, reproduction and representation to this photograph throughout the world and for the legal duration of the copyright;

— the notarial deed of transfer of September 10, 2012 from Mr. C to Mr. Y with the claimed photograph attached;

— the transactional agreement protocol of December 14, 2017 (and its amendment of September 14, 2018) concluded between Ms. ID and Mr. Y, by which Ms. D acknowledges that Mr. Y is co-author, with her and Mr. C, of the visual in dispute and assigns to him all of his property rights for the entire world, for the purposes and for the duration of the dispute between him and Mr. A, with, under the terms of the amendment, retroactive effect to December 31, 2013.

In view of these elements, the court considers that it is for just reasons, which it adopts, that the court held that the presumption of ownership of article L.113-1 of  the intellectual property code, in what it would benefit the company NAF-NAF, cannot be opposed to Mr. Y given his claim to the visual, and ruled that the claimed photograph could not qualify as a collective work, with regard to a collaborative work for which Mr. Y was eligible to act alone since his contribution was individualizable and the other authors – Mr. C and Mrs. D – had been implicated and had assigned their property rights to him.

The appellants call into question the sincerity of the certificates provided by Mr. SB by arguing, on the one hand, that the latter wrote in 2013, in another dispute between Mr. Y and the company NAF-NAF, a certificate denying straight to Mr. in the context of this dispute, two matching certificates from Mr. SB are provided, one co-signed with his brother, also co-founder and former director of the company NAF-NAF. Furthermore, the ties of

friendship between Mr. Y and Mr. B on a social network do not imply real ties of friendship which should have been mentioned on the latter's certificate and do not alter the probative value of this, which emanates from the director at the time of the company NAF-NAF, sponsor of the advertising campaign for the needs of which the photograph claimed by Mr. Y was designed, and therefore particularly able to testify to the conditions in which this photograph was taken. In addition, the certificates of MM. B are corroborated by the testimony of Mr. C and the aforementioned memoranda of understanding and deeds of transfer of rights and also by press articles showing that Mr. Y was presented in the press as the author or the one having signed ' *The Big Bad Look'* advertising campaign .

The appellants further argue that the legal act of transfer of rights concluded with Mrs. D is ineffective in providing proof of the legal fact which is the creation of the photograph and that this transfer, concluded in first instance for the needs of the case , while Mr. Y had initially concealed and then denied any contribution from Mrs. D, is unenforceable against them. But the transactional agreement protocol and its amendment, if they do not constitute direct testimony from Ms. D concerning the conditions of creation of the photograph, contain a first article by which the parties 'agree (...) that the Work *is a collaborative work to which the sole authors contributed: Madame ID and Monsieur HY as co-designers of the visual; and Mr. JC, as photographer'.* By this agreement and its amendment, the parties agree that the rights are transferred *'for the purposes and for the duration of the dispute between them and Mr. QA and the other defendants referred to in the preamble'* and also that *'in the context of the dispute between him at QA, Mr Y will be the only one able to take legal action under the copyright over the 'work'* . Even if they were concluded during the first instance, in order, according to Mr. Y, to avoid *'adding to the complexity of the debate'* , the transactional agreement protocol and its amendment can be taken into consideration for note that the claimed photograph is a collaborative work and that Mr. Y, assignee of the economic rights from the co-authors, is eligible to act alone for infringement in the context of this dispute.

### *On* the transfer of rights for the benefit of the company NAF-NAF

It is for good reasons, which the court adopts, that the court considered that Mr. Y had acted as an independent creator for the development of the campaign ' *The big bad look'* within the framework of which was created the visual, and that he rejected the argument according to which he had collaborated with the company NAF-NAF as an advertising agent, this status, in accordance with a standard contract of September 19, 1961, resulting, in absence of a specific agreement between the parties, the automatic transfer of Mr. Y's rights to the company NAF NAF.

The judgment will, consequently, be confirmed in that it said that Mr. E is the copyright holder of the photograph 'Fait d'hiver' and, as such, eligible to take action for infringement of his rights. 'author.

### On the prescription

The appellants claim that the sculpture had acquired significant notoriety before 2010, so that Mr. Y necessarily became aware of it before 2011 and that his requests concerning the facts of representation and reproduction of the disputed sculpture were time-barred on the day of subpoena (January 9, 2015). They add that the facts of reproduction on the site www.jeffkoons.com, which Mr. Y described as ' *essential to anyone interested in the work of Q A'* , were necessarily known to the respondent for more than 5 years before this head's first request, formulated by conclusions of April 25, 2017.

Mr. Y requests confirmation of the judgment which rejected the plea of inadmissibility.

It is for exact and relevant reasons, adopted by the court, that the court rejected the plea of inadmissibility, holding in particular that the circumstances in which the sculpture of

QA in France, in a Parisian gallery in 1995, do not allow us to take for granted that Mr. Y was or should have been aware of its existence from that time, and that Mr. Y cannot be required to monitors, particularly on the Internet, the dissemination of Q A's works.

The judgment will be confirmed on this basis.

**On the originality of the claimed photograph**

The appellants criticize the court for not having determined the work or the characteristics of the work of which Mr. Y was allegedly personally the author, for not having described the said work in its original characteristics, and for having recognized the originality of an indeterminate whole, constituting a simple imprecise juxtaposition of ideas of which we do not know from whom they emanate and of which it is not established that the composition bears the imprint of the personality of Mr. Y .

The CENTER POMPIDOU argues that the elements claimed and retained by the court for the originality of the photograph claimed by Mr. Y are ideas or clichés (the idea of the little pig being already present in the NAF-NAF brand, one of Walt DISNEY's three little pigs called that) or present a banal character (representation of a young woman for a ready-to-wear advertisement intended for a female clientele). He adds that the expression 'winter fact' cannot be considered as a title since it is not systematically reproduced with the photograph.

Mr. Y requests confirmation of the judgment which recognized the originality of the photograph. He explains that the originality results in particular from the combination of the following elements, reflections of his personality: representation of a young woman lying in the snow, while such a position is a priori *uncomfortable* due to the sensation of cold that it provides; representation of a pig in the snow, while this livestock animal is usually represented in hay, manure or mud; addition of a Saint-Bernard barrel around the pig's neck, although this object is in principle associated with the dog of the eponymous breed which is often trained to carry out search operations in the event of an avalanche; specific positions of the body, hands, face and hair of the young woman, as well as her makeup which translate, at the viewer's choice, a form of languor or distress, making the woman a victim, even a consenting victim; title 'Fait d'hiver', original in itself, made up of a play on words evoking both the news item that would constitute the accident occurring during an avalanche, the season of the said accident as well as that of the collection touted by the campaign; unusual confrontation, particularly in an advertising image, between an elegant young woman and a pig, an animal known to be dirty and little known for coming to the aid of accident victims.

It was said *above* that the claimed work was clearly identified in the writings of Mr. Y.

It is for exact and relevant reasons, which the court adopts, that the court held that the photograph was original.

It will be added that the expression 'Fait d'hiver' is not claimed as a title by Mr. Y, who is not making a particular request in this regard, but as one of the elements of the visual that he claims.

**On counterfeiting**

*On the extent of the referral to the court*

Mr. A and the QA company rightly observe that, notwithstanding the presentation made by Mr. Y of the developments devoted in his writings to the characterization of counterfeiting – cf. pages 53 and following: initial attacks on property and moral rights; *then 'subsequent' or 'additional'* acts of counterfeiting consisting of the exhibition of the sculpture at the CENTER POMPIDOU and its reproduction in various works as well as on the site www.jeffkoons.com - these are the only acts of representation of the sculpture at the CENTER POMPIDOU and reproduction in the works and on the website which are concerned by this dispute, excluding the acts of creation of the sculpture.

*On acts of counterfeiting*

Mr. A and the QA company criticize the court for having downplayed the tangible differences that may exist between the sculpture and the photograph, and for having also compared the sculpture with a staging and not with the photograph itself, the only one likely to be protected by copyright, and to have not taken into account, beyond the deliberately restricted description carried out by Mr. Y of the original elements of the photograph, the fact that the differences could, by their importance, make the resemblances forgotten, leading to the works not presenting the same general overall appearance, even though the court recognized that the QA

sculpture constituted an original work of the mind, which implies that it necessarily stands out from the prior art. They add that the judgment ignored the differences in messages and context of (advertising) photography and sculpture, the latter conveying a message, according to a constant in contemporary art, and in particular the Ready Made, Pop Art or appropriation art, in this case, an apology for banality through the use of materials, images, objects, references or characters borrowed from the universe, to popular culture, beliefs and reminiscences and elevated to the level of a work of art by the creative work of Q A. They contest any infringement of Mr. Y's moral rights, arguing that Mr. C and Mrs. D have retained their moral rights over the photograph (considered a collaborative work).

The CENTER POMPIDOU maintains that it had no way of detecting the potential infringement due to its lack of knowledge of the claimed advertising photograph which it considers in any event unrecognizable in the QA sculpture due to substantial differences relating to the form of the two creations (photo/sculpture), the subjects (the woman and the pig being different in each of the creations), the framing (the angle of the photograph is narrow and focuses on the heads of the subjects/sculpture fully represents the subjects that can be contemplated from infinite angles), the story (commercial speech / complex artistic message referring to the imagination, the dreamlike, the tale, and allowing multiple interpretations).

The KL maintains that the disputed work does not contain the protectable characteristics of the visual and stands out, due to its own meaning, as an independent work. She argues that the court, which recognized the classification of QA's sculpture as a work, should have, drawing conclusions from its reasoning, considered that it is a distinct, independent work not likely to constitute an infringement. photography.

Mr. Y requests confirmation of the judgment which held that the original elements of the photograph were reproduced in the sculpture so that the infringement was constituted infringing both his property rights and his moral copyright rights.

This being stated, article L. 122-4 of the intellectual property code provides that *'Any representation or reproduction in whole or in part made without the consent of the author or his successors in title or assigns is unlawful. The same applies to translation, adaptation or transformation, arrangement or reproduction by any art or process* .

It is for exact and relevant reasons, which the court adopts, that the court, after having duly noted the differences between the photograph and the sculpture, due to the nature of each

(photography/sculpture), the presence in the sculpture of elements absent from the visual (two penguins, flower necklace worn by the pig, glasses and flowers placed on the woman's forehead), the fact that the woman is wearing a jacket quilted in the photograph and a fishnet garment revealing her breasts in the sculpture, retained that the original elements of the photograph (same young woman with the same expression and the same lock of hair plastered on her left cheek, lying in the snow, the arms raised to head level; pig carrying a barrel of Saint Bernard in the same position near the young woman) were included in the sculpture and that the counterfeit was thus constituted.

It will be added that the infringement of copyright is assessed with regard to the resemblances between the works present and that the resemblances are predominant here in relation to the differences noted, the QA sculpture taking up the combination of the original characteristics of the photograph. Winter fact'.

It will be specified that therefore constitute acts of counterfeiting, the representation of the disputed sculpture during the retrospective exhibition at the CENTER POMPIDOU and its reproduction in the works published and marketed by the CENTER POMPIDOU and the company FLAMMARION, as well as on the site internet www.jeffkoons.com administered by the company Q A.

It will also be clarified that the sole fact that the QA sculpture incontestably constitutes itself a work, which the court rightly qualified as a composite work within the meaning of article L. 113-2 paragraph 2 of the intellectual property code ( *"Composite is the new work into which a pre-existing work is incorporated without the collaboration of the author of the latter"* ), and that it transmits a message, even if it is very far removed from

the advertising approach in which it is registering the photograph, without prejudice to the exception of parody and the principle of freedom of artistic expression which will be examined below, does not eliminate the infringement as long as this work is based, at least in part, on an appropriation unauthorized of a first work. The adaptation of the photograph, a pre-existing work, could only be done with the agreement of its author and in the absence of this agreement, the infringement is constituted.

It will also be added that the observed infringement infringes both Mr. works and on the website of infringements of his right of reproduction -, as well as of his moral rights, it being noted that Mr. Y only invokes his own moral rights, to the exclusion of those retained by Mr. C and Mrs. D, co-authors of the collaborative work that constitutes the photograph and assignees of their economic rights to Mr. Y.

### On the parody exception and the benefit of freedom of artistic expression invoked by Mr. A and the QA company

Mr. A and the company QA maintain that the court wrongly rejected the exception of parody, the conditions of which are met in this case, whereas neither the texts, nor the case law nor the doctrine require that the work being parodied be notorious. They claim in any case the benefit of the artist's freedom of expression, arguing, under Article 10 of the European  Convention for the Protection of Human Rights and Fundamental Freedoms, that the judges cannot interfere in this freedom of creation and deny QA's artistic approach by holding, as the court did, that the resumption of photography is based on personal considerations which allowed QA to achieve economy of a creative work, or taking into consideration the originality of the first work and its known or unknown character, assuming these are proven, and that, in accordance with the jurisprudence of the Court of Cassation (Klasen judgment, Civ. 1st, 15 May 2015, n°13-27391), which applies the Ashby Donald jurisprudence of the ECHR in domestic law, it

appropriate, in the balance of interests involved, to give priority to the creative freedom of QA whose sculpture is a transformative work conveying a message different from that of photography and whose artistic approach must necessarily be preserved in the interest of the public in a democratic society, whereas Mr. Y, whose advertising photography has seen very limited exploitation, can only claim an opportunistic approach and purely financial interests.

The KL also maintains that the work alleged to be infringing must benefit from the protection granted to QA's freedom of artistic expression or, at the very least, from the parody exception.

Mr. Y requests confirmation of the judgment in that he rejected freedom of expression and the exception of parody, arguing that the invocation of the first is not justified, while the conditions of the second do not are not fulfilled.

### On the parody exception

Article L. 122-5  of the intellectual property code provides that *'When the work has been disclosed, the author cannot prohibit: (…) 4° Parody, pastiche and caricature, taking into account the laws of the kind (…)'* .

In a judgment of September 3, 2014, the CJEU specified that *'parody has the essential characteristics, on the one hand, of evoking an existing work, while presenting perceptible differences from it and, on the other part, to constitute a manifestation of humor or a taunt'* (C6201/13, Deckmyn).

Three cumulative conditions therefore emerge from this decision: the second work must evoke an existing work; the second work must not risk being confused with the first work; and it must constitute a manifestation of humor or a taunt.

Assuming that the sculpture 'Fait d'hiver' could be seen as a *'manifestation of humor or a taunt'* , which is not evident from the description given by QA of his sculpture in a certificate reproduced on pages 38 and 39 of his writings

1:

*'The girl lying in the snow looked a little out of place. Rather than being in a skiing accident, I thought she looked sad, like she'd had love problems. I put her in a fishnet dress that showed off her breasts to make her even more out of place - you wouldn't expect someone to wear a fishnet dress in the snow - and I added glasses with daisies to reinforce the notion of Banality, but also to suggest that she sees the world through rose-colored glasses, and to give a feeling of spring. Inspired by the wreaths placed on cows during the Rites of Spring parades in Bavaria, I added flowers around the pig's neck as a symbol of fertility. I made the pig fat and healthy, rather than a small piglet. The penguins who come alongside the pig to save the girl are witnesses. The penguins suggest to the viewer that the girl is in a cold place, a secluded, distant place. There is a spiritual quality of abstraction and intellectualization. I included an adult penguin and a young penguin, reminiscent of a family, so they carry warmth and life. There are these multiple meanings and polarities in the sculpture 'cold and heat, winter and spring, spirituality and sexuality' even in the choice of material. Unlike wood, which is a living and warm material, porcelain is cold. But at the same time, because it shrinks in the kiln and it has this tension on the surface, porcelain has this sexual aspect. Porcelain was once reserved for the king, but now it is democratized and used not only for mundane figurines, but also in bathrooms for bathtubs and toilets where one begins to discover one's body. Winter has a big impact on life cycles. It's really a work on renewal; life goes on, everything will be fine. The girl's cultural history was perfect in that moment and as long as she accepts her cultural history, eliminating the guilt and the shame, eliminating the judgment, everything is going to be perfect from that moment on. It's about the process of self-acceptance.*

.

,

the appellant does not demonstrate, in the absence of any reference or comment on his part or that of his studio or the galleries or museums which exhibited his sculpture, his intention, at the time of the creation of this work or subsequently , particularly during the incriminated events, to evoke the pre-existing 'Winter Fact' photograph. In addition, the photograph 'Fait d'hiver', produced for the fall-winter 1985 advertising campaign of the company NAF-NAF, was incontestably forgotten or unknown to the public during the QA exhibition at the CENTER POMPIDOU at the end of the year 2014, so that the public was not able, upon seeing the sculpture exhibited in the museum or reproduced in works or on the website www.jeffkoons.com, to refer to the photograph distributed almost 30 years later early for the needs of an advertising campaign lasting several months for a ready-to-wear brand. Mr. A having not produced any element prior to the present proceedings likely to suggest that his work is linked in a parodic form to the disputed photograph, as Mr. Y points out, the public was not able to note the evocation of the pre-existing photography in the disputed sculpture and perceive its parodic dimension.

It is therefore right that in the absence of mention of the initial work, the court rejected the defense based on the exception of parody.

***On** freedom of artistic expression*

Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms states that *'1. Everyone has the right to freedom of expression. This right includes freedom of opinion and the freedom to receive or communicate information or ideas without interference from public authorities and regardless of borders.(...)*

*2. The exercise of these freedoms involving duties and responsibilities may be subject to certain formalities, conditions, restrictions or sanctions, provided for by law, which constitute measures necessary, in a democratic society, for national security, territorial integrity or public safety, the defense of order and the prevention of crime, the protection of health or morals, the protection of the reputation or rights of others, to prevent the disclosure of confidential information or to guarantee the authority and impartiality of the judiciary* .

These provisions enshrine the public's right to information and freedom of expression, particularly artistic expression, while recalling that this right must be exercised with respect for other fundamental rights such as the

right to property from which the right to author.

The Strasbourg Court holds that freedom of expression has greater or lesser force depending on the type of speech, distinguishing the situation where expression for strictly commercial purposes is at stake from that where participation is at issue. to a debate affecting the general interest: *'The extent of the margin of appreciation available to the Contracting States in this matter varies depending on several elements, among which the type of 'speech' or information in question takes on a particular importance. Thus, if Article 10 § 2 of the Convention leaves little room for restrictions on freedom of expression in political matters for example, the Contracting States have a wide margin of appreciation when they regulate freedom of expression in the commercial field (Mouvement raëlien v. Suisse [GC], no. 16354/06, § 61), it being understood that the extent of this must be put into perspective when it is not strictly expression 'commercial' of such an individual but his participation in a debate affecting the general interest (Hertel v. Switzerland, August 25, 1998, §47, Report of judgments and decisions 1998-VI).'* (Ashby Donald and others v. France case, January 10, 2013, no. 36769/08).

According to the aforementioned article 10, limitations on freedom of expression are only permitted on the condition that they are provided for by law, justified by the pursuit of a legitimate interest and proportionate to the aim pursued, this is that is, made necessary in a democratic society.

It is recalled that Article 27 of the Universal Declaration of Human Rights states in particular that *'Everyone has the right to the protection of the moral and material interests arising from any scientific, literary or artistic production of which he is the author'* .

In this case, the limitation on QA's freedom of expression is provided for by law since, as has been recalled, article L.122-4 of the intellectual property code condemns any adaptation or transformation of a work without the consent of its author or its rights holders.

Furthermore, it is not disputed that QA is a major artist, known worldwide, whose works carry a message. In this regard, the appellants explain that the 'Banality' series, to which the disputed sculpture 'Fait d'hiver' belongs, intends to convey two main ideas, at the heart of QA's artistic and intellectual approach: the democratization of art which must be accessible to as many people as possible (hence the use of porcelain, *'a material formerly reserved for the aristocracy'* to highlight the democratization of art) and the need to deliver the viewer's aesthetic pleasure from all shame and any guilt in relation to its cultural history, by resorting to the notion of 'banality', freed from any pejorative connotation and established as a 'work of art. Mr. A explains that his creative approach *is characterized by both the link with the works and the methodology of the past (via the artist's sources of inspiration and the resumption of the methodology of his predecessors such as DUCHAMP or WARHOL ) and by going beyond this link (via the decontextualization or recontextualization of his sources of inspiration and the methodological innovations that the artist implements)* , these particular characteristics serving the artist to better transmit the discourse that he wanted to convey it through his series 'Banality'. He explains that the sculpture in question allows him to construct *'a story about Banality as Savior'* , *'banality being embodied here, in addition to elements borrowed from popular culture* [flowers, penguins referring to kitsch and cheap figures in porcelain] *, by an innocuous farm animal, reputed to be dirty and graceless, which comes to the aid of humanity represented by the reclining woman. This banality saves the young woman by leading her to accept herself as she is, naked and free of any guilt or fear of being judged. She then comes to offer herself to the spectators who, like the penguins present alongside the young woman, witness this unusual scene* . He deduces that the artistic message thus transmitted by his sculpture is completely different from that expressed by Mr. Y's advertising photography, which is not disputed by the latter. The QA message thus defined, even if it carries a reflection of a social order, relates to freedom of artistic expression or artistic creation and not to freedom of expression in the field of political discourse or questions of general interest. In addition, as rightly noted by Mr. Y, who produces an article taken from the Le Monde website dated May 16, 2019 qualifying the artist as an *'unparalleled commercial'*and reporting the sale of one of his works, 'Rabbit', sold for the record price of 91.1 million dollars, QA's artistic approach is not devoid of commercial character.

It was seen that, notwithstanding the addition in the sculpture of two penguins, the flower necklace worn by the pig, glasses and flowers on the woman's forehead, and the different nature of the clothing worn by the latter, the sculpture substantially takes up the original elements of the original photograph 'Fait d'hiver', in particular its

composition, without making any reference to it, whereas, as the court rightly noted, this photograph is not familiar to the public who are not will therefore be able to identify it and understand the creation of QA by reference to it and therefore, perceive the claimed transformative character of the artist's creative approach. It is also underlined that the CENTER POMPIDOU pleads that it itself had no means of detecting the alleged infringement due to the lack of knowledge of the advertising photography *'undetectable in the QA sculpture* '.

Finally and above all, no circumstances justify that QA, which itself occupies a very first place on the art market, refrained from investigating who was the author of the photograph from which it intended to draw inspiration, in order to obtain authorization, where applicable, by acquiring exploitation rights. It must be remembered that the purpose of copyright is to allow each creator, whatever the merit of their work as long as it is original, to obtain remuneration in return for authorization to exploit their work. work, and to ensure respect for the moral rights of the author, and in particular his right to authorship.

Thus, having regard to the circumstances of the case, it must be considered that the implementation of the protection of the photograph 'Fait d'hiver' under copyright constitutes a proportionate and necessary infringement of the freedom of creative expression of Q A.

The judgment will therefore be confirmed in that it rejected the argument based on freedom of expression presented by Mr. A and the Q A company.

### *On the duty of information and good faith invoked by the CENTER POMPIDOU*

The CENTER POMPIDOU requests the reversal of the judgment which found it responsible. It argues, in accordance with Article 10 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, that the exhibition of QA's work and the edition of related publications fall within its mission. public service dedicated to modern and contemporary art, training, public information and dissemination of artistic creation in all its forms. He argues that in this case, the implementation of Mr. Y's copyright protection does not constitute, having regard to this mission and his status as a public establishment, a proportionate and necessary, in a democratic society, for its freedom of expression reinforced by its mission of general interest and its role as disseminator of the art of the time, particularly since Mr. Y could have his copyright recognized without seeking the responsibility of the museum. He also argues his perfect good faith, which must be taken into account in civil matters as well as in criminal matters, claiming to have had no way of knowing that QA's work was potentially infringing and to have organized the retrospective under the close direction and control of the artist and his studio, both with regard to the exhibition itself and with regard to the publication of the disputed works. The CENTER POMPIDOU specifies that QA and its studio have removed the liability guarantee clause contained in the draft contract that it had sent to them, relating to the publishing of works (catalogue, album, portfolio) and derivative products, all by concealing from him that one of the works exhibited was potentially infringing, thus seriously failing in their duty of loyalty towards him.

Mr. Y objects that the CENTER POMPIDOU, which admitted to knowing the sulphurous reputation of the artist QA and his past legal disputes with third parties regarding his works, has nevertheless carried out no research to ensure the absence of acts of counterfeiting, that the public service missions of the museum, in which it failed in this case through its negligence, cannot constitute an exception to copyright and that the CENTER POMPIDOU has engaged its liability for made the exhibition of the sculpture during the retrospective and its reproduction in the works that he published and marketed, his good faith being indifferent.

The appellants do not present any argument on this point.

This being exhibited, even under the direction and control of the artist and his company, the retrospective during which the sculpture 'Fait d'hiver' by QA was exhibited was organized by the CENTER POMPIDOU and presented in its premises, and the exhibition catalogue, the retrospective album and the portfolio reproducing the sculpture were published by the CENTER POMPIDOU and marketed in particular in its bookstore.

Counterfeiting is characterized, regardless of any fault or bad faith, by the reproduction, representation or exploitation of an intellectual work in violation of the property rights attached to it. Mr. Y is therefore justified in

seeking the responsibility of the CENTER POMPIDOU.

He invokes in vain Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms, the protection of his freedom of expression and the exercise of his public service mission. It is not, in fact, part of the mission of the CENTER POMPIDOU to exhibit and reproduce infringing works. Furthermore, as a professional, it was up to him to ensure before the exhibition and the disputed editions that the works of QA, in particular the sculpture 'Fait d'hiver', were not likely to infringe copyright rights. others – there is no justification for any action in this direction – and in any case, to obtain a guarantee on this point from the artist and his company.

The court was therefore right to reject the defense put forward by the CENTER POMPIDOU.

From all of the above, it follows that the judgment must be confirmed in that it said that Mr. QA, the company QA, the CENTER POMPIDOU and the company FLAMMARION committed acts of counterfeiting of the photograph 'Fait d' winter" by reproducing this visual as part of the retrospective exhibition dedicated to QA and by disseminating it in the catalog, album and portfolio of the exhibition, as well as in the book 'Interviews with Norman Rosenthal' *published* by the company FLAMMARION , and on the website www.jeffkoons.com.

**On remedial measures**

It is noted as a preliminary matter that Mr. Y requests the reversal of the judgment in all these provisions relating to financial penalties, except those relating to costs and irrecoverable costs of first instance, and that he no longer presents in question appeal request against the company FLAMAMARION which did not constitute an appeal lawyer.

*On compensation claims*

In support of his claims for compensation, Mr. to increase its popularity on the art market. He criticizes the court for not having distinguished, for each method of dissemination of the infringing work, property rights and moral rights, and under moral rights, for having considered that infringements of the right to respect for the work and the right to paternity could not be simultaneously invoked.

The appellants argue that the sculpture was only exhibited for a month, the success of the exhibition in no way linked to this work alone, that the damage suffered due to the reproduction of the sculpture on the website in English can only be limited, that the sculpture constitutes an original work derived from the photography from which it is inspired, that no profit was made by QA on the advertising photography of Mr. Y, very significant investments having been made to create and promote sculpture, that visitors to the retrospective exhibition were able to see nearly 100 works by QA and not only the disputed sculpture, that likewise the works published on the occasion of this exhibition included many works by the artist, that Mr. Y's prejudice can only be analyzed as a loss of chance of adaptation of the photograph in the form of sculpture, necessarily weak due to the fact that this photograph has never been re- exploited since 1985 and that Mr. Y has never published a work on his creations, that Mr. Y cannot invoke cumulative infringements of his right to respect for his work and his right of authorship over this work. They conclude that the sums claimed are not justified and are clearly

disproportionate to the harm actually suffered.

The CENTER POMPIDOU contests any damage caused by its action, arguing that it cannot be condemned *in solidum* with the artist until it becomes aware of the risk of counterfeiting linked to the exhibition of the work. Made in Winter' and at the request of the lender, the L Foundation, he quickly carried out all the necessary steps to remove the sculpture from the exhibition, which he acted under duress from QA and his studio who chose the works to be exhibited and reproduced. He pleads that in any event, the sentences handed down are disproportionate to the damage actually suffered by Mr. Y, who cannot exploit the visual outside of the NAF-NAF advertising campaign of 1985, and to the loss-making financial results recorded around the Q A retrospective. He adds that Mr. Y's damage could only be assessed on the basis of the prices of two societies for the collection and distribution of rights in the field of visual arts, the SAIF and the ADAGP.

Article L.331-1-3 of the Intellectual Property Code provides in particular that *'To determine damages, the court takes into separate consideration:*

*1° The negative economic consequences of the infringement of rights, including the loss of profit and loss suffered by the injured party;*

*2° The moral damage caused to the latter;*

*3° And the profits made by the author of the infringement of rights, including the savings in intellectual, material and promotional investments that he has obtained from the infringement of rights* .

*The damage resulting from the exhibition of the sculpture at the CENTER POMPIDOU*

The first judges precisely noted that the sculpture 'Fait d'hiver' was exhibited to the public from November 26 to December 23, 2014, the date of its withdrawal from the retrospective exhibition, that is to say for a little less than a month and that this exhibition experienced record attendance, with the CENTER POMPIDOU press release dated December 17, 2014 announcing 112,844 visitors on that date, as well as a record number of visitors on the first day of the exhibition. If it is common ground that visitors to the retrospective exhibition were able to see numerous works by QA other than the disputed sculpture, these figures lead us to conclude, like the court, that the infringement of Mr. Y on photography was massive. Mr. Y rightly emphasizes that his photograph constitutes a protectable work as such, regardless of its merit or its destination, and justifies that the image of the pig, created for the needs of the NAF-NAF advertising campaign in 1984/ 1985 was reused by the brand, certainly in another form (pig wearing a ribbon around its neck and no longer a barrel), for its fall-winter 2015/2016 collection, which leads to putting into perspective the opposing argument according to which the photograph has never been re-exploited. The infringement of the property right of representation will be repaired by the allocation of a sum of €110,000 in damages.

Mr. merits of the derived work and the notoriety of its author, and of the infringement of the right of authorship which is constituted since the name of Mr. Y was at no time mentioned during the exhibition of the sculpture and in the disputed reproductions. Violations of Mr. Y's moral copyright will be compensated by the allocation of a total sum of €40,000 in damages.

The CENTER POMPIDOU which contributed with Mr. A and company A to the damage suffered by Mr. Y must be ordered *in solidum* with the latter to repair it. However, he justifies that the QA company purely and simply withdrew the guarantee clause for the case of infringement of an intellectual property right contained in the draft contract that had been sent to it, and this shortly before the start of the exhibition, which left the museum little room to renegotiate the contract in order to include such a clause. It further establishes that QA and the QA company were largely involved in the organization of the exhibition, controlling the choice of each work exhibited, its location and the scenography. Finally, it is common ground that the museum was at no time informed of the possibly infringing nature of the sculpture. *Under these conditions, the in solidum* condemnation of the CENTER POMPIDOU will be limited to 20% of the sums allocated.

*The damage resulting from the reproduction of the sculpture in the works*

On the occasion of the retrospective, three works were developed and published by the CENTER POMPIDOU under the strict control of QA: the exhibition catalog which reproduces from page 109 the 'Banality' series, in particular the sculpture 'Winter fact', and which was

sold 7,953 copies; the retrospective album which reproduces on page 22 the sculpture 'Fait d'hiver', of which 12,624 copies were sold and the version published from January 2015 no longer reproduces the disputed sculpture; and the portfolio which reproduces the sculpture and has sold 5,515 copies; making a total of approximately 26,000 works.

The infringement of the property right of reproduction will be compensated by a sum of €25,000 and the infringements of the right to respect the work and the right of paternity, the name of Mr. Y not being mentioned

in these three works as during the exhibition, for a total sum of €15,000. The CENTER POMPIDOU, which also contributed to the creation of these damages, is held *in solidum* to pay these sums, within the limit of 20% for the reasons previously stated.

As has been said, no claim for compensation is made on appeal against the FLAMMARION company due to the publication of the work *'Interviews with Norman Rosenthal'* reproducing the infringing sculpture, while Mr. Y requests the invalidation of the judgment in all its provisions relating to monetary penalties . The judgment can therefore only be reversed in that it ordered the FLAMMARION company to pay the sum of €2,000 to Mr. Y as damages.

*The damage resulting from the reproduction of the sculpture on the site www.jeffkoons.com*

The infringing work was visible until August 2017 on the website www.jeffkoons.com, administered by the company QA, i.e. for more than two years after the summons was issued. The bailiff's report dated March 23, 2020 produced by Mr. Y in the appeal shows that the sculpture 'Fait d'hiver' was still visible on that date on the website www.jeffkoons.com despite the prohibitory measure pronounced by the judgment accompanied by provisional execution.

It is therefore appropriate to award Mr. paternity.

The judgment will thus be reformed with regard to the monetary sentences handed down.

### On accessory measures

The appellants request the reversal of the judgment regarding the prohibitory measure ordered,

name of the freedom of creation recognized to the adapter artist and arguing that nothing makes it possible to confine the future damage that this measure supposes to only French soil for which the court has jurisdiction. They seek confirmation of the judgment in that it rejected the requests for confiscation of the sculpture and publication, and the rejection of the request for confiscation of revenues linked to the exploitation and sale of the sculpture, all described as disproportionate.

The CENTER POMPIDOU requests confirmation regarding requests for confiscations and publications.

The KL argues that the requests for confiscation of the sculpture and a ban on representation and reproduction are inappropriate and disproportionate.

Mr. Y requests, in addition to the confirmation of the banning measure ordered by the court which he wishes to see accompanied by a high penalty taking into account in particular the persistence of the presence of the sculpture on the website as of March 23, 2020, the confiscation of the infringing work, necessary according to him to stop the infringement of his copyright, on the condition that he donates it to the French State, the confiscation for his benefit of the revenue generated by the sale and the exploitation of the sculpture on the basis of article L. 331-4  of the intellectual property code and the publication of this judgment in the specialized press and on the internet.

The CENTER POMPIDOU will be prohibited, as necessary, from Mr. QA and the company QA from exhibiting the sculpture 'Fait d'hiver' and any reproduction of it, including on websites, in particular on the website www.jeffkoons.com, which is accessible to the French public, and this under restriction as will be specified in the system. The judgment will be reformed in this sense.

The judgment will, however, be confirmed for the reasons it contains in that it rejected the requests for confiscation of QA's work and its publication.

The request for confiscation of the revenues generated by the sale and use of the sculpture 'Fait d'hiver' will be rejected, Mr. Y's damage being sufficiently repaired by the compensation awarded and the prohibitory measure pronounced.

**At the request of the CENTER POMPIDOU for abusive procedure**

The meaning of this judgment necessarily leads to the rejection of the request made by the CENTER POMPIDOU for abusive procedure.

**On costs and irrecoverable expenses**

Mr. A, the company QA, the CENTER POMPIDOU, the KL and the company FLAMMARION , losing parties, will be ordered to pay the costs of the appeal and will bear the costs not included in the costs they incurred on the occasion of the present proceedings, the arrangements made on costs and irrecoverable costs of first instance being confirmed.

The sum which must be borne by Mr. A, the company QA, the CENTER POMPIDOU, the KL and the company FLAMMARION for costs not included in the costs incurred by Mr. Y can be fairly set at €70,000 , this sum, which will supplement that allocated at first instance, will be distributed between the losing parties, in their relationships with each other, as follows: €50,000 payable by Mr. A and the QA company, €10,000 payable by the CENTER POMPIDOU, €5,000 payable by KL and €5,000 payable by the company FLAMMARION .

**FOR THESE REASONS** ,

THE COURTYARD,

Excludes the STICHTING KL and receives the KL in its voluntary intervention,

The CENTER POMPIDOU rejects its request to reject documents 6, 24 and 25 of Mr. HY,

Dismisses Mr. QA and the QA company of their request to have American law applied to the facts of the case,

Said that the photograph 'Fait d'hiver' is original and eligible for copyright protection,

Confirms the judgment except in its provisions relating to the prohibitory measure and the financial penalties pronounced against Mr. QA, the company QA, the CENTER POMPIDOU and the company FLAMMARION in compensation for the damage suffered by Mr. . Y resulting from the counterfeiting of the photograph 'Fait d'hiver',

Ruling again on these points,

Prohibits the CENTER POMPIDOU as necessary, Mr. QA and the company QA from exhibiting the sculpture 'Fait d'hiver' and any reproduction of it, including on websites , in particular on the website www.jeffkoons.com, and this subject to a penalty of €600 per offense per day, starting to run after a period of one month from the notification of this judgment,

Orders *in solidum* Mr. QA, the company QA, the CENTER POMPIDOU, the latter within the limit of 20% of the sums allocated, to pay to Mr. HY as damages:

— for damage caused by the retrospective exhibition of QA's work at the CENTER POMPIDOU:

— €110,000 in compensation for the infringement of the property rights of representation on the photograph 'Fait d'hiver'

— €40,000 in compensation for violations of moral rights in the said photograph,

— for damages caused by the publication of the catalog, album and portfolio of the retrospective exhibition:

— €25,000 in compensation for the infringement of reproduction rights on the photograph 'Fait d'hiver',

— €15,000 in compensation for violations of moral rights in the said photograph,

Orders the company QA to pay Mr. HY, as damages in compensation for the damage caused by the reproduction of the infringing sculpture on the website www.jeffkoons.com:

— €8,000 in compensation for the infringement of reproduction rights on the photograph 'Fait d'hiver',

— €6,000 in compensation for violations of moral rights in the said photograph,

Mr. HY rejects his request for confiscation of the revenue generated by the sale and exploitation of the sculpture 'Fait d'hiver' and publication,

The CENTER POMPIDOU rejects its request for abusive procedure,

Orders *in solidum* Mr. QA, the company QA, the CENTER POMPIDOU, the KL and the company FLAMMARION to pay the costs of the appeal, including distraction for the benefit of Me AITTOUARES , SELARL OX , in application of article 699 of the code of civil procedure ,

Orders *in solidum* Mr. QA, the company QA, the CENTER POMPIDOU, KL and the company FLAMMARION to pay Mr. HY

of the sum of €70,000 in application of article 700 of the code of civil procedure, this sum being distributed between the losing parties, in their relationships with each other, as follows: €50,000 payable by Mr. A and the QA company, €10,000 payable by the CENTER POMPIDOU, €5,000 payable by KL and €5,000 payable by the FLAMMARION company .

THE CLERK THE PRESIDENT

**Quoted in the same comments**

Paris Court of Appeal, Pôle 1 - chamber 8, February 26, 2021, no. 20/06129

Disclaimer

- Companies
- Machine
- Pieces
- Dysfunction
- Expertise
- Provision
- Assignment
- Commercial courts
- Bill
- Trade

Paris Court of Appeal, Pôle 4 - chamber 5, May 26, 2021, no. 17/19204

- Companies
- Constitution
- Instance
- Lawyer
- Title
- Termination of functions
- Judgement
- Disclaimer

11/2/23, 2:59 PM
Case 5:23-cv-03438-PCP   Document 26-2   Filed 11/30/23   Page 110 of 297
Paris Court of Appeal, Pôle 5 chamber 1, February 23, 2021, no. 18/05911, Doctrine

- Act
- Civil Procedure

Nîmes Court of Appeal, 2nd chamber section a, May 6, 2021, no. 19/03400

Confirmation

- Terms and conditions
- Sinister
- False declaration
- Insurer
- Guarantee
- Insurance contract
- Family
- Foresight
- Forfeiture
- Mail

**Reference on the same themes**

Toulouse Court of Appeal, 3rd chamber, September 10, 2020, no. 19/02116

Partial invalidation

- European company
- Furniture
- Turnover
- Operation
- Franchise
- Sinister
- Compensation
- Emergency state
- Fees
- Expert

Rennes Court of Appeal, 4th chamber, December 20, 2018, no. 15/09899

Confirmation

- Companies
- Bridge
- Nullity of the contract
- Error
- Consent
- Breakup
- Date
- Request
- Insurer
- In solidum

Douai Court of Appeal, Chamber 2 section 2, February 8, 2018, no. 17/04025

Confirmation

- Acoustic
- Companies

- Manifestly illicit disorder
- Product
- Denigration
- Support
- Imitation
- Competitor
- Price
- Marketing

**On the same themes**

Aix-en-Provence Court of Appeal, Chamber 1-9, September 7, 2021, no. 20/12366

Disclaimer

- Overindebtedness
- Personal recovery
- Finance
- Commission
- Debtor
- Refund
- Amount
- Consumption
- Debt
- Regularization

Rouen Court of Appeal, Social Chamber, March 15, 2017, No. 15/05232

Disclaimer

- Urssaf
- Letter of observations
- Recovery
- Control
- Minutes
- Consent
- Social Security
- Hidden work
- Companies
- Observation

Court of Cassation, Civil Chamber 2, November 25, 2021, 20-18.445, Unpublished

Cassation

- Home help
- Associations
- Urssaf
- Rhône-Alpes
- Medical care
- Autonomy
- Exemptions
- Social Security
- Recovery

- Security

Texts cited in the decision

1. [Rome II - Regulation (EC) 864/2007 of July 11, 2007 on the law applicable to non-contractual obligations (Rome II)](#)
2. [Law n°57-298 of March 11, 1957](#)
3. [Law No. 75-1 of January 3, 1975](#)
4. [Intellectual property code](#)
5. [Code of Civil Procedure](#)

Back to top
Save
Register for free to print your decision
Paris Court of Appeal, Pôle 5 - chamber 1, February 23, 2021, no. 19/09059
Frequently consulted case law:

- [Paris Court of Appeal, June 28, 2013, no. 12/00791](#)
- [Paris Court of Appeal, Pôle 5 - room 10, January 23, 2017, no. 15/15702](#)
- [Paris Court of Appeal, October 25, 2013, no. 12/14338](#)
- [Paris Court of Appeal, Pôle 1 - chamber 3, March 30, 2022, no. 21/16710](#)
- [Paris Court of Appeal, Pôle 5 - chamber 4, January 5, 2022, n° 20/00737](#)
- [Paris Court of Appeal, Pôle 5 - chamber 1, September 14, 2021, no. 21/00848](#)
- [Paris Court of Appeal, Pôle 5, December 16, 2015, no. 2013/12408](#)
- [Paris Court of Appeal, Pôle 1 - chamber 1, August 23, 2019, no. 19/13434](#)
- [Versailles Court of Appeal, 20th chamber, November 12, 2020, no. 20/00310](#)
- [Paris Court of Appeal, November 4, 2020, no. 19/09129](#)
- [Paris Court of Appeal, Pôle 5 chamber 1, February 2, 2021, no. 17/17688](#)
- [Paris Court of Appeal, Pôle 5, 2nd ch.](#)
- [Paris Court of Appeal, Pôle 5 - chamber 4, January 9, 2019, no. 18/09522](#)
- [Paris Court of Appeal, Pôle 5 chamber 4, June 21, 2017, no. 15/18784](#)
- [Paris Court of Appeal, March 29, 2017, no. 15/08757](#)
- [Paris Court of Appeal, Pôle 1 - chamber 8, February 18, 2022, no. 21/16596](#)
- [Paris Court of Appeal, September 9, 2021, 20/149277](#)
- [Paris Court of Appeal, Pôle 1 chamber 1, February 21, 2017, no. 15/01650](#)
- [Court of Appeal of Aix-en-Provence, October 20, 2016, n° 15/10096](#)
- [Lyon Court of Appeal, 8th chamber, February 25, 2020, no. 19/04516](#)

1. [Doctrine](#)
2. [Court decisions](#)
3. [2021](#)
4. CA Paris, pole 5 - ch. 1, 23 Feb. 2021, n° 19/09059

Contact our sales department on 01 84 80 33 48
[Doctrine](#)
1st legal intelligence platform
[linkedin twitter facebook youtube instagram](#)
[FORSETI SAS](#) - Reproduction prohibited - Private sources, INPI, INSEE, data.gouv.fr
Product
HomeFeaturesDocument AnalyzerNewsPricesSend a decision
Sitemap
DecisionsLaws and regulationsEU regulations and directivesParliamentary documentsCollective agreementsTax agreementsLawyersFirmsCompaniesJudicial headings
Community
Opinions from our customersBlog [Common Law Podcast](#) I swear! Doctrine TV

Assistance

HelpLegal noticesT&CsPersonal dataCookies policyRefuse cookiesContact us

Doctrine

About We are recruitingInside DoctrineCode of conductPressDoctrine Lab

# EXHIBIT 8



Federal Court                                        Cour fédérale

**Date: 20180307**

**Docket: T-60-16**

**Citation: 2018 FC 269**

**Ottawa, Ontario, March 7, 2018**

**PRESENT:    The Honourable Mr. Justice Gleeson**

**BETWEEN:**

### ANDREW COLLETT

**Plaintiff**

**and**

### NORTHLAND ART COMPANY
### CANADA INC. AND BREMNER FINE ART
INCORPORATED

**Defendants**

### JUDGMENT AND REASONS

I.    Overview

[1]    The plaintiff, Mr. Andrew Collett, is a professional photographer who creates works of

natural photography. Mr. Collett has sold prints of his photographic works, in different formats,

throughout Canada and the United States, either directly or through wholesalers and galleries.

[2]     The defendants, Northland Art Company Canada Inc. [NAC Canada] and Bremner Fine

Art Incorporated operating under the name of Northland Art Company [Northland], are in the

business of acquiring and selling prints of Canadian artwork to consumers and resellers.

[3]     Mr. Collett established a business relationship with Northland in the summer of 2011,

providing prints of his works for the purposes of resale. The relationship began to break down in

2012 following a change in Northland's ownership. Mr. Collett now brings this action alleging

the defendants have infringed copyright and moral rights in his photographic works. Mr. Collett

seeks statutory damages pursuant to section 38.1 of the *Copyright Act*¸ RSC, 1985, c C-42 [the

Act] in the amount of $20,000 for each of the alleged copyright infringements, damages for the

infringement of his moral rights in the amount of $60,000, aggravated and punitive damages in

the amount of $100,000, and injunctive relief.

[4]     The defendants deny Mr. Collett's allegations and seek to have the claim dismissed with

costs.

II.    Procedural History

[5]     Mr. Collett filed a Statement of Claim on January 12, 2016. By Order dated June 20,

2016, Prothonotary Martha Milczynski granted Mr. Collett leave to amend the Statement of

Claim and add Bremner Fine Art Incorporated as a defendant to the action. On September 30,

2016 Mr. Collett brought a motion for Summary Judgment.

[6]     On December 6, 2016, Justice Ann Marie McDonald issued an Order adjourning the

motion for Summary Judgment at the request of the defendants and issued an interim injunction

against the defendants. The Order also directed the defendants to serve and file responding

material not later than December 16, 2016. The defendants did not meet this deadline.


[7]     The motion for Summary Judgment was heard on January 17, 2017 and subsequently the

parties, at the suggestion of the Court, pursued mediation in a dispute resolution conference on

April 10, 2017. Those efforts were unsuccessful. In Order and Reasons dated June 29, 2017 I

reluctantly accepted the defendants' responding material for filing, found that copyright

subsisted in the works identified in the Amended Statement of Claim [the Works], and further

found that Mr. Collett was the owner of the copyright and moral rights in the Works. A summary

trial was ordered to address the issues of infringement and remedies.


III.     Background

A.     *General*


[8]     The parties agree that in 2011 Mr. Collett began to supply printed copies of his work to

the defendant Northland. At that time Northland was owned and operated by a Mr. Paul

Bremner.


[9]     The evidence indicates Mr. Bremner sold Northland to Mr. Nicholas Tamburi in or about

September 2012. After the change of ownership Mr. Collett continued to supply printed copies of

his photographic work to allow Northland to fulfill purchase orders.

[10]    Mr. Collett reports that his relationship with Northland began to deteriorate and that between February 2013 and August 2013 he did not provide any prints of his Works to Northland. Between August 2013 and November 2013, Mr. Collett again supplied prints to fulfill Northland's purchase orders. However, in or around November 2013 Mr. Collett reports the relationship finally ended: he advised Mr. Nicholas Tamburi that Northland was no longer authorized to distribute, offer for sale or sell any of his Works.

[11]    The Works at issue include six different pieces of Mr. Collett's photographic work and his "Website Home Page" and "Bio Page":

1.  "Spirit of our Land" created on July 10, 2006;

2.  "Inspiration" created on October 15, 2007;

3.  "Fall Along the Oxtongue" created on October 1, 2007;

4.  "Algonquin" created on June 13, 2007;

5.  "Morning Paddle" created on June 27 2009;

6.  "Winter Blues" created on January 6, 2008;

7.  "Website Home Page" and "Bio Page" created on or about September 9, 2009.

[12]    Mr. Collett's undisputed evidence was that prior to August, 2013 all of the prints he supplied to Northland were framed and in one of three formats; (1) on stretched canvas; (2) mounted on board; or (3) mounted onto acrylic. In August 2013 he began supplying unframed prints on paper. He stated that between August 2013 and the termination of the relationship with Northland he provided a total of 316 prints on paper. Aside from the claims relating to his

website, the infringements Mr. Collett alleges in this action all relate to reproductions of his works in a print on paper format.

[13]    The Amended Statement of Claim makes reference to two additional Works, "The Awakening" and "Pine Cliff". No evidence was led to support the claims of infringement in respect of either of these Works and they will not be mentioned further.

IV.    Issues

[14]    In the motion for Summary Judgment Mr. Collett established that: (1) copyright subsisted in the Works; and (2) he owns the copyright and moral rights in the Works. The following issues remain to be addressed:

1.  Are the defendants jointly and severally liable if infringement is found?

2.  Were Mr. Collett's copyright and moral rights in the Works infringed?

3.  If Mr. Collett's copyright or moral rights were infringed, what remedies are to be granted?

V.    Analysis

A.    *Are the defendants jointly and severally liable if infringement is found?*

[15]    The parties do not dispute that the defendant, NAC Canada, is a separate and distinct entity from Northland. It is also not in dispute that the defendant NAC Canada was incorporated under the *Canada Business Corporations Act*, RSC, 1985, c C-44, in March 2016. The Statement

of Claim alleging infringement was filed in January 2016 and there are no allegations of

infringement that postdate NAC Canada's incorporation. An obvious question in these

circumstances is whether NAC Canada can be held liable for the alleged infringements.


[16]    Mr. Collett's counsel has urged the Court to impose liability, jointly and severally, upon

both defendants. In support of this position Mr. Collett relies on: (1) the *viva voce* evidence of

Mr. Daniel Tamburi to the effect that NAC Canada was a subsidiary of Northland; (2) Mr.

Daniel Tamburi's statement that "in my eyes it's all the same company"; (3) the shared corporate

premises; and (4) the elements of common ownership and management.


[17]    There might be circumstances where a parent corporation may be liable for the actions of

a wholly owned subsidiary on the basis that the parent is the alter ego of the subsidiary (Kevin

McGuinness, *Canadian Business Corporations Law,* 3rd ed vol 1 (Toronto: LexisNexis, 2017) at

para 7.117, citing *Gregorio v Intrans-Corp* (1994)*,* 18 OR (3d) 527, 115 DLR (4th) 200 (Ont

CA)). There might also be circumstances where, applying a theory of "group enterprise," a

corporation may be held jointly liable for the actions of another (*Teti and ITET Corp v Mueller

Water Products*, 2015 ONSC 4434 at para 21). Neither theory of liability was advanced in this

matter. In any event it is not at all clear whether either theory could support holding a

corporation liable for events that occurred prior to its incorporation.


[18]    While the factual circumstances Mr. Collett has highlighted are noted, those

circumstances alone cannot support the imposition of liability on a corporation that did not exist

at the time the alleged harmful activity was undertaken. NAC Canada shares no liability for any

of the infringement claimed in this proceeding.

B.    *Were Mr. Collett's copyright and moral rights in the Works infringed?*

[19]    Subsection 3(1) of the Act provides that, in relation to a work, copyright "means the sole

right to produce or reproduce the work or any substantial part thereof in any material form

whatever," and also includes the sole right to authorize such acts. Subsection 27(1) of the Act

provides "[i]t is an infringement of copyright for any person to do, without the consent of the

owner of the copyright, anything that by this Act only the owner of the copyright has the right to

do."

[20]    Subsection 14.1(1) of the Act provides that "[t]he author of a work has, subject to section

28.2, the right to the integrity of the work and, in connection with an act mentioned in section 3,

the right, where reasonable in the circumstances, to be associated with the work as its author by

name or under a pseudonym and the right to remain anonymous."

[21]    Section 28.1 provides that "[a]ny act or omission that is contrary to any of the moral

rights of the author of a work or of the performer of a performer's performance is, in the absence

of the author's or performer's consent, an infringement of those rights."

[22]    Section 28.2 provides that an author's right to the integrity of a work is infringed "only if

the work or the performance is, to the prejudice of its author's or performer's honour or

reputation, (a) distorted, mutilated or otherwise modified; or (b) used in association with a

product, service, cause or institution." The jurisprudence recognizes that an author's right to the integrity of a work includes not only a highly subjective aspect, which the author of the work must establish, but also an objective element requiring evaluation of the prejudice to that author's honour or reputation based on public or expert opinion (*Maltz v. Witterick* 2016 FC 524 at para 49, citing *Prise de parole Inc. v Guérin Éditeur Ltée* (1995), 66 CPR (3d) 257, 104 FTR 104 (TD),appeal dismissed (1996), 73 CPR (3d) 557, 206 NR 311 (FCA).

(1)    The Work "Morning Paddle"

[23]    Mr. Collett's evidence was to the effect that between November 2013 and early 2014–after he had advised Northland through Mr. Nicholas Tamburi that Northland was no longer authorized to distribute, offer for sale or sell any of his Works–Northland advertised, made and sold unauthorized prints of the Work "Morning Paddle" on the defendants' website.  He stated that Mr. Darling, a former Northland employee, who had come to work for Mr. Collett, brought this to his attention. He further stated he asked Northland on a number of occasions to remove the Work from the website but Northland refused to do so.

[24]    Mr. Collett also stated that in January 2014 Northland displayed and offered his Works for sale at various tradeshows. In his oral evidence he generally identified these Works as including "Algonquin", "Morning Paddle" and "Winter Blues". These Works were in a print on paper format. Mr. Collett's evidence was that these prints were unauthorized prints of his Works and were not inventory left over from their prior business relationship.

[25]    Mr. Collett stated that a significant percentage of the purchase orders received from Northland between August and November 2013 were accompanied by tag numbers indicating the specific customer Northland was ordering the print for, that the prints he supplied were to fulfill specific purchase orders, and that Northland did not maintain surplus stock of his Works in any format. He stated that Northland had no reason to stock his Works as he delivered authorized prints on demand. He testified that any surplus prints on paper Northland held at the end of their relationship would have been minimal and insufficient to satisfy orders from, for example, trade shows.

[26]    On cross-examination Mr. Collett acknowledged that as many as 131 of the 316 prints on paper, representing all of the Works he supplied Northland between August and November 2013 were sold without reference to a tag number and these Works could have gone into Northland inventory. He further acknowledged that any returned orders from identified customers may have gone into Northland inventory.

[27]    I find Mr. Collett's evidence to be credible and corroborated by both the affidavit and oral evidence provided by Mr. Darling. I do not find Mr. Nicholas Tamburi's claim that Northland had "hundreds of prints left in stock that it [p]urchased from Collett" when it ceased dealing with Mr. Collett to be at all credible.

[28]    Despite my misgivings about Mr. Tamburi's evidence on this point, I am unable to conclude that Northland infringed Mr. Collett's copyright in "Morning Paddle" by advertising prints for sale on its website between December 2013 and February 2014.

[29]    Mr. Collett acknowledges not all prints on paper he sold Northland were identified for specific customers. I have reviewed the purchase orders included at Exhibit "C" to Mr. Collett's reply affidavit and it is evident that a number of copies of "Morning Paddle" were ordered without an associated tag number. Similarly Exhibit "D" of Nicholas Tamburi's affidavit identifies three copies of this Work being advertised for sale at a reduced rate in January 2014. This is consistent with Mr. Tamburi's claim that as a result of the termination of their relationship, Northland was disposing of a limited number of authorized copies of Mr. Collett's work held in inventory.

[30]    There is no specific evidence that would allow me to conclude Northland was seeking orders for large quantities of "Morning Paddle" by including the Work on the Northland website in the three months following the termination of the business relationship.

[31]    Similarly, while there is a general allegation of Works being displayed at tradeshows in January 2014 the evidence that these Works included "Morning Paddle" is limited to a very general statement in Mr. Collett's oral evidence that "[…] they started showing up on the walls of their booths at shows. So we'd see, oh, Morning Paddle, or Algonquin Moose."

[32]    In the circumstances, I am unable to conclude that the evidence has established, on a balance of probabilities, that Northland infringed Mr. Collett's copyright in "Morning Paddle" between December 2013 and February 2014.

(2)     The Work "Spirit of Our Land"

[33]     Mr. Collett's evidence is that in the fall of 2015 he discovered Northland had sold 50 prints of "Spirit of Our Land" to Funding Innovation, a prospective customer of Mr. Collett's. He stated that none of these prints were supplied by him and that he did not authorize the production of the prints. Rather, he alleges Northland made unauthorized copies of "Spirit of Our Land" from an original print.

[34]     Mr. Collett further states that Northland:

1.     participated in a trade show in August 2015 where unauthorized prints of "Spirit of Our Land" were displayed and orders solicited;

2.     posted an unauthorized copy of "Spirit of Our Land" on their website and advertised unauthorized copies for sale; and

3.     hid or removed Mr. Collett's signature from at least fifty unauthorized prints of "Spirit of Our Land"–those sold to Funding Innovation–and replaced his signature with that of another photographer, a Mr. Anthony Randall.

[35]     Mr. Collett also stated that the unauthorized copies produced by the Defendants were necessarily of lower resolution and inferior quality to his authorized prints. He stated that inferior copies of his work in the marketplace threatens the integrity of his work and is damaging to his reputation.

[36]     Mr. Chris Carter, an officer with Funding Innovation, confirms that Funding Innovation

purchased 50 prints of a Work called "Spirit of Our Land," attributed to Anthony Randall, from

Northland. He also states that remaining copies of this Work were returned to Northland after

Mr. Collett raised concerns about Anthony Randall's authorship of the Work. Mr. Anthony

Randall has provided evidence confirming he was not the author of the Work.

[37]     Mr. Nicholas Tamburi's evidence was that the scanning of "Spirit of Our Land" and the

placement of Mr. Randall's signature on the Work was done in error by a graphic designer

employed by Northland, Ms. Elisabeth Hrycyna. Mr. Tamburi's evidence in respect of the

alleged infringing activity was generally evasive and argumentative. His oral evidence was also

contradictory in a number of areas. I did not find Nicholas Tamburi's evidence on this issue to be

either persuasive or credible.

[38]     Ms. Hrycyna did not appear at the summary trial for reasons that are unclear. Her failure

to attend was not pursued by Northland. She did however provide an affidavit in support of the

Summary Judgment motion. In that affidavit she stated Nicholas Tamburi provided her with a

digital copy of "Spirit of Our Land" and instructed her to reproduce prints from it and to place

Anthony Randall's signature on the prints. Northland did not seek to cross-examine her on the

affidavit.

[39]     I accept Ms. Hrycyna'a evidence and find on a balance of probabilities that Northland

intentionally reproduced "Spirit of Our Land" and attributed the Work to Anthony Randall. I am

also satisfied on a balance of probabilities that unauthorized copies of "Spirit of Our Land" were displayed at a tradeshow in 2015 and the Work was offered for sale on the Northland website.

[40]    Reproducing "Spirit of Our Land" without Mr. Collett's authorization infringed his copyright in the Work. Attributing the reproductions to Anthony Randall infringed Mr. Collett's moral right "to be associated with the work as its author".

[41]    Having concluded an infringement of moral rights has been established for this Work under section 28.1 of the Act, I need not consider whether the inferior quality of the Northland prints also infringed Mr. Collett's right to the integrity of the Work as contemplated by section 28.2.

       (3)     The Works "Inspiration" and "Fall Along the Oxtongue"

[42]    Mr. Collett alleges that in early December 2015, he learned the defendants were engaged in infringing activity with respect to the Works "Inspiration" and "Fall Along the Oxtongue". Specifically he states the Defendants:

    1.     made and sold unauthorized prints through "Service Plus Rewards" an employee and referral source appreciation program operated by TD Bank;

    2.     supplied unauthorized prints of "Fall Along the Oxtongue" that were being offered on the Ticketmaster e-rewards website; and

3.      authorized the Service Plus Rewards and Ticketmaster e-rewards websites to
reproduce the Works "Inspiration" and "Fall Along the Oxtongue" on their
websites without Mr. Collett's knowledge or authorization.

[43]    Mr. Daniel Tamburi's evidence was to the effect that he was unaware of any relationship
between Northland, Service Plus Rewards or Ticketmaster and that he believed that any
relationship must have arisen during Mr. Bremner's ownership of Northland.  Mr. Darling, who
testified he had worked for Northland in 1989 and returned in 2008 where he was employed as a
warehouse manager, a national account manager and for a short time in 2013 as the Vice-
President of Operations, stated he had no knowledge of Service Plus Rewards or Ticketmaster as
customers of Northland. He states "as the warehouse manager I pretty much knew every
customer."

[44]    The Service Plus Rewards site does refer to Northland in its description of the Work
"Inspiration." But this alone is insufficient to establish, on a balance of probabilities that there
has been an intentional infringement of Mr. Collett's copyright. The evidence also fails to
establish that the prints being offered on the rewards sites are prints on paper, the format that Mr.
Collett alleges Northland used in infringing his copyright. Furthermore the evidence fails to
establish on a balance of probabilities that Northland authorized the reward websites to
reproduce his work.

[45]    Infringement of Mr. Collett's copyright and moral rights in the Works "Inspiration" and
"Fall Along the Oxtongue" has not been established on a balance of probabilities.

(4)    The Work "Algonguin"

[46]    Mr. Collett states that after learning in early December 2015 that the Works "Inspiration" and "Fall Along the Oxtongue" were being offered on reward websites, he discovered his work "Algonquin" had been reproduced on Northland's website and was being offered for sale.  Mr. Daniel Tamburi states that inclusion of the work on the website in 2015 was an error and it was removed despite having "some of his prints left in stock".

[47]    Daniel Tamburi's claim to still have Collett prints in stock as late as December 2015 is a bald assertion. It is not supported by evidence to show Collett prints remained in stock more than two years after the business relationship between Northland and Mr. Collett had ended. His evidence that Northland still had prints of Mr. Collett's Work in stock in December 2015 was also inconsistent with evidence he provided in both examination in chief and cross examination to the effect that Northland, in December 2015, had not sold or promoted Andrew Collett's Work "for a couple of years".

[48]    I am satisfied the evidence supports a finding that the reproduction of "Algonquin" on Northland's website infringed Mr. Collett's copyright in the Work. However there is no evidence of actual sales of "Algonquin." There is also no evidence relating to the quality of any reproduction of this Work, and as a result I am not satisfied that an infringement of Mr. Collett's moral rights in this Work has been established.

(5)     The Works "Winter Blues", "Website Home Page" and "Bio Page"

[49]     Mr. Collett states that the defendants have reproduced the entirety of his "Website Home Page" and "Bio Page" on their website to create the false impression that Northland continues to represent him and to promote the sale of unauthorized prints of his Works. He further states that in doing so the Defendants have reproduced "Winter Blues" without authorization.

[50]     Mr. Daniel Tamburi's evidence was to the effect that any link to Mr. Collett's web page was accidental and he alleged that the Northland website had been hacked.

[51]     The evidence that Mr. Collett's website had been linked to the Northland site is uncontroverted, as is the evidence that the link was neither removed nor disabled until 2015. The evidence of the Tamburi brothers on this issue was confused, evasive and in many respects incredible. I am satisfied on a balance of probabilities that Northland continued to maintain a link to Mr. Collett's website knowing it was not authorized to do so. In doing so Northland infringed Mr. Collett's copyright in the "Website Home Page" which included a reproduction of the image "Winter Blues" and the "Bio Page". A breach of moral rights has not been demonstrated in the evidence.

C.     *What Remedy?*

[52]     Having found infringement of the copyright and moral rights in the Work "Spirit of Our Land" and an infringement of copyright in the Works "Algonquin", the "Website Home Page"

which included a reproduction of the image "Winter Blues", and the "Bio Page" I will now address remedies.

[53]    Mr. Collett seeks a declaration that his copyright and moral rights in the Works have been infringed by the defendants. A declaration will issue that Northland has infringed Mr. Collett's copyright and moral rights in "Spirit of Our Land", and infringed his copyright in "Algonquin", the "Website Home Page" which includes a reproduction of "Winter Blues", and the "Bio Page".

[54]    Mr. Collett also seeks a permanent injunction against the defendants. While I have not found NAC Canada liable for infringement in this matter, in light of the evidence that the two corporate defendants are "all the same company" I am satisfied that an injunction against both is warranted. The interim injunction granted by Order of Justice McDonald, dated December 6, 2016, shall be made permanent.

[55]    Mr. Collett also seeks: (1) statutory damages pursuant to section 38.1 of the *Copyright Act* in the amount of $20,000 per Work infringed; (2) $60,000 for the infringement of moral rights; (3) aggravated, punitive and exemplary damages in the amount of $100,000; (4) pre and post judgment interest at the maximum allowable rate; and (5) costs on the highest scale.

(1)    Statutory Damages

[56]    Subsection 38.1(1)of the *Copyright Act* states the following:

| Statutory damages | Dommages-intérêts préétablis |
|---|---|
| 38.1 (1) Subject to this section, a copyright owner may elect, at any time before final judgment is rendered, to recover, instead of damages and profits referred to in subsection 35(1), an award of statutory damages for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, | 38.1 (1) Sous réserve des autres dispositions du présent article, le titulaire du droit d'auteur, en sa qualité de demandeur, peut, avant le jugement ou l'ordonnance qui met fin au litige, choisir de recouvrer, au lieu des dommages-intérêts et des profits visés au paragraphe 35(1), les dommages-intérêts préétablis ci-après pour les violations reprochées en l'instance à un même défendeur ou à plusieurs défendeurs solidairement responsables : |
| (a) in a sum of not less than $500 and not more than $20,000 that the court considers just, with respect to all infringements involved in the proceedings for each work or other subject-matter, if the infringements are for commercial purposes; and | a) dans le cas des violations commises à des fins commerciales, pour toutes les violations — relatives à une oeuvre donnée ou à un autre objet donné du droit d'auteur —, des dommages-intérêts dont le montant, d'au moins 500 $ et d'au plus 20 000 $, est déterminé selon ce que le tribunal estime équitable en l'occurrence; |
| […] | […] |

[57]    In written and oral submissions Mr. Collett has elected an award of statutory damages and seeks the maximum amount with respect to the infringement of each of the Works.

[58]    In assessing statutory damages the Act identifies, at subsection 38.1(5), the following factors for consideration where infringement is for commercial purposes:

| Factors to consider | Facteurs |
|---|---|
| (5) In exercising its discretion under subsections (1) to (4), the court shall consider all relevant factors, including | (5) Lorsqu'il rend une décision relativement aux paragraphes (1) à (4), le tribunal tient compte notamment des facteurs suivants : |
| (a) the good faith or bad faith of the defendant; | a) la bonne ou mauvaise foi du défendeur; |
| (b) the conduct of the parties before and during the proceedings; | b) le comportement des parties avant l'instance et au cours de celle-ci; |
| (c) the need to deter other infringements of the copyright in question; | c) la nécessité de créer un effet dissuasif à l'égard de violations éventuelles du droit d'auteur en question; |

[59]    I am satisfied that the infringements in this circumstance were for commercial purposes, however there is no evidence before me of the profits, if any, generated as a result of the infringing activity.  In the circumstances I am required to arrive at a reasonable assessment of statutory damages in all of the circumstances, "in order to yield a just result" (*Telewizja Polsat SA v Radiopol Inc*, 2006 FC 584 at para 37).

[60]    The factors set out in subsection 38.1(5) of the Act are all aggravating to some degree in relation to Northland.

[61]    First, Northland's bad faith conduct in respect of the Work "Spirit of Our Land" was flagrant and deliberate. It involved the unauthorized production of the Work, the intentional attribution of the Work to another artist and the sale of 50 copies of the unauthorized Work into the very marketplace that Mr. Collett relies upon in the pursuit of his business. The bad faith

conduct in respect of the remaining infringing activity was not nearly as egregious as that demonstrated in respect of the Work "Sprit of Our Land," but it similarly reflects intentional conduct and a disregard for the rights of the copyright holder.

[62]     Second, during these proceedings Northland also failed to comply with filing timelines imposed by this Court and there was a failure to ensure the timely payment of costs ordered by Justice McDonald.

[63]     Third, in light of the evidence showing the apparent ease with which copyright infringement of this type can be—and in this case has been—accomplished using modern technology, there is a clear and compelling need to deter the defendants from further infringements of Mr. Collett's Works.

[64]     Finally I note the Order of Justice James Russell in *Lorenz v Northland Art Company Canada Inc et al*, T-376-17 [*Lorenz*] where, in circumstances that are strikingly similar to those in this case, summary judgment was granted and Justice Russell stated "the inference is unavoidable that the Defendants knew what they were doing was wrong and used a false name to avoid detection."

[65]     Having regard to all these circumstances and the factors set out above I assess the award of statutory damages at the maximum of $20,000 for infringement of the Work "Spirit of Our Land." I assess statutory damage awards of $10,000 for the infringement of the Work "Algonquin", $7,500 for infringement of the "Website Home Page" which includes a

reproduction of "Winter Blues", and a further $7,500 for infringement of the "Bio Page". Northland is therefore ordered to pay a total of $45,000 in statutory damages pursuant to section 38.1 of the *Copyright Act*.

[66]    I recognize that subsection 38.1(5) requires the Court to consider "all relevant factors" when exercising its discretion to award statutory damages. To that end I have considered, in addition to the factors highlighted above, the factors of denunciation and retribution. However, in the present circumstances I feel these factors are better addressed by a separate award of punitive damages as discussed below.

(2)    Moral Damages

[67]    Northland's conduct in producing inferior versions of "Spirit of Our Land" in a significant quantity, attributing that Work to another artist and then selling the inferior product into the very marketplace in which Mr. Collett carrys on business violated his moral rights in that Work.

[68]    In *Lorenz* Justice Russell awarded $10,000 for infringement of moral rights in substantially similar circumstances. I am satisfied that Mr. Collett is entitled to an amount of $10,000 for the infringement of his moral rights.

(3)      Punitive Damages

[69]     An election by the owner of copyright to seek statutory damages does not affect any right

that the copyright owner may have to exemplary or punitive damages (*Copyright Act,* subsection

38.1(7)).

[70]     Punitive damages may be awarded against a defendant where the impugned conduct

represents a "marked departure from ordinary standards of decent behaviour;" the objective of

punitive damages is to punish a defendant (*Whiten v Pilot Insurance Co*, 2002 SCC 18 at para 36

[*Whiten*]).

[71]     Punitive damages should only be awarded where all other damages have been taken into

account and the Court concludes those damages are "inadequate to accomplish the objectives of

retribution, deterrence and denunciation" (*Whiten* at para 123).

[72]     In my view, a punitive damages award is required in these circumstances to appropriately

address the objectives of retribution and denunciation. The factors to be considered when

considering punitive damages were summarized by Justice Boswell in *Microsoft Corporation v*

*Liu,* 2016 FC 950 [*Liu*] at para 27:

> The relevant factors to be considered whether an award of punitive
> damages should be made were noted by this Court in *Yang*, where
> Justice Snider stated:
>
> > [47]     [...] As summarized by the Nova Scotia
> > Supreme Court in *2703203 Manitoba Inc. v. Parks*,
> > 47 C.P.R. (4th) 276 at para. 38 (rev'd in part 57
> > C.P.R. (4th) 391(N.S.C.A.)), the relevant factors to
> > consider are as follows:

- Whether the conduct was planned and deliberate;

- The intent and motive of the defendant;

- Whether the defendant persisted in the outrageous conduct over a lengthy period of time;

- Whether the defendant concealed or attempted to cover up its misconduct;

- The defendants awareness that what he or she was doing was wrong; and

- Whether the defendant profited from its misconduct.

[73]    The infringing activity in this case was planned and deliberate. It was motivated by profit. It was not limited to a single incident or occurrence. Northland was well aware of its infringing activity and sought to conceal the activity by attributing Mr. Collett's Work to another photographer. In short, Northland and its managers and officers demonstrated complete disregard for Mr. Collett's legitimate interests in protecting his copyright.

[74]    I am satisfied, having considered the nature of the conduct, and having concluded the quantum of statutory and moral damages awarded are insufficient to adequately address the objectives of retribution and denunciation which are warranted in this case, that a punitive damage award is appropriate.

[75]    Mr. Collett seeks punitive damages in the amount of $100,000. In *Liu* Justice Boswell notes at para 28 that "This Court in recent years has awarded punitive damages against individual defendants in amounts ranging from $15,000 to $100,000". Although Northland is a

corporate defendant I believe the upper and lower ends of the range identified in *Liu* are of assistance in this case.

[76]    The amount sought by Mr. Collett falls within the upper end of the range and is in my opinion excessive. However, in light of Northland's conduct, and in the interests of denunciation and retribution, a substantial award is nonetheless warranted.  I am of the opinion that punitive damages for the infringements in the amount of $25,000 is appropriate in this case.

(4)    Interest

[77]    Mr. Collett shall have pre- and post-judgment interest. Pre-judgment interest is to run from March 2015, the date Ms. Hrycyna's evidence establishes she was instructed to produce unauthorized copies of "Spirit of Our land", and is to be calculated on the basis that the cause of action arose in Ontario in accordance with subsection 36(1) of the *Federal Courts Act*, R.S.C. 1985, c. F-7. Post-judgment interest is to run from the date of this Judgment, and is also to be calculated on the basis that the cause of action arose in Ontario in accordance with subsection 37(1) of the *Federal Courts Act*.

(5)    Costs

[78]    Mr. Collett has sought costs "on the highest scale" and has submitted a draft bill of costs setting out actual fees inclusive of disbursements and HST in the amount of $49,463.32. The draft bill also sets out costs based on Column V of Tariff B, again inclusive of disbursements and HST, in the amount of $18,003.32.

[79]     While Northland's conduct in defending this matter has complicated and lengthened the proceeding I am unable to characterize that conduct as reprehensible, scandalous or outrageous and thus costs on a solicitor-client basis are not warranted (*Liu* at para 40).

[80]     An award of costs in the fixed amount of $20,000 inclusive of disbursements and taxes is appropriate in this case.

## JUDGMENT IN T-60-16

**THIS COURT'S JUDGMENT is that**:

1.      The plaintiff's claim is successful in part.

2.      The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company has infringed Mr. Collett's copyright and moral rights in "Spirit of Our Land," and infringed his copyright in "Algonquin," the plaintiff's "Website Home Page" which includes a reproduction of "Winter Blues," and his "Bio Page."

3.      The defendants themselves and their officers, directors, agents and employees, and anyone acting under their control shall be permanently restrained from:

    a.      Reproducing, without the plaintiff's expressed written consent, any of the plaintiff's Works, or a substantial part thereof;

    b.      Reproducing, without the plaintiff's expressed written consent, any other Work created by the Plaintiff, or a substantial part thereof, whether or not such Work exists as of today;

    c.      Selling, distributing, exposing for sale, or offering for sale, without the plaintiff's expressed written consent, any copies of the plaintiff's Work;

    d.      Authorizing, assisting, or directing other with respect to the plaintiff's Work.

4.      The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff the amount of $45,000 as statutory damages under section 38.1 of the *Copyright Act*, RSC 1985 c. C-42.

5.   The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff the amount of $10,000 for infringement the plaintiff's moral rights.

6.   The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff the amount of $25,000 as punitive damages.

7.   The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff costs in the fixed amount of $20,000 inclusive of disbursements and taxes.

8.   The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff pre-judgment interest calculated in accordance with subsection 36(1) of the *Federal Courts Act*, RSC, 1985, c F-7 and the applicable Ontario law.

9.   The defendant Bremner Fine Art Incorporated operating under the name of Northland Art Company shall forthwith pay to the plaintiff post-judgment interest calculated in accordance with subsection 37(1) of the *Federal Courts Act*, RSC, 1985, c F-7 and the applicable Ontario law.

"Patrick Gleeson"
Judge

## FEDERAL COURT

## SOLICITORS OF RECORD

**DOCKET:**                       T-60-16

**STYLE OF CAUSE:**         ANDREW COLLETT v NORTHLAND ART COMPANY
                            INC. AND BREMNER FINE ART INCORPORATED

**PLACE OF HEARING:**      TORONTO, ONTARIO

**DATE OF HEARING:**       NOVEMBER 6, 2017

**JUDGMENT AND REASONS:**  GLEESON J.

**DATED:**                 MARCH 7, 2018


**APPEARANCES:**

John Simpson                                        FOR THE PLAINTIFF


Robert Grad                                        FOR THE DEFENDANTS


**SOLICITORS OF RECORD:**

Shift Law                                           FOR THE PLAINTIFF
Toronto, Ontario

Grad Law Professional Corporation                   FOR THE DEFENDANTS
Toronto, Ontario

# EXHIBIT 9

Identity theft: Waits wins damages over VW advert | The Independent | The Independent

 INDEPENDENT

 Subscribe    Menu

NEWS    SPORTS    VOICES    **CULTURE**    LIFESTYLE    TRAVEL    PREMIUM

Culture > Music > News

# Identity theft: Waits wins damages over VW advert

**Graham Keeley**  •  Saturday 21 January 2006 01:00  •   Comments

    



**Sign up to Roisin O'Connor's free weekly newsletter Now Hear This for the inside track on all things music**



[ Email                                                                        ]   SIGN UP

☐ I would like to be emailed about offers, events and updates from The Independent. Read our privacy notice

The gravelly voice which accompanies his oddball but strangely addictive blues songs is his trademark. One fan famously described Tom Waits' caustic tones as "how you would sound if you drank a quart of bourbon, smoked a pack of cigarettes and swallowed a pack of razor blades late at night after not sleeping for three days".

It is a unique sound in the music industry. Or at least that is what the American singer thought when he turned down an offer to do an advertisement for Volkswagen-Audi España.



What Waits didn't know was that the car company and their agency would get an impersonator to cover his song "Innocent When You Dream" for the advertisement, which was used in Spain five years ago.

That decision has now cost the Volkswagen-Audi and the production company that made the advertisement dear.

An appeal court in Barcelona awarded the singer €36,000 (£24,500) in damages yesterday for copyright infringement and €30,000 for violation of his moral rights, which protect a person's personality and reputation.

Unluckily, for Volkswagen-Audi and the Spanish production company Tandem Campany Guasch, which was named in the lawsuit, Waits was in Spain when the advertisement was screened on television.

Waits claimed he had rejected a request by Tandem Campany Guasch to use the song. After the case, he said: "Now they understand the words to the song better. It wasn't 'Innocent When You Scheme', it was 'Innocent When You Dream'."

Waits and his publisher, Hans Kusters Music, won an initial court judgment in March 2004 before the case went to the appeal court.



100Gbps IP Transit $4000/month

Global Internet Backbone 30,000+ BGP sessions, 9500+ networks, 250+ exchanges. Join Us!

Volkswagen-Audi and Tandem Campany Guasch declined to comment on the Barcelona court's decision.

However, perhaps Volkswagen-Audi and the production company should have done their homework better before trying it on with a musician who is famous for refusing any requests to use his songs in advertisements.



Enjoy unlimited access to 70 million ad-free songs and podcasts with Amazon Music
**Sign up now for a 30-day free trial**



He is notoriously litigious and has a similar case pending in Germany against Opel, owned by General Motors, and the advertisement agency McCann Erickson.

Opel also allegedly used a Waits impersonator in a car advertisement shown in Finland and Sweden.

Waits, a reclusive singer who rarely performs outside the US, argues that advertisements damage his "artistic credibility". He said: "Commercials are an unnatural use of my work. It's like having a cow's udder sewn to the side of my face. Painful and humiliating.

"If I stole an Opel, Lancia or Audi, put my name on it and resold it, I'd go to jail. But over there they ask, you say no, and they hire impersonators. They profit from association and I lose time, money and credibility. What's that about?"

In 1990, Waits was awarded $2.6m (£1.4m) in damages by a court in California after he sued Frito-Lay, the American food company that makes Doritos snacks, for "false endorsement". The company had hired someone to impersonate Waits' voice on a version of his song "Step Right Up" for a radio advertisement.

Stephen Carter, a Waits fan from Dallas, Texas, who performs Waits' songs with his own band, was so good at imitating the singer that he was picked by Frito-Lay's advertising agency to "be Tom Waits".

Ironically, the song, which was written in 1976, is a parody of commercial hucksterism, and consists of a succession of jokey advertising pitches.

---

 **Join our commenting forum**
Join thought-provoking conversations, follow other Independent readers and see their replies

 Comments ↓

---

Promoted stories                    CCPA Notice                                    Tabola Feed

**Amazon Hates When Prime Members Do This, But They Can't Stop You**
ONLINE SHOPPING TOOLS | Sponsored

**Nick Jonas Sets Record High with Divorce Settlement**
FAMILYTHIS | Sponsored

**If you own a mouse, you have to try this game. No Install. Play for free.**
COMBAT SIEGE | Sponsored

Loading...



**GET IN TOUCH**

Contact us

 

**OUR PRODUCTS**

Subscribe

Register

Newsletters

Donate

Today's Edition

Install our app

Archive

International editions

Independent en Español

Independent Arabia

Independent Turkish

Independent Persian

Independent Urdu

Evening Standard

**LEGAL**

**EXTRAS**

Code of conduct and complaints

Advisor

Contributors

Puzzles

Cookie policy

All topics

Donations Terms & Conditions

Betting

Privacy notice

Voucher codes

User policies

Compare

Modern Slavery Act

Competitions and offers

Independent Advertising

Independent Ignite

Syndication

Working at The Independent

# EXHIBIT 10

IP Portal

 OMPI

Ayuda ⌄    Español ⌄    Conectarse al portal de PI

Inicio  >  WIPO Lex  >  Base de datos

LEYES    TRATADOS    SENTENCIAS    CONSULTAR POR JURISDICCIÓN

# Australia AU109-j

## Perez v Fernandez [2012] FMCA 2

🗛 Machine translation                                                              +

***Perez & Ors vFernandez*** **[2012] FMCA 2**

**FEDERAL MAGISTRATES COURT OF AUSTRALIA**

DRIVER FM

**DRIVER FM:**

Introduction and background

1      These proceedings concern the infringement of copyright and moral rights claimed by the
applicants (Mr Perez, an international recording artist known as "Pitbull" and two corporate
entities associated with him) in a sound recording and musical work known as *Bon, Bon*.
The infringements involved the respondent (Mr Fernandez, a disc jockey and music
promoter in Perth) distorting the *Bon, Bon* work in a way which was said to be harmful to its
author's reputation, and then streaming that distorted version of the song from a website
owned and operated by Mr Fernandez.

2      The applicants seek declarations as to infringements, injunctions, damages, interest and
costs. Mr Fernandez initially resisted the application in its entirety (and indeed intended to
seek its summary dismissal as an abuse of process, having regard to other proceedings
between the parties in the Supreme Court of NSW) but these proceedings were partially
settled and I made consent orders on 7 July 2011 which note the following undertakings
given by Mr Fernandez and the following agreed statement of facts:

I, Jaime Fernandez, undertake to the Court that:

1.      I will not, by myself, or by my servants or agents, make copies of, or communicate to the public in Australia, the whole or a substantial part of the Bon, Bon Sound Recording, or authorize any third person to do such acts in Australia, without the licence of the third applicant.

2.      I will not, by myself, or by my servants or agents, infringe the first applicant's moral rights in the literary and musical works comprised in the Bon, Bon Song.

3       Mr Fernandez also provided an apology on his website.

Agreed statement of facts[1]

Parties

4       Mr Perez is and was at all material times: an internationally-renowned performing artist known as "Pitbull" whose repertoire includes the *Bon, Bon* Song released in November 2010 in the United States of America on Mr Perez's album "Armando"; a natural person able to sue; a citizen of, and ordinarily resident in, the United States of America; and an officer of the second applicant.

5       Mr 305 is and was at all material times: a record label engaged in *inter alia* the licensing of copyright in sound recordings, including a sound recording embodying the *Bon, Bon* Song; a company incorporated under the laws of the United States of America; and a company able to sue.

6       Sweat It Out is and was at all material times: a record label engaged in *inter alia* the licensing of copyright in sound recordings, including the *Bon, Bon* Sound Recording; a company incorporated under the laws of the Commonwealth of Australia; and a company able to sue.

*Bon, Bon* Song

7       The *Bon, Bon* Song was created in the United States of America in 2010.

8       The *Bon, Bon* Song is an arrangement created by Mr Perez in 2010 of two earlier songs known as "We No Speak Americano" and "Tu Duo Fa L'Americano".

9       The song known as "We No Speak Americano" was written by Nicola Salerno, Matthew Handley, Duncan MacLennan and Andrew Stanley and the song known as "Tu Duo Fa L'Americano", was written by Renato Carsone (the Earlier Songs).

10      Each of the Earlier Songs comprises original music and literary works within the meaning of the *Copyright Act 1968* (Cth) ("the Copyright Act").

11      Mr Perez's creation of the *Bon, Bon* Song consisted of the addition of original lyrics and original music to the Earlier Songs.

12      The *Bon, Bon* Song comprises original music and literary works in the form of an adaptation of the Earlier Songs, in which copyright subsists.

13      Mr Perez is the author of the *Bon, Bon* Song and enjoys the rights of integrity of authorship in the copyright works comprised in the *Bon, Bon* Song pursuant to the Copyright Act.


*Bon, Bon* Sound Recording

14      The *Bon, Bon* Song is embodied in the *Bon, Bon* Sound Recording.

15      The *Bon, Bon* Sound Recording is a sound recording in which copyright subsists within the meaning of s.89 of the Copyright Act.

16      Mr 305 and Sweat It Out are the owners of copyright in the *Bon, Bon* Sound Recording.

17      Sweat It Out is exclusively licensed to make and distribute copies and otherwise exploit and protect the copyright in the *Bon, Bon* Sound Recording in Australia.


Suave Website

18      The Suave Website was set up by Mr Saxon Mailey in, or before, April 2008.

19      Mr Mailey and Mr Fernandez are co-workers.

20      The Suave Website was created for the purposes of promoting events that Mr Fernandez organized either by himself or with others.

21      The Suave Website was maintained by Mr Mailey from April 2008 to July 2009, and by Mr Fernandez since that time.

22      The registered owner of the Domain Name is Mr Oscar Texeira.

23      Mr Texeira and Mr Fernandez are business partners.

24      Mr Fernandez is the technical contact for the Suave Website.

25      Mr Fernandez was in receipt of website hosting services from www.justhost.com.au

26      Mr Fernandez owns the Suave Productions business name.

27      Mr Fernandez was wholly responsible for the content that appeared on the Suave Website from 1 November 2010 to the present.


Creation of Mixed Bon, Bon Song

28      In 2008, Mr Fernandez obtained a recording commonly known as an "Audio Drop" in which Mr Perez speaks the words to the effect of "Mr 305 and I am putting it down with DJ Suave" (Audio Drop). The Audio Drop was provided to Mr Fernandez in connection with the promotion of an Australian tour that Mr Fernandez and another promoter had organized in 2008.

29    In 2008, Mr Fernandez obtained a recording containing the *Bon, Bon* Song from Mr Perez's
      "Armando" album, which Mr Fernandez had been given by a friend, Mr Jairo Escobar who
      resides in Chile. The album was a gift from Mr Escobar and was delivered to Mr Fernandez
      by means of international post.

30    Mr Fernandez made a copy of the *Bon, Bon* Song, and digitally stored that copy on his
      computer in MP3 format (MP3 Copy). Mr Fernandez was the only person concerned in
      making that MP3 Copy.

31    Mr Fernandez combined the Audio Drop with the MP3 Copy, using and audio editing
      software program, in such a manner as to cause the Audio Drop to be mixed at the
      beginning of the *Bon, Bon* Song (Mixed *Bon, Bon* Version).

32    Mr Fernandez was the only person involved in creating the Mixed *Bon, Bon* Version.


Reproduction and streaming from Suave Website


33    On or before 9 December 2010, Mr Fernandez uploaded a copy of the *Bon, Bon* Sound
      Recording embodying the Mixed *Bon, Bon* Version to the Suave Website (Website Copy).

34    From on or before 9 December 2010 until 12 January 2011, Mr Fernandez caused digital
      files containing the Website Copy to be made available to members of the public who
      visited the Suave Website, by means of a process commonly known as "streaming". The
      result of this process was that any person who visited the Suave Website immediately
      heard the Website Copy through their computer.

35    On 12 January 2011, Mr Fernandez removed the Website Copy from the Suave Website
      using Wix website editing tools.

36    Mr Fernandez had, at an interlocutory stage of these proceedings, sought security for costs.
      On 12 April 2011 I made orders noting the undertaking of the applicants to retain a balance
      of not less than $16,000 in the trust account of Gilbert + Tobin Lawyers, pending the final
      disposition of these proceedings as security for Mr Fernandez's costs. In light of the
      outcome of these proceedings, that undertaking can now be discharged.

37    The proceedings between the parties in the NSW Supreme Court are an action by Mr
      Fernandez against Mr Perez for an alleged breach of contract arising from circumstances
      in which Mr Perez was to come to Australia in December 2008 to perform a series of
      concerts. Those concerts did not go ahead. Mr Perez denies breach of contract and has
      filed a cross-claim alleging breach of contract by Mr Fernandez.


The evidence


38    The applicants rely upon their application and points of claim filed on 11 January 2011, and
      the affidavit of Angela Martinez made on 29 August 2011. Ms Martinez is a United States
      attorney acting for the applicants in the United States who has had a long professional and
      personal association with Mr Perez. Ms Martinez manages the day to day legal and
      commercial operations of Mr Perez, including music publishing and merchandising
      agreements and overseeing tour related legal and business affairs issues. Ms Martinez was
      cross-examined on her affidavit by telephone from the United States.

39    The applicants also rely on interrogatories and notices to admit served upon Mr Fernandez
      as well as the following documents tendered during the trial of this matter on 8 November
      2011:

·         AM-1 – CD, Pitbull, *Rebelution*

·         AM-2 – CD, Pitbull, *Planet Pit*

·         AM-3 – CD, Pitbull, *Armando*

·         AM-4 – Bundle of documents

·         AM-5 – CD provided by Gilbert + Tobin

·         AM-6 – Confidential exhibit

·         AM-7 – CD provided by Gilbert + Tobin

·         B1 – Screen shot of Suave Productions website

·         B2 – Applicants' tender bundle

40    Mr Fernandez relies upon his amended response filed on 15 April 2011 and his own affidavit
      made on 12 October 2011, on which he was cross-examined. He also relies upon the
      affidavit of Zong Mao Li made on 14 October 2011. Ms Li was not required for cross-
      examination. Ms Li is a solicitor and deposes as to research conducted by her about the
      rate of royalties paid to recording artists when music is streamed through the artist's
      myspace web page and music chart positions of Mr Perez's music.


Submissions

41    Both parties filed opening written submissions. At the end of the trial of the matter I invited
      further written submissions. Only the applicants filed closing submissions on 24 November
      2011. On 8 December 2011 the solicitors for Mr Fernandez filed a Notice of Withdrawal of
      Lawyer in accordance with the *Federal Magistrates Court Rules 2001* (Cth).

42    The applicants contend that Mr Fernandez's use of the Audio Drop to produce a distorted
      version of *Bon, Bon* was conduct engaged in without authorisation and involved
      infringements of the rights of reproduction and communication to the public when Mr
      Fernandez streamed the altered version of the song on his website. This is said to amount
      also to infringements of Mr Perez's moral rights to the integrity and authorship (as the
      author of *Bon, Bon*) pursuant to s.195AI of the Copyright Act. The conduct is said by the
      applicants to warrant the awarding of both compensatory and additional damages,
      including aggravated damages for moral rights infringement, as well as interest and costs.

43    Mr Fernandez contends that most of the remedies sought by the applicants have been
      overtaken by the partial settlement of the proceedings. He contends that the only real issue
      remaining in dispute is what remedy should be granted in addition to Mr Fernandez's
      undertakings. He submits that in view of the partial settlement, the declarations and
      injunctions sought should not be granted and that the circumstances disclosed by the
      evidence do not warrant the awarding of damages. He seeks the dismissal of the
      application with costs and the release to him of the moneys held by the applicants'
      solicitors as security.

Consideration

The evidence of Mr Fernandez

44   Mr. Fernandez maintained a website known as "www.suaveproductions.com.au". By
     occupation he is a disk jockey and promoter. The host site is "www.justhost.com" and the
     owner of the www.suaveproductions.com.au site is Mr Oscar Texeira.

45   Mr. Fernandez has had full control over the maintenance of the website for the past two
     years.

46   He admits that on 15 December 2010 he personally added four songs to the website so that
     when it loaded the songs would automatically play. The first song was *Bon, Bon* by Mr
     Perez. Ms Martinez states that it was streaming on the website on 8 December 2010. The
     agreed statement of facts states that streaming of the song on the website commenced no
     later than 9 December 2010.

47   The song would play once and would cease to play thereafter. Mr Fernandez says that the
     song could not be downloaded from the website, only streamed to play in the background.
     He had obtained the *Bon, Bon* recording from a CD which was a gift from a friend from
     South America.

48   The Court's attention was directed to www.myspace.com/pitbull where the *Bon, Bon* Song is
     free for use via Mr Perez's official myspace page. Mr Fernandez says that that song can be
     "added to your playlist" or "shared with your friends" or "bought for musical download". The
     first two options are free and the last requires the payment of money. The opportunity to
     listen to the recording for free promotes the purchase of it.

49   Mr Fernandez exhibits to his affidavit as "JFO1" a search of myspace showing
     approximately 33 million users and the fact that the song has been played for free
     according to the documents produced on at least 711,218 times.

50   There is other litigation in the NSW Supreme Court arising out of a cancelled tour involving
     Mr Perez and Mr Fernandez.

51   The interference with the sound recording was based on the Audio Drop that had been
     provided to Mr Fernandez by Mr Perez's agent, a man by the name of "Mr Barry London"
     who also goes by the stage name "Mr Purple". An Audio Drop or oral message had been
     provided to Mr Fernandez for the purposes of promoting the tour. The Audio Drop in its
     textual form is set out at [15] of the affidavit of Mr Fernandez.

52   On or about 30 September 2010 Mr Fernandez inserted the Audio Drop into the *Bon, Bon*
     track lasting for approximately 10 seconds into the song. Mr Fernandez was made aware of
     the fact that Mr Perez was disconcerted by the addition to the song and it was removed
     from the website no later than 12 January 2011.

53   Mr Fernandez states that he did not receive any income or derive any benefit as a result of
     the playing of the Audio Drop as part of the *Bon, Bon* Song.

54   Mr Fernandez asserts, and Ms Li deposes that, Mr Fernandez's website is of little or no
     importance with a calculation having been undertaken which demonstrates, applying

averages, that there would have been only approximately 10 visits to the site during the relevant period prior to the song being taken from the Suave Productions website. That is, however, no more than a guess, as the website traffic at the time the *Bon, Bon* Sound Recording was streaming on it has not been measured.

55    Mr Fernandez was an unimpressive witness. His approach to giving evidence under cross-examination reflects poorly on his credit. He was at times untruthful, and gave answers which he thought would put his case in the best possible light, depending on what he perceived that case to be at any particular point in the cross-examination. When confronted with the inconsistency, falsity or improbability of his evidence, Mr Fernandez ranged between refusing to concede the obvious and seeking to draw immaterial and/or irrelevant distinctions, or was simply nonplussed by the illogicality of his answers.

56    It was made clear from the cross-examination that Mr Fernandez has a continuing grievance with Mr Perez resulting from the failed tour, and a sense of entitlement to leverage off Mr Perez's reputation. This explains both his motive for engaging in the infringing conduct in the first place, and the approach that he took to the proceedings until the partial settlement.

57    In particular, Mr Fernandez:

   (a)    was untruthful as to his reputation as a promoter. Mr Fernandez initially tried to down play his reputation, describing himself as "unknown"[2] and his website as "puny".[3]. However, when confronted with representations he has made on the Suave Website he said that "in Perth" he regarded himself as "on top of the Latin DJ scene"[4]. He was then forced to concede that he had been promoting "the biggest Latin concert of 2011 in Perth" for an artist that was a very significant Latin entertainer on the "worldwide scene"[5]. Later, when asked about the purpose of the press release he had issued about the litigation against Mr Perez in the NSW Supreme Court (which had been picked up in various media including a website claiming to be "Australia's biggest urban culture website")[6], he unequivocally (but perhaps forgetting his earlier evidence) put forward the need to defend his reputation as a promoter[7]. I infer that Mr Fernandez has a substantial reputation as a DJ in Perth, and most likely elsewhere in Australia, but attempted in the first instance to downplay his reputation because he thought it would advance his case;

   (b)    refused to acknowledge that the Audio Drop conveyed an association between himself and Mr Perez[8]. He was referred to the text of the Audio Drop, having earlier suggested that the Audio Drop was intended to promote the DJ only[9], and gave evidence that "Well, obviously there's an association there between him mentioning my name on the Audio Drop."[10] He then conceded that he had inserted the Audio Drop into the *Bon, Bon* Song in order to "make him look better" and to "promote himself"[11]. However, at the end of the cross-examination he refused to accept that he even understood what the word "association" means[12];

   (c)    maintained an illogical and implausible position about his right to use the Audio Drop. Mr Fernandez first suggested that the provision of the Audio Drop to him by Mr Perez "had nothing to do with the tour", but was a general purpose recording to be deployed for "personal use", and was "his property". He then sought to differentiate a video drop he had been given (which he accepted was to promote the tour) from the Audio Drop, and eventually conceded that there were at least

limitations on what he could use for the Audio Drop for, but without being able to articulate what those limitations were[13]. I infer that Mr Fernandez was well aware that he could not exploit the Audio Drop for his own purposes, and certainly not in a manner which was harmful to Mr Perez;

(d)   obfuscated on the significance of the internet audience. Mr Fernandez even put forward the example of a hypothetical "server crash" (there having been no suggestion of any such server crash during the relevant time period) as in some way limiting the audience, in an attempt to down play the impact of his infringing conduct[14];

(e)   obfuscated as to his knowledge of copyright requirements. Mr Fernandez conceded that he had knowledge of copyright as a result of being heavily involved in the music scene as a DJ and promoter[15]. Yet, he continued to assert that he had believed he was entitled to stream *Bon, Bon* from his website without a licence[16]. Those assertions are inconsistent with his attempts to secure retrospective licences from copyright collecting societies. His attempt to feign ignorance about whether he had in fact been retrospectively licensed (which he then promptly retreated from) did him no credit[17]. Even at the conclusion of the cross-examination Mr Fernandez would only concede that "legally" he was required to obtain authorisation to reproduce the sound recording[18];

(f)   resisted the inference that his infringing conduct formed part of a campaign against Mr Perez resulting from the failed tour[19]. That Mr Fernandez is engaging in such a campaign (arising from events which occurred almost three years ago) is evident from the following:

   (i)    engaging in press publicly and most notably on the internet via electronic publications responding to a press release issued some six months after the tour was cancelled;

   (ii)   continued use of the failed tour as a promotional device on his website[20]. Mr Fernandez considers he is entitled to continue this conduct until a judgment vindicating him is obtained in the NSW Supreme Court proceedings[21];

   (iii)  continued use of the Suave Website to further agitate his dispute with Mr Perez ("failed to show up"), making no concession that it is inappropriate to do so[22];

   (iv)   the very act of creating the Mixed *Bon, Bon* Version and streaming it from it his website;

   (v)    the playing of the Mixed *Bon, Bon* Version in the nightclubs where Mr Fernandez works as a DJ[23] (the inference to be drawn from Mr Fernandez's unfounded assertion that there are licences in places permitting this, is that he may be continuing to do so);

   (vi)   the substitution for the Mixed *Bon, Bon* Version of the stand alone Audio Drop after these proceedings were commenced, an act of defiance intended to mock Mr Perez, for which Mr Fernandez gave no cogent explanation, and

which only ceased after process had eventually been personally served upon him[24];

(vii) his conduct during the proceedings, which included initially challenging the basis for the assertion of the applicants' rights, and even the entitlement of the applicants to bring the action;

(viii) the failure to make any concession that collecting society licences cannot retrospectively cover him until cross-examination on the topic;

(ix) the attitude displayed under cross-examination, where Mr Fernandez's grievance against Mr Perez, and his sense of entitlement to conduct his campaign against Mr Perez were clear[25].

(g) obfuscated on his intention to use the Mixed *Bon, Bon* Version to leverage off Mr Perez's popularity by suggesting (for the first time in the proceedings) that he had in fact been motivated by the popularity of an earlier Australian sound recording (as though wishing to pass the re-mix off as the Australian sound recording was a matter that reflected well on him), although, tellingly, he was unable to recall either the Australian band or the name of the song[26];

(h) gave inconsistent evidence about the extent of his use of the Mixed *Bon, Bon* Version; having first volunteered that he had played it in nightclubs (as I find he did), he realised the implications of that and sought to suggest that he had done nothing with the recording in the two month period between its creation, and its discovery on his website (while also appreciating that he could not plausibly accept the suggestion that it had just sat on his computer)[27].

58    Mr Fernandez also failed to provide an acceptable explanation for the negative response he gave in July 2011 to interrogatories requiring evidence of traffic to the Suave Website, when his affidavit evidence contended that he had inserted the Google Analytics code into his website in March 2011. No satisfactory explanation for this was advanced[28]. That matter goes to both his attitude to these proceedings, and the unreliable nature of the Google Analytics report he has sought to rely on.

59    Further matters which arose in Mr Fernandez's cross-examination include:

(a) Mr Fernandez's admission that he had also been playing the Mixed *Bon, Bon* Version in nightclubs, thereby increasing the harm caused among the key audience for Mr Perez's music. I reject his suggestion that he was entitled to "mix songs" (ie. overlay drops onto sound recordings) at the clubs where he works as a DJ by virtue of collecting societies licences. It is illogical that a collecting society would licence the alteration of works, particularly where this would involve an infringement of the artist's moral rights (such rights being incapable of assignment in any event). The collecting society licences and correspondence in evidence contradict the assertion.

(b) Mr Fernandez's concession that had taken *Bon, Bon* at a time when people (certainly in Perth) would not have heard it; he described this as "a great thing for me to have"[29].

Applicants' evidence

60    Mr Perez did not give evidence. The Court was invited by counsel for Mr Fernandez to draw an inference from that failure to give evidence that his evidence would not have assisted him. I am unwilling to draw that inference. Mr Perez is a foreign litigant and an international entertainer who is accustomed to have others attend to his business and legal affairs. In this instance, Ms Martinez, his attorney and advisor, gave evidence in support of his application. I am prepared to accept her evidence that Mr Perez was concerned and upset by the distortion of the *Bon, Bon* Sound Recording and the use made of it by Mr Fernandez. Ms Martinez was not, however, in a position to give evidence which quantified the loss suffered by Mr Perez as a result of the actions of Mr Fernandez. I accept that as the second and third applicants are co-owners of the copyright in the *Bon, Bon* Sound Recording, the evidence given by Ms Martinez applies equally to the second and third applicants' interests insofar as is relevant to the matters in issue.

61    In cross-examination Ms Martinez gave evidence further clarifying the manner in which Mr Perez's honour and reputation had been damaged. She said that in 2010 Mr Perez had been collaborating with artists and DJs, and had lost exclusivity as a result of Mr Fernandez's actions; that is, Mr Perez could not now offer the opportunity to another DJ "who has a higher value to his name the opportunity to come and be a guest or do a remix of the [*Bon, Bon*] song"[30]. Ms Martinez also clarified that the losses suffered from the false association with Mr Fernandez were referable to money not made, and in this sense were unquantifiable[31].

62    Ms Martinez also clarified that the appearances with Mr Perez that major artists would pay for pursuant to agreements such as those in evidence may be for "as little as eight bars"[32]. Viewed in that light, the length of time for which the Audio Drop plays within the Mixed *Bon, Bon* Version is significant, and substantial within the context of creating a commercially, and artistically, valuable association and within the meaning of copyright law.

63    Counsel for Mr Fernandez suggested to Ms Martinez that Mr Perez's reputation had been tarnished by various unrelated events (such as a libel suit by the celebrity Lindsay Lohan). That was a reference to defamation proceedings apparently instituted in the United States by Ms Lohan against Mr Perez because of a reference to her incarceration made by Mr Perez in one of his songs. All I am prepared to conclude from that evidence is that celebrities place a great store on their reputation and are quick to take action to protect it. Mr Perez is no exception.

The infringements

64    Mr Fernandez's distortion of *Bon, Bon* involved combining a promotional recording known as an "Audio Drop" on which Mr Perez perform the words "Mr 305 and I am putting it right down with DJ Suave" with a copy of *Bon, Bon* Mr Fernandez had reproduced without authorisation from the *Armando* album. "Mr 305" is known among Mr Perez's fans to be a reference to himself, and "DJ Suave" is a reference to Mr Fernandez. Mr Perez had provided the Audio Drop to Mr Fernandez in order to assist in promoting the failed tour which is the subject of the NSW Supreme Court proceedings.

65    The combination of the Audio Drop with *Bon, Bon* makes it sound to the listener like Mr Perez is positively referring to Mr Fernandez at the beginning of the song, and that this reference forms part of the original work. Mr Fernandez then uploaded this altered copy of *Bon, Bon* to the Suave Website, such that it would immediately begin streaming whenever anyone visited the Suave Website. It was an act designed both to avenge Mr Fernandez's

grievances with Mr Perez arising from the subject matter of the NSW Supreme Court proceedings, and to promote Mr Fernandez.

66    Mr Fernandez's conduct was engaged in without any authorisation and involved infringements of the rights of reproduction and communication to the public comprised in the *Bon, Bon* Sound Recording (owned by the second and third applicants) pursuant to ss.85 and 101(1) of the Copyright Act, and infringements of Mr Perez's moral rights to the integrity of authorship (as the author of the *Bon, Bon* Song) pursuant to s.195AI of the Copyright Act, which provides:

   (1)    The author of a work has a right of integrity of authorship in respect of the work.

   (2)    The author's right is the right not to have the work subjected to derogatory treatment.

The nature of the conduct

67    I accept that the applicants were harmed by the conduct of Mr Fernandez and that he benefited from it.

68    I accept from the evidence of Ms Martinez that the rap/hip hop genre is one in which an artist's commercial and artistic associations really matter. Success in building a reputation, developing a fan base, selling records, attracting people to concerts, and ultimately entering into lucrative commercial sponsorships and endorsements depends in large measure on the other artists and brands the artist is seen to associate with. It is also a genre which has been closely linked to "DJ-ing". Association between artists and DJs continue to play an important role in promoting and building audiences for rap/hip hop music.

69    Mr Fernandez is a prominent DJ and live music promoter in Western Australia. He conceded that as well as streaming the Mixed *Bon, Bon* Version on his website, he also played the altered version of the sound recording at public venues where he performed as a DJ. He benefited by falsely representing a positive association between himself and Mr Perez. I further accept that Mr Fernandez was motivated in part by animosity towards Mr Perez because of the failed tour and the legal proceedings resulting from that failure. I accept that Mr Fernandez, in altering the sound recording of *Bon, Bon* to represent himself as a subject of the song and then prominently streaming it from his website, intended to cause Mr Perez artistic, reputational and commercial harm as an act of retribution for the grievances he has for the failed tour, while at the same time leveraging off the infringement for the sake of self promotion.

70    When he was made aware of the infringement by his solicitors, Mr Fernandez did not simply remove the infringing content from his website, but replaced it with the Audio Drop alone. Service of process upon him proved difficult. He also initially disputed all issues in the proceedings although ultimately conceded a number of matters which have been discussed above.

71    Mr Fernandez, in effect, acknowledged his wrongful conduct by seeking to obtain licences from APRA and the PPCA (copyright collecting societies) which he thought would retrospectively excuse his conduct. The APRA licence is irrelevant to the sound recording and the PPCA licence is not retrospective. In any event, a licence from either PPCA or APRA does not permit the licensee to remix or alter sound recordings in any way.

## Compensatory damages

72    In assessing damages for copyright infringement, the Court traditionally adopts either a licence fee approach, if appropriate, or otherwise makes an assessment at large.

73    This is not a case in which a licence would have been offered to Mr Fernandez. However, there is evidence available to the Court as to a range of licence fees which is of assistance to the Court in making an at large assessment.

74    The right to reproduce and communicate a sound recording from a website is a valuable one. On Mr Fernandez's own evidence the licence fee charged by PPCA for streaming sound recordings from a website is $1,400. The licence fee charged by APRA is $912. In considering the relevance of collecting society licences to an at large assessment the Court has considered that it should not "too lightly interfere with the right of a copyright holder to market his product at the best possible price"[33]. In this case, the licence fee would not of course permit the licensee to use the work in the manner engaged in by Mr Fernandez. Nevertheless, the unpaid licence fees at the time of the infringements is the best available measure of the compensation due to the second and third applicants for the infringements.

## Additional damages

75    The applicants seek an award of damages under s.115(4) of the Copyright Act. I accept their submissions as to the relevant principles to apply. In awarding those damages, the Court's discretion is broad and unfettered. It is not necessary for there to be any arithmetic nexus with the amount of compensatory damages awarded. The objective is independent of compensation of the copyright owner[34].

76    The relevant factors listed under s.115(4) which the Court may take into account in awarding additional damages include:

    (a)    flagrancy – Mr Fernandez's disregard for the first applicant's rights here has been manifest, and indeed his conduct was calculated to give offence;

    (b)    need for deterrence – Mr Fernandez has given an undertaking not to infringe again;

    (c)    benefit accrued to the defendant – Mr Fernandez sought to gain a benefit from an association with Mr Perez in a genre in which such associations are highly valuable;

    (d)    conduct after the infringement – this includes Mr Fernandez's conduct after the proceedings were commenced[35]. Here, Mr Fernandez initially denied infringement and sought retrospective licences from the collecting agencies. He subsequently admitted the infringements.

77    Other factors which the Court has taken into account in awarding additional damages which are relevant here include evidence of contempt for the rights of the copyright owner[36] and Mr Fernandez's awareness that he needed a licence[37], evidenced here by Mr Fernandez's approaches to the collecting societies.

78    Mr Fernandez's use involved creating a direct association between the artist and himself, through the alteration of the work, and its prominent use as the first work which streamed each time the website was visited. That use should be presumed to have involved the exercise of commercially valuable rights.

79    The other evidence available to the Court in making an assessment comprises the confidential commercial agreements that Mr Perez has entered into with other artists to associate himself with them by way of appearances on those artist's recordings.

80    I am not persuaded, however, that Mr Fernandez's conduct warrants an award of damages under s.115(4) of the Copyright Act. The conduct of Mr Fernandez most grievously impacted upon Mr Perez, who is the author of the works but not the copyright owner of the sound recordings. In the present case I take into account the claim for compensation for moral rights infringements which, in my view, covers the same field as would an award of additional damages.

Moral rights infringement

81    I accept the applicants' legal submissions concerning moral rights. The moral rights protections in Part IX of the Copyright Act were introduced by the *Copyright Amendment (Moral Rights) Act 2000* (Cth). They have independent existence from the bundle of "economic" rights protected by copyright, are inalienable to the author, and give protection to the investment of the author's personality in his or her creation. Moral rights draw their jurisprudential force from civil law traditions and a number of international copyright and human rights conventions to which Australia is a party[38]. Further, in his Second Reading Speech introducing the relevant amendments to the Copyright Act, the then Attorney-General said:

But this bill is not just about fulfilling international obligations. More importantly, it is about acknowledging the great importance of respect for the integrity of creative endeavour. At its most basic, this bill is a recognition of the importance to Australian culture of literary, artistic, musical and dramatic works and of those who create them.

82    Although Australia and other common law jurisdictions were slow to recognise moral rights, Part IX of the Copyright Act now gives full force to Australia's international obligations in this respect. In 2011, an expert group of copyright academics convened by the Australian Copyright Council recognised moral rights protection as one of the four fundamental principles of Australian copyright law[39].

83    The author's moral rights recognised in Part IX of the Copyright Act comprise the right of attribution (not in issue here), and right of integrity of authorship. Specifically, s.195AI provides that the right of integrity of authorship is the author's right "not to have the work subjected to derogatory treatment"[40].

84    Here, the act in question undertaken by Mr Fernandez consisted of the deletion of a prominent part of *Bon, Bon* (the Spanish words *je, je, je, je, je, mira que tu estas rica*) and its replacement with words performed by Mr Perez in an entirely different context ("Mr 305 and I am putting it right down with DJ Suave" – intended to promote the failed tour). This made it appear that Mr Fernandez was a subject of the song. This alteration was carried out skilfully (presumably drawing on Mr Fernandez's DJ skills), and exploited the fact that Mr Fernandez already had in his possession the Audio Drop provided to him by Mr Perez.

This created the impression that the author had authored the altered content himself and included it in the song. The reference to Mr Perez's alter ego "Mr 305" particularly attracts the listener's attention. The change made to the song by Mr Fernandez must be regarded as a "distortion" or "alteration" (if not a "mutilation") of the work, which is material, thereby satisfying that element of s.195AJ.

85    The fact that Mr Fernandez's treatment of *Bon, Bon* was "prejudicial to the author's honour or reputation" (the second element which must be satisfied to engage s.195AJ) is evident in two ways.

86    First, given that the work had only recently been released in the United States, and not in Australia at the time of the infringement (Mr Fernandez obtained it from a friend in Chile), there will have been a class of listeners, who upon listening to *Bon, Bon* for the first time through the Suave Website, will have presumed that the altered section formed part of the authentic, original work. In other words, they would have presumed that Mr Fernandez was indeed a subject of the song, and that Mr Perez had written and performed it about him.

87    I accept the affidavit evidence provided by Ms Martinez that, associations between artists and DJs in the hip-hop/rap genre are highly significant. Artists go to great lengths to choose whom they associate with, and these associations form a central part of their reputation. In those circumstances, I accept that the fact that the reference to Mr Fernandez in the altered version of the song had not been authorised by the author should be regarded as prejudicial to him *per se*. Were it to be suggested otherwise, Ms Martinez's affidavit establishes to my satisfaction that the association with Mr Fernandez is one which Mr Perez himself strongly considered to be prejudicial to his reputation, and which caused him anger and distress[41].

88    Secondly, there will have been an alternative class of listeners who were more intimately aware of both Mr Perez's music and Mr Fernandez. This class is likely to have been alert to Mr Fernandez's ruse. Persons in this class are also likely to have been aware of the circumstances of the failed Australian tour, and the fact that Mr Fernandez is suing Mr Perez in the NSW Supreme Court in relation to it. These are matters which Mr Fernandez has sought to publicise for himself[42]. Listeners in this class will know the significance of Mr Perez's associations as an artist, and will understand the alterations to the song made by Mr Fernandez to be mocking Mr Perez's reputation.

89    The defence of reasonableness is not available to Mr Fernandez to excuse his conduct. In fact, an examination of the matters to be taken into account by the Court when deciding whether this defence is available, as set out in s.195AS of the Copyright Act, only serves to emphasise the harm caused by Mr Fernandez. In particular:

   (a)    the nature of the work, which is one existing in a genre in which associations between artists is of considerable significance;

   (b)    the purpose for which the work was used, which in this case was to either promote Mr Fernandez for his own benefit, or to mock Mr Perez as an act of retribution;

   (c)    the manner and context, which in this case includes the fact that the work was streamed from Mr Fernandez's own website, and the existing relationship between the parties.

90    Section 195AZA sets out the remedies that may be granted for an infringement of moral rights. In light of the relief which has now been obtained by way of the part settlement, the

remedies which the applicants seek from the Court is an award of damages for loss resulting from the infringement pursuant to subsection (1)(b).

91    In *Meskenas v ACP Publishing Pty Ltd*[43], when considering the approach to be taken to awarding damages[44], the Court took account of the academic commentary on moral rights, which notes among other things, that an author may also claim for injured feelings arising from the infringement. In this case, the Martinez affidavit establishes to my satisfaction that such harm was suffered by Mr Perez. He is entitled to be compensated for it.

92    In *Meskenas*, the Court ultimately took the view that the compensation awarded for moral rights infringement should reflect that which it would have awarded for copyright infringement. The applicants submit that this approach would not be apposite here. In this case there are two distinct groups of applicants involved: Mr Perez sues on the basis of his moral rights; the second and third applicants sue on the basis of their copyright. Were the conflation of copyright and moral right damages in *Meskenas* to be applied here without appreciation of the underlying factual differences it would leave one class of applicant uncompensated at the expense of the other. Here, the copyright and moral rights causes of action should sound in separate and cumulative heads of damage, in relation to compensatory damages for copyright infringement and breach of moral rights. However, as I have already found above, the considerations relevant to an award of additional damages are those bearing on the award of damages for breach of moral rights, as matters bearing on the interests of Mr Perez.

93    In *Meskenas* the Court also noted the availability of aggravated damages for moral rights infringement, which were awarded in that case on the basis of the respondent's conduct following the time when the infringement of the moral rights was made known. Mr Fernandez here has allegedly similarly aggravated the harm caused by his conduct after the infringement was made known to him, as has been set out above.

94    Mr Fernandez continues to deny that his conduct has resulted in any harm or embarrassment. His affidavit evidence continues to maintain that he is entitled to do as he pleases with the Audio Drop. I do not accept that Mr Fernandez has displayed contrition. The conduct following the infringement further aggravated the harm caused, for which, Mr Perez is also entitled to be compensated. However, Mr Fernandez is entitled to the benefit of his acknowledgment of his infringements (however belatedly).

95    An action for infringement of moral rights is actionable as a breach of statutory duty without proof of damage. What is required for a breach of the author's right of integrity (provided for in s.195AI) is the subjection of the work to "derogatory treatment", which means the doing of anything in relation to a work that results in a material distortion of, the mutilation of, or a material alteration to the work (or anything else) that is prejudicial to the author's honour or reputation[45]. A person infringes the author's right of integrity if he or she so subjects the work to derogatory treatment[46].

96    In other words, all that is required is proof that Mr Fernandez's act in respect of the *Bon, Bon* Song was prejudicial to Mr Perez's honour or reputation, not that Mr Perez suffered damage. This approach has also been taken under the equivalent UK legislation[47].

97    The Copyright Act does not require that Mr Perez's reputation has been prejudiced. All that is required is that the respondent's act in relation to the work "is prejudicial". That statutory language is derived from Article 6*bis* of the Berne Convention, which requires Australia to afford authors the right to object to derogatory treatment "which *would be prejudicial* to their honour or reputation" (emphasis added).

98    As is evident from the Martinez affidavit, issues concerning the reputation and honour of an artist in the rap/hip-hop genre in which Mr Perez creates are highly attuned:

    (a)    an artist's honour and reputation depends on whom he or she associates with, and is a driver of artistic (and with it commercial) success. The artist goes to great lengths to control whom he or she associates with;

    (b)    given that evidence, the distortion of Mr Perez's work, such as to create a false association, should be regarded as prejudicial to his honour and reputation as an artist *per se*;

    (c)    that it is in fact prejudicial is made clear by the circumstances of Mr Perez's relationship with Mr Fernandez[48]; it is not necessary for the applicants to lead evidence from members of the public as to the way the work would be received;

    (d)    that the treatment of the work was prejudicial may be presumed.

99    In *Meskenas* the Court awarded damages of $9,100 for breach of ss.195AO and 195AP of the Copyright Act, for breach of the author's right of attribution, in circumstances where Raphael FM held that he would have awarded the same amount for copyright infringement (for both compensatory and additional damages).

100    However, the basis for compensation is not the same. Section 195AZA(1) provides that the remedies for moral rights infringement include "damages for loss resulting from the infringement". Moral rights are not proprietary rights (a matter which is evident by the absence in the statute of any provision allowing assignment). Moral rights attach to the personality of the author. They may be compared, for instance, with the reputational interests protected by an action in defamation.

101    It is relevant to consider that prior to the introduction of Part IX one of the ways that Australia sought to comply with its *Berne* obligations with respect to the right of integrity, was pursuant to the law of defamation. There are clear parallels between the two laws (noting that defamation protects reputation, whereas moral rights protect both "honour and reputation").

102    This means that the loss which is compensable includes not only pecuniary loss, but also damage to goodwill and reputation enjoyed by the author[49].

103    In awarding damages for moral rights infringement on this basis the Court should have regard to the matters described above, with respect to extent and value of Mr Perez's reputation as an artist, and the harm caused by Mr Fernandez's conduct. This includes the fact that the distortion of the work and the false association created by it occurred at a time when the song was newly released, the artistic significance which associations have within the genre in which Mr Perez creates, the fact that the distorted work was performed in nightclubs which reach the target audience for Mr Perez, and that the distorted work was communicated on the internet where its audience was potentially unlimited.

104    In addition, damages awarded under s.195AZA(1) may further provide compensation for injured feelings, and vindication of the artist, by way of an award of aggravated damages. A parallel here may be drawn with an award of damages under this limb in the law of defamation. An award of aggravated damages may also take account of the respondent's conduct in the litigation. This would also accord with the approach taken in the law of defamation, where it has been held that conduct by counsel during the trial may also justify the award of aggravated damages through increasing the hurt done to the plaintiff[50].

105    In *Meskenas*, Raphael FM awarded the applicant a separate component of damages, which he characterised as aggravated damages, for the distress caused to the applicant, including by reference to the respondent's conduct after the proceedings were commenced. In that case, his Honour considered that, the necessary factors going to flagrancy otherwise being absent in that case, the amount should be equal to that which he would have awarded under s.115(4) (ie. $8,000).

106    Here, it is submitted that the Court should have regard to the need to provide compensation to Mr Perez for the distress caused to Mr Perez as an artist both at the time of the infringement, the conduct of Mr Fernandez since that time, including the ongoing campaign which is said to be being waged by Mr Fernandez, and the need to provide vindication to Mr Perez as an artist. In doing so, the Court may have regard for the range of damages it would award under s.115(4) for infringement of the copyright.

107    The applicants seek $35,000 for the harm to Mr Perez's reputation and $50,000 aggravated damages for distress to Mr Perez. That claim considerably overstates the applicants' case, trespasses into matters more appropriate to be dealt with in the NSW Supreme Court proceedings, and gives no acknowledgment of Mr Fernandez's concessions, undertakings and apology. I do not accept that Mr Perez's reputation has suffered any lasting damage. His moral rights were infringed in circumstances which caused him distress, and which were serious, but Mr Fernandez ultimately saw the error of his ways and appropriately gave undertakings and an apology, however grudgingly. In all the circumstances, I have decided that an appropriate award of damages for the infringement of Mr Perez's moral rights is $10,000.

Conclusions

108    Mr Fernandez infringed copyright in the *Bon, Bon* Sound Recording by streaming it on his website and by publicly performing it without a licence. He also infringed Mr Perez's moral rights by altering the sound recording of the song to falsely represent that he (Mr Fernandez) was a subject of the song. In doing so, Mr Fernandez also misused the Audio Drop provided to him for the limited purpose of promoting an Australian tour by Mr Perez which did not take place.

109    Notwithstanding the concessions made by Mr Fernandez in the course of proceedings, it remains appropriate to make the declarations sought in the application before the Court. In particular, Mr Fernandez should be left in no doubt that he cannot use the Mixed *Bon, Bon* Version of the sound recording in his DJ performances at nightclubs, or otherwise. I accept, however, that it is no longer appropriate to issue the injunctions sought or the order for delivery up and an apology.

110    I will order that Mr Fernandez pay the second and third applicants compensatory damages for breach of copyright of $2,312 and that Mr Fernandez pay Mr Perez damages of $10,000 for infringement of his moral rights.

111    In respect of pre-judgment interest, I will apply Federal Court of Australia Practice Note CM16 issued on 1 August 2011. The following rates apply:

| | |
|---|---|
| 1 July 2010 to 31 December 2010 | 8.5 per cent |
| 1 January 2011 to 30 June 2011 | 8.75 per cent |
| 1 July 2011 to 31 December 2011 | 8.75 per cent |

1 January 2012 to 30 June 2012        8.25 per cent

112    Interest will accrue from the date that the sound recording commenced streaming on Mr Fernandez's website (9 December 2010). The first applicant will receive interest up to judgment in the sum of $1018.90 and the second and third applicants will receive interest up to judgment in the sum of $235.58.

113    I will hear the parties as to costs.

---

[1] Definitions: Except where otherwise indicated, capitalized terms have the same meaning as ascribed to those terms in the applicants' Points of Claim.

[2] transcript "T" 37.6

[3] T 35.46

[4] T 38.44

[5] T 39.40-45

[6] see T. 47.16-30

[7] T 46.3-25; T 47.6-14

[8] T 60

[9] T 41.23

[10] T 50.45

[11] T 55.27-33

[12] T 60.42-61.7

[13] see T 41-42; 59

[14] T 35.2

[15] T 42.36 – 43.38

[16] T 55.13; Fernandez [36]

[17] T 59.5–18

[18] T 62.34–41

[19] T45.4 – 47.40

[20] T 51.12-23

[21] T 52.5

[22] T 51.25–52.10; T 53.3-54.15

[23] T 49.15-23

[24] T 59.23-28; 60.1-7; 61.18-23

[25] see T 51.13 – 52.12

[26] T55.15 – 57.36

[27] T 50.17-30

[28] T 62.43 – 63.32

[29] T 49.6

[30] T 10.18-36, T 11.2836

[31] T 16.32 – 17.2

[32] T 16.38-41

[33] See *Top Plus Pty Ltd v K Square Pty Ltd (No 3)* [2010] FMCA 590 per Raphael FM at [8]

[34] See *Raben Footwear Ltd v Polygram Records Inc & Anor* (1997) 75 FCR 88 at 103-4; 37 IPR 417 at 432 per Tamberlin J; *Aristocrat Technologies Australia Pty Ltd v Global Gaming Supplies Pty Ltd* [2009] FCA 1495 at [910] per Jacobson J; and *PPCA & Ors v Jabouri Brothers Pty Ltd and Ors* [2011] FMCA 799

[35] see *Aristocrat Technologies Australia Pty Ltd v Global Gaming Supplies Pty Ltd* [2009] FCA 1495 at [911] per Jacobson J

[36] see *Sony Music Entertainment (Australia) Ltd & Ors v Smith & Ors* [2005] FCA 228

[37] see *APRA v Cougars Tavern & Ors*[2008] FMCA 369; *Microsoft Corporation v Tyn Electronics Pty Ltd (in liq)* [2004] FCA 1307

[38]  See article 6*bis* of the *Berne Convention*, the *Australia United States Free Trade Agreement* (which requires compliance with *Berne*), the *WIPO Performances and Phonograms Treaty* (which extended moral rights to performers) and article 15(1) of the *International Covenant on Economic, Social and Cultural Rights* (which requires recognition of the rights of everyone "to benefit from the protection of the *moral* and material interests resulting from any scientific, literary or artistic production of which he is the author").

[39]  See *Directions in Copyright Reforms in Australia*, Copyright Council Expert Group, Copyright Symposium 2011

[40]  See also ss.195AJ, 195AQ(2) and 195AQ(3)

[41]  see Martinez's affidavit at [60]

[42]  see Martinez's affidavit at [51]-[52]

[43]  [2006] FMCA 1136

[44]  at [39]-[41]

[45]  see s.195AJ

[46]  see s.195AQ(3)

[47]  See *Clark v Associated Newspapers* [1998] 1 All ER. (Specifically there, with respect to the right of attribution.)

[48]  see applicants' opening submissions [28]-[31]

[49]  See commentary in Laddie, Prescott and Vitoria, *The Modern Law of Copyright and Designs* (2011) at [13.57]

[50]  See *Rigby v Associated Newspapers* [1969] 1 NSWR 729

# EXHIBIT 11



# Code de procédure civile
## Version en vigueur au 26 octobre 2023

Livre Ier : Dispositions communes à toutes les juridictions (Articles 1 à 749)
Titre XVIII : Les frais et les dépens. (Articles 695 à 725-1)
Chapitre Ier : La charge des dépens. (Articles 695 à 700)

## Article 695
**Modifié par Décret n°2023-25 du 23 janvier 2023 - art. 1**

Les dépens afférents aux instances, actes et procédures d'exécution comprennent :

1° Les droits, taxes, redevances ou émoluments perçus par les greffes des juridictions ou l'administration des impôts à l'exception des droits, taxes et pénalités éventuellement dus sur les actes et titres produits à l'appui des prétentions des parties ;

2° Les frais de traduction des actes lorsque celle-ci est rendue nécessaire par la loi ou par un engagement international ;

3° Les indemnités des témoins ;

4° La rémunération des techniciens ;

5° Les débours tarifés ;

6° Les émoluments des officiers publics ou ministériels ;

7° La rémunération des avocats dans la mesure où elle est réglementée y compris les droits de plaidoirie ;

8° Les frais occasionnés par la notification d'un acte à l'étranger ;

9° Les frais d'interprétariat et de traduction rendus nécessaires par les mesures d'instruction effectuées à l'étranger à la demande des juridictions dans le cadre du règlement (UE) 2020/1783 du Parlement européen et du Conseil du 25 novembre 2020 relatif à la coopération entre les juridictions des Etats membres dans le domaine de l'obtention des preuves en matière civile et commerciale (obtention des preuves) (refonte) ;

10° Les enquêtes sociales ordonnées en application des articles 1072, 1171 et 1221 ;

11° La rémunération de la personne désignée par le juge pour entendre le mineur, en application de l'article 388-1 du code civil ;

12° Les rémunérations et frais afférents aux mesures, enquêtes et examens requis en application des dispositions de l'article 1210-8.

## Article 696
**Modifié par Décret n°2020-1717 du 28 décembre 2020 - art. 181**

La partie perdante est condamnée aux dépens, à moins que le juge, par décision motivée, n'en mette la totalité ou une fraction à la charge d'une autre partie.

Les conditions dans lesquelles il peut être mis à la charge d'une partie qui bénéficie de l'aide juridictionnelle tout ou partie des dépens de l'instance sont fixées par les dispositions de la loi n° 91-647 du 10 juillet 1991 et du décret n° 2020-1717 du 28 décembre 2020.

*NOTA :*
*Conformément à l'article 190 du décret n° 2020-1717 du 28 décembre 2020, les présentes dispositions entrent en vigueur le 1er janvier 2021.*

## Article 697
**Modifié par Décret n°2012-634 du 3 mai 2012 - art. 20**

Les avocats, anciens avoués et huissiers de justice peuvent être personnellement condamnés aux dépens afférents aux instances, actes et procédures d'exécution accomplis en dehors des limites de leur mandat.

## Article 698
**Modifié par Décret 76-714 1976-07-29 art. 4 JORF 30 juillet 1976**

Les dépens afférents aux instances, actes et procédures d'exécution injustifiés sont à la charge des auxiliaires de justice qui les ont faits, sans préjudice des dommages-intérêts qui seraient réclamés. Il en est de même des dépens afférents aux instances, actes et procédures d'exécution nuls par l'effet de leur faute.

10/25/23, 8:15 PM
Case 5:23-cv-03438-PCP   Document 26-2   Filed 11/16/23   Page 173 of 297
Chapitre II : La charge des dépens (Articles 699 à 700)   Légifrance

## Article 699

**Modifié par Décret n°2012-634 du 3 mai 2012 - art. 21**

Les avocats peuvent, dans les matières où leur ministère est obligatoire, demander que la condamnation aux dépens soit assortie à leur profit du droit de recouvrer directement contre la partie condamnée ceux des dépens dont ils ont fait l'avance sans avoir reçu provision.

La partie contre laquelle le recouvrement est poursuivi peut toutefois déduire, par compensation légale, le montant de sa créance de dépens.

## Article 700

**Modifié par Décret n°2022-245 du 25 février 2022 - art. 1**

Le juge condamne la partie tenue aux dépens ou qui perd son procès à payer :

1° A l'autre partie la somme qu'il détermine, au titre des frais exposés et non compris dans les dépens ;

2° Et, le cas échéant, à l'avocat du bénéficiaire de l'aide juridictionnelle partielle ou totale une somme au titre des honoraires et frais, non compris dans les dépens, que le bénéficiaire de l'aide aurait exposés s'il n'avait pas eu cette aide. Dans ce cas, il est procédé comme il est dit aux alinéas 3 et 4 de l'article 37 de la loi n° 91-647 du 10 juillet 1991 .

Dans tous les cas, le juge tient compte de l'équité ou de la situation économique de la partie condamnée. Il peut, même d'office, pour des raisons tirées des mêmes considérations, dire qu'il n'y a pas lieu à ces condamnations.

Les parties peuvent produire les justificatifs des sommes qu'elles demandent.

La somme allouée au titre du 2° ne peut être inférieure à la part contributive de l'Etat majorée de 50 %.

*NOTA :*
*Conformément à l'article 6 du décret n° 2022-245 du 25 février 2022, ces dispositions entrent en vigueur le lendemain de la publication dudit décret. Toutefois, elles sont applicables aux instances en cours.*

# EXHIBIT 12

## 1 The French Code of Civ. Proc. in English Article 700

**The French Code of Civil Procedure in English** | July 2023 Update
Translation by Philip Raworth

**The French Code of Civil Procedure in English**
**2022**
Le Code de Procédure Civile Français Traduit en Anglais[*]

**Book I. Provisions Common to All Courts**

**Title XVIII. Costs and Expenses**

**Chapter I. The Burden of the Costs**

Article700.

The judge orders the party obliged to pay the costs or who loses his case to pay:
1. To the other party the sum that the judge determines in respect of the sums expended and not included in the costs.
2. And, if needs be, to the attorney of the beneficiary of partial or total legal aid a sum in respect of fees and costs not included in the costs that the beneficiary of legal aid would have incurred if he had not had this aid. In this case, it is proceeded in accordance with paragraphs 3 and 4 of Article 37 of Law No. 91-647 of 10 July 1991.

In all cases, the judge takes into consideration equity and the economic situation of the party ordered to pay. The judge may, even on his own initiative and for reasons based on the same considerations, rule that there is no need for such orders.

The parties may produce supporting documents for the sums that they are demanding.

The sum allocated pursuant may not be less than the part contributed by the State plus 50%.

The judge presiding over a dispute may, with the agreement of the parties, order a mediation.

The mediator designated by the judge has the assignment of hearing the parties and comparing their points of view in order to permit them to find a solution to the dispute between them.

Mediation may also be ordered during the proceedings by the urgent applications judge.

Westlaw. © 2023 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

[*] As at March 9, 2021. Please note that footnotes are translator's notes, which provide further explanation of the terminology, and are not part of the official text.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

Service provided by the Federal Ministry of Justice
and the Federal Office of Justice – www.gesetze-im-internet.de

Übersetzung (außer Buch 10) durch Samson Übersetzungen GmbH, Dr. Carmen von Schöning
Übersetzung (Buch 10) betreut durch Samson Übersetzungen GmbH, Dr. Carmen von Schöning
*Buch 10 der deutschen Zivilprozessordnung orientiert sich weitgehend am UNCITRAL Model Law on International Commercial Arbitration (UNCITRAL-Modellgesetz über die internationale Handelsgerichtsbarkeit). Die vorliegende englische Übersetzung überträgt den Wortlaut der deutschen ZPO-Bestimmungen, was teilweise zu Abweichungen vom Wortlaut des nur auf Englisch vorliegenden UNCITRAL-Modellgesetzes führt.*
Translation (except Book 10) provided by Samson Übersetzungen GmbH, Dr. Carmen von Schöning
Translation (Book 10) looked after by Samson Übersetzungen GmbH, Dr. Carmen von Schöning
*Book 10 of the German Code of Civil Procedure is largely based on the UNCITRAL Model Law on International Commercial Arbitration, of which no official translation is available. The present translation reflects the wording used in the German provisions, resulting in some differences between the wording of the translation and the wording of the UNCITRAL Model Law.*
Stand: Die Übersetzung (außer Buch 10) berücksichtigt die Änderung(en) des Gesetzes durch Artikel 1 des Gesetzes vom 10. Oktober 2013 (BGBl. I S. 3786)
Stand: Die Übersetzung (Buch 10) berücksichtigt die Änderung(en) des Gesetzes durch Artikel 1 des Gesetzes vom 5. Oktober 2021 (BGBl. I S. 4607)
Version information: The translation (except Book 10) includes the amendment(s) to the Act by Article 1 of the Act of 10 October 2013 (Federal Law Gazette I p. 3786)
Version information: The translation (Book 10) includes the amendment(s) to the Act by Article 1 of the Act of 5 October 2021 (Federal Law Gazette I, p. 4607)

Zur Nutzung dieser Übersetzung lesen Sie bitte den Hinweis auf www.gesetze-im-internet.de unter "Translations".

For conditions governing use of this translation, please see the information provided at www.gesetze-im-internet.de under "Translations".

# Code of Civil Procedure

Code of Civil Procedure as promulgated on 5 December 2005 (Bundesgesetzblatt (BGBl., Federal Law Gazette) I page 3202; 2006 I page 431; 2007 I page 1781), last amended by Article 1 of the Act dated 10 October 2013 (Federal Law Gazette I page 3786) and Book 10 last amended by Article 1 of the Act of 5 October 2021 (Federal Law Gazette I, p. 4607)
Footnote
Source cited valid from 1 January 1980; some of the measures based on the Treaty between the Federal Republic of Germany and the German Democratic Republic on the Establishment of German Unity (Unification Treaty) are no longer to be applied, cf. Annex "EV" to the Code of Civil Procedure.
Version of the Code of Civil Procedure dated 30 January 1877, promulgated in Reichsgesetzblatt (RGBl., Law Gazette of the Reich) page 83, amended by Article 9 of the Act dated 12 September 1950 (Federal Law Gazette I page 455).
Pursuant to the ruling handed down by the Federal Constitutional Court of 7 October 2003, published in Entscheidungen des Bundesverfassungsgerichts (BVerfGE, Rulings of the Federal Constitutional Court) 2004 I 124 – 1 BvR 10/99 – the Code of Civil Procedure as valid until 31 December 2001 was unconstitutional as it was not compatible with the principle of a state governed by the rule of law, nor with Article 103 (1) of the German Constitution

Service provided by the Federal Ministry of Justice
and the Federal Office of Justice – www.gesetze-im-internet.de

(1) The termination of an agreement governing a power of attorney will take legal effect vis-à-vis the opponent only upon notification being made that the power of attorney has expired; in proceedings in which the parties must be represented by counsel, it will so take effect only upon notification as to another attorney having been appointed.

(2) A termination by the attorney-in-fact himself will not prevent him from acting on behalf of the grantor of the power of attorney until the latter has otherwise ensured the protection of its interests under law.

### Section 88
### Lack of power of attorney

(1) Where a power of attorney is lacking, the opponent may file an objection, regardless of the status of the legal dispute.

(2) The court is to take account of the lack of power of attorney ex officio, unless an attorney is acting as the attorney-in-fact.

### Section 89
### Representative without a power of attorney

(1) Where a person acts on behalf of a party as a negotiorum gestor (person acting on behalf of another without having been granted express authority to do so), or as an attorney-in-fact, without submitting a power of attorney to the court, he may be admitted to the litigation on a preliminary basis against or without provision of security for costs and damages. The final judgment may be delivered only after the period for submitting the approval has expired. Should the approval not have been submitted by the time the final judgment is delivered, the person admitted to the litigation on a preliminary basis is to be sentenced to compensating the opponent for the costs he has had to incur as a result of the former's admission to the litigation; moreover, he is to compensate the opponent for the damages the latter has suffered as a result of such admission.

(2) The party must allow the case against it to be conducted in this manner if it has granted the power of attorney only orally, or if it has expressly or tacitly approved the litigation.

### Section 90
### Advisers

(1) The parties to the dispute may appear at the hearing in the company of advisers. Anyone may be an adviser who is authorised to represent a party as an attorney-in-fact in a hearing in proceedings in which the party may pursue the legal dispute itself. The court may admit other persons as advisers provided this serves the purpose intended, and provided the circumstances of the individual case indicate that a corresponding need exists. Section 79 (3) sentences 1 and 3 and (4) shall apply mutatis mutandis.

(2) The statements made by advisers shall be deemed to be submissions by the party unless the latter immediately recants or corrects such statements.

### Title 5
### Costs of the proceedings

### Section 91
### Principle of the obligation to bear costs; scope of this obligation

(1) The party that has not prevailed in the dispute is to bear the costs of the legal dispute, in particular any costs incurred by the opponent, to the extent these costs were required in order to bring an appropriate action or to appropriately defend against an action brought by others. The compensation of costs also comprises compensation of the opponent for any necessary travel or for time the opponent has lost by having been required to make an appearance at hearings; the rules governing the compensation of witnesses shall apply mutatis mutandis.

(2) In all proceedings, the statutory fees and expenditures of the attorney of the prevailing party are to be compensated. However, the travel expenses of an attorney who has not established himself in the judicial district of the court hearing the case, and who does not

Service provided by the Federal Ministry of Justice
and the Federal Office of Justice – www.gesetze-im-internet.de

reside at the location of the court hearing the case, shall be compensated only insofar as it was necessary to involve him in order to bring an appropriate action, or to appropriately defend against an action brought by others. The costs of retaining several attorneys shall be compensated only insofar as they do not exceed the costs of a single attorney, or insofar as personal reasons required an attorney to be replaced by another. Where an attorney represents himself, he shall be reimbursed for those fees and expenditures that he could demand as fees and expenditures had he been granted power of attorney to represent another party.

(3) The costs of the legal dispute in the sense as defined by subsections (1) and (2) also include the fees arising as a result of conciliation proceedings before a dispute-resolution entity established or recognised by a Land department of justice (Landesjustizverwaltung); this shall not apply if a period longer than one year has lapsed between the date on which the conciliation proceedings ended and the date on which proceedings were brought in the courts.

(4) The costs of the legal dispute in the sense of subsection (1) also include costs that the prevailing party has paid to the party that has not prevailed in the course of the legal dispute.

### Section 91a
### Costs where the main action has been dealt with and terminated

(1) Where the parties to the dispute declare the matter terminated in the hearing, or make such declaration in a written pleading, or by recording it with the registry for the files of the court, the court shall issue, at its equitably exercised discretion, an order on the costs, taking account of the circumstances and facts as well as the status of the dispute thus far. The same shall apply if the defendant fails to oppose, within a statutory period of two (2) weeks from service of the written pleading, the plaintiff's declaration as to the matter having been dealt with and terminated, provided that this consequence was indicated to the defendant previously.

(2) A complaint subject to a time limit may be lodged against the decision. This shall not apply where the value of the claim in the main action is equal to or lower than the amount specified in section 511. The court is to hear the opponent prior to handing down its decision on the complaint.

### Section 92
### Costs in the event a party prevails in part

(1) Where each of the parties has prevailed for a part of its claim, but has not been able to enforce another part of its claim in the dispute, the costs are to be cancelled against each other, or they are to be shared proportionately. If the costs have been cancelled against each other, the parties shall bear the court costs at one half each.

(2) The court may impose the entire costs of the proceedings on one of the parties if:

    1.    The amount the other party claimed in excess was relatively small, or has resulted in only slightly higher costs, or

    2.    The amount of the claim brought by the other party depended on the judges determining it at their discretion, on the assessment by experts, or on the parties settling their reciprocal claims.

### Section 93
### Costs in the event an immediate acknowledgment is made

Where the defendant has not given cause for an action to be brought, the plaintiff shall bear the costs of the proceedings should the defendant immediately acknowledge the claim.

### Section 93a
### (repealed)

### Section 93b
### Costs of actions brought for the vacation of premises

# EXHIBIT 14



✕

In caso di problemi di visualizzazione dell'atto clicca qui

stai visualizzando l'atto

○ vigente al  **26/10/2023**

🔍

**Cerca**

○ originario                    ◉ multivigente

REGIO DECRETO 28 ottobre 1940, n. 1443

Codice di procedura civile. (040U1443)

*(Ultimo aggiornamento all'atto pubblicato il 22/03/2023)*

(GU n.253 del 28-10-1940)                    visualizza atto intero



nascondi

Art. 91.
(Condanna alle spese).

Il giudice, con la sentenza che chiude il processo davanti a lui, condanna la parte soccombente al rimborso delle spese a favore dell'altra parte e ne liquida l'ammontare insieme con gli onorari di difesa. Se accoglie la domanda in misura non superiore all'eventuale proposta conciliativa, condanna la parte che ha rifiutato senza giustificato motivo la proposta al pagamento delle spese del processo maturate dopo la formulazione della proposta, salvo quanto disposto dal secondo comma dell'articolo 92.

Le spese della sentenza sono liquidate dal cancelliere con nota in margine alla stessa; quelle della notificazione della sentenza, del titolo esecutivo e del precetto sono liquidate dall'ufficiale giudiziario con nota in margine all'originale e alla copia notificata.

I reclami contro le liquidazioni di cui al comma precedente sono decisi con le forme previste negli articoli 287 e 288 dal capo dell'ufficio a cui appartiene il cancelliere o l'ufficiale giudiziario.

***((Nelle cause previste dall'articolo 82, primo comma, le spese, competenze ed onorari liquidati dal giudice non possono superare il valore della domanda.))***



**articolo successivo**

**articolo**

**precedente**

APPROFONDIMENTI

aggiornamenti all'atto

note atto

aggiornamenti alla struttura

nascondi





If you have problems viewing the document, click here

you are viewing the act

○ in force at   **26/10/2023**

Near

○ native to                              ● multicurrent

ROYAL DECREE 28 October 1940, n. 1443

Code of Civil Procedure. (040U1443)

*(Last update to the act published on 03/22/2023)*

(GU n.253 of 10/28/1940)                                    view entire act



Art. 91.
(Sentencing to pay costs).

The judge, with the sentence that closes the trial before him, orders the losing party to reimburse the expenses in favor of the other party and liquidates the amount together with the defense fees. If it accepts the request to an extent not exceeding the possible conciliation proposal, it orders the party who rejected the proposal without justified reason to pay the costs of the proceedings accrued after the formulation of the proposal, without prejudice to the provisions of the second paragraph of article 92.

The costs of the sentence are paid by the chancellor with a note in the margin thereof; those of the notification of the sentence, of the enforcement order and of the precept are liquidated by the judicial officer with a note in the margin of the original and of the notified copy.

Complaints against the liquidations referred to in the previous paragraph are decided in the manner provided for in articles 287 and 288 by the head of the office to which the chancellor or bailiff belongs.

***((In the cases provided for by article 82, first paragraph, the expenses, fees and fees paid by the judge cannot exceed the value of the request.))***



**next article**

**previous**

**article**

**INSIGHTS**

**updates in progress**

**deed notes**

**updates to the structure**

hide

# EXHIBIT 15

# Ministerio de Justicia



**LAW 1/2000, OF 7 JANUARY, ON CIVIL PROCEDURE**

**2015**

# Colección: Traducciones del Derecho Español

**Edita**
Ministerio de Justicia
Secretaría General Técnica

**NIPO**
051-15-045-4

**ISBN**
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-434-8

**Actualización**
Linguaserve

**Maquetación**
Subdirección General de Documentación y Publicaciones

Incluye las modificaciones introducidas por la Ley 42/2015 de 5 de octubre.

"El presente texto es una traducción de un original en castellano que no tiene carácter oficial en el sentido previsto por el apartado 1º) artículo 6 del Real Decreto 2555/1977, de 27 de agosto, por el que se aprueba el Reglamento de la Oficina de Interpretación de Lenguas del Ministerio de Asuntos Exteriores y de Cooperación."

# LAW 1/2000, OF 7 JANUARY, ON CIVIL PROCEDURE

(«OFFICIAL STATE GAZETTE» No. 7, of 8 January 2000; correction of errors in OFFICIAL STATE GAZETTES numbers 90, of 14 April 2000, and 180, of 28 July 28 2001)

## PRELIMINARY TITLE

### ON PROCEDURAL RULES AND THEIR IMPLEMENTATION

**Article 1.** *The principle of procedural legality.*

In civil procedure, the courts and those who appear and act in court shall act in keeping with the provisions herein.

**Article 2.** *Application of civil procedural rules in time.*

Unless otherwise stipulated in the legal provisions of transitory law, the cases which correspond to the civil courts shall always be substantiated by these in keeping with the procedural rules in force, which shall never be retroactive.

**Article 3.** *Territorial scope of civil procedural rules.*

With the sole exceptions which may be stipulated in international treaties and conventions, civil procedure taking place in Spain shall only be regulated by Spanish procedural rules.

**Article 4.** *Supplementary nature of the Civil Procedural Act.*

In the absence of provisions in the laws which regulate criminal, contentious-administrative, employment and military proceedings, the provisions herein shall apply to all of these.

Catálogo de Publicaciones

question involves a previous pronouncement, within a time limit of ten days, a court order shall be issued with a decision on the issue and providing what is appropriate as regards the continuation of the proceedings.

If the question involves a special pronouncement, it shall be decided, duly separated, in the final judgement.

**5.** When the issue is decided through a court order, and the decision is to terminate the proceedings, an appeal may be lodged, and, if the decision is that the proceedings shall continue, there shall be no appeal, notwithstanding the fact that the party damaged may challenge the decision and appeal the final judgement.

CHAPTER VIII

ON ORDERS TO PAY COSTS

**Article 394.** *Orders to pay costs in the first instance.*

**1.** In declaratory proceedings, the costs in the first instance shall be imposed on the party who has had his pleas rejected unless the court considers and reasons that the case may pose serious de facto or de iure doubts.

For the purposes of ordering a party to pay costs, in order to verify that the case is legally doubtful, the jurisprudence of similar cases shall be taken into account.

**2.** If the upholding or dismissal of the pleas is partial, each party shall pay the costs involved in his proceedings and the common costs shall be shared equally, unless there are reasons to impose the costs on one of these as he litigated recklessly.

**3.** In application of the provisions in paragraph 1 of this article, when the costs are imposed on the litigant who has lost the case, only he shall be obliged to pay the full amount of the part which corresponds to the attorneys and other professionals who are not subjects to rates or dues, which shall not exceed one third of the cost of the proceedings, for each of the litigants in this situation. Solely for such effects, the pleas which cannot be estimated shall be valued at €18000, unless, due to the complexity of the case, the court decides otherwise.

The provisions in the preceding paragraph shall not apply when the court declares the recklessness of the litigant ordered to pay costs.

When the party ordered to pay costs is the holder of the right to free legal assistance, he shall only be obliged to pay the costs arising in defence of the counter-party in the cases expressly stated in the Free Legal Assistance Act.

**4.** In no case shall the costs of the Public Prosecution Service be imposed in the proceedings where this Service intervenes as a party.

**Article 395.** *Orders to pay costs in cases of acceptance of a claim.*[228]

**1.** If the defendant accepts the claim before responding, there shall be no imposition of costs unless the court duly reasons the matter and observes bad faith in the defendant.

In any case, it shall be understood that there is bad faith if, before the claim is filed, an irrefutable and justifiable requirement for payment is served on the defendant, or if mediation proceedings have been initiated or a request for reconciliation has been brought against them.

**2.** If the acceptance of claim occurs after the response to the claim, paragraph 1 of the preceding article shall apply.

**Article 396.** *Orders to pay costs when the proceedings terminate in abandonment.*

**1.** If the proceedings terminate due to abandonment by the claimant, and the defendant does not consent, the claimant shall be ordered to pay all the costs.

**2.** If the abandonment which terminated the proceedings is consented by the defendant or the defendants, none of the litigants shall be ordered to pay costs.

**Article 397.** *Appeals concerning costs.*

The provisions in Article 394 shall apply in order to decide remedies to appeal in the second instance, which shall challenge the order or the absence of an order to pay the costs of the first instance.

---

[228]    Paragraph 1 is amended by final provision 3.2 of Law 15/2015, of 2 July.

Paragraph 1(2) amended by final provision 3.9 of Law 5/2012 of 6 July.

Catálogo de Publicaciones

**Article 398.** *Costs in appeal, extraordinary appeal for breach of procedure and cassation.*

**1.** When all the pleas for a remedy of appeal, extraordinary appeal for breach of procedure or cassation are dismissed, Article 394 shall apply with regard to the costs of the appeal.

**2.** In the event that a remedy of appeal, recourse to appeal for breach of procedure or cassation is upheld either in full or in part, none of the litigants shall be ordered to pay the costs of such appeals.

TITLE II

**ON DECLARATORY ACTIONS**

CHAPTER ONE

ON THE INITIAL ALLEGATIONS

**Section 1. On the claim and its purpose**

**Article 399.** *The claim and its content.*

**1.** The proceedings shall begin with a claim in which, once the identification data and circumstances of the claimant and the defendant and the address or place of residence where they can be ordered to attend are consigned pursuant to Article 155, the facts and the grounds in law shall be put forward numbered and separately, and what is requested shall be established clearly and with precision.

**2.** Together with the designation of the claimant, mention shall be made of the names and surnames of the court representative and the attorney, when these intervene.

**3.** The facts shall be narrated in an orderly and clear manner in order to facilitate their admission or rejection by the defendant when he replies. The documents, means and instruments which are provided in relation to the facts on which the pleas are based shall be stated with the same order and clarity and, finally, evaluations or reasoning shall be formulated regarding these if this appears to be advisable for the rights of the litigant.

**4.** In fundamental points of law, besides those which refer to the grounds of the case in question, the proper allegations on the capacity of the

MAQUETACIÓN
Ministerio de Justicia. Secretaría General Técnica
Subdirección General de Documentación y Publicaciones
tienda.publicaciones@mjusticia.es
San Bernardo 62
28015, Madrid



# EXHIBIT 16



# Federal Court Rules 2011

**Select Legislative Instrument No. 134, 2011**

made under the

*Federal Court of Australia Act 1976*

# Compilation No. 8

| | |
|---|---|
| **Compilation date:** | 13 January 2023 |
| **Includes amendments up to:** | F2023L00033 |
| **Registered:** | 8 February 2023 |

Prepared by the Office of Parliamentary Counsel, Canberra

Authorised Version F2023C00174 registered 08/02/2023

# About this compilation

**This compilation**

This is a compilation of the *Federal Court Rules 2011* that shows the text of the law as amended and in force on 13 January 2023 (the ***compilation date***).

The notes at the end of this compilation (the ***endnotes***) include information about amending laws and the amendment history of provisions of the compiled law.

**Uncommenced amendments**

The effect of uncommenced amendments is not shown in the text of the compiled law. Any uncommenced amendments affecting the law are accessible on the Legislation Register (www.legislation.gov.au). The details of amendments made up to, but not commenced at, the compilation date are underlined in the endnotes. For more information on any uncommenced amendments, see the series page on the Legislation Register for the compiled law.

**Application, saving and transitional provisions for provisions and amendments**

If the operation of a provision or amendment of the compiled law is affected by an application, saving or transitional provision that is not included in this compilation, details are included in the endnotes.

**Editorial changes**

For more information about any editorial changes made in this compilation, see the endnotes.

**Modifications**

If the compiled law is modified by another law, the compiled law operates as modified but the modification does not amend the text of the law. Accordingly, this compilation does not show the text of the compiled law as modified. For more information on any modifications, see the series page on the Legislation Register for the compiled law.

**Self-repealing provisions**

If a provision of the compiled law has been repealed in accordance with a provision of the law, details are included in the endnotes.

Authorised Version F2023C00174 registered 08/02/2023

# Part 40—Costs

## Division 40.1—General

### 40.01 Party and party costs

If an order is made that a party or person pay costs or be paid costs, without any further description of the costs, the costs are to be costs as between party and party.

Note: **_Costs as between party and party_** is defined in the Dictionary.

### 40.02 Other order for costs

A party or a person who is entitled to costs may apply to the Court for an order that costs:

(a) awarded in their favour be paid other than as between party and party; or

(b) be awarded in a lump sum, instead of, or in addition to, any taxed costs; or

(c) be determined otherwise than by taxation.

Note 1: The Court may order that costs be paid on an indemnity basis.

Note 2: The Court may order that the costs be determined by reference to a cost assessment scheme operating under the law of a State or Territory.

### 40.03 Costs reserved

If the Court reserves the question of costs, and no further order is made, costs follow the event.

### 40.04 Costs on interlocutory application or hearing

If no order for costs is made on an interlocutory application or hearing, the costs of the application or hearing:

(a) if an order is made in favour of any party—follow the event; or

(b) if no order is made in favour of any party—are taken to be costs in the cause of the successful party to the proceeding.

### 40.05 Costs in other courts

If a proceeding is transferred to the Court, a party may apply to the Court for an order that the costs of the proceeding in the other court be:

(a) taxed in accordance with Division 40.2; or

(b) awarded as a lump sum in lieu of taxation.

### 40.06 Costs improperly, unreasonably or negligently incurred

A party may apply to the Court for an order:

(a) that any costs that have been improperly, unreasonably or negligently incurred be disallowed; or

(b) directing an inquiry whether any costs have been improperly, unreasonably or negligently incurred and providing for the costs of such inquiry.

Note 1:    A taxing officer has the responsibility on any taxation to disallow any costs that have been improperly, unreasonably or negligently incurred.

Note 2:    *Taxing officer* is defined in the Dictionary.

## 40.07  Liability of lawyer to their client for misconduct

(1) A party who has reasonable cause to believe that additional costs have been incurred because of the party's lawyer's misconduct, may apply to the Court for an order:

(a) that the whole or part of the costs as between the lawyer and the party be disallowed; or

(b) if the lawyer is a barrister—that the whole or part of the costs as between the barrister and the barrister's instructing lawyer be disallowed; or

(c) that the lawyer pay to the party costs that the party has been ordered to pay to another party; or

(d) that the lawyer indemnify any other party against any costs payable by that party.

(2) For this rule, a lawyer has engaged in misconduct if:

(a) a proceeding or an application is delayed, adjourned or abandoned because of the lawyer's failure:

(i) to attend or make arrangements for a proper representative to attend a hearing; or

(ii) to file a relevant document; or

(iii) to provide the Court or another party with a relevant document; or

(iv) to be prepared for a hearing; or

(v) to comply with these rules or an order of the Court; or

(b) the lawyer:

(i) incurs costs improperly or without reasonable cause; or

(ii) incurs costs that are unnecessary or wasteful; or

(iii) is guilty of undue delay.

Note 1:    *Lawyer* is defined in the Dictionary.

Note 2:    For the duty of a party's lawyer to assist the party to conduct proceedings in accordance with the overarching purpose of the Act, see section 37N(2) of the Act.

Note 3:    For the power of the Court to order a lawyer to pay costs if the lawyer fails to comply with the duty under section 37N(2) of the Act, see section 37N(4) of the Act.

## 40.08  Reduction in costs otherwise payable

A party other than in a proceeding under the *Admiralty Act 1988* may apply to the Court for an order that any costs and disbursements payable to another party in the proceeding be reduced by an amount to be specified by the Court if:

**Chapter 5** Judgments, costs and other general provisions
**Part 40** Costs
**Division 40.1** General

Rule 40.08

(a) the applicant has claimed a money sum or damages and has been awarded a sum of less than $100 000; or

(b) the proceeding (including a cross-claim) could more suitably have been brought in another court or tribunal.

**Rules 40.09 – 40.11 left blank**

Case 5:23-cv-03438-PCP   Document 26-2   Filed 11/10/23   Page 200 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Taxation of costs  **Division 40.2**

Rule 40.12

## Division 40.2—Taxation of costs

### 40.12  Application of Division 40.2 and 40.3

If an order is made in favour of a party for payment of the party's costs, the costs must be taxed in accordance with this Part, unless the amount of costs is agreed between the parties to the order.

### 40.13  Taxation of costs awarded on an interlocutory application

If an order for costs is made on an interlocutory application, the party in whose favour the order is made must not tax those costs until the proceeding in which the order is made is finished.

Note:      The Court may order that costs of an interlocutory application be taxed immediately.

### 40.14  Order for taxation not required

If these Rules or an order of the Court entitle a party to costs, the party may have those costs taxed without an order directing taxation.

### 40.15  Failure to file bill of costs

(1)  If a party entitled to costs does not file a bill in accordance with this Division within a reasonable time of being entitled to do so, any party who is liable to pay those costs and is prejudiced as a result, may apply to the taxing officer:

(a)  to certify the costs; or

(b)  to allow a nominal or other sum by way of costs.

Note:      *Taxing officer* is defined in the Dictionary.

(2)  An application under subrule (1) must be accompanied by an affidavit stating the prejudice said to be suffered.

Note:      *Bill* is defined in the Dictionary.

### 40.16  Unnecessary expense in proceeding before taxing officer

If, in a proceeding before a taxing officer, a party has engaged in conduct that puts another party to any unnecessary expense, the taxing officer may exercise the powers in rule 40.15(1).

### 40.17  Filing bill for taxation

A party who wants to have costs taxed must file a bill for taxation.

Note:      *Bill* is defined in the Dictionary.

Chapter 5  Judgments, costs and other general provisions
Part 40  Costs
Division 40.2  Taxation of costs

Rule 40.18

## 40.18  Contents of bill

A bill, other than a short form bill, must be in accordance with Form 127 and must:

(a)  contain particulars of:

(i)  the work done by the lawyer, their staff and agents; and

(ii)  the costs claimed for the work; and

(iii)  disbursements incurred; and

(b)  have attached to it, or be accompanied by, a copy of the receipt for each disbursement or, if not paid, a copy of the relevant accounts.

Note:       When a bill is filed, a Registrar will fix a time and date for the taxing officer to make an estimate of the bill under rule 40.20 and endorse those details on the bill.

## 40.19  Service of a bill

A party who files a bill must serve on each party interested in the bill, at least 7 days before the date endorsed on the bill:

(a)  a copy of the bill as endorsed by a Registrar; and

(b)  the documents mentioned in paragraph 40.18(b).

Note:       *Party interested in the bill* is defined in the Dictionary.

## 40.20  Estimate of costs

(1)  Before a bill is taxed, a taxing officer is to make an estimate of the approximate total for which, if the bill were taxed, the certificate of taxation would be likely to issue.

(2)  The estimate in subrule (1) is to be made in the absence of the parties and without making any determination on the individual items in the bill.

(3)  The taxing officer will give notice, in writing, to each party interested in the bill, of the estimate made under subrule (1) (the *notice of estimate*).

(4)  Unless a party interested in the bill objects to the estimate in accordance with rule 40.21, the amount of the estimate is the amount for which the certificate of taxation will be issued.

Note:       *Certificate of taxation* is defined in the Dictionary. See also rule 40.32.

## 40.21  Objection to estimate

(1)  A party interested in the bill who wants to object to the estimate must, within 21 days after the issue of the notice of estimate:

(a)  file a notice of objection, in accordance with Form 128; and

(b)  pay into the Litigants' Fund an amount of $2 000 as security for the costs of any taxation of the bill.

(2)  On receipt of the notice of objection and the payment in paragraph (1)(b), a Registrar may direct:

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 202 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Taxation of costs  **Division 40.2**

Rule 40.22

(a) the parties to attend before a designated Registrar for a confidential conference to:

   (i) identify the real issues in dispute; and

   (ii) reach a resolution of the dispute; or

(b) a provisional taxation; or

(c) that the taxation of the bill proceed.

## 40.22  Resolution at confidential conference

If the parties achieve a resolution of the dispute at a confidential conference, a Registrar will:

(a) issue a sealed certificate of taxation for the amount agreed by the parties; and

(b) pay the monies paid into the Litigants' Fund in accordance with paragraph 40.21(1)(b) to:

   (i) a party, in accordance with any agreement between the parties; or

   (ii) if there is no agreement between the parties—to the party who objected to the estimate.

Note:    For payment out of the Litigants' Fund, see rule 2.43.

## 40.23  Provisional taxation

(1) A taxing officer may, in the absence of the parties, provisionally tax a bill.

(2) However, the taxing officer may, before completing the provisional taxation, require the parties to file submissions identifying the issues in dispute in relation to the bill.

(3) The taxing officer will give a written notice to the parties stating the amount for which the bill is provisionally taxed and identifying the amounts provisionally taxed off the bill.

(4) A party interested in the bill may, within 21 days after the date of the written notice given by the taxing officer in accordance with subrule (3), file a notice requesting a full taxation, in accordance with Form 129.

(5) In the absence of a party filing a notice in accordance with subrule (4), the amount to which a bill was provisionally taxed will be the amount for which the certificate of taxation will be issued.

Note:    *Party interested in the bill* is defined in the Dictionary.

## 40.24  Notice that bill is to be taxed

A Registrar will give notice that a bill is to be taxed if:

(a) a Registrar has directed, under paragraph 40.21(2)(c), that the taxation of the bill proceed; or

(b) a resolution is not achieved at a confidential conference; or

(c) a party has given notice requesting a full taxation under rule 40.23(4).

**Chapter 5**  Judgments, costs and other general provisions
**Part 40**  Costs
**Division 40.2**  Taxation of costs

Rule 40.25

## 40.25  Notice of objection

(1) If a Registrar has notified the parties interested in a bill that a taxing officer is to tax the bill, a party on whom the bill has been served and who wants to object to any item of the bill must file and serve on the parties interested in the bill a notice of objection, in accordance with Form 130, that:

    (a)  identifies each item or part of an item to which objection is taken; and

    (b)  states, briefly but specifically:

        (i)  why the item or part of the item should be disallowed; and

        (ii)  the amount by which it is contended the item should be reduced; and

       (iii)  any authority on which the party relies.

(2) The notice of objection must be filed and served on the parties interested in the bill not later than 14 days before the date appointed for taxing the bill.

    Note:      ***Party interested in the bill*** is defined in the Dictionary.

## 40.26  Response to notice of objection

(1) A party who files a bill, and any party who might be affected by any objection to the bill, must file and serve a notice of response, in accordance with Form 131, stating:

    (a)  whether each objection to an item or part of an item is admitted or opposed;

    (b)  for each objection that is opposed—briefly but specifically:

        (i)  why the item or part of the item should be allowed; and

        (ii)  why the objection should be dismissed; and

       (iii)  any authority on which the party relies.

(2) The notice of response must be filed and served on any party who has given a notice of objection or notice of response within 5 days before the date appointed for taxing the bill.

    Note:      ***Party interested in the bill*** is defined in the Dictionary.

## 40.27  Taxation

(1) If a notice of objection under rule 40.25(1) has not been filed, only the party who has filed the bill may attend the taxation.

(2) If a notice of objection has been filed, only the party who has filed the notice of objection and a party who has filed a notice of response under this Division may attend the taxation.

(3) A party is bound by the party's notice of objection or notice of response, with the effect that:

    (a)  no amount will be taxed off any item to which objection has not been taken in the notice of objection; and

    (b)  no amount will be allowed for any item to which objection has been taken in the notice of objection but not responded to in the notice of response.

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 204 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Taxation of costs  **Division 40.2**

Rule 40.28

(4) Despite subrule (3) the taxing officer will only allow costs to which a party is entitled.

Note:    ***Costs as between party and party*** and ***costs on an indemnity basis*** are defined in the Dictionary.

(5) At the taxation, a party may apply to the taxing officer for leave to make oral submissions for the purpose of explaining or clarifying an objection in the notice of objection or a response in the notice of response.

(6) The taxing officer is to tax the bill in accordance with this Part and on completion is to issue a certificate of taxation.

## 40.28  Powers of taxing officer

A taxing officer may, for the purpose of the taxation of costs under this Division, do any of the following:

(a) summon and examine witnesses either orally or on affidavit;

(b) administer oaths;

(c) direct or require the production of books, papers and documents;

(d) issue subpoenas;

(e) make separate or interim certificates of taxation.

Note:    ***Taxing officer*** is defined in the Dictionary.

## 40.29  Costs to be allowed on taxation

A taxing officer is to allow costs for the work done:

(a) before 1 August 2011—in accordance with Schedule 2 to the Federal Court Rules, for the relevant period mentioned in that Schedule; and

(b) on or after 1 August 2011—in accordance with Schedule 3, for the relevant period, if any, mentioned in that Schedule.

## 40.30  Costs not to be allowed on taxation

A taxing officer is not to allow:

(a) barrister's fees on a hearing if the barrister:

   (i) was not present at the hearing for a substantial amount of the relevant period; or

   (ii) did not give substantial assistance in the conduct of the proceeding; and

(b) costs that in the opinion of the taxing officer have been incurred or increased:

   (i) through impropriety, unreasonableness or negligence; or

   (ii) through overcaution; or

   (iii) by agreeing:

      (A) special fees to counsel; or

      (B) special charges or expenses to witnesses or other persons; or

   (iv) by other unnecessary expense.

**Chapter 5** Judgments, costs and other general provisions
**Part 40** Costs
**Division 40.2** Taxation of costs

Rule 40.31

**40.31 Exercise of taxing officer's discretion**

If a party wants a fee, allowance or disbursement that may be allowed in the taxing officer's discretion, the taxing officer may have regard to the following:

   (a) the nature and importance of the proceeding;

   (b) the amount of the claim;

   (c) the damages, if any, awarded;

   (d) the principle involved;

   (e) the conduct and cost of the proceeding;

   (f) other fees and allowances claimed by the party's lawyers;

   (g) any other relevant circumstance.

**40.32 Certificate of taxation**

(1) A taxing officer is to issue a sealed certificate of taxation, in accordance with Form 132, that must be served, within 14 days after the date it is issued, by the party who filed the bill, on the party responsible for payment of the costs.

(2) A certificate of taxation has the force and effect of an order of the Court.

(3) The costs certified in the certificate of taxation accrue interest, calculated in accordance with rule 39.06 from the date the certificate of taxation is served.

Note 1:    Section 52 of the Act empowers the Court to award interest.

Note 2:    For the rate of interest, see rule 39.06.

**40.33 Costs of taxation**

(1) A party who files an objection under rule 40.21 must pay the costs of taxation of all parties from the date on which the taxing officer notified the parties of the estimate unless:

   (a) if the party is the party who filed the bill—the costs are taxed at more than 115% of the taxing officer's estimate; or

   (b) in any other case—the costs are taxed at less than 85% of the taxing officer's estimate.

(2) A party may apply to the taxing officer to be relieved of the consequences of subrule (1) if:

   (a) the party had offered to compromise the costs on terms more favourable than the costs were taxed; or

   (b) the conduct of any other party at the taxation added significantly to the duration or cost of the taxation.

**40.34 Review by Court**

(1) A party who attended a taxation may apply to the Court for a review of the taxation and any consequential orders.

Authorised Version F2023C00174 registered 08/02/2023

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 206 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Taxation of costs  **Division 40.2**

Rule 40.35

(2) The application must be in accordance with Form 133 and state, briefly but specifically:

    (a) the items in the bill that are subject to challenge; and

    (b) whether the party wants the item included, deleted or varied and, if varied, the amount of the variation.

(3) A party must not, on an application for review, raise any ground of objection, or response to an objection, not taken in the party's notice under rules 40.25(1) or 40.26(1).

    Note:    For the parties who may attend the taxation, see rule 40.27.

(4) The application must be filed and served on all interested parties within 28 days after the issue of the certificate of taxation.

(5) The Court may call for a written report from the taxing officer.

(6) No further evidence will be received on the review.

    Note:    The Court may exercise all of the powers of the taxing officer in relation to the items under review and may make any other orders, including altering the certificate of taxation or remitting an item to the same or any other taxing officer for taxation.

## 40.35  Stay of costs

(1) An application for a review of a taxation, does not operate to stay execution for costs that are the subject of a certificate of taxation.

(2) However, a party making an application under rule 40.34, may apply to the Court to stay execution on any costs included in a certificate of taxation until the application is heard and determined.

**Rules 40.36 – 40.40 left blank**

**Chapter 5**  Judgments, costs and other general provisions
**Part 40**  Costs
**Division 40.3**  Short form bills

Rule 40.41

# Division 40.3—Short form bills

### 40.41  Short form bill on application for winding up under *Corporations Act 2001*

(1)  A plaintiff who has obtained an order for the costs of the winding up of a corporation under the *Corporations Act 2001* is entitled to:

(a)  the costs mentioned in item 13 of Schedule 3 that applied on the date that the winding up application was filed; and

(b)  any disbursements properly incurred.

(2)  If the application for winding up is dismissed and the plaintiff obtains an order for costs against the defendant, the plaintiff is entitled to:

(a)  the costs mentioned in item 13 of Schedule 3 that applied on the date that the winding up application was filed; and

(b)  any disbursements properly incurred.

### 40.42  Procedure—short form bills under *Corporations Act 2001*

(1)  A plaintiff who claims costs under rule 40.41 must serve on the liquidator of the corporation, and the defendant, a bill that includes disbursements (the ***bill***), which need not include an itemised account of:

(a)  the work or services performed; or

(b)  the disbursements incurred.

(2)  Unless a party interested in a bill objects to the amount claimed in the bill, in accordance with rule 40.25, a certificate of taxation will be issued for the sum of:

(a)  the amount mentioned in item 13 of Schedule 3 or, if a lesser amount is claimed in the bill, that amount; and

(b)  any disbursements properly incurred.

(3)  If the liquidator, or the defendant, objects to the claim being made under rule 40.41, the liquidator, or the defendant, must, within 14 days after being served with the bill, give the plaintiff written notice of the objection.

(4)  If the plaintiff receives a notice of objection, the plaintiff must, within 14 days after receiving the notice, file a copy of the following documents:

(a)  the notice;

(b)  the bill;

(c)  the affidavit of service of the bill on the liquidator and the defendant;

(d)  either:

(i)  an itemised account;

(ii)  or evidence that the costs incurred by the plaintiff were equal to, or more than, the amount of the bill.

Note:      For the taxation of a bill, see rule 40.27.

(5)  The parties, and the liquidator, must not attend on taxation of the bill unless directed to do so by the taxing officer.

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 208 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Short form bills  **Division 40.3**

Rule 40.43

(6) This rule does not limit a plaintiff's right to claim taxed costs of the proceeding, under Division 40.2.

(7) However, a plaintiff who claims costs:

    (a) under this rule—has no further claim to recover any of the taxed costs of the proceeding under Division 40.2; and

    (b) under Division 40.2—has no further right to recover any of the taxed costs of the proceeding under this rule.

## 40.43  Short form bills for migration appeals

(1) This rule applies in relation to:

    (a) an appeal from an order made by the Federal Circuit and Family Court of Australia (Division 2) in respect of a migration decision (within the meaning of the *Migration Act 1958*); and

    (b) an application for leave to appeal from an order mentioned in paragraph (a); and

    (c) an application for an extension of time to start an appeal mentioned in paragraph (a) or to make an application mentioned in paragraph (b).

(2) If:

    (a) an appeal or application is discontinued or dismissed before hearing; and

    (b) a party is entitled to costs or obtains an order for costs;

the party is entitled, subject to subrule (4), to the costs mentioned in item 15.1 of Schedule 3.

(3) If:

    (a) an appeal or application is discontinued or dismissed after hearing; and

    (b) a party is entitled to costs or obtains an order for costs;

the party is entitled, subject to subrule (4), to the costs mentioned in item 15.2 of Schedule 3.

(4) If:

    (a) a party is entitled to an amount under subrule (2) or (3) in relation to an appeal; and

    (b) the court had, at a separate hearing, granted leave to appeal or an extension of time to start the appeal;

the party is entitled, in addition to the costs to which the party is entitled under subrule (2) or (3) (as the case may be), to the costs mentioned in item 15.3 of Schedule 3.

## 40.44  Procedure—short form bills for migration appeals

(1) A party (the ***claimant***) who claims costs to which the claimant is entitled under rule 40.43 must file a bill for an amount not exceeding the amount to which the claimant is entitled under that rule. The bill need not include an itemised account of:

    (a) the work or services performed; or

**Chapter 5** Judgments, costs and other general provisions
**Part 40** Costs
**Division 40.3** Short form bills

Rule 40.44

(b) the disbursements incurred.

(2) A certificate of taxation will be issued for the amount claimed in the bill unless a party interested in the bill files a notice of objection in accordance with subrule 40.25(1) within 14 days after being served with the bill.

(3) If the claimant receives a notice of objection, the claimant must, within 14 days after receiving the notice, file a copy of the following documents:

(a) the notice;

(b) the affidavit of service of the bill on the other party;

(c) an itemised account or evidence that the costs incurred by the claimant were equal to, or more than, the amount of the bill.

Note:    For the taxation of the bill, see rule 40.27.

(5) The claimant and the other party must not attend on the taxation of the bill, unless directed to do so by the taxing officer.

(6) This rule does not limit a party's right to claim taxed costs of the appeal under Division 40.2.

(7) However, a party who claims costs:

(a) under this rule—has no further claim to recover any of the taxed costs of the appeal under Division 40.2; and

(b) under Division 40.2—has no further right to recover any of the taxed costs of the appeal under this rule.

Note:    *File* is defined in the Dictionary as meaning file and serve.

**Rules 40.45–40.50 left blank**

Case 5:23-cv-03438-PCP    Document 26-2    Filed 11/10/23    Page 210 of 297

Judgments, costs and other general provisions  **Chapter 5**
Costs  **Part 40**
Determination of maximum costs  **Division 40.4**

Rule 40.51

# Division 40.4—Determination of maximum costs

## 40.51  Maximum costs in a proceeding

(1) A party may apply to the Court for an order specifying the maximum costs as between party and party that may be recovered for the proceeding.

> Note:     *Costs as between party and party* is defined in the Dictionary.

(2) An order made under subrule (1) will not include an amount that a party is ordered to pay because the party:

    (a)  has failed to comply with an order or with these Rules; or

    (b)  has sought leave to amend pleadings or particulars; or

    (c)  has sought an extension of time for complying with an order or with any of these Rules; or

    (d)  has not conducted the proceeding in a manner to facilitate a just resolution as quickly, inexpensively and efficiently as possible, and another party has been caused to incur costs as a result.

Authorised Version F2023C00174 registered 08/02/2023

# Schedule 1—Dictionary

(rule 1.51)

*AAT Act* means the *Administrative Appeals Tribunal Act 1975*.

*Act* means the *Federal Court of Australia Act 1976*.

*address for service*, for a person in a proceeding—see rule 11.01.

*AD(JR) Act* means the *Administrative Decisions (Judicial Review) Act 1977*.

*ADR process* means an alternative dispute resolution process conducted by a suitable person.

*AFCA* has the meaning given by section 761A of the *Corporations Act 2001*.

*appeal* means an appeal brought in the appellate jurisdiction of the Court under Division 2 of Part III of the Act, but does not include an appeal under Part 33 of these Rules.

*appellant* means a person who has filed a notice of appeal, under Chapter 4 of these Rules.

*applicant* means:

    (a) a party, other than a cross-claimant, claiming relief; or

    (b) for Division 34.7—a person who is an applicant for section 61(2) of the *Native Title Act 1993*.

*approved form* means a form approved by the Chief Justice.

*arbitration* means arbitration conducted under an arbitration order.

*arbitration order* means an order mentioned in rule 28.02, referring a matter to an arbitrator.

*arbitrator* means an arbitrator to whom a matter is referred under an arbitration order.

*Attorney-General* means the Commonwealth Attorney-General.

*Attorney-General's Department* means the Commonwealth Attorney-General's Department.

*Australia* includes the external Territories.

*Australian Consumer Law* has the meaning given by section 4(1) of the *Consumer and Competition Act 2010*.

*authenticity of a document* means:

    (a) if the document is an original—it was created, printed, written, signed and executed as it purports to have been; or

    (b) if the document is a copy—it is a true copy.

*award* includes a final award and an interim award.

*bank* means:

(a) an authorised deposit-taking institution within the meaning of the *Banking Act 1959*; or

(b) the Reserve Bank of Australia.

*Bankruptcy Rules* means the *Federal Court (Bankruptcy) Rules 2016*.

*barrister* means a person who is entitled to practise as a barrister in a federal court.

*bill* means a bill of costs.

*business day*, in a place, means any day other than:

(a) a Saturday or Sunday; or

(b) a day that is a public holiday in the place; or

(c) any other day on which the Registry in the place is closed.

*business name* means a name, style, title or designation under which a person carries on a business, other than a name consisting only of the name of that person and the name of any other person in association with whom the person carries on business.

*certificate of taxation* means a certificate issued by a taxing officer in accordance with rule 40.32.

*Chief Executive Officer*—see section 4 of the Act.

*Civil Dispute Resolution Act* means the *Civil Dispute Resolution Act 2011*.

*claim* includes a cross-claim unless a contrary intention appears.

*conduct money* means a sum of money or its equivalent, sufficient to meet the reasonable expenses of a person attending Court for the purposes of complying with a subpoena or order.

*constitutional writ* means a writ of mandamus or a writ of prohibition.

*control*, if referring to a document, means possession, custody or power.

*convention* means a convention (other than the Hague Convention), agreement, arrangement or treaty about service abroad of judicial documents to which the Crown in right of the Commonwealth or, if applicable, in right of a State, and a foreign country are parties.

*corporation* means any artificial person other than an organisation.

*Corporations Rules* means the *Federal Court (Corporations) Rules 2000*.

*costs*, unless the context otherwise provides, means costs as between party and party.

*costs as between party and party* means only the costs that have been fairly and reasonably incurred by the party in the conduct of the litigation.

*costs on an indemnity basis* means costs as a complete indemnity against the costs incurred by the party in the proceeding, provided that they do not include any amount shown by the party liable to pay them to have been incurred unreasonably in the interests of the party incurring them.

*Court file*: a document is part of the Court file of a particular proceeding if:

(a) the document:

 (i) has been accepted for filing in respect of the proceeding, in accordance with rule 2.25; or

 (ii) is a redacted copy replaced on the Court file in accordance with rule 2.29; and

(b) the document has not been the subject of an order, under rule 2.28 or 2.29, that the document be removed from the Court file.

*cross–claim* includes a counter-claim, cross-action, set-off and third party claim.

*cross–claimant* means a party claiming relief in a cross-claim.

*cross-respondent* means a party against whom relief is claimed in a cross-claim.

*description* means:

(a) for a person who is an individual—the person's name, residential or business address and occupation;

(b) for a person that is not an individual:

 (i) the person's name; and

 (ii) the address of one of the following:

  (A) the person's registered office;

  (B) the person's principal office;

  (C) the person's principal place of business.

*direction* means an order of the Court.

*directions hearing* means the first date, and any other date appointed by the Court for the management and conduct of a proceeding.

*document* includes:

(a) any record of information mentioned in the definition of *document* in Part 1 of the Dictionary to the *Evidence Act 1995*; and

(b) any other material, data or information stored or recorded by mechanical or electronic means.

*electronic communication* means a communication of information in the form of data, text or images by means of guided or unguided electromagnetic energy, including an email or an attachment to an email.

*email address* means an address to or from which an electronic communication may be sent, or at which an electronic communication may be received, using the internet, an intranet or other similar electronic network.

*examination* includes:

   (a)  an examination held under an order made under Division 29.2; and

   (b)  in proceedings under Division 1 of Part 2 of the *Foreign Evidence Act 1994*—any proceeding for the taking of evidence of a person conducted by the judicial authorities of a foreign country in relation to a letter of request issued as a result of an order made by the Court under that Part.

*examiner* includes a Registrar of the Court, or any other person, appointed for the purpose of an examination of a person under:

   (a)  these Rules; or

   (b)  section 7(1)(a) or (b) of the *Foreign Evidence Act 1994*.

*expert* means a person who has specialised knowledge based on the person's training, study or experience.

*expert evidence* means the evidence of an expert that is based wholly or substantially on the expert's specialised knowledge.

> Note:     For the admissibility of the evidence of the opinion of an expert, see section 79 of the Evidence Act.

*expert report* means a written report that contains the opinion of any expert on any question in issue in the proceeding based wholly or substantially on that expert's specialised knowledge, including any report in which an expert comments on the report of any other expert.

*file* means file and serve.

*genuine steps statement*—see section 5 of the Civil Dispute Resolution Act.

*guardian*, of a mentally disabled person or the estate of a mentally disabled person, includes a person entrusted under a law of the Commonwealth, or of a State or Territory, with the care or management of the person or the estate.

*Hague Convention* means the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done at The Hague on 15 November 1965.

> Note:     The Convention is in Australian Treaty Series 2010 No. 23 ([2010] ATS 23) and could in 2022 be viewed in the Australian Treaties Library on the AustLII website (http://www.austlii.edu.au).

*hearing* means any hearing before the Court, whether final or interlocutory.

*hearing date*, for an application or a proceeding, means the date fixed by a Registrar for a hearing for the application or proceeding.

*High Court* means the High Court of Australia.

*image* means a picture that has been created, copied, stored or sent in electronic form.

*interested person* means:
  (a) for a minor under a legal incapacity—the person's parent or guardian; or
  (b) for a mentally disabled person under a legal incapacity—the person's guardian; or
  (c) in any other case—a person affected:
      (i) by an order of the Court; or
      (ii) by any act or thing done by another person.

*interlocutory application* means an application, other than a cross-claim, in a proceeding already started.

*issuing officer*, for a subpoena to give evidence or produce documents—see subrule 24.11(1).

*issuing party*:
  (a) for a subpoena to give evidence, or produce documents, mentioned in Division 24.2—see subrule 24.11(1); and
  (b) for a subpoena to attend for examination or produce documents in arbitral proceedings under subsection 23(3) of the International Arbitration Act—see subrule 28.46(1).

*Judge*—see section 4 of the Act.

*judgment*—see section 4 of the Act.

*lawyer* has the meaning given by section 4 of the Act.

*Litigants Fund* means the Federal Court of Australia Litigants' Fund established under Division 2.5 of these Rules.

*litigation representative* means a person who has been appointed for a proceeding, as a litigation representative for a person under a legal incapacity.

*mediation* means mediation conducted under a mediation order.

*mediation order* means an order referring a matter to a mediator as mentioned in rule 28.01.

*mediator* means a person to whom a matter is referred under a mediation order.

*mentally disabled person* means a person who, because of a mental disability or illness, is not capable of managing the person's own affairs in a proceeding.

*migration litigation* has the meaning given by section 486K of the *Migration Act 1958*.

*minor* means a person under the age of 18 years.

*Native Title Registrar* means the Native Title Registrar appointed under Part 5 of the *Native Title Act 1993*.

*oath* includes an affirmation.

*order* includes a final order, an interlocutory order, a direction and a sentence of the Court.

*organisation* has the meaning given by section 6 of the *Fair Work (Registered Organisations) Act 2009*.

*originating application* means an application starting a proceeding, including a cross-claim in the proceeding against a person who was not previously a party to the proceeding, but not a notice of appeal.

*partnership name* means a name under which 2 or more persons carry on business in partnership in Australia.

*party* means a party to a proceeding.

*party interested in the bill* means a party or a person in whose favour or against whom an order for costs has been made.

*person under a legal incapacity* means:
  (a) a minor; or
  (b) a mentally disabled person.

*pleading* means:
  (a) a statement of claim; or
 (aa) an alternative accompanying document referred to in rule 8.05; or
  (b) a statement of cross claim; or
  (c) a defence; or
 (ca) a concise statement in response; or
  (d) a reply; or
 (da) a concise statement in reply; or
  (e) any pleading after a reply;
but does not include:
  (f) an originating application; or
  (g) an interlocutory application
  (h) a notice of any kind; or
  (i) an affidavit.

*principal proceeding* means a proceeding in which:
  (a) a respondent wants to make a cross-claim; or
  (b) a cross-claim has been made under Part 15.

*proceeding*—see section 4 of the Act.

*proper address*, for a person to be served, means:
  (a) the person's address for service; or

(b) if the person has no address for service—the person's usual or last-known business or residential address.

*proper place*, for a proceeding, means:
(a) the place where the proceeding is started; or
(b) if the proceeding is transferred to another place—the other place, from the date of transfer.

*proper Registry*, for a proceeding, means the Registry at the proper place for the proceeding.

*Register of Native Title Claims* means the Register established and maintained in accordance with Part 7 of the *Native Title Act 1993*.

Note:    See section 253 and Part 7 of the *Native Title Act 1993*.

*Registrar* means:
(a) the Chief Executive Officer, or a Registrar, District Registrar or Deputy District Registrar of the Court; and
(b) any officer from time to time authorised to perform the duties of the Chief Executive Officer, or a Registrar, District Registrar or Deputy District Registrar of the Court.

*Registry* means the Principal Registry or a District Registry of the Court.

*respondent* means:
(a) a party, other than a cross-respondent, against whom relief is claimed, and
(b) a party to an appeal brought by an appellant.

*return date* means the date fixed by a Registrar for the hearing of an application and endorsed on any approved form.

*Sheriff* means:
(a) the Sheriff of the Court appointed under section 18N of the Act; and
(b) a Deputy Sheriff appointed under that section; and
(c) any person from time to time authorised to perform the duties of the Sheriff or a Deputy Sheriff.

*short form bill* means a bill under Division 40.3 of these Rules or Part 13 of the Bankruptcy Rules.

*stamp*, for a document, means to affix the stamp of the Court or a particular Registry to the document under rule 2.01(2) or (3).

*submitting notice* means a notice filed in accordance with rule 12.01.

*taxed costs* means costs taxed in accordance with Division 40.2.

*taxing officer* means a Registrar.

*Trans-Tasman Proceedings Act* means the *Trans-Tasman Proceedings Act 2010*.

*trial* includes any hearing other than an interlocutory hearing.

*vexatious proceeding*: see section 37AM of the Act.

*vexatious proceedings order*: see section 37AM of the Act.

*without notice* means without serving or advising another party or other person of an application to be made to the Court.

Authorised Version F2023C00174 registered 08/02/2023

# EXHIBIT 17



# Federal Circuit and Family Court of Australia (Division 2) (General Federal Law) Rules 2021

made under Chapter 4 of the

*Federal Circuit and Family Court of Australia Act 2021*

## Compilation No. 2

**Compilation date:**         4 January 2023

**Includes amendments up to:**   F2023L00008

**Registered:**            18 January 2023

Prepared by the Office of Parliamentary Counsel, Canberra

# About this compilation

**This compilation**

This is a compilation of the *Federal Circuit and Family Court of Australia (Division 2) (General Federal Law) Rules 2021* that shows the text of the law as amended and in force on 4 January 2023 (the **compilation date**).

The notes at the end of this compilation (the **endnotes**) include information about amending laws and the amendment history of provisions of the compiled law.

**Uncommenced amendments**

The effect of uncommenced amendments is not shown in the text of the compiled law. Any uncommenced amendments affecting the law are accessible on the Legislation Register (www.legislation.gov.au). The details of amendments made up to, but not commenced at, the compilation date are underlined in the endnotes. For more information on any uncommenced amendments, see the series page on the Legislation Register for the compiled law.

**Application, saving and transitional provisions for provisions and amendments**

If the operation of a provision or amendment of the compiled law is affected by an application, saving or transitional provision that is not included in this compilation, details are included in the endnotes.

**Editorial changes**

For more information about any editorial changes made in this compilation, see the endnotes.

**Modifications**

If the compiled law is modified by another law, the compiled law operates as modified but the modification does not amend the text of the law. Accordingly, this compilation does not show the text of the compiled law as modified. For more information on any modifications, see the series page on the Legislation Register for the compiled law.

**Self-repealing provisions**

If a provision of the compiled law has been repealed in accordance with a provision of the law, details are included in the endnotes.

# Part 22—Costs

## Division 22.1—Security for costs

### 22.01  Security for costs

(1) On application by a respondent, the Court may order the applicant to give the security that the Court considers appropriate for the respondent's costs of the proceeding.

(2) In this rule:

*respondent* includes an applicant if a cross-claim is made or the response to the application seeks orders in relation to matters not covered by the applicant.

(3) An application must be made in accordance with the approved form and supported by an affidavit setting out the facts relied on.

Note:    For the power of the Court to order an applicant in a proceeding to give security for the payment of costs and for other matters relating to security for costs, see section 215 of the Act.

# Division 22.2—Orders for costs

## 22.02 Order for costs

(1) An application for an order for costs may be made:
  (a) at any stage in a proceeding; or
  (b) within 28 days after a final decree or order is made; or
  (c) within any further time allowed by the Court.

(2) In making an order for costs in a proceeding, the Court may:
  (a) set the amount of the costs; or
  (b) set the method by which the costs are to be calculated; or
  (c) refer the costs for taxation under Part 40 of the Federal Court Rules; or
  (d) set a time for payment of the costs, which may be before the proceeding is concluded.

## 22.03 Determination of maximum costs

(1) The Court may specify the maximum costs that may be recovered on a party and party basis:
  (a) by order at the first court date; and
  (b) on its own initiative or on the application of a party.

(2) However, an amount specified must not include an amount that a party is ordered to pay because the party:
  (a) has failed to comply with, or has sought an extension of time for complying with, an order or any of these Rules; or
  (b) has sought leave to amend a document; or
  (c) has otherwise caused another party to incur costs that were not necessary for the economic and efficient progress of the proceeding or hearing of the proceeding.

(3) The Court may vary the maximum costs specified if, in the Court's opinion, there are special reasons and it is in the interests of justice to do so.

## 22.04 Costs reserved

If the costs of a motion, application or other proceeding are reserved, the costs reserved follow the event unless the Court otherwise orders.

## 22.05 Costs if proceedings transferred

(1) This rule applies if a proceeding is transferred to the Court from the Federal Court.

(2)  If the Federal Court has not made an order for costs, the Court may make an order for costs including costs before the transfer.

(3)  Unless the Federal Court otherwise orders, costs before the transfer must be in accordance with this Part.

## 22.06  Order for costs against lawyer

(1)  The Court or a Registrar may make an order for costs against a lawyer if the lawyer, or an employee or agent of the lawyer, has caused costs:

(a)  to be incurred by a party or another person; or

(b)  to be thrown away;

because of undue delay, negligence, improper conduct or other misconduct or default.

(2)  A lawyer may be in default if a hearing may not proceed conveniently because the lawyer has unreasonably failed:

(a)  to attend, or send another person to attend, the hearing; or

(b)  to file, lodge or deliver a document as required; or

(c)  to prepare any proper evidence or information; or

(d)  to do any other act necessary for the hearing to proceed.

(3)  An order for costs against a lawyer may be made:

(a)  on the initiative of the Court or Registrar; or

(b)  on application by a party to the proceeding; or

(c)  by another person who has incurred the costs or costs thrown away.

(4)  The order may provide:

(a)  that the costs, or part of the costs, as between the lawyer and party be disallowed; or

(b)  that the lawyer pay the costs, or part of the costs, incurred by the other person; or

(c)  that the lawyer pay to the party or other person the costs, or part of the costs, that the party has been ordered to pay to the other person.

(5)  Before making an order for costs, the Court or Registrar:

(a)  must give the lawyer, and any other person who may be affected by the decision, a reasonable opportunity to be heard; and

(b)  may order that notice of the order, or of any proceeding against the lawyer, be given to a party for whom the lawyer may be acting or any other person.

## 22.07  Interest on outstanding costs

(1)  Unless the Court otherwise orders, interest is payable on outstanding costs at the rate applying under subrule (2).

Rule 22.07

(2) For the purposes of paragraph 212(3)(a) of the Act, the rate of interest is the rate prescribed by rule 39.06 of the Federal Court Rules.

Note:  This rate applies to all proceedings. The Court may in a particular case determine a lower rate in the interests of justice (see paragraph 212(3)(b) of the Act).

# Division 22.3—Costs and disbursements

## 22.08  Application of Division 22.3

(1)  This Division applies to costs payable, or to be taxed, under an Act, these Rules or an order of the Court, in a proceeding.

(2)  Unless otherwise provided, these Rules do not regulate the fees to be charged by lawyers as between lawyer and client in relation to proceedings in the Court.

> Note:    In relation to a dispute between a lawyer and a client about the fees charged by the lawyer, see the State or Territory legislation governing the legal profession in the State or Territory where the lawyer practises.

## 22.09  Costs and disbursements

Unless the Court otherwise orders, a party entitled to costs in a general federal law proceeding (other than a proceeding to which the *Bankruptcy Act 1966* applies) is entitled to:

(a)  costs in accordance with Schedule 2; and

(b)  disbursements properly incurred.

> Note 1:    For costs in a proceeding to which the *Bankruptcy Act 1966* applies, see Part 13 of the *Federal Circuit and Family Court of Australia (Division 2) (Bankruptcy) Rules 2021*.

> Note 2:    For costs in a migration proceeding, see rule 29.13 and Part 2 of Schedule 2 to these Rules.

## 22.10  Taxation of costs

(1)  In taxing a statement of costs, a taxing officer must apply the scale of costs set out in Schedule 3 to the Federal Court Rules.

(2)  In this rule:

***taxing officer*** means a Registrar.

## 22.11  Expenses for attendance by witness

An amount paid, or to be paid, for attendance by a witness at a hearing is a disbursement properly incurred for a proceeding if:

(a)  the attendance is reasonably required; and

(b)  the amount is reasonable or is authorised, or approved, by the Court.

## 22.12  Expenses for preparation of report by expert

An amount paid, or to be paid, to an expert for preparation of a report for a party is a disbursement properly incurred for a proceeding if:

(a)  the report is reasonably required; and

(b)  the amount is reasonable or is authorised, or approved, by the Court.

Rule 22.13

## 22.13  Solicitor as advocate

(1) If a solicitor appeared for a party at a hearing alone or as instructed by another solicitor who is a member of the same firm, the amount to which the party is entitled for the hearing is limited to:

    (a) 150% of the daily hearing fee for one solicitor; and

    (b) a fee for preparation.

(2) The party is not entitled to an amount for the preparation of a brief on hearing.

## 22.14  Advocacy certificate

The Court or a Registrar may certify that it was reasonable to employ an advocate, or more than one advocate, to appear for a party to a proceeding.

## 22.15  Counsel as advocate

If the employment of an advocate is certified as reasonable, the amount payable for counsel to appear is the daily hearing fee and advocacy loading in accordance with Part 1 of Schedule 2.

# EXHIBIT 18

 Justice

# PART 44 - GENERAL RULES ABOUT COSTS

Contents of this Part

| Title | Number |
|---|---|
| I GENERAL | |
| Interpretation and application | Rule 44.1 |
| Court's discretion as to costs | Rule 44.2 |
| Basis of assessment | Rule 44.3 |
| Factors to be taken into account in deciding the amount of costs | Rule 44.4 |
| Amount of costs where costs are payable under a contract | Rule 44.5 |
| Procedure for assessing costs | Rule 44.6 |
| Time for complying with an order for costs | Rule 44.7 |
| Legal representative's duty to notify the party | Rule 44.8 |
| Cases where costs orders deemed to have been made | Rule 44.9 |
| Where the court makes no order for costs | Rule 44.10 |
| Court's powers in relation to misconduct | Rule 44.11 |
| Set Off | Rule 44.12 |
| II QUALIFIED ONE-WAY COSTS SHIFTING | |
| Qualified one-way costs shifting: scope and interpretation | Rule 44.13 |
| Effect of qualified one-way costs shifting | Rule 44.14 |
| Exceptions to qualified one-way costs shifting where permission not required | Rule 44.15 |
| Exceptions to qualified one-way costs shifting where permission required | Rule 44.16 |
| Transitional provision | Rule 44.17 |
| III DAMAGES-BASED AGREEMENTS | |
| Award of costs where there is a damages-based agreement | Rule 44.18 |

## I GENERAL

## Interpretation and application

**44.1**

(1) In Parts 44 to 47, unless the context otherwise requires –

'authorised court officer' means any officer of –

(i) the County Court;

(ii) a district registry;

(iii) the Family Court;

(iiia) the High Court; or

(iv) the Costs Office,

whom the Lord Chancellor has authorised to assess costs;

'conditional fee agreement' means an agreement enforceable under section 58 of the Courts and Legal Services Act 1990[1];

'costs' includes fees, charges, disbursements, expenses, remuneration, reimbursement allowed to a litigant in person under rule 46.5 and any fee or reward charged by a lay representative for acting on behalf of a party in proceedings allocated to the small claims track;

'costs judge' means a taxing master of the Senior Courts;

'Costs Office' means the Senior Courts Costs Office;

'costs officer' means –

(i) a costs judge;

(ii) a District Judge; or

(iii) an authorised court officer;

'detailed assessment' means the procedure by which the amount of costs is decided by a costs officer in accordance with Part 47;

'the Director (legal aid)' means the person designated as the Director of Legal Aid Casework pursuant to section 4 of the Legal Aid, Sentencing and Punishment of Offenders Act 2012[2], or a person entitled to exercise the functions of the Director;

'fixed costs' means costs, the amounts of which are fixed by these Rules;

'free of charge' has the same meaning as in section 194(10) of the 2007 Act;

'fund' includes any estate or property held for the benefit of any person or class of person and any fund to which a trustee or personal representative is entitled in that capacity;

'HMRC' means HM Revenue and Customs;

'legal aid' means civil legal services made available under arrangements made for the purposes of Part 1of the Legal Aid, Sentencing and Punishment of Offenders Act 2012;

'paying party' means a party liable to pay costs;

'the prescribed charity' has the same meaning as in section 194(8) of the 2007 Act;

'pro bono representation' means legal representation provided free of charge;

'receiving party' means a party entitled to be paid costs;

'summary assessment' means the procedure whereby costs are assessed by the judge who has heard the case or application;

'VAT' means Value Added Tax;

'the 2007 Act' means the Legal Services Act 2007[3].

('Legal representative' has the meaning given in rule 2.3).

(2) The costs to which Parts 44 to 47 apply include –

(a) the following costs where those costs may be assessed by the court –

(i) costs of proceedings before an arbitrator or umpire;

(ii) costs of proceedings before a tribunal or other statutory body; and

(iii) costs payable by a client to their legal representative; and

(b) costs which are payable by one party to another party under the terms of a contract, where the court makes an order for an assessment of those costs.

(3) Where advocacy or litigation services are provided to a client under a conditional fee agreement, costs are recoverable under Parts 44 to 47 notwithstanding that the client is liable to pay the legal representative's fees and expenses only to the extent that sums are recovered in respect of the proceedings, whether by way of costs or otherwise.

Back to top

## Court's discretion as to costs

**44.2**

(1) The court has discretion as to –

(a) whether costs are payable by one party to another;

(b) the amount of those costs; and

(c) when they are to be paid.

(2) If the court decides to make an order about costs –

(a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but

(b) the court may make a different order.

(3) The general rule does not apply to the following proceedings –

(a) proceedings in the Court of Appeal on an application or appeal made in connection with proceedings in the Family

Division; or

(b) proceedings in the Court of Appeal from a judgment, direction, decision or order given or made in probate proceedings or family proceedings.

(4) In deciding what order (if any) to make about costs, the court will have regard to all the circumstances, including –

(a) the conduct of all the parties;

(b) whether a party has succeeded on part of its case, even if that party has not been wholly successful; and

(c) any admissible offer to settle made by a party which is drawn to the court's attention, and which is not an offer to which costs consequences under Part 36 apply.

(5) The conduct of the parties includes –

(a) conduct before, as well as during, the proceedings and in particular the extent to which the parties followed the Practice Direction – Pre-Action Conduct or any relevant pre-action protocol;

(b) whether it was reasonable for a party to raise, pursue or contest a particular allegation or issue;

(c) the manner in which a party has pursued or defended its case or a particular allegation or issue; and

(d) whether a claimant who has succeeded in the claim, in whole or in part, exaggerated its claim.

(6) The orders which the court may make under this rule include an order that a party must pay –

(a) a proportion of another party's costs;

(b) a stated amount in respect of another party's costs;

(c) costs from or until a certain date only;

(d) costs incurred before proceedings have begun;

(e) costs relating to particular steps taken in the proceedings;

(f) costs relating only to a distinct part of the proceedings; and

(g) interest on costs from or until a certain date, including a date before judgment.

(7) Before the court considers making an order under paragraph (6)(f), it will consider whether it is practicable to make an order under paragraph (6)(a) or (c) instead.

(8) Where the court orders a party to pay costs subject to detailed assessment, it will order that party to pay a reasonable sum on account of costs, unless there is good reason not to do so.

Back to top

## Basis of assessment

**44.3**

(1) Where the court is to assess the amount of costs (whether by summary or detailed assessment) it will assess those costs –

(a) on the standard basis; or

(b) on the indemnity basis,

but the court will not in either case allow costs which have been unreasonably incurred or are unreasonable in amount.

(Rule 44.5 sets out how the court decides the amount of costs payable under a contract.)

(2) Where the amount of costs is to be assessed on the standard basis, the court will –

(a) only allow costs which are proportionate to the matters in issue. Costs which are disproportionate in amount may be disallowed or reduced even if they were reasonably or necessarily incurred; and

(b) resolve any doubt which it may have as to whether costs were reasonably and proportionately incurred or were reasonable and proportionate in amount in favour of the paying party.

(Factors which the court may take into account are set out in rule 44.4.)

(3) Where the amount of costs is to be assessed on the indemnity basis, the court will resolve any doubt which it may have as to whether costs were reasonably incurred or were reasonable in amount in favour of the receiving party.

(4) Where –

(a) the court makes an order about costs without indicating the basis on which the costs are to be assessed; or

(b) the court makes an order for costs to be assessed on a basis other than the standard basis or the indemnity basis,

the costs will be assessed on the standard basis.

(5) Costs incurred are proportionate if they bear a reasonable relationship to –

(a) the sums in issue in the proceedings;

(b) the value of any non-monetary relief in issue in the proceedings;

(c) the complexity of the litigation;

(d) any additional work generated by the conduct of the paying party,

(e) any wider factors involved in the proceedings, such as reputation or public importance; and

(f) any additional work undertaken or expense incurred due to the vulnerability of a party or any witness.

(6) Where the amount of a solicitor's remuneration in respect of non-contentious business is regulated by any general orders made under the Solicitors Act 1974[4], the amount of the costs to be allowed in respect of any such business which falls to be assessed by the court will be decided in accordance with those general orders rather than this rule and rule 44.4.

(7) Paragraphs (2)(a) and (5) do not apply in relation to –

(a) cases commenced before 1st April 2013; or

(b) costs incurred in respect of work done before 1st April 2013,

and in relation to such cases or costs, rule 44.4.(2)(a) as it was in force immediately before 1st April 2013 will apply instead.

Back to top

## Factors to be taken into account in deciding the amount of costs

**44.4**

(1) The court will have regard to all the circumstances in deciding whether costs were –

(a) if it is assessing costs on the standard basis –

(i) proportionately and reasonably incurred; or

(ii) proportionate and reasonable in amount, or

(b) if it is assessing costs on the indemnity basis –

(i) unreasonably incurred; or

(ii) unreasonable in amount.

(2) In particular, the court will give effect to any orders which have already been made.

(3) The court will also have regard to –

(a) the conduct of all the parties, including in particular –

(i) conduct before, as well as during, the proceedings; and

(ii) the efforts made, if any, before and during the proceedings in order to try to resolve the dispute;

(b) the amount or value of any money or property involved;

(c) the importance of the matter to all the parties;

(d) the particular complexity of the matter or the difficulty or novelty of the questions raised;

(e) the skill, effort, specialised knowledge and responsibility involved;

(f) the time spent on the case;

(g) the place where and the circumstances in which work or any part of it was done; and

(h) the receiving party's last approved or agreed budget.

(Rule 35.4(4) gives the court power to limit the amount that a party may recover with regard to the fees and expenses of an expert.)

Back to top

## Amount of costs where costs are payable under a contract

**44.5**

(1) Subject to paragraphs (2) and (3), where the court assesses (whether by summary or detailed assessment) costs which are payable by the paying party to the receiving party under the terms of a contract, the costs payable under those terms are, unless the contract expressly provides otherwise, to be presumed to be costs which –

(a) have been reasonably incurred; and

(b) are reasonable in amount,

and the court will assess them accordingly.

(2) The presumptions in paragraph (1) are rebuttable. Practice Direction 44 – General rules about costs sets out circumstances where the court may order otherwise.

(3) Paragraph (1) does not apply where the contract is between a solicitor and client.

Back to top

## Procedure for assessing costs

**44.6**

(1) Where the court orders a party to pay costs to another party (other than fixed costs) it may either –

(a) make a summary assessment of the costs; or

(b) order detailed assessment of the costs by a costs officer,

unless any rule, practice direction or other enactment provides otherwise.

(Practice Direction 44 – General rules about costs sets out the factors which will affect the court's decision under paragraph (1).)

(2) A party may recover the fixed costs specified in Part 45 in accordance with that Part.

Back to top

## Time for complying with an order for costs

**44.7**

(1) A party must comply with an order for the payment of costs within 14 days of –

(a) the date of the judgment or order if it states the amount of those costs;

(b) if the amount of those costs (or part of them) is decided later in accordance with Part 47, the date of the certificate which states the amount; or

(c) in either case, such other date as the court may specify.

(Part 47 sets out the procedure for detailed assessment of costs.)

Back to top

## Legal representative's duty to notify the party

**44.8** Where –

(a) the court makes a costs order against a legally represented party; and

(b) the party is not present when the order is made,

the party's legal representative must notify that party in writing of the costs order no later than 7 days after the legal representative receives notice of the order.

(Paragraph 10.1 of Practice Direction 44 defines 'party' for the purposes of this rule.)

Back to top

## Cases where costs orders deemed to have been made

**44.9**

(1) Subject to paragraph (2), where a right to costs arises under –

(a) rule 3.7 or 3.7A1 (defendant's right to costs where claim is struck out for non-payment of fees);

(a1) rule 3.7B (sanctions for dishonouring cheque);

(b) rule 36.13(1) or (2) (claimant's entitlement to costs where a Part 36 offer is accepted); or

(c) rule 38.6 (defendant's right to costs where claimant discontinues),

a costs order will be deemed to have been made on the standard basis.

(2) Paragraph 1(b) does not apply where a Part 36 offer is accepted before the commencement of proceedings.

(3) Where such an order is deemed to be made in favour of a party with pro bono representation, that party may apply for an order under section 194(3) of the 2007 Act.

(4) Interest payable under section 17 of the Judgments Act 1838[5] or section 74 of the County Courts Act 1984[6] on the costs deemed to have been ordered under paragraph (1) will begin to run from the date on which the event which gave rise to the entitlement to costs occurred.

Back to top

## Where the court makes no order for costs

**44.10**

(1) Where the court makes an order which does not mention costs –

(a) subject to paragraphs (2) and (3), the general rule is that no party is entitled –

(i) to costs; or

(ii) to seek an order under section 194(3) of the 2007 Act,

in relation to that order; but

(b) this does not affect any entitlement of a party to recover costs out of a fund held by that party as trustee or personal representative, or under any lease, mortgage or other security.

(2) Where the court makes –

(a) an order granting permission to appeal;

(b) an order granting permission to apply for judicial review; or

(c) any other order or direction sought by a party on an application without notice,

and its order does not mention costs, it will be deemed to include an order for applicant's costs in the case.

(3) Any party affected by a deemed order for costs under paragraph (2) may apply at any time to vary the order.

(4) The court hearing an appeal may, unless it dismisses the appeal, make orders about the costs of the proceedings giving rise to the appeal as well as the costs of the appeal.

(5) Subject to any order made by the transferring court, where proceedings are transferred from one court to another, the court to which they are transferred may deal with all the costs, including the costs before the transfer.

Back to top

## Court's powers in relation to misconduct

**44.11**

(1) The court may make an order under this rule where –

(a) a party or that party's legal representative, in connection with a summary or detailed assessment, fails to comply with a rule, practice direction or court order; or

(b) it appears to the court that the conduct of a party or that party's legal representative, before or during the proceedings or in the assessment proceedings, was unreasonable or improper.

(2) Where paragraph (1) applies, the court may –

(a) disallow all or part of the costs which are being assessed; or

(b) order the party at fault or that party's legal representative to pay costs which that party or legal representative has caused any other party to incur.

(3) Where –

(a) the court makes an order under paragraph (2) against a legally represented party; and

(b) the party is not present when the order is made,

the party's legal representative must notify that party in writing of the order no later than 7 days after the legal representative receives notice of the order.

Back to top

## Set Off

**44.12**

(1) Where a party entitled to costs is also liable to pay costs, the court may assess the costs which that party is liable to pay and either –

(a) set off the amount assessed against the amount the party is entitled to be paid and direct that party to pay any balance; or

(b) delay the issue of a certificate for the costs to which the party is entitled until the party has paid the amount which that party is liable to pay

Back to top

## II QUALIFIED ONE-WAY COSTS SHIFTING

### Qualified one-way costs shifting: scope and interpretation

**44.13**

(1) This Section applies to proceedings which include a claim for damages –

(a) for personal injuries;

(b) under the Fatal Accidents Act 1976[7]; or

(c) which arises out of death or personal injury and survives for the benefit of an estate by virtue of section 1(1) of the Law Reform (Miscellaneous Provisions) Act 1934[8],

but does not apply to applications pursuant to section 33 of the Senior Courts Act 1981[9] or section 52 of the County Courts Act 1984[10] (applications for pre-action disclosure), or where rule 44.17 applies.

(2) In this Section, 'claimant' means a person bringing a claim to which this Section applies or an estate on behalf of which such a claim is brought, and includes a person making a counterclaim or an additional claim.

Back to top

### Effect of qualified one-way costs shifting

**44.14**

(1) Subject to rules 44.15 and 44.16, orders for costs made against a claimant may be enforced without the permission of the court but only to the extent that the aggregate amount in money terms of such orders does not exceed the aggregate amount in money terms of any orders for, or agreements to pay or settle a claim for, damages, costs and interest made in favour of the claimant.

(2) For the purposes of this Section, orders for costs includes orders for costs deemed to have been made (either against the claimant or in favour of the claimant) as set out in rule 44.9.

(3) Orders for costs made against a claimant may only be enforced after the proceedings have been concluded and the costs have been assessed or agreed.

(4) Where enforcement is permitted against any order for costs made in favour of the claimant, rule 44.12 applies.

(5) An order for costs which is enforced only to the extent permitted by paragraph (1) shall not be treated as an unsatisfied or outstanding judgment for the purposes of any court record.

Back to top

### Exceptions to qualified one-way costs shifting where permission not required

**44.15**  Orders for costs made against the claimant may be enforced to the full extent of such orders without the permission of the court where the proceedings have been struck out on the grounds that –

(a) the claimant has disclosed no reasonable grounds for bringing the proceedings;

(b) the proceedings are an abuse of the court's process; or

(c) the conduct of –

(i) the claimant; or

(ii) a person acting on the claimant's behalf and with the claimant's knowledge of such conduct,

is likely to obstruct the just disposal of the proceedings.

Back to top

## Exceptions to qualified one-way costs shifting where permission required

**44.16**

(1) Orders for costs made against the claimant may be enforced to the full extent of such orders with the permission of the court where the claim is found on the balance of probabilities to be fundamentally dishonest.

(2) Orders for costs made against the claimant may be enforced up to the full extent of such orders with the permission of the court, and to the extent that it considers just, where –

(a) the proceedings include a claim which is made for the financial benefit of a person other than the claimant or a dependant within the meaning of section 1(3) of the Fatal Accidents Act 1976 (other than a claim in respect of the gratuitous provision of care, earnings paid by an employer or medical expenses); or

(b) a claim is made for the benefit of the claimant other than a claim to which this Section applies.

(3) Where paragraph (2)(a) applies, the court may, subject to rule 46.2, make an order for costs against a person, other than the claimant, for whose financial benefit the whole or part of the claim was made.

Back to top

## Transitional provision

**44.17** This Section does not apply to proceedings where the claimant has entered into a pre-commencement funding arrangement (as defined in rule 48.2).

## III DAMAGES-BASED AGREEMENTS

## Award of costs where there is a damages-based agreement

**44.18**

(1) The fact that a party has entered into a damages-based agreement will not affect the making of any order for costs which otherwise would be made in favour of that party.

(2) Where costs are to be assessed in favour of a party who has entered into a damages-based agreement –

(a) the party's recoverable costs will be assessed in accordance with rule 44.3; and

(b) the party may not recover by way of costs more than the total amount payable by that party under the damages-based agreement for legal services provided under that agreement.

Back to top

## Footnotes

1. 1990 c.41. Section 58 was substituted by the Access to Justice Act 1990 section 27(1) and was amended by S.I. 2005/3429 article 8, Schedule paragraph 2 and the Legal Aid, Sentencing and Punishment of Offenders Act section 44(1) and (2). Back to text
2. 2012 c.10. Back to text
3. 2007 c.29. Back to text
4. 1974 c.47. Back to text
5. 1838 c.110. Section 17 was amended by the Civil Procedure Acts Repeal Act 1879 (c.59) section 2, Schedule Part I; Statute Law Revision (no 2) Act 1888 (c. 57); S.I. 1993/564 article 2; S.I. 1998/2940 article 3(a), (c). Back to text
6. 1984 c.28. Section 5A was inserted by the Private International Law (Miscellaneous Provisions) Act 1995 (c.42) section 2. Back to text
7. 1976 c.30. A new section 1 was substituted by the Administration of Justice Act 1982 (c. 53), section 3, and subsequently amended by the Civil Partnership Act 2004 (c. 33), section 83. Back to text
8. 1934 c.41. Section 1(1) was amended by the Law Reform (Miscellaneous Provisions) Act 1970 (c. 33) section 7, Schedule, and by the Administration of Justice Act 1982 (c. 53) section 75, Schedule 9 Part 1. Back to text
9. 1981 c.54. Back to text 10. 1984 c. 28. Section 52 was amended by the Civil Procedure Act 1997 (c. 12) section 10, Schedule 2 paragraph 2(2) and by the Courts and Legal Services Act 1990 (c. 41) section 125(3), Schedule 18 paragraph 43. Back to text
10. 1984 c. 28. Section 52 was amended by the Civil Procedure Act 1997 (c. 12) section 10, Schedule 2 paragraph 2(2) and by the Courts and Legal Services Act 1990 (c. 41) section 125(3), Schedule 18 paragraph 43. Back to text

# EXHIBIT 19

**Version**
**as at 1 May 2023**



# High Court Rules 2016

(LI 2016/225)

These rules—

(a)   are deemed to form part of the Senior Courts Act 2016 under section 147 of that Act; but

(b)   are published as the High Court Rules 2016, as if they were a legislative instrument within the meaning of the Legislation Act 2012, under section 154 of the Senior Courts Act 2016.

## Contents

Page

### Part 1
### Rules of general application

Subpart 1—Objective and interpretation

| | | |
|---|---|---|
| 1.1 | Title | 38 |
| 1.2 | Objective | 38 |
| 1.3 | Interpretation | 38 |

Subpart 2—Application and compliance

| | | |
|---|---|---|
| 1.4 | Application | 42 |
| 1.4A | Transitional, savings, and related provisions | 42 |
| 1.5 | Non-compliance with rules | 43 |
| 1.6 | Cases not provided for | 43 |
| 1.7 | Oral applications for relief | 44 |
| 1.8 | Consent instead of leave of court | 44 |
| 1.9 | Amendment of defects and errors | 44 |
| 1.10 | Security | 44 |

---

**Note**

The Parliamentary Counsel Office has made editorial and format changes to this version using the powers under subpart 2 of Part 3 of the Legislation Act 2019.

Note 4 at the end of this version provides a list of the amendments included in it.

**These rules are administered by the Ministry of Justice.**

# Part 14
# Costs

## Subpart 1—Costs generally

### 14.1 Costs at discretion of court

(1) All matters are at the discretion of the court if they relate to costs—

    (a) of a proceeding; or

    (b) incidental to a proceeding; or

    (c) of a step in a proceeding.

(2) Rules 14.2 to 14.10 are subject to subclause (1).

(3) The provisions of any Act override subclauses (1) and (2).

Compare: 1908 No 89 Schedule 2 r 46

### 14.2 Principles applying to determination of costs

(1) The following general principles apply to the determination of costs:

    (a) the party who fails with respect to a proceeding or an interlocutory application should pay costs to the party who succeeds:

    (b) an award of costs should reflect the complexity and significance of the proceeding:

    (c) costs should be assessed by applying the appropriate daily recovery rate to the time considered reasonable for each step reasonably required in relation to the proceeding or interlocutory application:

    (d) an appropriate daily recovery rate should normally be two-thirds of the daily rate considered reasonable in relation to the proceeding or interlocutory application:

    (e) what is an appropriate daily recovery rate and what is a reasonable time should not depend on the skill or experience of the solicitor or counsel involved or on the time actually spent by the solicitor or counsel involved or on the costs actually incurred by the party claiming costs:

    (f) an award of costs should not exceed the costs incurred by the party claiming costs:

    (g) so far as possible the determination of costs should be predictable and expeditious.

(2) Despite subclause (1)(f), costs for legal professional services provided in relation to a proceeding may be awarded to a party under this Part even though the services are provided under a conditional fee agreement.

(3) In subclause (2), **conditional fee agreement** means an agreement under which a party to a proceeding and a person who provides legal professional services

235

agree that the party to the proceeding is liable for payment of some or all of the person's fees and expenses depending on the outcome of the proceeding.

Compare: 1908 No 89 Schedule 2 r 47

Rule 14.2(2): inserted, on 1 September 2017, by rule 20 of the High Court Rules 2016 Amendment Rules (No 2) 2017 (LI 2017/191).

Rule 14.2(3): inserted, on 1 September 2017, by rule 20 of the High Court Rules 2016 Amendment Rules (No 2) 2017 (LI 2017/191).

**14.3 Categorisation of proceedings**

(1) For the purposes of rule 14.2(b), proceedings must be classified as falling within one of the following categories:

| | |
|---|---|
| Category 1 proceedings | Proceedings of a straightforward nature able to be conducted by counsel considered junior in the High Court |
| Category 2 proceedings | Proceedings of average complexity requiring counsel of skill and experience considered average in the High Court |
| Category 3 proceedings | Proceedings that because of their complexity or significance require counsel to have special skill and experience in the High Court |

(2) The court may at any time determine in advance a proceeding's category, which applies to all subsequent determinations of costs in the proceeding, unless there are special reasons to the contrary.

Compare: 1908 No 89 Schedule 2 r 48

**14.4 Appropriate daily recovery rates**

For the purposes of rule 14.2(1)(c), the appropriate daily recovery rates for the categories referred to in rule 14.3—

(a) are the rates specified in Schedule 2; and

(b) must be applied to those categories.

Compare: 1908 No 89 Schedule 2 r 48A

**14.5 Determination of reasonable time**

(1) For the purposes of rule 14.2(1)(c), a reasonable time for a step is—

(a) the time specified for it in Schedule 3; or

(b) a time determined by analogy with that schedule, if Schedule 3 does not apply; or

(c) the time assessed as likely to be required for the particular step, if no analogy can usefully be made.

(2)    A determination of what is a reasonable time for a step under subclause (1) must be made by reference—

    (a)    to band A, if a comparatively small amount of time is considered reasonable; or

    (b)    to band B, if a normal amount of time is considered reasonable; or

    (c)    to band C, if a comparatively large amount of time for the particular step is considered reasonable.

Compare: 1908 No 89 Schedule 2 r 48B

### 14.6   Increased costs and indemnity costs

(1)    Despite rules 14.2 to 14.5, the court may make an order—

    (a)    increasing costs otherwise payable under those rules (**increased costs**); or

    (b)    that the costs payable are the actual costs, disbursements, and witness expenses reasonably incurred by a party (**indemnity costs**).

(2)    The court may make the order at any stage of a proceeding and in relation to any step in it.

(3)    The court may order a party to pay increased costs if—

    (a)    the nature of the proceeding or the step in it is such that the time required by the party claiming costs would substantially exceed the time allocated under band C; or

    (b)    the party opposing costs has contributed unnecessarily to the time or expense of the proceeding or step in it by—

        (i)    failing to comply with these rules or with a direction of the court; or

        (ii)    taking or pursuing an unnecessary step or an argument that lacks merit; or

        (iii)    failing, without reasonable justification, to admit facts, evidence, documents, or accept a legal argument; or

        (iv)    failing, without reasonable justification, to comply with an order for discovery, a notice for further particulars, a notice for interrogatories, or other similar requirement under these rules; or

        (v)    failing, without reasonable justification, to accept an offer of settlement whether in the form of an offer under rule 14.10 or some other offer to settle or dispose of the proceeding; or

    (c)    the proceeding is of general importance to persons other than just the parties and it was reasonably necessary for the party claiming costs to bring it or participate in it in the interests of those affected; or

    (d)    some other reason exists which justifies the court making an order for increased costs despite the principle that the determination of costs should be predictable and expeditious.

(4)    The court may order a party to pay indemnity costs if—

    (a)    the party has acted vexatiously, frivolously, improperly, or unnecessarily in commencing, continuing, or defending a proceeding or a step in a proceeding; or

    (b)    the party has ignored or disobeyed an order or direction of the court or breached an undertaking given to the court or another party; or

    (c)    costs are payable from a fund, the party claiming costs is a necessary party to the proceeding affecting the fund, and the party claiming costs has acted reasonably in the proceeding; or

    (d)    the person in whose favour the order of costs is made was not a party to the proceeding and has acted reasonably in relation to it; or

    (e)    the party claiming costs is entitled to indemnity costs under a contract or deed; or

    (f)    some other reason exists which justifies the court making an order for indemnity costs despite the principle that the determination of costs should be predictable and expeditious.

Compare: 1908 No 89 Schedule 2 r 48C

**14.7    Refusal of, or reduction in, costs**

Despite rules 14.2 to 14.5, the court may refuse to make an order for costs or may reduce the costs otherwise payable under those rules if—

    (a)    the nature of the proceeding or the step in a proceeding is such that the time required by the party claiming costs would be substantially less than the time allocated under band A; or

    (b)    the property or interests at stake in the proceeding were of exceptionally low value; or

    (c)    the issues at stake were of little significance; or

    (d)    although the party claiming costs has succeeded overall, that party has failed in relation to a cause of action or issue which significantly increased the costs of the party opposing costs; or

    (e)    the proceeding concerned a matter of public interest, and the party opposing costs acted reasonably in the conduct of the proceeding; or

    (f)    the party claiming costs has contributed unnecessarily to the time or expense of the proceeding or step in it by—

        (i)    failing to comply with these rules or a direction of the court; or

        (ii)    taking or pursuing an unnecessary step or an argument that lacks merit; or

(iii)   failing, without reasonable justification, to admit facts, evidence, or documents, or accept a legal argument; or

(iv)    failing, without reasonable justification, to comply with an order for discovery, a notice for further particulars, a notice for interrogatories, or other similar requirement under these rules; or

(v)     failing, without reasonable justification, to accept an offer of settlement whether in the form of an offer under rule 14.10 or some other offer to settle or dispose of the proceeding; or

(g)   some other reason exists which justifies the court refusing costs or reducing costs despite the principle that the determination of costs should be predictable and expeditious.

Compare: 1908 No 89 Schedule 2 r 48D

### 14.8   Costs on interlocutory applications

(1)   Costs on an opposed interlocutory application, unless there are special reasons to the contrary,—

(a)   must be fixed in accordance with these rules when the application is determined; and

(b)   become payable when they are fixed.

(2)   Despite subclause (1), the court may reverse, discharge, or vary an order for costs on an interlocutory application if satisfied subsequently that the original order should not have been made.

(3)   This rule does not apply to an application for summary judgment.

Compare: 1908 No 89 Schedule 2 r 48E

### 14.9   Costs may be determined by different Judge or Associate Judge

Costs may be determined by a Judge or an Associate Judge other than the one who heard the matter to which the costs relate, if he or she is not available conveniently to make the determination.

Compare: 1908 No 89 Schedule 2 r 48F

### 14.10   Written offers without prejudice except as to costs

(1)   A party to a proceeding may make a written offer to another party at any time that—

(a)   is expressly stated to be without prejudice except as to costs; and

(b)   relates to an issue in the proceeding.

(2)   The fact that the offer has been made must not be communicated to the court until the question of costs is to be decided.

Compare: 1908 No 89 Schedule 2 r 48G

**14.11 Effect on costs**

(1) The effect (if any) that the making of an offer under rule 14.10 has on the question of costs is at the discretion of the court.

(2) Subclauses (3) and (4)—

    (a) are subject to subclause (1); and

    (b) do not limit rule 14.6 or 14.7; and

    (c) apply to an offer made under rule 14.10 by a party to a proceeding (**party A**) to another party to it (**party B**).

(3) Party A is entitled to costs on the steps taken in the proceeding after the offer is made, if party A—

    (a) offers a sum of money to party B that exceeds the amount of a judgment obtained by party B against party A; or

    (b) makes an offer that would have been more beneficial to party B than the judgment obtained by party B against party A.

(4) The offer may be taken into account, if party A makes an offer that—

    (a) does not fall within paragraph (a) or (b) of subclause (3); and

    (b) is close to the value or benefit of the judgment obtained by party B.

Compare: 1908 No 89 Schedule 2 r 48GA

**14.12 Disbursements**

(1) In this rule,—

**disbursement**, in relation to a proceeding,—

    (a) means an expense paid or incurred for the purposes of the proceeding that would ordinarily be charged for separately from legal professional services in a solicitor's bill of costs; and

    (b) includes—

        (i) fees of court for the proceeding:

        (ii) expenses of serving documents for the purposes of the proceeding:

        (iii) expenses of photocopying documents required by these rules or by a direction of the court:

        (iv) expenses of conducting a conference by telephone or video link; but

    (c) does not include counsel's fee.

(2) A disbursement must, if claimed and verified, be included in the costs awarded for a proceeding to the extent that it is—

    (a) of a class that is either—

        (i) approved by the court for the purposes of the proceeding; or

     (ii)    specified in paragraph (b) of subclause (1); and

  (b)    specific to the conduct of the proceeding; and

  (c)    reasonably necessary for the conduct of the proceeding; and

  (d)    reasonable in amount.

(3)    Despite subclause (2), a disbursement may be disallowed or reduced if it is disproportionate in the circumstances of the proceeding.

(4)    A Judge or an Associate Judge may direct a Registrar to exercise the powers of the court under subclause (2) or (3).

(5)    When considering whether a disbursement paid or payable for an expert witness's fee or expenses is reasonable for the purposes of subclause (2)(d), a Judge or an Associate Judge may—

  (a)    call for a report or an assessment from a professional organisation or otherwise; and

  (b)    make any incidental order considered just, including an order as to the cost of that report or assessment.

(6)    Where an expert witness provides services in relation to a proceeding, disbursements in respect of the witness's fees and expenses may be included in costs awarded under this Part even though the services are provided under a conditional fee agreement.

(7)    In subclause (6), **conditional fee agreement** has the same meaning as in rule 14.2(3), except that the reference to legal professional services must be read as if it were a reference to expert witness services.

(8)    Nothing in subclause (6) affects the application of subclauses (3) to (5).

Compare: 1908 No 89 Schedule 2 r 48H

Rule 14.12(1) **relevant issue**: revoked, on 24 July 2020, by rule 12 of the High Court Amendment Rules 2020 (LI 2020/125).

Rule 14.12(6): inserted, on 1 September 2017, by rule 21 of the High Court Rules 2016 Amendment Rules (No 2) 2017 (LI 2017/191).

Rule 14.12(7): inserted, on 1 September 2017, by rule 21 of the High Court Rules 2016 Amendment Rules (No 2) 2017 (LI 2017/191).

Rule 14.12(8): inserted, on 1 September 2017, by rule 21 of the High Court Rules 2016 Amendment Rules (No 2) 2017 (LI 2017/191).

## 14.13  Proceedings within jurisdiction of District Court

Costs ordered to be paid to a successful plaintiff must not exceed the costs and disbursements that the plaintiff would have recovered in the District Court if the proceeding could have been brought there, unless the court otherwise directs.

Compare: 1908 No 89 Schedule 2 r 49

**14.14  Joint and several liability for costs**

The liability of each of 2 or more parties ordered to pay costs is joint and several, unless the court otherwise directs.

Compare: 1908 No 89 Schedule 2 r 50

**14.15  Defendants defending separately**

The court must not allow more than 1 set of costs, unless it appears to the court that there is good reason to do so, if—

(a)    several defendants defended a proceeding separately; and

(b)    it appears to the court that all or some of them could have joined in their defence.

Compare: 1908 No 89 Schedule 2 r 51

**14.16  Claim and counterclaim both established**

The court must award costs as if each party had succeeded in an independent proceeding, unless, in the court's opinion, the justice of the case otherwise requires, if—

(a)    the plaintiff succeeds in his or her proceeding; and

(b)    the defendant succeeds in a counterclaim.

Compare: 1908 No 89 Schedule 2 r 52

**14.17  Set-off if costs allowed to both parties**

If opposite parties are awarded costs against each other, their respective costs must be set off and the lesser sum must be deducted from the greater, unless the court otherwise directs.

Compare: 1908 No 89 Schedule 2 r 53

Subpart 2—Taxation of costs between parties

**14.18  Appointment to tax costs**

(1)    Any party entitled to costs subject to taxation may obtain from the Registrar an appointment for taxation of the costs.

(2)    The party entitled to the costs must serve a copy of the appointment on the party liable to pay the costs at least 2 working days before the day appointed if the party liable to pay the costs has given an address for service.

Compare: 1908 No 89 Schedule 2 r 54

**14.19  Taxation of disbursements**

(1)    On taxation, all disbursements claimed must be proved to the satisfaction of the Registrar.

(2)    Only disbursements that may be included in an award of costs under rule 14.12(2) may be claimed under subclause (1).

Compare: 1908 No 89 Schedule 2 r 55

### 14.20  No charge allowed for bill of costs

No charge is allowed on taxation for the preparation or service of the bill of costs or of any copy of it.

Compare: 1908 No 89 Schedule 2 r 56

### 14.21  Registrar sole judge of questions of fact

The Registrar is the sole judge of all questions of fact that may arise on taxation, and his or her decision is final.

Compare: 1908 No 89 Schedule 2 r 57

### 14.22  Direction to Registrar to ascertain expenses

Without ordering taxation of costs, the court may direct the Registrar to ascertain what amount should be allowed in respect of witnesses' expenses and other disbursements to a party to whom costs are awarded.

Compare: 1908 No 89 Schedule 2 r 58

### 14.23  Review of taxation

The court may, on the application of a party dissatisfied with the Registrar's decision, refer a matter back to the Registrar with any necessary directions, or may itself make any amendments that appear necessary, if—

(a)    the Registrar has ascertained or fixed the amount of costs or disbursements or the head under which costs are allowed; and

(b)    the Registrar's actions referred to in paragraph (a) were done under these rules or by a direction of the court; and

(c)    it appears that the Registrar acted erroneously as to amount or principle.

Compare: 1908 No 89 Schedule 2 r 59

# Part 15
# Disposal other than by trial

## Subpart 1—Dismissal or stay without trial

### 15.1  Dismissing or staying all or part of proceeding

(1)    The court may strike out all or part of a pleading if it—

(a)    discloses no reasonably arguable cause of action, defence, or case appropriate to the nature of the pleading; or

(b)    is likely to cause prejudice or delay; or

(c)    is frivolous or vexatious; or

**Version
as at 1 May 2023**



# District Court Rules 2014
## (LI 2014/179)

Rules name: amended, on 1 March 2017, by section 246(a) of the District Court Act 2016 (2016 No 49).

Jerry Mateparae, Governor-General

## Order in Council

At Wellington this 26th day of May 2014

Present:
His Excellency the Governor-General in Council

Pursuant to section 122 of the District Courts Act 1947, section 11 of the Admiralty Act 1973, section 16 of the Arbitration Act 1996, section 42 of the Harassment Act 1997, section 81 of the Construction Contracts Act 2002, and section 213 of the Local Government Act 2002, His Excellency the Governor-General, acting on the advice and with the consent of the Executive Council, and (in relation to the jurisdiction conferred by the District Courts Act 1947, the Admiralty Act 1973, or the Construction Contracts Act 2002), with the concurrence of the Chief District Court Judge and at least 2 members of the Rules Committee established under section 51B of the Judicature Act 1908 (of whom at least 1 was a District Court Judge), makes the following rules.

---

**Note**

The Parliamentary Counsel Office has made editorial and format changes to this version using the powers under subpart 2 of Part 3 of the Legislation Act 2019.

Note 4 at the end of this version provides a list of the amendments included in it.

**These rules are administered by the Ministry of Justice.**

    (a)    by affixing to some conspicuous part of the land the documents required to be served under subclause (1); and

    (b)    if practicable, by leaving in the letterbox or other receptacle for mail on the land the documents required to be served under subclause (1) (those documents must be enclosed in a sealed envelope addressed to "The Occupiers").

Compare: HCR 13.5

### 13.6 Time for filing statement of defence

Despite rule 5.49(2)(b), if service is effected in accordance with rule 13.5(3), the statement of defence must be filed within 25 working days after the day on which that service is effected.

Compare: HCR 13.6

### 13.7 Power of court to make unlawful occupiers defendants

A Judge may order that an unlawful occupier who is not a defendant be made a defendant or be added as a defendant.

Compare: HCR 13.7

### 13.8 Judgment for possession

Rule 15.8 (which allows the plaintiff to seal judgment immediately upon certain defaults by the defendant) does not apply to proceedings to which this Part applies.

Compare: HCR 13.8

### 13.9 Possession order

(1)    Once 3 months have elapsed after the date on which a judgment is given in a proceeding to which this Part applies, a possession order to enforce the judgment may issue only with the leave of the court.

(2)    An application for leave under subclause (1) may be made without notice unless a Judge otherwise directs.

Compare: HCR 13.9

# Part 14
# Costs

### 14.1 Costs at discretion of court

(1)    All matters are at the discretion of the court if they relate to costs—

    (a)    of a proceeding; or

    (b)    incidental to a proceeding; or

    (c)    of a step in a proceeding.

(2)    Rules 14.2 to 14.10 are subject to subclause (1).

(3)    The provisions of any Act override subclauses (1) and (2).

Compare: HCR 14.1; SR 2009/257 r 4.1

### 14.2    Principles applying to determination of costs

(1)    The following general principles apply to the determination of costs:

(a)    the party who fails with respect to a proceeding or an interlocutory application should pay costs to the party who succeeds:

(b)    an award of costs should reflect the complexity and significance of the proceeding:

(c)    costs should be assessed by applying the appropriate daily recovery rate to the time considered reasonable for each step reasonably required in relation to the proceeding or interlocutory application:

(d)    an appropriate daily recovery rate should normally be two-thirds of the daily rate considered reasonable in relation to the proceeding or interlocutory application:

(e)    what is an appropriate daily recovery rate and what is a reasonable time should not depend on the skill or experience of the solicitor or counsel involved or on the time actually spent by the solicitor or counsel involved or on the costs actually incurred by the party claiming costs:

(f)    an award of costs should not exceed the costs incurred by the party claiming costs:

(g)    so far as possible the determination of costs should be predictable and expeditious.

(2)    Despite subclause (1)(f), costs for legal professional services provided in relation to a proceeding may be awarded to a party under this Part even though the services are provided under a conditional fee agreement.

(3)    In subclause (2), **conditional fee agreement** means an agreement under which a party to a proceeding and a person who provides legal professional services agree that, in relation to the liability of the party to the proceeding for some or all of the person's fees and expenses, these are payable depending on the outcome of the proceeding.

Compare: HCR 14.2; SR 2009/257 r 4.2

Rule 14.2(2): inserted, on 1 September 2017, by rule 13 of the District Court Amendment Rules 2017 (LI 2017/187).

Rule 14.2(3): inserted, on 1 September 2017, by rule 13 of the District Court Amendment Rules 2017 (LI 2017/187).

### 14.3    Categorisation of proceedings

(1)    For the purposes of rule 14.2(1)(b), proceedings must be classified as falling within 1 of the following categories:

| | |
|---|---|
| Category 1 proceedings | Proceedings of a straightforward nature able to be conducted by counsel considered junior |

| Category 2 proceedings | Proceedings of average complexity requiring counsel of skill and experience considered average |
| Category 3 proceedings | Proceedings that because of their complexity or significance require counsel to have special skill and experience |

(2) The court may at any time determine in advance a proceeding's category, which applies to all subsequent determinations of costs in the proceeding, unless there are special reasons to the contrary.

(3) Each step specified in item 19 of Schedule 4 of these rules must be treated as having been taken in a category 2 proceeding.

(4) Unless the court otherwise directs, subclause (3) applies to a proceeding even if the court has, under subclause (2), determined the category of the proceeding.

Compare: HCR 14.3; SR 2009/257 r 4.3

**14.4 Appropriate daily recovery rates**

For the purposes of rule 14.2(1)(c), the appropriate daily recovery rates for the categories of proceedings referred to in rule 14.3 (whether taken before or after the commencement of these rules)—

(a) are the rates specified in Schedule 5; and

(b) must be applied to those categories.

Compare: HCR 14.4; SR 2009/257 r 4.4

**14.5 Determination of reasonable time**

(1) For the purposes of rule 14.2(1)(c), a reasonable time for a step in a proceeding is—

(a) the time specified for it in Schedule 4; or

(b) a time determined by analogy with that schedule, if Schedule 4 does not apply; or

(c) the time assessed as likely to be required for the particular step, if no analogy can usefully be made.

(2) A determination of what is a reasonable time for a step in a proceeding under subclause (1) must be made by reference—

(a) to band A, if a comparatively small amount of time for the particular step is considered reasonable; or

(b) to band B, if a normal amount of time for the particular step is considered reasonable; or

(c) to band C, if a comparatively large amount of time is considered reasonable.

Compare: HCR 14.5; SR 2009/257 r 4.5

**14.6 Increased costs and indemnity costs**

(1) Despite rules 14.2 to 14.5, the court may make an order—

**District Court Rules 2014**

(a)    increasing costs otherwise payable under those rules (**increased costs**); or

(b)    that the costs payable are the actual costs, disbursements, and witness expenses reasonably incurred by a party (**indemnity costs**).

(2)    The court may make the order at any stage of a proceeding in relation to any step in the proceeding.

(3)    The court may order a party to pay increased costs if—

(a)    the nature of the proceeding or the step in the proceeding is such that the time required by the party claiming costs would substantially exceed the time allocated under band C; or

(b)    the party opposing costs has contributed unnecessarily to the time or expense of the proceeding or step in the proceeding by—

(i)    failing to comply with these rules or a direction of the court; or

(ii)    taking or pursuing an unnecessary step or an argument that lacks merit; or

(iii)    failing, without reasonable justification, to admit facts, evidence, or documents or accept a legal argument; or

(iv)    failing, without reasonable justification, to comply with an order for discovery, a notice for further particulars, a notice for interrogatories, or any other similar requirement under these rules; or

(v)    failing, without reasonable justification, to accept an offer of settlement, whether in the form of an offer under rule 14.10 or some other offer to settle or dispose of the proceeding; or

(c)    the proceeding is of general importance to persons other than just the parties and it was reasonably necessary for the party claiming costs to bring the proceeding or participate in the proceeding in the interests of those affected; or

(d)    some other reason exists that justifies the court making an order for increased costs despite the principle that the determination of costs should be predictable and expeditious.

(4)    The court may order a party to pay indemnity costs if—

(a)    the party has acted vexatiously, frivolously, improperly, or unnecessarily in commencing, continuing, or defending a proceeding or a step in a proceeding; or

(b)    the party has ignored or disobeyed an order or a direction of the court or breached an undertaking given to the court or another party to the proceeding; or

(c)    costs are payable from a fund, the party claiming costs is a necessary party to the proceeding affecting the fund, and the party claiming costs has acted reasonably in the proceeding; or

(d)     the person in whose favour the order of costs is made was not a party to the proceeding and has acted reasonably in relation to the proceeding; or

(e)     the party claiming costs is entitled to indemnity costs under a contract or deed; or

(f)     some other reason exists that justifies the court making an order for indemnity costs despite the principle that the determination of costs should be predictable and expeditious.

Compare: HCR 14.6; SR 2009/257 r 4.6

**14.7    Refusal of, or reduction in, costs**

Despite rules 14.2 to 14.5, the court may refuse to make an order for costs or may reduce the costs otherwise payable under those rules if—

(a)     the nature of the proceeding or the step in a proceeding was such that the time required by the party claiming costs would have been substantially less than the time allocated under band A; or

(b)     the property or interests at stake in the proceeding were of exceptionally low value; or

(c)     the issues at stake were of little significance; or

(d)     although the party claiming costs has succeeded overall, that party has failed in relation to a cause of action or issue that significantly increased the costs of the party opposing costs; or

(e)     the party claiming costs has contributed unnecessarily to the time or expense of the proceeding or step in the proceeding by—

      (i)     failing to comply with these rules or a direction of the court; or

      (ii)     taking or pursuing an unnecessary step or an argument that lacks merit; or

      (iii)     failing, without reasonable justification, to admit facts, evidence, or documents or accept a legal argument; or

      (iv)     failing, without reasonable justification, to comply with an order for discovery, a notice for further particulars, a notice for interrogatories, or any other similar requirement under these rules; or

      (v)     failing, without reasonable justification, to accept an offer of settlement, whether in the form of an offer under rule 14.10 or some other offer to settle or dispose of the proceeding; or

(f)     some other reason exists that justifies the court refusing costs or reducing costs despite the principle that the determination of costs should be predictable and expeditious.

Compare: HCR 14.7; SR 2009/257 r 4.7

**District Court Rules 2014**

**14.8    Costs in interlocutory applications**

(1)    Costs on an opposed interlocutory application, unless there are special reasons to the contrary,—

    (a)    must be fixed in accordance with these rules when the application is determined; and

    (b)    become payable when they are fixed.

(2)    Despite subclause (1), the court may reverse, discharge, or vary an order for costs on an interlocutory application if satisfied subsequently that the original order should not have been made.

(3)    This rule does not apply to an application for summary judgment.

Compare: HCR 14.8; SR 2009/257 r 4.8

**14.9    Costs may be determined by different Judge**

Costs may be determined by a Judge other than the Judge who heard the matter to which the costs relate, if the Judge who heard the matter to which the costs relate is not available conveniently to make the determination.

Compare: HCR 14.9; SR 2009/257 r 4.9

**14.10    Written offers without prejudice except as to costs**

(1)    A party to a proceeding may at any time make to any other party to the proceeding a written offer that—

    (a)    is expressly stated to be without prejudice except as to costs; and

    (b)    relates to an issue in the proceeding.

(2)    The fact that the offer has been made must not be communicated to the court until the question of costs is to be decided.

Compare: HCR 14.10; SR 2009/257 r 4.10

**14.11    Effect on costs**

(1)    The effect (if any) that the making of an offer under rule 14.10 has on the question of costs is at the discretion of the court.

(2)    Subclauses (3) and (4)—

    (a)    are subject to subclause (1); and

    (b)    do not limit rule 14.6 or 14.7; and

    (c)    apply to an offer made under rule 14.10 by a party to a proceeding (**party A**) to another party to it (**party B**).

(3)    Party A is entitled to costs on the steps taken in the proceeding after the offer is made, if party A—

    (a)    offers a sum of money to party B that exceeds the amount of a judgment obtained by party B against party A; or

(b)    makes an offer that would have been more beneficial to party B than the judgment obtained by party B against party A.

(4)    The offer may be taken into account if party A makes an offer that—

    (a)    does not fall within subclause (3)(a) or (b); and

    (b)    is close to the value or benefit of the judgment obtained by party B.

Compare: HCR 14.11; SR 2009/257 r 4.11

### 14.12  Disbursements

(1)    In this rule, **disbursement**, in relation to a proceeding,—

    (a)    means an expense paid or incurred for the purposes of the proceeding that would ordinarily be charged for separately from professional services in a solicitor's bill of costs; and

    (b)    includes—

        (i)    fees of court for the proceeding:

        (ii)    expenses for serving documents for the purposes of the proceeding:

        (iii)    expenses for photocopying documents required by these rules or by a direction of the court:

        (iv)    expenses incurred in providing or complying with discovery by electronic means in accordance with these rules:

        (v)    expenses of conducting a conference by telephone or video link; but

    (c)    does not include counsel's fee.

(1A)    For the purposes of this rule, disbursements in respect of an expert witness's fees and expenses must be treated as disbursements within the meaning of subclause (1)(a) even though the expert witness's services in relation to the proceeding are provided under a conditional fee agreement.

(1B)    In subclause (1A), **conditional fee agreement** has the same meaning as in rule 14.2(3), except that the reference to legal professional services must be read as if it were a reference to expert witness services.

(2)    A disbursement may be included in the costs awarded for a proceeding to the extent that the disbursement is—

    (a)    of a class that is—

        (i)    approved by the court for the purposes of the proceeding; or

        (ii)    specified in subclause (1)(b); and

    (b)    specific to the conduct of the proceeding; and

    (c)    necessary for the conduct of the proceeding; and

    (d)    reasonable in amount.

(3) A Judge may direct a Registrar to exercise the powers of the court under this rule.

Compare: HCR 14.12; SR 2009/257 r 4.12

Rule 14.12(1A): inserted, on 1 September 2017, by rule 14 of the District Court Amendment Rules 2017 (LI 2017/187).

Rule 14.12(1B): inserted, on 1 September 2017, by rule 14 of the District Court Amendment Rules 2017 (LI 2017/187).

### 14.13 Joint and several liability for costs

The liability of each of 2 or more parties ordered to pay costs is joint and several, unless the court otherwise directs.

Compare: HCR 14.14; SR 2009/257 r 4.13

### 14.14 Defendants defending separately

The court must not allow more than 1 set of costs, unless it appears to the court that there is good reason to do so, if—

(a) several defendants defended a proceeding separately; and

(b) it appears to the court that all or some of them could have joined in their defence.

Compare: HCR 14.15; SR 2009/257 r 4.14

### 14.15 Claim and counterclaim both established

The court must award costs as if each party had succeeded in an independent proceeding, unless, in the court's opinion, the justice of the case otherwise requires, if—

(a) the plaintiff succeeds in his or her proceeding; and

(b) the defendant succeeds in a counterclaim.

Compare: HCR 14.16; SR 2009/257 r 4.15

### 14.16 Set-off if costs allowed to both parties

If opposite parties are awarded costs against each other, their respective costs must be set off and the lesser sum must be deducted from the greater, unless the court otherwise directs.

Compare: HCR 14.17; SR 2009/257 r 4.16

### 14.17 Solicitor acting in person

A solicitor who is a party to a proceeding and acts in person is entitled to solicitors' costs.

Compare: SR 2009/257 r 4.17

### 14.18 Proceeding transferred from High Court

(1) This rule applies if a proceeding has been transferred from the High Court to the District Court and the amount remaining in dispute at the date on which the

Registrar receives the documents referred to in section 47 of the Act is less than the amount originally claimed.

(2) The costs incurred after that date must be allowed on the scale and subject to the rules applicable to the costs of a proceeding started in the District Court to recover the amount remaining in dispute.

Compare: SR 2009/257 r 4.18

### 14.19 Enforcement of order for costs

An order for the payment of costs may be enforced in the same manner as any other order of the District Court for the payment of money.

Compare: SR 2009/257 r 4.19

# Part 15
# Disposal other than by trial

## Subpart 1—Dismissal or stay without trial

### 15.1 Dismissing or staying all or part of proceeding

(1) The court may strike out all or part of a pleading if it—

    (a) discloses no reasonably arguable cause of action, defence, or case appropriate to the nature of the pleading; or

    (b) is likely to cause prejudice or delay; or

    (c) is frivolous or vexatious; or

    (d) is otherwise an abuse of the process of the court.

(2) If the court strikes out a statement of claim or a counterclaim under subclause (1), it may by the same or a subsequent order dismiss the proceeding or the counterclaim.

(3) Instead of striking out all or part of a pleading under subclause (1), the court may stay all or part of the proceeding on such conditions as it considers just.

Compare: HCR 15.1

### 15.2 Dismissal for want of prosecution

Any opposite party may apply to have all or part of a proceeding or counterclaim dismissed or stayed, and the court may make such order as it thinks just, if—

    (a) the plaintiff fails to prosecute all or part of the plaintiff's proceeding to trial and judgment; or

    (b) the defendant fails to prosecute all or part of the defendant's counterclaim to trial and judgment.

Compare: HCR 15.2

# EXHIBIT 20

1

2
Ryan A. Hamilton
CA Bar No. 291349
3
HAMILTON LAW
5125 S. Durango Dr., Ste. C
4
Las Vegas, NV 89113
(702) 818-1818
5
(702) 974-1139
ryan@hamlegal.com
6
*Attorney for the Plaintiff,*
*Richard N. Bell*

7

## UNITED STATES DISTRICT COURT

8

## SOUTHERN DISTRICT OF CALIFORNIA

9

| RICHARD N. BELL, an individual, | Case No.: 3:18-cv-01491-DMS-BGS |
|---|---|
| Plaintiff, | **DECLARATION OF RYAN A. HAMILTON, ESQ., IN SUPPORT OF PLAINTIFF'S MOTION TO AMEND JUDGMENT** |
| vs. | |
| STEPHEN JAMES BARBER; JETSETZ, INC.; and DOES 1-100, ROE Corporations I-X, inclusive, | |
| Defendants. | |

10

11

12

13

14

15

16

17
I am attorney for the Plaintiff in the above-captioned action. I have personal knowledge of the following:

18
1. I have been a licensed attorney since 2006. I am licensed and in good standing in the states of California, Nevada, and Indiana.

19

20
2. For work on this case, I am charging my client $350.00 per hour.

21
3. I believe this fee to be reasonable given the nature of the work, my experience, and the prevailing market rates.

22
4. According to hourly rates deemed reasonable for comparable work in the Ninth Circuit I believe this to a reasonable fee. In fact, I believe the hourly rate is lower than the prevailing rate in California for copyright litigation. Because this was not a complicated matter I am seeking a lower hourly rate.

23

24

25

1

5.  The bulk of my time expended on this case related to my preparation, in consultation with my client, of the motion for default judgment. Attached hereto as an Exhibit is a breakdown of my time on this case.

6.  In total I spent 12.2 hours working on this case. The Defendants chose not to participate in the case.

Further declarant sayeth naught.

Executed this 8th day of October, 2019, under penalty of perjury.

*/s/ Ryan A. Hamilton*

# Hamilton Law

# Billing Summary

5125 S. Durango Dr., Ste C
Las Vegas, NV 89119
Ph. 702-818-1818 Fax 702-974-1139

**DATE:** October 7, 2019
**INVOICE #** 100
**FOR:** Legal Services

**BILL TO:**
Richard N. Bell
(Bell v.Barber)

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| 06/28/18 - Draft and file complaint and prepare supporting documents | 1.00 | $350.00 | $ 350.00 |
| Research possible places for service on defendant | 1.00 | $350.00 | $ 350.00 |
| Review docket filings from court and research Judge | 0.40 | $350.00 | $ 140.00 |
| 08/31/18 - File proof of service (JetSetz, Inc.) and mail chambers copy | 0.20 | $350.00 | $ 70.00 |
| 02/08/19 - Prepare and file proof of service (Stephen Barber) | 0.20 | $350.00 | $ 70.00 |
| 02/15/19 - Prepare and file default | 0.20 | $350.00 | $ 70.00 |
| 06/06/19 - Prepare and file motion for default | 6.00 | $350.00 | $ 2,100.00 |
| Review judgment of default | 0.20 | $350.00 | $ 70.00 |
| 10/07/19 - Prepare and file Motion to Amend | 3.00 | $350.00 | $ 1,050.00 |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |
| | | | $ - |

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  |  |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  | $ - |
|  |  |  |  |
|  |  |  |  |
|  |  |  | $ - |

| | |
|---|---|
| SUBTOTAL | $ 4,270.00 |
| TAX RATE |  |
| SALES TAX | $ - |
| OTHER |  |
| **TOTAL** | $ 4,270.00 |

Make all checks payable to Hamilton Law.

Total due in 15 days. Overdue accounts subject to a service charge of 1% per month.

**THANK YOU FOR YOUR BUSINESS!**

# EXHIBIT 21

1   Andrew Grimm (WSBA No. 51486)
    DIGITAL JUSTICE FOUNDATION
2   15287 Pepperwood Drive
3   Omaha, Nebraska 68154
    (531) 210-2381
4   Andrew@DigitalJusticeFoundation.org

5   Rory L. Stevens (WSBA No. 57152)
    LAW OFFICE OF RORY L. STEVENS
6   4303 Southwest Cambridge Street
7   Seattle, Washington 98136
    (206) 850-4444
8   RoryLawStevensEsq@Gmail.com

9   *Attorneys for James Abrams*

10

11

12              **IN THE UNITED STATES DISTRICT COURT**

13          **FOR THE WESTERN DISTRICT OF WASHINGTON**

14                      **TACOMA DIVISION**

15   JAMES RANDALL ABRAMS,                Case No. 3:21-cv-5374-LK
                 *Plaintiff,*
16                                        <u>***Corrected***</u> **Declaration of Andrew Grimm**
     *on behalf of himself and others similarly*  **in support of Plaintiff's Motion for**
17   *situated,*                          **Attorney Fees**

18                      vs.

19   SEQUIUM ASSET SOLUTIONS, LLC,
                 *Defendant.*
20

21         I, Andrew Grimm, a Senior Counsel at the DIGITAL JUSTICE FOUNDATION and counsel for

22   Plaintiff James Abrams in the above-captioned case, hereby make this Declaration in support of

23   Plaintiff's Motion for Attorney Fees.

           The following statements are true to the best of my knowledge, information, and belief, and
24
     I could testify to them if called as a witness:
25
     **1.**  <u>Andrew Grimm</u>: I am the Senior Counsel for Intake & Litigation at the DIGITAL JUSTICE
26
           FOUNDATION ("DJF"), a nonprofit public-interest law firm focusing on cutting-edge issues at
27
           the intersection of technology and law and on access to law. My practice focuses on the
28

                                                  1

targeted uses of appellate advocacy and of innovative technological solutions to address, remedy, and ideally avoid abuses of underrepresented persons. My practice also focuses on strategic uses of litigation and technology resources to improve access to law or, better yet, establish precedent that avoids abuses of power. My specific focus within the organization is on finding those who most need the assistance of the organization, assisting in litigating all aspects of their cases, coordinating with clients, and ensuring that there is continuous alignment between the client's goals and purposes and the representation. Relevant additional background on my practice of law at the DJF is as follows:

a. <u>Admissions & Past Jobs</u>: I am a bar-licensed attorney in Washington and have been admitted to the Washington State Bar Association since 2016. I have practiced law consistently since that time. I am also admitted to several U.S. District Courts, each of the U.S. Courts of Appeals, and the U.S. Supreme Court. Prior to the DJF, I worked for K&L GATES. I attended and graduated from STANFORD LAW SCHOOL.

b. <u>Major Experience</u>: I represent all clients without regard to their ability to pay and without regard to the amount in controversy in their respective case so long as the issues in play advance the nonprofit purposes and mission of the DJF. I take a creative approach with respect to otherwise underrepresented person to ensure that their legal victories count, with impact for them and significance beyond the parties to the case. I have played a major role in the three merits victories of the DJF at the Courts of Appeals: <u>Bell v. Wilmott Storage Services, LLC</u>, 12 F.4th 1065 (9th Cir. 2021), <u>reh'g denied</u> Nov. 17, 2021; <u>Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.</u>, 9 F.4th 803 (8th Cir. 2021), <u>reh'g denied</u> Oct. 5, 2021, <u>cert. denied</u> June 27, 2022; <u>Grimm v. City of Portland</u>, 971 F.3d 1060 (9th Cir. 2020), <u>reh'g denied</u> Nov. 13, 2020. I have also contributed to a number of amicus briefs where the public-interest position of the DJF either reframed appeal or was directly

2

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

adopted into law: <u>Everly v. Everly</u>, 958 F.3d 442, 452 (6th Cir. 2020) (reframed the issue on appeal with significant impact for creators); <u>Mozilla Corp. v. FCC</u>, 940 F.3d 1, 48 (D.C. Cir. 2019), <u>reh'g denied</u> Feb. 6, 2020 (major procedural victory on access to administrative review but loss on the merits); <u>Brammer v. Violent Hues Prods., LLC</u>, 922 F.3d 255 (4th Cir. Apr. 26, 2019) (DJF's point adopted into law); <u>Smith v. Thomas</u>, 911 F.3d 378 (6th Cir. 2018) (citing and quoting DJF amicus brief at 382 and adopting the overall position).  I also have particular expertise in finding cases and building client relationships with vulnerable and underrepresented persons who most need nonprofit litigation assistance, often in the midst of litigation with no other options for counsel.

    **c.** <u>Billing Records</u>: A true and correct record of my time spent on this case is attached to this Declaration as **Exhibit A**.

**2.** <u>Gregory Keenan</u>: Mr. Keenan is the Senior Advisory & Appellate Counsel at the DIGITAL JUSTICE FOUNDATION, a nonprofit public-interest law firm focusing on cutting-edge issues at the intersection of technology and law and on access to law.  As with mine, his practice focuses on the targeted uses of appellate advocacy and of innovative technological solutions to address, remedy, and ideally avoid abuses of underrepresented persons.  Likewise, his practice also focuses on strategic uses of litigation and technology resources to improve access to law or, better yet, establish precedent that avoids abuses of power.  Some additional background on his legal career is as follows:

    **a.** <u>Admissions</u>: Mr. Keenan a bar-licensed attorney in the State of New York and has been since 2018.  He has practiced law consistently since that time, most often in an advisory capacity in the trial courts and as lead counsel in the Courts of Appeals.  He is admitted to most of the U.S. Courts of Appeals.

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

Prior to the DJF, Mr. Keenan worked for JONES DAY. Mr. Keenan attended
and graduated from STANFORD LAW SCHOOL.

**b.** Major Experience: Like me, Mr. Keenan represents all clients without regard
to their ability to pay and without regard to the amount in controversy in their
respective case so long as the issues in play advance the purposes of mission
of the DJF. Mr. Keenan was lead counsel in each of the DJF's three appellate
victories: Bell v. Wilmott Storage Services, LLC, 12 F.4th 1065 (9th Cir.
2021), reh'g denied Nov. 17, 2021; Designworks Homes, Inc. v. Columbia
House of Brokers Realty, Inc., 9 F.4th 803 (8th Cir. 2021), reh'g denied Oct.
5, 2021, cert. denied June 27, 2022; Grimm v. City of Portland, 971 F.3d
1060 (9th Cir. 2020), reh'g denied Nov. 13, 2020. Mr. Keenan was also lead
counsel on a number (or contributing counsel) where the public-interest
position of the DJF either reframed appeal or was directly adopted into law:
Everly v. Everly, 958 F.3d 442, 452 (6th Cir. 2020) (reframed the issue on
appeal with significant impact for creators); Mozilla Corp. v. FCC, 940 F.3d
1, 48 (D.C. Cir. 2019), reh'g denied Feb. 6, 2020 (major procedural victory
on access to administrative review but loss on the merits); Brammer v.
Violent Hues Prods., LLC, 922 F.3d 255 (4th Cir. Apr. 26, 2019) (DJF's
point adopted into law); Smith v. Thomas, 911 F.3d 378 (6th Cir. 2018)
(citing and quoting DJF amicus brief at 382 and adopting the overall
position). Mr. Keenan has particular expertise in pre-appeal trial court
strategy, spotting of highly significant public-interest issues; appellate
briefing; and oral presentation of issues.

**c.** Billing Records: A true and correct record of Mr. Keenan's time spent on this
case is attached to this Declaration as **Exhibit B**.

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

4

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**3.** <u>Rory Stevens</u>: For the period of this suit, Mr. Stevens has been a solo practitioner running his own firm that practices in the areas of family law, consumer protection, and personal injury.  Mr. Stevens associated for cases with the DIGITAL JUSTICE FOUNDATION, a nonprofit public-interest law firm focusing on cutting-edge issues at the intersection of technology and law and on access to law.  Some additional background on his legal career is as follows:

    **a.** <u>Admissions</u>: Mr. Stevens a bar-licensed attorney in the State of Washington and has been since 2020.  He has practiced law consistently since that time, most often in the trial courts Prior to his own practice, Mr. Stevens work for reputable personal-injury firms in the Seattle area.  Mr. Stevens attended and graduated from SEATTLE UNIVERSITY SCHOOL OF LAW.

    **b.** <u>Major Experience</u>: Mr. Stevens has experience in a wide range of litigation matters, including cases involving personal injury, wrongful death, unfair debt collection practices, and intellectual property matters, with a focus on complex and novel legal matters. For example, Mr. Stevens represents clients in a case involving complex questions of CAFA jurisdiction and novel questions of California tort law in <u>The Estate of Bella Herndon v. Netflix, Inc.</u>  Mr. Stevens also represents a client in a case involving claims of Japanese Copyright law brought in a U.S. Federal Court as a transitory cause of action.  Mr. Stevens has also had experience and success in the area of personal injury law. For example, Mr. Stevens has obtained a $113,000 default judgment for his client in <u>Morey v. McConnell</u>; Mr. Stevens procured a $40,000 settlement in the personal injury case of <u>Bradley v. Speer</u>; and Mr. Stevens successfully settled a matter for another client in <u>Miller Bates v. Great Seattle Development, LLC</u>.

    **c.** <u>Billing Records</u>: A true and correct record of Mr. Stevens' time spent on this case is attached to this Declaration as **<u>Exhibit C</u>**.

5

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**4.** My client told me the removal to federal court terrified and frightened his family and that, prior to my offer of representation, he was receiving significant pressure to simply accept the legal violations that occurred here due to the complexity of federal court relative to small-claims court.

**5.** A summary of the fees requested in this case is as follows:

| *Attorney* | *Hours* | *Rate* | *Total* |
|---|---|---|---|
| Andrew Grimm | 82.3 | $400 | $32,920 |
| Gregory Keenan | 39.6 | $400 | $15,840 |
| Rory Stevens | 75.4 | $350 | $26,390 |
| **TOTAL** | **197.3** | **-** | **$75,150** |

On this day (Sunday, January 29, 2023), and within the United States,

**I declare under penalty of perjury that the foregoing is true and correct.**

        */s/ Andrew Grimm*

Andrew Grimm (WSBA 51486)
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
Andrew@DigitalJusticeFoundation.org
(531) 210-2381

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**Exhibit A**

| Date | Minutes | Task |
|---|---|---|
| 5/25/2021 | 30 | Email correspondence with client regarding possibility of nonprofit representation |
| 5/25/21 | 45 | Reviewing email from client regarding the nature of his case and his goals and then considering this case for full retention or at least partial retention by the client |
| 5/25/21 | 30 | Emailed a possible outside counsel at another nonprofit for assistance in the case and discussed the matter with her |
| 5/28/2021 | 30 | Reviewing email from the client regarding the small-claims forum |
| 5/29/2021 | 60 | Draft contract to client specification and email to my team for review and agreement on terms |
| 30-May | 15 | Implemented requested changes and emailed the contract to the client |
| 5/30/2021 | 20 | I added some new terms to the contract at the client's request upon pressure from family members |
| 6/1/2021 | 30 | Reviewed another email from the client regarding the facts of the case and notice the potential of a possibly significant issue relating to the use of technology in debt-collection service |
| 6/1/2021 | 10 | Emailed opposing counsel to introduce myself |
| 6/2/2021 | 30 | Emailed Rory Stevens request for research regarding remand possibilities and how to return to small-claims court |
| 6/2/2021 | 15 | Drafted notice of limited appearance to help with remand litigation |
| 6/3/2021 | 10 | Emailed appearance to opposing counsel and read email and discussed with co-counsel |
| 6/3/2021 | 5 | Filed notice of appearance and emailed opposing |
| 6/3/2021 | 15 | Emailed client regarding case updates |
| 6/3/2021 | 10 | Reviewed email from co-counsel to client regarding |
| 6/3/2021 | 120 | Reviewed documents supplied by client, including additional correspondence about the case and possible bases for identity theft |
| 6/3/2021 | 10 | Reviewed email about the accountholder being Randy's wife |
| 6/8/2021 | 20 | Drafted and sent email to the Court regarding the timeline for initial disclosures |
| 6/14/2021 | 20 | Worked on the unopposed motion to extend initial disclosures |
| 6/16/2021 | 10 | Reviewed the SAS corporate disclosures statement |
| 6/17/2021 | 60 | Reviewed the motion to dismiss filed today and came up with a strategy to get it dismissed |

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

| 6/27/2021 | 60 | Drafted new client contract for full service and prosecution of the case given its importance |
|---|---|---|
| 7/5/2021 | 120 | Began research and drafting into the motion to dismiss |
| 7/6/2021 | 180 | Finished research, drafted, and submitted the opposition to the motion to dismiss |
| 7/7/2021 | 15 | Finalized client contract and sent to the client |
| 7/8/2021 | 75 | Reviewed the reply on the motion to dismiss and emailed a copy to the client |
| 8/12/201 | 15 | Emailed counsel draftee template for extension of time and stipulation on the disclosures |
| 8/12/2021 | 195 | I did an in-depth review of cases litigated by SAS to date, including cases that did not end in opinions; I further researched SAS' operations and uses of technology |
| 8/16/2021 | 60 | Reviewed the order from the judge on the motion for dismiss and strategizing on how to proceed with the case |
| 8/16/2021 | 45 | Drafted stipulated motion to extend and filed it after email correspondence with the other side |
| 8/23/2021 | 90 | Reviewed the initial disclosures provided by opposing counsel and the initial disclosures rule |
| 8/27/2021 | 180 | Began an extensive review of 9th Circuit decisions on FDCPA cases |
| 8/28/2021 | 300 | Continued extensive review of 9th Circuit FDCPA cases with a focus on the uses of technology and disclosures |
| 8/29/2021 | 300 | Continued review looking into open issues of appellate law that could be developed, especially focused on 11th Circuit ruling relating to disclosures |
| 8/30/2021 | 600 | Spent the entire day focused on drafting the amended complaint |
| 9/1/2021 | 20 | Emailed opposing counsel to introduce myself |
| 9/1/2021 | 45 | Emailed my client extensively about the case and requested a 1.4 letter for informed consent |
| 9/3/2021 | 90 | Emailing with opposing counsel and researching into preservation because opposing counsel would not agree to require his client to preserve all evidence |
| 9/7/2021 | 15 | Review email about settlement |
| 9/21/2021 | 60 | Extensive email to opposing counsel regarding case management |
| 10/8/2021 | 90 | Extensive discovery strategy email to the team about how to prove the case and how to narrowly focus on the case; discussion of whether the disclosures are sufficient |
| 10/12/2021 | 75 | Researched local rules on JSR an then emailed my opposing counsel regarding it |

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

| | | |
|---|---|---|
| 10/21/2021 | 240 | Receipt and review of the initial disclosures from my client and preparation for transmission |
| 10/21/2021 | 30 | Receipt and review of opposing side's initial disclosures (largely the same as before; same deficiencies); response to my opposing counsel |
| 10/22/2021 | 60 | Finalized and transferred the initial disclosures to the other side |
| 10/22/2021 | 180 | Received threatening settlement offer from opposing and reviewed and discussed with team and client; including drafting email correspondence to my client; Drafted responsive email to my opposing counsel for the threatening letter asking for authority to substantiate very strange Rule 11 threats; reviewed another email response and took to team |
| 10/25/2021 | 60 | Reviewed Rory's email to the client and then discussed with him |
| 10/26/2021 | 60 | Gave an extensive response to the client indicating why I believe the other side's threats were really poor form |
| 10/28/2021 | 90 | Wrote a further extensive email responding to the Rule 11 threats to opposing counsel |
| 11/2/2021 | 240 | Worked on the Joint Status Report and sent a draft to my team and opposing counsel |
| 11/14/2021 | 150 | Worked on the motion for clarification of the local rule on class-actions; did research into the citing sources and then reframed work that Rory had done on it |
| 11/15/2021 | 145 | Extensive research into the Rule 37 consequences for failure to file sufficient disclosures in consideration of filing a motion for sanctions in response to any newly introduced materials not previously disclosed |
| 11/15/201 | 20 | Finalized and filed the motion to clarify |
| 11/29/2021 | 30 | Reviewed the response to the motion to clarify the local rule on class actions |
| 11/29/2021 | 30 | Calendared all the new case deadlines |
| 12/19/2021 | 60 | Drafted RFPs |
| 1/4/2022 | 30 | Email correspondence with opposing counsel on case administration |
| 1/18/2022 | 45 | Reviewed yet another threatening email from the other side |
| 2/11/2022 | 20 | Reviewing Order on motion for clarification from Judge King |
| 4/27/2022 | 15 | Reviewed depo emails |
| 5/2/2022 | 45 | Conference call with client with brief intro from Greg |
| 5/3/2022 | 165 | Deposition and then debrief with rory and then with Greg |
| **TOTAL** | **4940** | |

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**Exhibit B**

| Date | Time | Task |
|---|---|---|
| June 3, 2021 | 0.5 | Phone call co-counsel and client |
| June 3, 2021 | 1.25 | Legal Research |
| June 4, 2021 | 1.15 | Legal Research |
| June 5, 2021 | 1.5 | Draft Memo re: research findings |
| July 6, 2021 | 0.5 | Review Draft Opposition to SAS' 12(c) motion. Provide edits/additions to Opposition Motion |
| July 12, 2021 | 0.3 | call with client |
| August 25, 2021 | 1.5 | Legal Research re: damages, statutory injury, standing etc. |
| August 29, 2021 | 1.15 | call with client and co-counsel |
| August 29, 2021 | 3.5 | Legal Research |
| August 29, 2021 | 2.15 | Draft Complaint |
| August 30, 2021 | 4.5 | Legal Research |
| August 30, 2021 | 3.5 | Draft Complaint |
| September 1, 2021 | 1.25 | Legal Research in preparation for followup client call |
| September 2, 2021 | 0.25 | Call with co-counsel |
| September 7, 2021 | 1 | call with client and co-counsel |
| September 30, 2021 | 1.5 | Review answer and outline issues for research |
| October 1, 2021 | 2.75 | Legal Research |
| October 2, 2021 | 1.25 | Create memo research findings, update master document containing caselaw, quotes and research findings |
| October 21, 2021 | 0.75 | Call w/client |
| November 2, 2021 | 0.5 | Edit and review draft JSR |
| November 10, 2021 | 1.25 | Legal research regarding motion for clarification of local civil rule 23(i)(3) |
| November 12, 2021 | 0.5 | Edit and review draft of Motion for Clarification of Local Civil Rule 23(i)(3) |
| January 19, 2021 | 0.5 | Review Discovery Responses |
| May 2, 2022 | 0.75 | Deposition Preparation Call with Client |
| May 3, 2022 | 2.5 | Telephonically attended Abrams Deposition |
| May 3, 2022 | 1.25 | Conference call with co-counsel and Post deposition meeting with client and discussion of settlement strategy |

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

| | | |
|---|---|---|
| 5/3/2022 | 0.5 | Call with attorney Grimm discussing settlement strategy and recap deposition and post-deposition client call |
| 5/18/2022 | 0.75 | Legal research re: attorney fees caselaw FDCPA |
| 5/19/2022 | 0.75 | Call with Client |
| 6/1/2022 | 0.15 | Call with Opposing Counsel |
| | 39.65 | |

11

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**Exhibit C**

| Date | Minutes | Task |
|------|---------|------|
| 6/2/2021 | 15 | Draft notice of appearance |
| | 90 | Review filings in the case thus far |
| | 95 | Research risk of adverse fee-shifting |
| | 80 | |
| 6/3/2021 | 37 | Phone call |
| | 40 | Research and email to client |
| | 96 | Research law and facts |
| | 96 | Email client and research law |
| 6/4/2021 | 45 | Writing memo |
| | 25 | Phone call with Andrew |
| | 170 | Writing memo |
| 6/14/2021 | 30 | Draft motion to extend |
| 6/16/2021 | 30 | Research remand for no standing |
| | 13 | Correct Motion to Extend |
| | 18 | Search HR |
| 6/17/2021 | 17 | Phone call with Andrew |
| 6/18/2021 | 21 | Read pleading & research |
| | 102 | Draft complaint |
| 6/20/2021 | 49 | Draft complaint |
| 6/21/2021 | 57 | Draft complaint |
| | 89 | Draft complaint |
| | 98 | Draft complaint |
| 7/6/2021 | 86 | Draft Mtn to Amend |
| 7/12/2021 | 19 | Client call |
| | 27 | Research 1692(b) |
| 7/14/2021 | 56 | Redraft complaint |
| 8/11/2021 | 35 | Call with Andrew & email to defense counsel |
| 8/12/2021 | 51 | Draft Stipulated Mtn to Extend |
| 8/13/2021 | 60 | Draft Proposed Order |
| 8/16/2021 | 20 | Call with Andrew\ |
| | 15 | Review motions |
| 8/19/2021 | 45 | Revise complaint |
| 8/25/2021 | 45 | Research WACPA |
| 8/26/2021 | 150 | Research WACPA |
| 8/26/2021 | 48 | Research credit injury |
| 8/28/2021 | 254 | Research WACPA and draft complaint |
| 8/29/2021 | 70 | Phone conference |
| 8/30/2021 | 189 | Finish complaint and phone conference |

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

| | | |
|---|---|---|
| 8/31/2021 | 207 | Research and draft motion for clarification |
| 9/1/2021 | 33 | Research case law |
| | 34 | Look at BBB complaints |
| | 57 | Research remanding staying mtn to dismiss |
| 9/2/2021 | 17 | Phone conference with Andrew & Greg |
| 9/6/2021 | 16 | Prepare and send lack of insurance notice |
| | 125 | Research duty to preserve |
| 9/7/2021 | 56 | Conference with Randy and other counsel |
| 9/30/2021 | 5 | Read Defendant's Answer |
| 10/11/2021 | 62 | Research 1692(e)(8) |
| 10/14/2021 | 14 | Read through emails |
| | 72 | Research LR 23(i)(3) |
| 10/21/2021 | 92 | Draft 26(a)(1) disclosure |
| | 42 | Call with client |
| 10/25/2021 | 88 | Email to client |
| 10/26/2021 | 45 | Research subpoena |
| | 50 | Phone call with Andrew |
| 11/2/2021 | 67 | Compare JSR and edit |
| | 93 | Teleconference review JSR and submit |
| 11/8/2021 | 40 | Draft RFAs |
| 11/12/2021 | 11 | Review Motion for Clarification |
| 12/19/2021 | 20 | Review and edit 1st set of RFPs |
| 12/30/2021 | 10 | Look at Order and Notice |
| 1/18/2021 | 20 | Look over SAS docs and email client and opposing counsel |
| 1/19/2021 | 40 | Review Discovery responses and email client |
| 2/10/2022 | 31 | Draft subpoena to Comcast |
| 2/22/2022 | 102 | Look over SAS docs and email client and co-counsel hypothesis |
| | 68 | Email client and look over Latitude doc and research |
| 2/23/2022 | 12 | Email to James Abrams email address and client |
| | 24 | Call with Andrew & Client |
| 2/27/2022 | 29 | Prepare subpoena to Neustar |
| 3/4/2022 | 18 | Research out of state subpoena |
| 3/14/2022 | 34 | Research and edit subpoena |
| 3/28/2022 | 4 | Subpoena edit |
| 3/29/2022 | 13 | Subpoena edit |
| | 5 | Finish subpoena and email opposing counsel |
| 3/30/2022 | 10 | Contact server |
| 4/21/2022 | 9 | Research subpoena & email Neustar |
| | 35 | Email Neustar's legal team |

13

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

| 4/27/2022 | 2 | Email to Xerxes about depo availability |
|---|---|---|
| | 1 | Email to client |
| | 44 | Work on ROGs & RFPs |
| 4/30/2022 | 32 | Email to client about deposition |
| 5/2/2022 | 42 | Conference call with client |
| 5/3/2022 | 155 | Deposition |
| | 15 | Debrief |
| 5/19/2022 | 52 | Call with counsel & client |
| 5/22/2022 | 39 | Research attorney fees |
| 6/1/2022 | 9 | Call with Andrew & Xerxes |
| 6/3/2022 | 4 | Draft Notice of Acceptance of Offer |
| **TOTAL** | **4588** | **(75.466 hours)** |

14

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing on:

> Mr. Andrew "Andy" D. Shafter
> Attorney
> KETTER SHEPPARD & JACKSON, LLP
> 50 – 116th Avenue Southeast
> Suite 201
> Bellevue, Washington 98004
> Telephone: (206) 330-2054
> AShafer@SKSP.com
>
> Mr. Xerces Martin
> Partner
> MALONE FROST MARTIN, PLLC
> Northpark Central
> Suite 1850
> 8750 N. Central Expressway
> Dallas, Texas 75231
> Telephone: (214) 346-2626
> CWalker@MamLaw.com
>
> Mr. Cooper M. Walker
> Associate
> MALONE FROST MARTIN, PLLC
> Northpark Central
> Suite 1850
> 8750 N. Central Expressway
> Dallas, Texas 75231
> Telephone: (214) 346-2624
> CWalker@MamLaw.com

> *Attorneys for Defendant Sequium Asset Solutions LLC*

by **CM/ECF**.

Dated: January 29, 2023          Respectfully submitted,

                    */s/ Andrew Grimm*
                    Andrew Grimm

Corrected Grimm Decl. ISO Abrams Motion
for Award of Attorneys' Fees

DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive, Omaha, NE 68154
(531) 210-2381

# EXHIBIT 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE, NORTHERN DIVISION**

| | |
|---|---|
| **ONE TWO THREE, LLC** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 3:19-cv-00442** |
| | ) |
| **JERRY L. TRENTHAM** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

**DECLARATION OF RYAN LEVY IN SUPPORT OF PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES**

I, Ryan Levy, declare under penalty of perjury as follows:

1.      I am over the age of eighteen (18) and otherwise competent to testify in the above-
captioned matter. I have personal knowledge of the facts set forth below, and if called upon to do
so, I could and would competently testify thereto.

2.      I make this Declaration in support of Plaintiff's Motion for Attorneys' Fees and
Costs.

3.      Plaintiff's attorneys' fees in this case have been $54,106.55 to date.

4.      Ryan D. Levy, a shareholder with Patterson Intellectual Property Law, has
performed 20.20 hours of work in this case.

5.      Seth R. Ogden, Ph.D., a shareholder with Patterson Intellectual Property Law, has
performed 17.70 hours of work in this case.

6.      Scott M. Douglass, an associate with Patterson Intellectual Property Law, has
performed 7.00 hours of work in this case.

7.      Mark A. Kilgore, Ph.D., an associate with Patterson Intellectual Property Law, has performed 26.20 hours of work in this case.

8.      Dominic A. Rota, an associate with Patterson Intellectual Property Law, has performed 12.20 hours of work in this case.

9.      Caitlin J. Carter, a paralegal with Patterson Intellectual Property Law, has performed 25.40 hours of work in this case.

10.     Phillip Free, a partner with Phillip Free, PLLC, has performed 62.90 hours of work in this case.

11.     Included with Plaintiff's Motion for Attorneys' Fees and Costs as Exhibit B are contemporaneous time records and background information for the above-identified attorneys and paralegals in support of this request.

12.     Plaintiff has expended $1,367.32 in filing fees and service of process in this case.

13.     The billing and fee structure between Plaintiff and counsel is standard, set forth pursuant to an engagement letter, and billed monthly reflecting the time entries and amounts incurred by the attorneys on the case.

14.     A redacted copy of the engagement letter setting forth the fee structure is included Plaintiff's Motion for Attorneys' Fees and Costs as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of October, 2020, in Nashville, Tennessee.


Ryan D. Levy

/s/ Ryan D. Levy



**INVOICE**

Invoice # 1010
Date: 12/19/2019

1300 E. 9th Street, Suite 8
Edmond, Oklahoma 73034
Phone: (405) 446-8860
Email: phil.free@okciplaw.com
okcIPLaw.com

Coldiron Companies

## 00009-Coldiron Specialized Company

## Cease and desist letter to Norton Transport, Inc.



| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 11/14/2019 | Redacted | 0.20 | $350.00 | $70.00 |
| Service | 11/18/2019 | Redacted | 2.40 | $350.00 | $840.00 |
| Service | 11/29/2019 | Redacted | 0.20 | $350.00 | $70.00 |
| | | | **Quantity Subtotal** | | **2.8** |
| | | | | **Subtotal** | **$980.00** |

## 00002-Coldiron Specialized Company

## Replevin - Coldiron Specialized Company v. Jerry L. Trentham

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 11/01/2019 | Redacted | 0.10 | $350.00 | $35.00 |
| Service | 11/11/2019 | Redacted | 0.10 | $350.00 | $35.00 |
| Service | 11/14/2019 | Redacted | 0.30 | $350.00 | $105.00 |
| Service | 11/15/2019 | Redacted | 0.50 | $350.00 | $175.00 |

| Service | 11/26/2019 | Email from local counsel; reviewed return of service document | 0.20 | $350.00 | $70.00 |
| --- | --- | --- | --- | --- | --- |

| | | | Quantity Subtotal | | 1.2 |
| --- | --- | --- | --- | --- | --- |
| | | | Subtotal | | $420.00 |

## 00007-One Two Three, LLC

## Patent Infringement - One Two Three, LLC v. Jerry L. Trentham

| Type | Date | Notes | Quantity | Rate | Total |
| --- | --- | --- | --- | --- | --- |
| Service | 11/04/2019 | Redacted | 0.30 | $350.00 | $105.00 |
| Service | 11/08/2019 | Redacted | 0.10 | $350.00 | $35.00 |
| Service | 11/26/2019 | Redacted | 0.50 | $350.00 | $175.00 |

| | | | Quantity Subtotal | | 0.9 |
| --- | --- | --- | --- | --- | --- |
| | | | Subtotal | | $315.00 |

| | | | Quantity Total | | 4.9 |
| --- | --- | --- | --- | --- | --- |
| | | | Subtotal | | $1,715.00 |
| | | | Total | | $1,715.00 |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
| --- | --- | --- | --- | --- |
| 1010 | 12/19/2019 | $1,715.00 | $0.00 | $1,715.00 |

| | | | Outstanding Balance | $1,715.00 |
| --- | --- | --- | --- | --- |
| | | | Total Amount Outstanding | $1,715.00 |

Please make all amounts payable to: Phillip Free Law, PLLC
EIN 83-4472430

Invoices are due upon receipt and considered late after 30 days.



# INVOICE

Invoice # 1017
Date: 01/08/2020

1300 E. 9th Street, Suite 8
Edmond, Oklahoma 73034
Phone: (405) 446-8860
Email: phil.free@okciplaw.com
okcIPLaw.com

Coldiron Companies

## 00007-One Two Three, LLC

## Patent Infringement - One Two Three, LLC v. Jerry L. Trentham

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 12/10/2019 | Redacted | 0.30 | $350.00 | $105.00 |
| Service | 12/10/2019 | Redacted | 1.80 | $350.00 | $630.00 |
| Service | 12/11/2019 | Redacted | 0.30 | $350.00 | $105.00 |
| Service | 12/12/2019 | Redacted | 1.20 | $350.00 | $420.00 |
| Service | 12/20/2019 | Redacted | 0.50 | $350.00 | $175.00 |

| | | |
|---|---|---|
| **Quantity Subtotal** | **4.1** |
| **Quantity Total** | **4.1** |
| **Subtotal** | **$1,435.00** |
| **Total** | **$1,435.00** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|

| 1017 | 01/08/2020 | $1,435.00 | $0.00 | $1,435.00 |
|------|------------|-----------|-------|-----------|

|  | **Outstanding Balance** | **$1,435.00** |
|--|-------------------------|---------------|
|  | **Total Amount Outstanding** | **$1,435.00** |

Please make all amounts payable to: Phillip Free Law, PLLC
EIN 83-4472430

Invoices are due upon receipt and considered late after 30 days.



# INVOICE

Invoice # 1064
Date: 10/07/2020

1300 E. 9th Street, Suite 8
Edmond, Oklahoma 73034
Phone: (405) 446-8860
Email: phil.free@okciplaw.com
okcIPLaw.com

Coldiron Companies

## 00007-One Two Three, LLC

## Patent Infringement - One Two Three, LLC v. Jerry L. Trentham



| Type | Date | Notes | Quantity | Rate | Discount | Total |
|------|------|-------|----------|------|----------|-------|
| Service | 01/02/2020 | Redacted | 0.90 | $350.00 | - | $315.00 |
| Service | 01/07/2020 | Redacted | 1.20 | $350.00 | - | $420.00 |
| Service | 01/09/2020 | Redacted | 0.30 | $350.00 | - | $105.00 |
| Service | 01/17/2020 | Redacted | 1.80 | $350.00 | - | $630.00 |
| Service | 01/22/2020 | Redacted | 0.50 | $350.00 | - | $175.00 |
| Service | 01/23/2020 | Redacted | 1.50 | $350.00 | - | $525.00 |
| Service | 01/27/2020 | Redacted | 1.10 | $350.00 | - | $385.00 |

| Service | 01/28/2020 | Redacted | 1.30 | $350.00 | - | $455.00 |
|---|---|---|---|---|---|---|
| Service | 01/29/2020 | Redacted | 2.10 | $350.00 | - | $735.00 |
| Service | 01/31/2020 | Redacted | 0.40 | $350.00 | - | $140.00 |
| Service | 02/03/2020 | Redacted | 0.30 | $350.00 | - | $105.00 |
| Service | 02/04/2020 | Redacted | 1.00 | $350.00 | - | $350.00 |
| Service | 02/05/2020 | Redacted | 0.50 | $350.00 | - | $175.00 |
| Service | 02/06/2020 | Redacted | 0.10 | $350.00 | - | $35.00 |
| Service | 02/11/2020 | Redacted | 0.30 | $350.00 | 100.0% | $0.00 |
| Service | 02/20/2020 | Redacted | 0.40 | $350.00 | 100.0% | $0.00 |
| Service | 03/12/2020 | Redacted | 0.20 | $350.00 | 100.0% | $0.00 |
| Service | 03/23/2020 | Redacted | 0.50 | $350.00 | 100.0% | $0.00 |
| Service | 04/07/2020 | Redacted | 0.30 | $350.00 | 100.0% | $0.00 |
| Service | 04/20/2020 | Redacted | 0.30 | $350.00 | 100.0% | $0.00 |
| Service | 04/22/2020 | Redacted | 0.20 | $350.00 | 100.0% | $0.00 |
| Service | 04/30/2020 | Redacted | 0.30 | $350.00 | 100.0% | $0.00 |
| Service | 05/01/2020 | Redacted | 1.10 | $350.00 | 100.0% | $0.00 |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Service | 09/04/2020 | Redacted | 0.10 | $350.00 | - | $35.00 |
| Service | 09/05/2020 | Redacted | 0.30 | $350.00 | - | $105.00 |
| Service | 09/10/2020 | Redacted | 0.30 | $350.00 | - | $105.00 |
| Service | 09/17/2020 | Redacted | 0.30 | $350.00 | - | $105.00 |
| Service | 09/18/2020 | Redacted | 2.50 | $350.00 | - | $875.00 |
| Service | 09/20/2020 | Redacted | 1.80 | $350.00 | - | $630.00 |
| Service | 09/22/2020 | Redacted | 0.50 | $350.00 | - | $175.00 |
| Service | 09/22/2020 | Redacted | 3.50 | $350.00 | - | $1,225.00 |

|  |  |
|---|---|
| **Quantity Subtotal** | **25.9** |
| **Line Item Discount Subtotal** | **-$1,260.00** |
| **Quantity Total** | **25.9** |
| **Subtotal** | **$7,805.00** |
| **Total** | **$7,805.00** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1064 | 10/07/2020 | $7,805.00 | $0.00 | $7,805.00 |

|  |  |
|---|---|
| **Outstanding Balance** | **$7,805.00** |
| **Total Amount Outstanding** | **$7,805.00** |

Please make all amounts payable to: Phillip Free Law, PLLC
EIN 83-4472430

Invoices are due upon receipt and considered late after 30 days.

# Phillip Free Law, PLLC

Intellectual Property Counseling & Litigation

EIN: 83-4472430

14001 Quail Springs Parkway

Oklahoma City, OK 73134

Phone: 405-607-1440   |   Fax: 405-607-1450

Account Statement

Prepared for Coldiron Companies

Re: Coldiron Specialized Company v. Jerry L. Trentham

| | |
|---|---|
| Previous Balance | $0.00 |
| Current Charges | $11,200.00 |
| New Balance | $11,200.00 |
| | |
| Adjustments | $0.00 |
| | |
| Payments | $0.00 |
| Now Due | $11,200.00 |
| Trust Account | $0.00 |

# Phillip Free Law, PLLC

Intellectual Property Counseling & Litigation

EIN: 83-4472430

14001 Quail Springs Parkway

Oklahoma City, OK 73134

Phone: 405-607-1494   |   Fax: 405-607-1450

## INVOICE

Coldiron Companies

Invoice Date: November 18, 2019
Invoice Number: 10100
Invoice Amount: $11,200.00

## Matter: Coldiron Specialized Company v. Jerry L. Trentham

**Attorney's Fees**



| Date | Description | Attorney | Hours | Amount |
|------|-------------|----------|-------|--------|
| 10/9/2019 | Redacted | P.L.F. | 4.50 | $1,575.00 |
| 10/10/2019 | Redacted | P.L.F. | 4.50 | $1,575.00 |
| 10/14/2019 | Redacted | P.L.F. | 3.80 | $1,330.00 |
| 10/18/2019 | Redacted | P.L.F. | .20 | $70.00 |
| 10/24/2019 | Redacted | P.L.F. | 2.80 | $980.00 |
| 10/25/2019 | Redacted | P.L.F. | 3.80 | $1,330.00 |
| 10/28/2019 | Redacted | P.L.F. | 4.50 | $1,575.00 |



| | | | | |
|---|---|---|---|---|
| 10/29/2019 | Redacted | P.L.F. | 3.50 | $1,225.00 |
| 10/30/2019 | Redacted | P.L.F. | 3.20 | $1,120.00 |
| 10/31/2019 | Redacted | P.L.F. | 1.20 | $420.00 |
| SUBTOTAL: | | | 32.00 | $11,200.00 |

**Costs**

| | |
|---|---|
| SUBTOTAL: | $0.00 |

**Matter Ledgers**

| | | |
|---|---|---|
| 11/17/2019 | Invoice 10100 | $11,200.00 |
| SUBTOTAL: | | $11,200.00 |

**Trust Account**

| | | |
|---|---|---|
| 11/17/2019 | Previous Balance | $0.00 |
| Available in Trust: | | $0.00 |

TOTAL $11,200.00

PREVIOUS BALANCE DUE $0.00

**CURRENT BALANCE DUE AND OWING $11,200.00**