ROBERT H. ROTSTEIN (SBN 72452), rxr@msk.com
EMILY F. EVITT (SBN 261491), efe@msk.com
JAMES D. BERKLEY (SBN 347919), jdb@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendant
Netflix, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| WHYTE MONKEE PRODUCTIONS, LLC, and TIMOTHY SEPI, <br><br> Plaintiffs, <br><br> v. <br><br> NETFLIX, INC. <br><br> Defendant. | CASE NO. 5:23-CV-03438-PCP <br><br> [The Honorable P. Casey Pitts] <br><br> *Removed from Superior Court for Santa Clara County Case No. 23CV413161* <br><br> **SUPPLEMENTAL DECLARATION OF JAMES D. BERKLEY IN SUPPORT OF DEFENDANT NETFLIX, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND** <br><br> Prior Hearing Date: Thursday, Dec. 14, 2023 <br> Time: 10:00am <br> Courtroom: 8 (4th Floor) |

Mitchell
Silberberg &
Knupp LLP

16140528.1

I, James D. Berkley, declare as follows:

1.      I am an attorney-at-law, duly licensed to practice law in the State of California and before this Court.  I am Special Counsel at the law firm of Mitchell Silberberg & Knupp LLP ("MSK"), and am counsel of record for Defendant Netflix, Inc. ("Netflix") in this action.  Unless otherwise noted, I know the following of my own personal knowledge and, if called as a witness, could and would competently testify thereto.

2.      Attached hereto as **Exhibit 23** is a true and correct copy of a of a web page containing a decision of the French Court of Cassation dated April 7, 1998, in the matter *Scania v. Diesel Technic de l'Ouest*, No. 96-13.712, which I accessed and caused to be printed on or about January 11, 2024 from the Uniform Resource Locator ("URL") https://www.legifrance.gouv.fr/juri/id/JURITEXT000007379298.

3.      Attached hereto as **Exhibit 24** is a true and correct copy of an automated English translation of the web page shown in Exhibit 23, reflecting the decision of the French Court of Cassation in *Scania v. Diesel Technic de l'Ouest*, that I created using the Google Chrome browser and caused to be printed on or about January 11, 2024.  To allow proper translation, references to "X…" were replaced by "XX…" prior to generating the translation.

4.      Attached hereto as **Exhibit 25** is a true and correct copy of a web page containing a decision of the French Court of Cassation dated January 30, 2007, in the matter *Jean Lamore v Universal City et al.*, No. 03-12.354, which I accessed and caused to be printed on or about January 11, 2024 from the URL https://www.courdecassation.fr/decision/607941da9ba5988459c41149.

5.      Attached hereto as **Exhibit 26** is a true and correct copy of an automated English translation of the same web page shown in Exhibit 25, reflecting the decision of the Court of Cassation in *Jean Lamore v Universal City et al.*, that I created using the Google Chrome browser, which I generated and caused to be printed on or about January 11, 2024.

6.      Attached hereto as **Exhibit 27** is a true and correct copy of Part III of the United Kingdom Private International Law (Miscellaneous Provisions) Act 1995, which I accessed and caused to be downloaded on or about December 30, 2023 via the URL https://www.legislation.gov.uk/ukpga/1995/42/part/III.

7.      Attached hereto as **Exhibit 28** is a true and correct copy of New Zealand's Private International Law (Choice of Law in Tort) Act 2017, which I accessed and caused to be downloaded on or about January 11, 2024 via the URL https://www.legislation.govt.nz/act/public/2017/0044/12.0/whole.html.

8.      Attached hereto as **Exhibit 29** is a true and correct copy of what I understand to be a an excerpt from Fromm/Nordemann, *Urheberrecht*, pre §§ 88-94, notes 110-113 (12th ed. 2018), obtained from the German legal database www.beck-online.de, which was accessed and retrieved at my direction on or about January 3, 2024.

9.      Attached hereto as **Exhibit 30** is a true and correct copy of an automated Google translation of the contents of note 111 in the above-referenced Exhibit 29, which I caused to be generated and printed from the URL http://translate.google.com on or about January 4, 2024.

10.     Attached hereto as **Exhibit 31** is a true and correct copy of a screenshot of an automated Google translation of a web page displaying information corresponding to the text referenced in the preceding paragraphs, which I accessed using the Google Chrome browser and caused to be printed on or about January 4, 2024 from the URL https://www.sack.de/fromm-nordemann-urheberrecht.

11.     Attached hereto as **Exhibit 32** is a true and correct copy of a web page titled "Canada's Approach to the Treaty-Making Process," which I accessed and caused to be printed on or about December 29, 2023 from the URL https://lop.parl.ca/sites/PublicWebsite/default/en_CA/ResearchPublications/200845E.

12.     Attached hereto as **Exhibit 33** is a true and correct copy of a web page titled "Treaties - International Law," addressing the law of Australia, that I accessed and caused to be printed on or about January 4, 2024 from the URL https://libguides.usc.edu.au/c.php?g=508794.

13.     Attached hereto as **Exhibit 34** is a true and correct copy of a web page titled "International Law and the Law of New Zealand," which I accessed and caused to be printed on or about January 4, 2024 from the URL http://www.nzlii.org/nz/other/nzlc/report/R34/R34-Part.html.

14.     Attached hereto as **Exhibit 35** is a true and correct copy of excerpts from the Canadian Copyright Act, which I accessed and caused to be downloaded on or about January 4, 2024 from the URL https://laws-lois.justice.gc.ca/PDF/C-42.pdf.

15.     Attached hereto as **Exhibit 36** is a true and correct copy of excerpts from the United Kingdom Copyright, Designs and Patents Act 1988 which I accessed and caused to be downloaded on or about January 4, 2024 from the URL https://www.legislation.gov.uk/ukpga/1988/48/data.pdf.

16.     Attached hereto as **Exhibit 37** is a true and correct copy of Article L113-7 of the French Intellectual Property Code, which I accessed and caused to be printed on or about January 4, 2024 from the URL https://www.legifrance.gouv.fr/codes/article_lc/LEGIARTI000006278887.

17.     Attached hereto as **Exhibit 38** is a true and correct copy of excerpts from an English translation of the French Intellectual Property Code, including Article L113-7, which I accessed and caused to be downloaded on or about January 4, 2024 from an archived URL available at https://web.archive.org/web/20150414201858/https://www.legifrance.gouv.fr/content/download/1959/13723/version/3/file/Code_35.pdf.

18.     Attached hereto as **Exhibit 39** is a true and correct copy of excerpts from Spain's Law on Intellectual Property, including Article 5(1), which I accessed and caused to be downloaded on or about January 4, 2024 from the URL https://www.wipo.int/wipolex/en/text/584952.

19.     Attached hereto as **Exhibit 40** is a true and correct copy of excerpts from an English translation of Spain's Law on Intellectual Property, including Article 5(1), which I accessed and caused to be printed from the URL https://www.wipo.int/wipolex/en/text/469194 on or about January 4, 2024.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of January, 2024, at Los Angeles, California.

By: _____
James D. Berkley

# EXHIBIT 23



# RÉPUBLIQUE FRANÇAISE

## Légifrance
Le service public de la diffusion du droit

*Liberté*
*Égalité*
*Fraternité*

### Cour de Cassation, Chambre civile 1, du 7 avril 1998, 96-13.712, Inédit

**Cour de cassation - Chambre civile 1**

N° de pourvoi : 96-13.712
Non publié au bulletin
Solution : Rejet

**Audience publique du mardi 07 avril 1998**

Décision attaquée : cour d'appel de Rennes (2e chambre) 1996-01-17, du 17 janvier 1996

**Président**
Président : M. LEMONTEY

## Texte intégral

### RÉPUBLIQUE FRANCAISE
### AU NOM DU PEUPLE FRANCAIS

AU NOM DU PEUPLE FRANCAIS

LA COUR DE CASSATION, PREMIERE CHAMBRE CIVILE, a rendu l'arrêt suivant :

Sur le pourvoi formé par :

1°/ la société Scania CV AB (anciennement SAAB X...), société de droit suédois, dont le siège est S 58188 - Linkoping (Suède),

2°/ la société X... France, société anonyme, dont le siège est ..., en cassation d'un arrêt rendu le 17 janvier 1996 par la cour d'appel de Rennes (2e chambre), au profit :

1°/ de la société Diesel Technic de l'Ouest, dont le siège est ...,

2°/ de la société Diesel Technic GMBH, dont le siège est D 2839, Kirchdorf (Allemagne), défenderesses à la cassation ;

Les demanderesses invoquent, à l'appui de leur pourvoi, le moyen unique de cassation annexé au présent arrêt ;

LA COUR, composée selon l'article L. 131-6, alinéa 2, du Code de l'organisation judiciaire, en l'audience publique du 4 mars 1998, où étaient présents : M. Lemontey, président, M. Ancel, conseiller rapporteur, M. Renard-Payen, conseiller, M. Sainte-Rose, avocat général, Mme Aydalot, greffier de chambre ;

Sur le rapport de M. Ancel, conseiller, les observations de Me Jacoupy, avocat des sociétés Scania CV AB et X... France, de Me Thomas-Raquin, avocat des sociétés Diesel Technic de l'Ouest et Diesel Technic GMBH, les conclusions de M. Sainte-Rose, avocat général, et après en avoir délibéré conformément à la loi ;

Sur le moyen unique, pris en ses six branches, tel qu'il est énoncé dans le mémoire en demande et reproduit en annexe :

Attendu que la cour d'appel (Rennes, 17 janvier 1996) a, sans dénaturation, légalement justifié sa décision déclarant la société suédoise X..., irrecevable, pour défaut de qualité, à agir en contrefaçon contre les sociétés Diesel Technic, pour la reproduction de dessins et schémas figurant des pièces d'automobile, en retenant que, selon le droit suédois déclaré compétent pour la définition de la titularité du droit d'auteur, il appartenait à la société X... de démontrer que les dessins étaient l'oeuvre de ses employés, qui lui auraient cédé leurs droits, ce qui ne résultait pas des attestations produites soumises à son appréciation souveraine ;

PAR CES MOTIFS :

REJETTE le pourvoi ;

Condamne les sociétés Scania CV AB et X... France aux dépens ;

Vu l'article 700 du nouveau Code de procédure civile, rejette la demande des sociétés Diesel Technic de l'Ouest et Diesel Technic GMBH ;

Ainsi fait et jugé par la Cour de Cassation, Première chambre civile, et prononcé par le président en son audience publique du sept avril mil neuf cent quatre-vingt-dix-huit.

# EXHIBIT 24

French Republic. Liberty, Equality, Fraternity.



Home
Légifrance.fr
- the public
service for
the
dissemination
of law

## Court of Cassation, Civil Chamber 1, of April 7, 1998, 96-13.712, Unpublished

**Court of Cassation - Civil Chamber 1**

Appeal number: 96-13.712
Not published in the bulletin
Solution: Rejection

**Public hearing of Tuesday April 7, 1998**

Contested decision: Rennes Court of Appeal (2nd chamber) 1996-01-17, of January 17, 1996

**President**
President: Mr. LEMONTEY

Full Text

## FRENCH REPUBLIC
## IN THE NAME OF THE FRENCH PEOPLE

IN THE NAME OF THE FRENCH PEOPLE

THE COURT OF CASSATION, FIRST CIVIL CHAMBER, rendered the following judgment:

On the appeal filed by:

1°/ the company Scania CV AB (formerly SAAB XX...), a company incorporated under Swedish law, whose head office is S 58188 - Linkoping (Sweden),

2°/ the company XX... France, public limited company, whose head office is..., in cassation of a judgment rendered on January 17, 1996 by the Court of Appeal of Rennes (2nd chamber), for the benefit of:

1°/ of the company Diesel Technic de l'Ouest, whose head office is ...,

2°/ of the company Diesel Technic GMBH, whose head office is D 2839, Kirchdorf (Germany), defendants in the cassation;

The plaintiffs invoke, in support of their appeal, the sole means of cassation annexed to this judgment;

THE COURT, composed according to article L. 131-6, paragraph 2, of the Code of judicial organization, at the public hearing of March 4, 1998, where were present: Mr. Lemontey, president, Mr. Ancel, advisor rapporteur, Mr. Renard-Payen, advisor, Mr. Sainte-Rose, advocate general, Ms. Aydalot, chamber clerk;

On the report of Mr. Ancel, advisor, the observations of Me Jacoupy, lawyer of the companies Scania CV AB and XX... France, of Me Thomas-Raquin, lawyer of the companies Diesel Technic de l'Ouest and Diesel Technic GMBH, the conclusions of Mr. Sainte-Rose, attorney general, and after having deliberated in accordance with the law;

On the single plea, taken in its six branches, as set out in the statement of claim and reproduced in the annex:

Whereas the Court of Appeal (Rennes, January 17, 1996) has, without distortion, legally justified its decision declaring the Swedish company XX..., inadmissible, for lack of quality, to take action for infringement against the Diesel Technic companies, for the reproduction of drawings and diagrams representing automobile parts, bearing in mind that, according to Swedish law declared competent for the definition of copyright ownership, it was up to the company XX... to demonstrate that the drawings were the work of its employees, who would have assigned their rights to it, which did not result from the certificates produced subject to its sovereign appreciation;

FOR THESE REASONS :

REJECTS the appeal;

Orders the companies Scania CV AB and XX... France to pay the costs;

Considering article 700 of the new Code of Civil Procedure, rejects the request of the companies Diesel Technic de l'Ouest and Diesel Technic GMBH;

Thus done and judged by the Court of Cassation, First Civil Chamber, and pronounced by the President in his public hearing on April 7, nineteen hundred and ninety-eight.

# EXHIBIT 25

Accueil > Décision

# 30 janvier 2007
# Cour de cassation
# Pourvoi n° 03-12.354

**Première chambre civile**
**PUBLIÉ AU BULLETIN**
ECLI:FR:CCASS:2007:C100129

## Titres et sommaires

---

CONVENTIONS INTERNATIONALES - accords et conventions divers - convention d'union de berne du 9 septembre 1886 - protection des oeuvres littéraires et artistiques - article 5 § 2 - contrefaçon - loi applicable - loi du lieu de commission des faits - conflit de lois - application de la loi étrangère - mise en oeuvre par le juge français - recherche de sa teneur - teneur - preuve - certificat de coutume - appréciation souveraine - lois et reglements - loi étrangère - appréciation souveraine conflit de lois - office du juge lois et reglements - office du juge - propriete litteraire et artistique - définition - détermination - portée

En application des dispositions de l'article 5 § 2 de la Convention d'Union de Berne du 9 septembre 1886, selon lesquelles la protection dûe à tout auteur d'un pays unioniste est exclusivement dévolue à la législation du pays où elle est réclamée, cette dernière désigne la loi de l'Etat sur le territoire duquel se sont produits les agissements délictueux et non celle du pays où le dommage a été subi

## Texte de la **décision**

---

Attendu que M.X..., soutenant que le roman de science-fiction Waterworld et le film de même titre, diffusés concomitamment en France en octobre 1995, l'un publié par la société Les Presses Solar, l'autre produit par la société américaine Universal City Studios et distribué par la société United International Pictures, contrefaisaient le livre " Tideworks ", écrit par lui en 1981, jamais publié mais enregistré au Copyright office le 15 avril 1995, a assigné les sociétés précitées et la société mère américaine MCA en réparation de son préjudice ; qu'il a été débouté et condamné pour procédure abusive ;

Sur le premier moyen :

Attendu qu'il est fait grief à l'arrêt attaqué (Paris,13 novembre 2002), d'avoir fait application au litige de la loi américaine, substituée par lui à la loi française appliquée en première instance, alors, selon le pourvoi, qu'aux termes de l'article 5 § 2 de la Convention de Berne, violé par fausse application, la protection due à tout auteur d'un pays unioniste est exclusivement dévolue à la législation du pays où elle est réclamée, ce qui désignerait celle de l'Etat sur le territoire duquel se produisent les agissements délictueux à propos desquels l'auteur revendique la protection de son oeuvre, et que, par suite, l'action en contrefaçon par

laquelle M.X... demandait réparation du préjudice subi en France et causé par la distribution et l'édition sur son territoire du film litigieux, ainsi que de la traduction française de son adaptation littéraire, devait être soumise à la loi française, peu important qu'il ait été originairement produit, adapté et exploité aux Etats-Unis ;

Mais attendu que, au sens de la disposition visée, la législation du pays où la protection est réclamée n'est pas celle du pays où le dommage est subi mais celle de l'Etat sur le territoire duquel se sont produits les agissements délictueux, l'obligation à réparation n'étant que la conséquence éventuelle de ceux-ci ; que la cour d'appel a retenu que le film avait été conçu, réalisé et représenté aux Etats-Unis et que le roman tiré de celui-ci avait été édité dans le même pays ; qu'elle en a exactement déduit que le droit américain était applicable ; d'où il suit que le moyen n'est pas fondé ;

Sur le deuxième moyen, pris en ses deux branches :

Attendu qu'il est aussi fait grief à la cour d'appel, qui a estimé que l'attestation de l'avocat américain Y... valait certificat de coutume quant au contenu de la loi américaine, faute pour M.X... d'établir le caractère erroné ou partial de ce document, d'avoir ainsi, d'une part et en violation des articles 3 du code civil et 12 du nouveau code de procédure civile, méconnu son devoir de s'enquérir elle-même de la teneur du droit étranger applicable, et d'autre part, en manque de base légale au regard de l'article 1315 du code civil, de s'être abstenue de rechercher si le certificat litigieux n'était pas privé de toute valeur par le passé de son auteur, ancien conseil des quatre sociétés attraites ;

Mais attendu que le juge qui déclare applicable un droit étranger, devant alors en rechercher la teneur, peut à cette fin recourir au concours des parties, et, par ailleurs, apprécie souverainement la valeur probante d'un certificat de coutume ; que, pour accorder crédit à l'affidavit d'après les enseignements duquel elle s'est déterminée, la cour d'appel a souligné, outre les éminentes qualifications professionnelles de son auteur, certes ancien conseil de la société Universal, les productions d'une traduction jurée et des plus importantes jurisprudences citées, ainsi que l'abstention de M.X... à tenter de contester, notamment par le biais d'un autre certificat de coutume pourtant aisé à obtenir, l'exposé fourni par les sociétés défenderesses sur le droit américain et son application ; d'où il suit que le moyen n'est pas davantage fondé ;

Et sur le troisième moyen, pris en ses sept branches :

Attendu que la cour d'appel, après avoir établi que le droit américain imposait au demandeur en contrefaçon de démontrer que le prétendu contrefacteur avait pu raisonnablement avoir accès à l'oeuvre antérieure avant de créer la sienne et qu'il existait entre elles des similitudes fondamentales ne s'expliquant que par la copie de la première par la seconde et portant sur son expression originale, a minutieusement relaté le contenu de " Tideworks " et de " Waterworld " ; qu'elle a relevé que, si leur commune inspiration consistait en un récit de science-fiction situé sur une terre recouverte par les eaux, cette idée ne pouvait faire l'objet d'une quelconque appropriation en dehors de la forme donnée, qu'aucun point de ressemblance n'était discernable dans leur thématique ou le déroulement de l'intrigue, que les personnages ne présentaient nullement les mêmes caractères, n'entretenaient pas les mêmes relations et ne jouaient pas le même rôle dans le déroulement dramatique de l'action, qu'aucune similitude substantielle portant sur des éléments d'expression protégeables n'existait entre les deux oeuvres, et que, par ailleurs, la loi française conduisait pareillement à exclure la contrefaçon ; que le moyen s'avère ainsi dépourvu de tout fondement ;

Et sur le quatrième moyen, pris en ses trois branches :

Attendu que la mention, dans le dispositif de l'arrêt, d'une confirmation du jugement " en toutes ses dispositions ", malgré le rejet en première instance de la demande reconventionnelle formée contre M.X... pour procédure abusive, résulte d'une erreur manifeste de rédaction que la Cour de cassation est à même de réparer par application de l'article 462 du nouveau code de procédure civile ; que, par ailleurs, la cour d'appel, a relevé que M.X..., qui ne pouvait sérieusement se méprendre sur l'étendue de ses droits, avait formulé son grief de contrefaçon au prix d'une présentation fallacieuse et déformée des deux oeuvres en présence et après avoir tardivement déposé la sienne au copyright tandis que le film, qui avait défrayé la chronique, était terminé et que sa sortie était annoncée à grand renfort de publicité ; qu'elle a pu en déduire une volonté persistante et délibérée de l'intéressé de porter atteinte à la crédibilité et à la probité des sociétés adverses ; d'où il suit que le moyen n'est pas plus fondé que les précédents ;

PAR CES MOTIFS :

REJETTE le pourvoi ;

DIT que le dispositif de l'arrêt attaqué, en sa page 17, sera rectifié comme suit : " Confirme par substitution de motifs la décision entreprise en toutes ses dispositions, sauf en ce qu'elle a rejeté la demande reconventionnelle formé contre M. Jean X... pour procédure abusive " ;

Condamne M.X... aux dépens ; Vu l'article 700 du nouveau code de procédure civile, condamne M.X... à payer la somme de 3 000 euros, ensemble, à la société Universal City Studios Inc, la société Les Presses Solar hors collection, la société United International Picture et la société MCA Inc ;

Ainsi fait et jugé par la Cour de cassation, première chambre civile, et prononcé par le président en son audience publique du trente janvier deux mille sept.

# Décision **attaquée**



**Cour d'appel de paris**
**13 novembre 2002**

# EXHIBIT 26

Welcome > Decision

# January 30, 2007
# Court of Cassation
# Appeal No. 03-12.354

**First Civil Chamber**
**PUBLISHED IN THE BULLETIN**
ECLI:FR:CCASS:2007:C100129

## Titles and summaries

INTERNATIONAL CONVENTIONS - various agreements and conventions - Berne Union Convention of September 9, 1886 - protection of literary and artistic works - article 5 § 2 - counterfeiting - applicable law - law of the place where the facts were committed - conflict of laws - application of foreign law - implemented by the French judge - research into its content - content - proof - certificate of custom - sovereign assessment - laws and regulations - foreign law - sovereign assessment conflict of laws - office of the judge laws and regulations - office of judge - literary and artistic property - definition - determination - scope

In application of the provisions of article 5 § 2 of the Berne Union Convention of September 9, 1886, according to which the protection due to any author from a unionist country is exclusively devolved to the legislation of the country where it is claimed, the latter designates the law of the State in whose territory the criminal acts occurred and not that of the country where the damage was suffered

## Text of the **decision**

Whereas MX.., maintaining that the science fiction novel Waterworld and the film of the same title, released concurrently in France in October 1995, one published by the company Les Presses Solar, the other produced by the American company Universal City Studios and distributed by the company United International Pictures, infringed the book "Tideworks", written by him in 1981, never published but registered with the Copyright office on April 15, 1995, sued the aforementioned companies and the American parent company MCA for compensation for its harm; that he was dismissed and sentenced for abusive procedure;

On the first ground:

Whereas the contested judgment (Paris, November 13, 2002) is criticized for having applied to the dispute American law, substituted by it for the French law applied in first instance, then , according to the appeal, that under the terms of Article 5 § 2 of the Berne Convention, violated by false application, the protection due to any author from a unionist country is exclusively devolved to the legislation of the country where it is claimed , which would designate that of the State on the territory of which the criminal acts occur in

respect of which the author claims protection of his work, and that, consequently, the infringement action by which Mr. damage suffered in France and caused by the distribution and edition on its territory of the disputed film, as well as the French translation of its literary adaptation, had to be subject to French law, regardless of whether it was originally produced, adapted and operated in the United States;

But given that, within the meaning of the provision referred to, the legislation of the country where protection is claimed is not that of the country where the damage is suffered but that of the State in whose territory the criminal acts occurred, the obligation to compensate is only the possible consequence of these; that the court of appeal held that the film had been conceived, produced and presented in the United States and that the novel based on it had been published in the same country; that she accurately deduced that American law was applicable; from which it follows that the plea is unfounded;

On the second plea, taken in its two branches:

Whereas the court of appeal is also criticized, which considered that the attestation of the American lawyer Y... was equivalent to a certificate of custom as to the content of American law, fault on the part of MX... of establish the erroneous or partial nature of this document, to have thus, on the one hand and in violation of articles 3 of the civil code and 12 of the new code of civil procedure, disregarded its duty to inquire into the content itself applicable foreign law, and on the other hand, lacking a legal basis with regard to Article 1315 of the Civil Code, to have refrained from investigating whether the disputed certificate was not deprived of any value in the past of its author, former advisor to the four companies involved;

But given that the judge who declares a foreign law applicable, having then to investigate its content, can for this purpose resort to the assistance of the parties, and, moreover, sovereignly assesses the probative value of a certificate of custom; that, to give credence to the affidavit on the basis of which it made its determination, the court of appeal underlined, in addition to the eminent professional qualifications of its author, admittedly a former advisor to the Universal company, the productions of a sworn translation and the most important case law cited, as well as the abstention of Mr. American law and its application; from which it follows that the plea is not well-founded either;

And on the third ground, taken in its seven branches:

Whereas the court of appeal, after establishing that American law required the plaintiff for infringement to demonstrate that the alleged infringer could reasonably have had access to the prior work before create his own and that there were fundamental similarities between them which could only be explained by the copying of the first by the second and relating to its original expression, meticulously recounted the content of "Tideworks" and "Waterworld"; that she noted that, if their common inspiration consisted of a science fiction story set on a land covered by water, this idea could not be the subject of any appropriation outside the given form, that no point of resemblance was discernible in their theme or the development of the plot, that the characters did not present the same characters, did not maintain the same relationships and did not play the same role in the dramatic development of the story. action, that no substantial similarity relating to elements of protectable expression existed between the two works, and that, moreover, French law similarly led to the exclusion of counterfeiting; that the plea thus proves to be devoid of any basis;

And on the fourth ground, taken in its three branches:

Whereas the mention, in the operative part of the judgment, of a confirmation of the judgment "in all its provisions", despite the rejection in first instance of the counterclaim filed against MX.. for abusive procedure, results from a manifest editorial error which the Court of Cassation is able to repair by application of article 462 of the new code of civil procedure; that, moreover, the court of appeal noted that MX..., who could not seriously misunderstand the extent of his rights, had formulated his complaint of infringement at the cost of a fallacious and distorted presentation of the two works in the presence and after having belatedly registered his copyright while the film, which had hit the headlines, was finished and its release was announced with great publicity; that she was able to deduce a persistent and deliberate desire on the part of the person concerned to undermine the credibility and probity of the opposing companies; from which it follows that the plea is no more founded than the preceding ones;

FOR THESE REASONS:

REJECTS the appeal;

SAYS that the operative part of the contested judgment, on page 17, will be corrected as follows: "Confirms by substitution of reasons the decision taken in all its provisions, except in that it rejected the counterclaim filed against Mr. Jean X... for abusive procedure ";

Orders MX... to pay the costs; Having regard to article 700 of the new code of civil procedure, orders MX...

to pay the sum of 3,000 euros, together, to the company Universal City Studios Inc, the company Les Presses Solar hors collection, the company United International Picture and the company MCA Inc;

Thus done and judged by the Court of Cassation, first civil chamber, and pronounced by the president in his public hearing on January 30, two thousand and seven.

## Decision **contested**



**Paris Court of Appeal**
**November 13, 2002**

# EXHIBIT 27



# Private International Law (Miscellaneous Provisions) Act 1995

## 1995 CHAPTER 42

### PART III

#### Choice of Law in Tort and Delict

**9**     **Purpose of Part III.**

(1) The rules in this Part apply for choosing the law (in this Part referred to as "the applicable law") to be used for determining issues relating to tort or (for the purposes of the law of Scotland) delict.

(2) The characterisation for the purposes of private international law of issues arising in a claim as issues relating to tort or delict is a matter for the courts of the forum.

(3) The rules in this Part do not apply in relation to issues arising in any claim excluded from the operation of this Part by section 13 below.

(4) The applicable law shall be used for determining the issues arising in a claim, including in particular the question whether an actionable tort or delict has occurred.

(5) The applicable law to be used for determining the issues arising in a claim shall exclude any choice of law rules forming part of the law of the country or countries concerned.

(6) For the avoidance of doubt (and without prejudice to the operation of section 14 below) this Part applies in relation to events occurring in the forum as it applies in relation to events occurring in any other country.

(7) In this Part as it extends to any country within the United Kingdom, "the forum" means England and Wales, Scotland or Northern Ireland, as the case may be.

(8) In this Part "delict" includes quasi-delict.

Case 5:23-cv-03438-PCP    Document 38-1    Filed 01/12/24    Page 19 of 81

2    *Private International Law (Miscellaneous Provisions) Act 1995 (c. 42)*
*PART III – Choice of Law in Tort and Delict*
*Document Generated: 2023-05-06*

*Changes to legislation:* There are currently no known outstanding effects for the Private
International Law (Miscellaneous Provisions) Act 1995, PART III. (See end of Document for details)

**10    Abolition of certain common law rules.**

The rules of the common law, in so far as they—

(a)  require actionability under both the law of the forum and the law of another country for the purpose of determining whether a tort or delict is actionable; or

(b)  allow (as an exception from the rules falling within paragraph (a) above) for the law of a single country to be applied for the purpose of determining the issues, or any of the issues, arising in the case in question,

are hereby abolished so far as they apply to any claim in tort or delict which is not excluded from the operation of this Part by section 13 below.

**11    Choice of applicable law: the general rule.**

(1) The general rule is that the applicable law is the law of the country in which the events constituting the tort or delict in question occur.

(2) Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being—

(a)  for a cause of action in respect of personal injury caused to an individual or death resulting from personal injury, the law of the country where the individual was when he sustained the injury;

(b)  for a cause of action in respect of damage to property, the law of the country where the property was when it was damaged; and

(c)  in any other case, the law of the country in which the most significant element or elements of those events occurred.

(3) In this section "personal injury" includes disease or any impairment of physical or mental condition.

**12    Choice of applicable law: displacement of general rule.**

(1) If it appears, in all the circumstances, from a comparison of—

(a)  the significance of the factors which connect a tort or delict with the country whose law would be the applicable law under the general rule; and

(b)  the significance of any factors connecting the tort or delict with another country,

that it is substantially more appropriate for the applicable law for determining the issues arising in the case, or any of those issues, to be the law of the other country, the general rule is displaced and the applicable law for determining those issues or that issue (as the case may be) is the law of that other country.

(2) The factors that may be taken into account as connecting a tort or delict with a country for the purposes of this section include, in particular, factors relating to the parties, to any of the events which constitute the tort or delict in question or to any of the circumstances or consequences of those events.

**13    Exclusion of defamation claims from Part III.**

(1) Nothing in this Part applies to affect the determination of issues arising in any defamation claim.

(2) For the purposes of this section "defamation claim" means—

Case 5:23-cv-03438-PCP    Document 38-1    Filed 01/12/24    Page 20 of 81

*Private International Law (Miscellaneous Provisions) Act 1995 (c. 42)*    3
*PART III – Choice of Law in Tort and Delict*
*Document Generated: 2023-05-06*

*Changes to legislation:* There are currently no known outstanding effects for the Private
International Law (Miscellaneous Provisions) Act 1995, PART III. (See end of Document for details)

   (a)   any claim under the law of any part of the United Kingdom for libel or slander or for slander of title, slander of goods or other malicious falsehood and any claim under the law of Scotland for verbal injury; and

   (b)   any claim under the law of any other country corresponding to or otherwise in the nature of a claim mentioned in paragraph (a) above.

**14     Transitional provision and savings.**

(1) Nothing in this Part applies to acts or omissions giving rise to a claim which occur before the commencement of this Part.

(2) Nothing in this Part affects any rules of law (including rules of private international law) except those abolished by section 10 above.

(3) Without prejudice to the generality of subsection (2) above, nothing in this Part—

   (a)   authorises the application of the law of a country outside the forum as the applicable law for determining issues arising in any claim in so far as to do so—

       (i) would conflict with principles of public policy; or

       (ii) would give effect to such a penal, revenue or other public law as would not otherwise be enforceable under the law of the forum; or

   (b)   affects any rules of evidence, pleading or practice or authorises questions of procedure in any proceedings to be determined otherwise than in accordance with the law of the forum.

(4) This Part has effect without prejudice to the operation of any rule of law which either has effect notwithstanding the rules of private international law applicable in the particular circumstances or modifies the rules of private international law that would otherwise be so applicable.

**15     Crown application.**

(1) This Part applies in relation to claims by or against the Crown as it applies in relation to claims to which the Crown is not a party.

(2) In subsection (1) above a reference to the Crown does not include a reference to Her Majesty in Her private capacity or to Her Majesty in right of Her Duchy of Lancaster or to the Duke of Cornwall.

(3) Without prejudice to the generality of section 14(2) above, nothing in this section affects any rule of law as to whether proceedings of any description may be brought against the Crown.

**[F1 15A.   Disapplication of Part III where the rules in the Rome II Regulation apply.**

(1) Nothing in this Part applies to affect the determination of issues relating to tort which fall to be determined under the Rome II Regulation.

**[F2(2)** In this section "the Rome II Regulation" means Regulation (EC) No. 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations as that Regulation has effect as retained direct EU legislation (including that Regulation as applied by regulation 6 of the Law Applicable to Non-Contractual Obligations (England and Wales and Northern Ireland) Regulations 2008), unless the

issues are ones in respect of which Regulation (EC) No. 864/2007 has effect by virtue of Article 66 of the EU withdrawal agreement, in which case it means that Regulation as it has effect by virtue of that Article.]

(3) This section extends to England and Wales and Northern Ireland only.]

---

**Textual Amendments**

**F1**    S. 15A inserted (E.W.N.I.) (11.1.2009) by The Law Applicable to Non-Contractual Obligations (England and Wales and Northern Ireland) Regulations 2008 (S.I. 2008/2986), regs. 1(1), **2**

**F2**    S. 15A(2) substituted (31.12.2020) by The Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (EU Exit) Regulations 2019 (S.I. 2019/834), regs. 1, **4(2)** (as substituted by S.I. 2020/1574, regs. 1, **6(5)**)

---

## [F315B    Disapplication of Part III where the rules in the Rome II Regulation apply: Scotland

(1) Nothing in this Part applies to affect the determination of issues relating to delict which fall to be determined under the Rome II Regulation.

[F4(2) In this section "the Rome II Regulation" means Regulation (EC) No. 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations as that Regulation has effect as retained direct EU legislation (including that Regulation as applied by regulation 4 of the Law Applicable to Non-Contractual Obligations (Scotland) Regulations 2008), unless the issues are ones in respect of which Regulation (EC) No. 864/2007 has effect by virtue of Article 66 of the EU withdrawal agreement, in which case it means that Regulation as it has effect by virtue of that Article.]

(3) This section extends to Scotland only.]

---

**Textual Amendments**

**F3**    S. 15B inserted (S.) (11.1.2009) by The Law Applicable to Non-Contractual Obligations (Scotland) Regulations 2008 (S.S.I. 2008/404), regs. 1(1), **2(a)**

**F4**    S. 15B(2) substituted (31.12.2020) by The Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (EU Exit) Regulations 2019 (S.I. 2019/834), regs. 1, **4(3)** (as substituted by S.I. 2020/1574, regs. 1, **6(5)**)

---

**Changes to legislation:**
There are currently no known outstanding effects for the Private International Law (Miscellaneous Provisions) Act 1995, PART III.

# EXHIBIT 28



# Private International Law (Choice of Law in Tort) Act 2017

| | |
|---|---|
| Public Act | 2017 No 44 |
| Date of assent | 4 December 2017 |
| Commencement | see section 2 |

## Contents

| | | Page |
|---|---|---|
| 1 | Title | 2 |
| 2 | Commencement | 2 |

**Part 1**
**Preliminary provisions**

| | | |
|---|---|---|
| 3 | Purpose | 2 |
| 4 | Transitional, savings, and related provisions | 2 |
| 5 | Interpretation | 2 |
| 6 | Act binds the Crown | 2 |

**Part 2**
**Substantive provisions**

| | | |
|---|---|---|
| 7 | General principles | 2 |
| 8 | General rule | 3 |
| 9 | When general rule displaced | 3 |
| 10 | Rule of double actionability and related common law rules abolished | 4 |
| 11 | Relationship between Act and other rules of law | 4 |

**Schedule 1**    6
**Transitional, savings, and related provisions**

**The Parliament of New Zealand enacts as follows:**

**1     Title**

This Act is the Private International Law (Choice of Law in Tort) Act 2017.

**2     Commencement**

This Act comes into force 15 days after the date on which it receives the Royal assent.

# Part 1
# Preliminary provisions

**3     Purpose**

The purpose of this Act is to establish rules for choosing the law to be used for determining issues relating to tort.

**4     Transitional, savings, and related provisions**

The transitional, savings, and related provisions set out in Schedule 1 have effect according to their terms.

**5     Interpretation**

In this Act, unless the context otherwise requires,—

**applicable law** means the law to be used for determining issues relating to tort

**claim** means a claim in tort

**country** means a country in the sense of private international law.

**6     Act binds the Crown**

(1)   This Act binds the Crown.

(2)   Nothing in this Act limits or affects the application of the Crown Proceedings Act 1950 in respect of any claim in tort by or against the Crown.

Compare: Private International Law (Miscellaneous Provisions) Act 1995 s 15 (UK)

# Part 2
# Substantive provisions

**7     General principles**

(1)   The characterisation for the purposes of private international law of issues arising in a claim as issues relating to tort is a matter for the courts of New Zealand.

(2)   The applicable law is to be used for determining the issues arising in a claim that have been characterised as relating to tort, including the question of whether an actionable tort has occurred.

(3) The applicable law excludes any choice of law rules forming part of the law of the country or countries concerned.

(4) To avoid doubt, this Act applies in relation to events occurring in New Zealand as well as to events occurring in any other country.

Compare: Private International Law (Miscellaneous Provisions) Act 1995 s 9 (UK)

## 8 General rule

(1) The general rule is that the applicable law is the law of the country in which the events constituting the tort in question occur.

(2) Where elements of those events occur in different countries, the applicable law under the general rule is,—

(a) for a cause of action in respect of personal injury caused to an individual or death arising from personal injury, the law of the country where the individual was when he or she sustained the injury; and

(b) for a cause of action in respect of damage to property, the law of the country where the property was when it was damaged; and

(c) in any other case, the law of the country in which the most significant element or elements of those events occurred.

(3) In this section, **personal injury**—

(a) means a physical, mental, or physical and mental injury (even if the injury causes death); and

(b) includes disease or infection.

Compare: 2010 No 110 s 17(4), (5); Private International Law (Miscellaneous Provisions) Act 1995 s 11 (UK)

## 9 When general rule displaced

(1) The general rule is displaced if the court determines in accordance with subsection (2) that in all the circumstances it is substantially more appropriate for the law of another country (**country B**) to be the applicable law.

(2) The court must make its determination by comparing the following:

(a) the significance of the factors that connect a tort with the country whose law would be the applicable law under the general rule; and

(b) the significance of any factors connecting the tort with any other country.

(3) The factors that may be taken into account as connecting a tort with a country for the purposes of this section include, but are not limited to, factors relating to—

(a) the parties; or

(b) any of the events that constitute the tort in question; or

(c) any of the circumstances or consequences of those events.

**Private International Law (Choice of Law in Tort) Act
2017**

(4) If the general rule is displaced under this section, the law of country B (excluding any choice of law rules forming part of the law of that country, in accordance with section 7(3)) applies for the purposes of determining the issues, or any issue, arising in the case.

Compare: Private International Law (Miscellaneous Provisions) Act 1995 s 12 (UK)

**10    Rule of double actionability and related common law rules abolished**

The following rules of common law, to the extent that they apply to a claim in tort, are abolished:

(a) the rules of common law, to the extent that they require actionability under both New Zealand law and the law of another country, for the purpose of determining whether a tort is actionable:

(b) the rules of common law, to the extent that they allow (as an exception from the rules falling within paragraph (a)) for the law of a single country to be applied for the purposes of determining the issues, or any of the issues, arising in the case in question.

Compare: Private International Law (Miscellaneous Provisions) Act 1995 s 10 (UK)

**11    Relationship between Act and other rules of law**

(1) Nothing in this Act affects any rule of law (including rules of private international law) other than the rules that section 10 abolishes.

(2) Without limiting the generality of subsection (1), nothing in this Act—

(a) authorises the application of the law of a country outside New Zealand as the applicable law to the extent that doing so—

(i) would conflict with principles of public policy; or

(ii) would give effect to such a penal, revenue, or other public law as would not otherwise be enforceable under the law of New Zealand; or

(b) affects any rules of evidence, pleading, or practice, or authorises questions of procedure in any proceedings, to be determined otherwise than in accordance with the law of New Zealand; or

(c) precludes recognition or development of a choice of law rule giving effect to an agreement as to the applicable law.

(3) To avoid doubt, subsection (2)(b) must be applied in accordance with the rules of New Zealand private international law in force at the time that the rules or questions referred to in that provision fall to be applied or determined in relation to a claim.

(4) This Act has effect without prejudice to the operation of any New Zealand rule of law that—

(a) has effect despite the rules of private international law applicable in the particular circumstances; or

(b)    modifies the rules of private international law that would otherwise be applicable in the particular circumstances.

Compare: Private International Law (Miscellaneous Provisions) Act 1995 s 14 (2)–(4) (UK)

# Schedule 1
# Transitional, savings, and related provisions

s 4

# Part 1
# Provision relating to this Act as enacted

### 1    Transitional provision

Nothing in this Act applies to acts or omissions that give rise to a claim that occur before the commencement of this Act.

### Legislative history

| | |
|---|---|
| 22 September 2016 | Introduction (Bill 181–1) |
| 7 December 2016 | First reading and referral to Justice and Electoral Committee |
| 7 June 2017 | Reported from Justice and Electoral Committee (Bill 181–2) |
| 28 June 2017 | Second reading |
| 26 July 2017 | Committee of the whole House |
| 29 November 2017 | Third reading |
| 4 December 2017 | Royal assent |

This Act is administered by the Ministry of Justice.

Wellington, New Zealand:

Published under the authority of the New Zealand Government—2017

# EXHIBIT 29

## f) Wahrnehmung von Rechten durch Verwertungsgesellschaften:

Im Hinblick auf **Filmmusik** ist zwischen Synchronisationsrecht und Auswertungsrecht zu unterscheiden: Das **Synchronisationsrecht** für das Musikwerk (Komposition und Text) liegt zwar grds. bei der musikalischen Verwertungsgesellschaft GEMA. Die Wahrnehmungsbefugnis ist aber auflösend bedingt; im Regelfall nimmt der Urheber (oder sein Musikverlag) das Recht selbst wahr (dazu vgl. § 88 Rn. 36). Für die **Auswertung** werden Filmrechte umfassend durch die musikalische Verwertungsgesellschaft GEMA **(Musikurheber)** und tw. auch durch die GVL **(ausübende Künstler, Tonträgerhersteller, Filmhersteller)** wahrgenommen, und zwar sowohl bei Verleih (vgl. Rn. 71 ff.) als auch bei Video/DVD (vgl. Rn. 83 ff.) als auch bei Sendung (vgl. Rn. 97 ff.). Auch für die Nutzung von Filmmusik durch On-Demand im Internet beansprucht die GEMA eine umfassende Wahrnehmungsbefugnis, was aber etwas zweifelhaft ist (vgl. Rn. 90 ff.). **Werbespots** sind eigenständige Nutzungsarten und gem. § 1k GEMA-Berechtigungsvertrag von der kollektiven Rechtewahrnehmung nicht gedeckt (OLG Hamburg GRUR 1991, 599, 600 – *Rundfunkwerbung*; zum Werbebegriff OLG München NJW 1998, 1413, 1415 – *O Fortuna*). Darunter fallen auch eigene Programmtrailer eines Fernsehsenders, da es für den Urheber weniger wichtig ist, wer die werbliche Ankündigung herstellt, als dass er mit seiner Einwilligung die werbliche Verwendung des Werkes steuern kann (OLG München NJW 1998, 1413, 1415 – *O Fortuna*). Allerdings ist die **Eigenwerbung** für die filmische Nutzung (Kino, Video/DVD, Fernsehen etc.) unter Verwendung der existierenden Filmmusik GEMA-frei, weil die Werbung für eine erlaubte Nutzung keine relevante Nutzung ist (vgl. § 31 Rn. 64; Praxis der GEMA tw. anders). Zur Praxis der GEMA im Bereich Filmmusik allgemein *Kyre* UFITA 2011, 81, 86 ff.; *Becker* ZUM 1999, 16, 19 ff.

**110**

Eine Wahrnehmung der Filmmusikrechte insb. durch die GEMA scheidet aus, wenn sie die Rechte weder von einem Mitglied noch von einer ausländischen Schwesterorganisation erhalten hat. Das erscheint z. B. dann ausgeschlossen, wenn es sich um Filmmusik handelt, die in den USA als **„work made for hire"** beispielsweise durch einen Arbeitnehmer für einen Arbeitgeber speziell für einen bestimmten Film geschaffen wurde. Nach US-Urheberrecht wird dann der Arbeitgeber „Urheber", nach deutschem internationalen Urheberprivatrecht bleibt davon zumindest eine ausschließliche Rechteeinräumung an den Arbeitgeber nach US-Vertragsstatut übrig (*Wilhelm Nordemann/Jan Bernd Nordemann* FS Schricker II S. 473 ff.; s. a. den Parteivortrag, wiedergegeben in BGH GRUR 1988, 296, 297 – *GEMA-Vermutung IV*; vgl. Vor § 120 ff. Rn. 84). Dann wird bedingt durch die Mitgliedschaft des Urhebers in der GEMA durch die mit „work for hire" verbundene ausschließliche Rechteinräumung nach US-Vertragsstatut die Wahrnehmungsbefugnis der GEMA durchbrochen (so auch LG München I Urteil vom 26.11.1985, Az. 7 O 17215/85 (n. v.); ferner *Jan Bernd Nordemann* JCSUSA (2006) 53, 603, 614; *Heyde* FS Mathias Schwarz S. 149, 162 ff.). Auch nach der Praxis der GEMA nimmt die GEMA Rechte an dieser Filmmusik nicht wahr. Eine Ausnahme gilt für bestimmte Senderechte an Filmmusik, die die GEMA über Gegenseitigkeitsvereinbarungen mit ausländischen Verwertungsgesellschaften, z. B. der ASCAP, beansprucht (dazu *Heyde* FS Mathias Schwarz S. 149, 162 ff., 168). Werden Musiktexte, die als work for hire geschaffen wurden und von ihr nicht wahrgenommen werden, durch ein GEMA-Mitglied übersetzt, beansprucht die GEMA zumindest 50 % des einschlägigen Tarifs.

**111**

Die VG Wort nimmt für Wortautoren insb. im Sendebereich Rechte wahr (vgl. Rn. 97 ff.), die VG BildKunst für die Berufsgruppe I (Bildende Künstler) und für die Berufsgruppe II (Fotografen, Designer) vor allem im Bereich Verleih (vgl. Rn. 68 ff.) und Sendung (vgl. Rn. 97 ff.), für die Berufsgruppe III (Filmurheber) allerdings nur in sehr begrenztem Umfang (s. a. auch die Wahrnehmungsverträge der VG BildKunst, www.bildkunst.de).

**112**

Urhebern, ausübenden Künstlern und Produzenten (als Inhaberin des Leistungsschutzrechts gemäß § 94 Abs. 4) stehen über dies **gesetzliche Vergütungsansprüche** gemäß §§ 20b Abs. 2, 27 Abs. 2, 46 Abs. 4, 47 Abs. 2, 54 ff. zu. Diese sind gemäß §§ 20b Abs. 2, 27 Abs. 2, 63a im Voraus nicht verzichtbar und

**113**

© Verlag C.H.BECK oHG 2024

können im Voraus nur an eine Verwertungsgesellschaft abgetreten werden; zu Vorausabtretungen an Fernsehanstalten bei der Auftragsproduktion vgl. Rn. 59; zu bestimmten Gestaltungsmöglichkeiten vgl. § 63a Rn. 14 ff. Die gesetzlichen Vergütungsansprüche werden von verschiedenen Verwertungsgesellschaften wahrgenommen, beispielsweise GEMA, GVL, VG Wort, VG BildKunst, VFF, GWFF, VGF und VG Media.

□ Verlag C.H.BECK oHG 2024

# EXHIBIT 30



**Google** Translate

⚙ ⋮⋮⋮ [Sign in]

---

Text | Images | Websites

German - Detected   English   Spanish   French   ⌄     ⇄     **English**   Spanish   Arabic   ⌄

Eine Wahrnehmung der Filmmusikrechte insb. durch die GEMA scheidet aus, wenn sie die Rechte weder von einem Mitglied noch von einer ausländischen Schwesterorganisation erhalten hat. Das erscheint z.b. dann ausgeschlossen, wenn es sich um Filmmusik handelt, die in den USA als „work made for hire" beispielsweise durch einen Arbeitnehmer für einen Arbeitgeber speziell für einen bestimmten Film geschaffen wurde. Nach US-Urheberrecht wird dann der Arbeitgeber „Urheber", nach deutschem internationalen Urheberprivatrecht bleibt davon zumindest eine ausschließliche Rechteeinräumung an den Arbeitgeber nach US-Vertragsstatut übrig (Wilhelm Nordemann/Jan Bernd Nordemann FS Schricker II S. 473 ff.; s. a. den Parteivortrag, wiedergegeben in BGH GRUR 1988, 296, 297 – GEMA-Vermutung IV; vgl. Vor §§ 120 ff. Rn. 84). Dann wird selbst bei Mitgliedschaft des Urhebers in der GEMA durch die mit „work for hire" verbundene ausschließliche Rechtseinräumung nach US-Vertragsstatut die Wahrnehmungsbefugnis der GEMA durchbrochen (so auch LG München I Urteil vom 26.11.1985, Az. 7 O 17215/85 (n. v.); ferner Jan Bernd Nordemann JCSUSA (2006) 53, 603, 614; Heyde FS Mathias Schwarz S. 149, 162 ff.,). Auch nach der Praxis der GEMA nimmt die GEMA Rechte an dieser

GEMA in particular cannot exercise film music rights if it has not received the rights from either a member or a foreign sister organization. This appears, for example, excluded if it is film music that was created in the USA as "work made for hire", for example by an employee for an employer specifically for a specific film. According to US copyright law, the employer then becomes the "author", and according to German international private copyright law, what remains is at least an exclusive grant of rights to the employer according to the US contractual statute (Wilhelm Nordemann/Jan Bernd Nordemann FS Schricker II p. 473 ff.; see also the party presentation, reproduced in BGH GRUR 1988, 296, 297 - GEMA presumption IV; cf. before §§ 120 ff. Rn. 84). Then, even if the author is a member of GEMA, the exclusive granting of rights associated with "work for hire" under the US contractual statutes violates GEMA's authority to exercise responsibility (also the LG Munich I judgment of November 26, 1985, Ref. 7 O 17215/85 ( n.v.); also Jan Bernd Nordemann JCSUSA (2006) 53, 603, 614; Heyde FS Mathias Schwarz p. 149, 162 ff.,). Even according to GEMA's practice, GEMA does not recognize the rights to this film music. An exception applies to certain broadcasting rights to film music, which GEMA obtains through reciprocity agreements with foreign collecting societies, e.g. B. the ASCAP, claimed (see Heyde FS Mathias Schwarz p. 149, 162 ff., 168). If music texts that were created as work for hire and are not recognized by the GEMA member are translated by a GEMA member, GEMA will claim at least 50% of the relevant tariff.

1,702 / 5,000

*Send feedback*



History

Saved

Contribute

# EXHIBIT 31



← → C ⌂ 🔒 sack.de/fromm-nordemann-urheberrecht

# Sack

Your online bookstore for
law, business and taxes

All ▾ | Title, ISBN, author, publisher... | **Seek**

**Right** | Steer | Business | Other specialist areas | Legal databases | Further training | Legal Tech | SackBusiness | Services | Cur

Fromm / Nordemann | Copyright | Book

## Fromm / Nordemann copyright

Commentary on the Copyright Act, Publishing Act, Unification Treaty (Copyright), new: on the EU Portability Regulation
12th, expanded and revised edition 2018
ISBN: 978-3-17-034406-8
Publisher: Kohlhammer

**€250.00**  (including VAT)

🟢 Ready to ship immediately, delivery time: 1-3 working days

**Add to Cart**    [−] [ 1 ] [+]

🖨 Free shipping on books
⇄ free return

Web code: sack.de/dkio5

📖 Book, German, 2990 pages, format (W × H): 165 mm x 245 mm, weight: 2115 g

Row:Law and administration, comments

**New edition:**
* copyright
  13th revised edition 2024, 978-3-17-043860-6

**Also available as an e-book:**
* Share EPB
  12th expanded and revised edition 2018, 978-3-17-034408-2, eBook, EPUB, Digital watermarking

The Fromm/Nordemann is the oldest commentary on the copyright law and, like the copyright law, celebrated its 50th anniversary in 2016. Since its first edition in 1966, it has become a standard commentary on copyright practice.

The 12th edition follows on from this tradition. It also sees itself as an explanatory work by practitioners for practitioners. This reflects the composition of the author team, which consists of lawyers and legal advisors with many years of experience in all areas of copyright law. Thanks to its clear, understandable and practical language, Fromm/Nordemann is also suitable for reading by non-lawyers. Since the last edition, copyright law has undergone numerous changes. Particularly noteworthy here is the law to improve the enforcement of the right of authors and performers to appropriate remuneration and to regulate questions of publisher participation, with which the legislature once again intervenes in copyright contract law.

All legal innovations, including the Copyright Science Act, which was only passed by the Bundestag on June 30, 2017, as well as current case law at European and national levels, were taken into account and incorporated by the authors. In addition to the Copyright Act, the Publishing Act will also be commented on in detail. What is new is the commentary on the Portability Regulation, the first EU regulation in the area of copyright. In addition, there are new independent comments on plagiarism in science and open source software.

# EXHIBIT 32

**Canada's Approach to the Treaty-Making Process**
HillStudies

**Laura Barnett,** Legal and Social Affairs Division

Publication No. 2008-45-E
PDF 2.39 MB, (19 Pages) 📕 (/staticfiles/PublicWebsite/Home/ResearchPublications/HillStudies/2008-45-e.pdf)
2021-04-01

About this publication

# Contents

Executive Summary
1 Introduction
2 Authority Respecting International Treaties
3 The Treaty-Making Process
    3.1 Negotiations
    3.2 Signature
    3.3 Ratification and Implementation
        3.3.1 Ratification
        3.3.2 Implementation
    3.4 Coming into Force
4 Compliance and Enforcement Mechanisms
    4.1 Enforcement on an International Scale
    4.2 Federal Accountability
    4.3 Cooperation with the Provinces
5 Conclusion
Notes

# Executive Summary

In Canada, the treaty-making process is controlled by the executive branch of the federal government, while the Parliament of Canada ("Parliament") is often responsible for passing legislation to implement international treaties at the federal level. The treaty-making process is made up of five broad stages: negotiation, signature, ratification, implementation and coming into force.

The Minister of Foreign Affairs is technically responsible for negotiating international treaties on Canada's behalf. In practice, Global Affairs Canada plays a supervisory role during negotiations with foreign states and international organizations, along with other relevant government departments, depending on the subject matter. Treaty negotiations most often occur behind closed doors, although negotiations of multilateral treaties may sometimes be more transparent and open to civil society.

Once negotiators agree on the text of an agreement, Cabinet must give its approval before the treaty can be signed on Canada's behalf. Such a signature indicates that Canada agrees in principle with the treaty and intends to abide by its terms. After signature, the government must not take any actions that go against the object or purpose of the treaty.

Canada becomes bound by a treaty after ratification. Once all the formalities for the implementation and coming into force of the treaty are in place, Cabinet authorizes the Minister of Foreign Affairs to ratify the treaty. Although this entire process is controlled by the executive branch, the federal government does involve Parliament in this stage of the treaty-making process by tabling treaties and relevant explanatory documents for debate in the House of Commons.

As well, the executive branch cannot ratify an international treaty until measures are in place to ensure that the terms of the agreement are implemented in Canadian law. In some cases, this means that domestic laws must be passed by Parliament before ratification. In other cases, the federal government, after consultations with provinces and territories and other stakeholders, may consider that Canada's laws are already consistent with the international treaty obligations.

A treaty comes into force according to the terms of the treaty itself – this may mean that the treaty comes into force on a specific date or after it has been ratified by a certain number of countries.

A wide variety of international mechanisms exist for the enforcement of international treaties, from trade tribunals to United Nations treaty bodies and international courts. At the national level, however, there are few formal means of ensuring the government's compliance with the treaties it has ratified. Parliament has a role to play in oversight through the scrutiny of annual reports tabled before it and through committee studies. Non-governmental organizations and the Canadian Human Rights Commission may also hold the government to account, while Canada's courts generally interpret domestic laws based on a presumption that they are consistent with the country's international obligations.

Finally, it is important to note that many international treaties deal with issues under provincial jurisdiction, even if the federal government is ultimately responsible for the treaty-making process and for respecting its international commitments. Because of this, the federal government often involves the provinces and territories in the negotiating process to ensure collaboration for implementation and compliance.

# 1 Introduction

In Canada, the negotiation, signature and ratification of international treaties are controlled by the executive branch of the federal government, while the Parliament of Canada ("Parliament") is often responsible for passing legislation to implement such treaties at the federal level. This HillStudy explores Canada's approach to the negotiation, signature, ratification, implementation and coming into force of international treaties at the federal level, and includes a description of power over

international affairs, the treaty making process itself, various compliance mechanisms, and the federal–provincial/territorial relationship with respect to international treaties.

# 2 Authority Respecting International Treaties

The *Constitution Act, 1867*[1] does not explicitly delineate federal or provincial authority with respect to the conduct of international affairs. In 1867, Canada was still a colony of the British Empire, and the British Parliament delegated the power to represent the Dominion of Canada internationally to the British Crown. However, although the British Crown had the authority to enter into treaties with foreign countries on Canada's behalf, the Canadian Parliament was granted responsibility for implementing those treaties in Canada under section 132 of the *Constitution Act, 1867*.

Over the years, Canada began to take increasingly independent action in its external affairs,[2] with the federal government gradually intervening on its own initiative in discussions relating to the negotiation of international treaties and conventions.[3] In 1926, Canada acquired the power to establish foreign relations and to negotiate and conclude its own treaties through the Balfour Declaration,[4] although some treaties still needed formal ratification by the British government. This power was incorporated into the 1931 *Statute of Westminster* and later confirmed in the 1947 Letters Patent Constituting the Office of Governor General of Canada.[5] As the federal government gained full powers over foreign affairs, section 132 of the *Constitution Act, 1867* became obsolete.[6]

Although authority over international relations is not explicitly conferred on the executive branch of the federal government under any constitutional provision, it is broadly recognized that this power has devolved upon it.[7] In countries like Canada that have inherited the British tradition, international relations are a prerogative of the Crown, which, in Canada, is exercised by the federal executive branch of government as the Crown's representative. As such, the executive branch is the only branch of government with the authority to negotiate, sign and ratify international conventions and treaties.[8]

# 3 The Treaty-Making Process

## 3.1 Negotiations

The *Department of Foreign Affairs, Trade and Development Act* states that the Minister of Foreign Affairs is responsible for negotiating international treaties on Canada's behalf.[9] In practice, however, Global Affairs Canada does not have a monopoly on negotiations with foreign states and international organizations, but rather plays a supervisory role, depending on the subject matter. For example, negotiations on the environment are generally conducted by Environment and Climate Change Canada; those on tax matters are led by the Canada Revenue Agency, etc. The people involved in negotiations can include ministers, deputy ministers, diplomatic representatives or other negotiators.

While multilateral treaty negotiations may have become more transparent and open to civil society input, bilateral and plurilateral[10] treaty negotiations are often conducted behind closed doors. Little may be revealed of the contents of treaties until the parties have reached an agreement in principle on content or wording.[11] Nevertheless, in recent years, the Government of Canada has initiated consultations with stakeholders and the public during the negotiation of some treaties.[12] Civil society and Parliament can also ensure that their perspectives are heard during the negotiating process by issuing reports with specific recommendations.[13]

## 3.2 Signature

Once treaty negotiators have agreed on the terms or text of an agreement, the lead department, working with Global Affairs Canada, requests Cabinet's approval, submitting an explanatory Memorandum to Cabinet setting out the details of the agreement. The treaty can be signed when approval is granted.[14] A signing order (Instrument of Full Powers) will designate one or more persons who have the authority to sign the treaty on behalf of Canada.[15]

It is important to recognize that the signature of an international treaty is not the last step in the treaty-making process; it only signifies a country's agreement in principle with the terms of the treaty and an intent to become bound by it. Upon signing a treaty, Canada must refrain from actions that would defeat the object and purpose of the treaty but is not officially bound by the treaty until ratification.[16]

## 3.3 Ratification and Implementation

### 3.3.1 Ratification

Once Canada is ready to be bound by an international treaty it has signed, a document is prepared establishing that the formalities for the coming into force and implementation of the treaty have been completed and that Canada agrees to be bound by the treaty. More formally, Cabinet prepares an order in council authorizing the Minister of Foreign Affairs to sign an Instrument of Ratification or Accession.[17] Once this instrument is deposited with the appropriate authority, the treaty is officially ratified. At this point, Canada is bound by the treaty as soon as it comes into force (if it is not already in force).[18] The ratification process is thus wholly controlled by the executive branch, although Parliament has had an ad hoc involvement in that process over the past 90 years. For example, between 1926 and 1966, only treaties of sufficient importance were submitted by the executive to Parliament for approval prior to ratification.[19] Examples of the executive branch tabling treaties in Parliament *following* ratification were also relatively common until 1999.[20]

In January 2008, the federal government announced a new policy, later updated in November 2020, to enhance parliamentary involvement in the process by tabling all treaties between Canada and other states or entities in the House of Commons before ratification.[21] The Clerk of the House of Commons distributes the full text of the agreement, accompanied by a memorandum explaining the primary issues at stake, including subject matter, primary obligations, national interests, policy considerations, federal–provincial/territorial considerations, implementation issues, a description of any intended reservations or declarations, and a description of consultations undertaken. The House of Commons then has 21 sitting days to consider the treaty before the executive branch may take action to bring the treaty into effect through ratification at the international level or via preliminary domestic measures, such as by introducing legislation. The House of Commons has the power to debate the treaty and to pass a motion recommending action, including ratification; however, such a vote has no legal force.

Tabling treaties in the House of Commons remains a courtesy on the part of the executive, which retains full authority to decide whether to ratify the treaty after the parliamentary review. The policy states clearly that in exceptional cases, the executive branch may have to ratify treaties before they can be tabled in Parliament. To do this, the executive will seek approval from the prime minister for an exemption and will inform the House of Commons of the treaty as soon as possible upon ratification.[22]

### 3.3.2 Implementation

Any discussion of ratification in Canada is incomplete without a discussion of implementation. Canada cannot ratify an international treaty until measures are in place to ensure that the terms of the treaty are enforceable in Canadian law. Unlike some countries that operate according to a monist model (for example, in France, once Parliament approves ratification of a treaty it is, in principle, enforceable in French law), Canada operates according to a dualist model: a treaty that has been signed and ratified by

**Update to the Policy on Tabling of Treaties in Parliament: Focus on Free Trade Agreements**

In November 2020, the federal government updated its policy on tabling treaties in Parliament to allow for enhanced information sharing during the negotiation of free trade agreements. Before commencing such negotiations, the government must now table in the House of Commons the following:

- a **Notice of Intent** to enter into negotiations at least 90 days before those negotiations begin;

the executive branch still requires incorporation through domestic law to be enforceable at the national level. Jurisprudence underscores that turning international law into domestic law is not a self-executing process in Canada.[23] International law is entirely separate from domestic law and sometimes the two can conflict.

There are two ways for this task to be accomplished. In some cases, it is abundantly clear that domestic legislation must be put in place to implement the terms of an international treaty. If so, the minister concerned gives instructions for an implementation bill to be drafted. After receiving Cabinet approval, the bill is tabled in Parliament and goes through the parliamentary legislative process. The treaty itself may be included as a schedule to the bill in some cases.[24] Although neither the treaty itself (in the schedule) nor its principle or scope can be amended during the legislative process, other amendments that are not inconsistent with obligations arising from the treaty may be made to the implementing bill.[25] For example, the bill implementing the *Canada–Colombia Free Trade Agreement* was amended by the House of Commons Standing Committee on International Trade to include new provisions obligating the Minister for International Trade to table an annual report in Parliament with respect to the impact of the agreement on human rights in both countries. Implementing legislation also often contains a provision by which the treaty is approved. In most cases, this approval is stated very simply, for example, by the expression "the agreement is approved" (or a variation thereof).[26] In addition to (or in lieu of) stand-alone implementing legislation, existing legislation may need to be amended. For example, trade treaties are generally implemented through amendments to the *Customs Tariff*, among other statutes.[27]

Examples of federal stand-alone legislation implementing an international treaty include the following:

- the *Crimes Against Humanity and War Crimes Act*,[28] implementing the *Rome Statute of the International Criminal Court*;
- the *Geneva Conventions Act*, implementing the *Geneva Conventions for the Protection of War Victims*;
- the *Canada–United States–Mexico Agreement Implementation Act*, implementing the *Agreement between Canada, the United States of America and the United Mexican States* (CUSMA); and
- the *Canada–European Union Comprehensive Economic and Trade Agreement Implementation Act*,[29] implementing the *Canada–European Union Comprehensive Economic and Trade Agreement*.

Although it is rare for an implementing bill not to be passed by Parliament, this can happen. For example, in 1988 the Senate refused to pass the proposed Canada–United States Free Trade Agreement Implementation Act,[30] thereby triggering an election. A similar bill was passed shortly afterwards by a new Parliament.

Nevertheless, Canada has traditionally considered that many treaties and agreements, particularly international human rights treaties and foreign investment promotion and protection agreements, do not necessarily require specific legislation for implementation. In such cases, the government will state that domestic legislation is already consistent with Canada's international obligations or that the object of the treaty does not require new statutory provisions. Thus, ratification can proceed without specific implementing legislation. In this case, prior to ratification, government officials will conduct a review of existing legislation to determine whether any amendments are needed or new legislation is required to comply with the treaty. In doing so, officials from the Department of Justice consult with other federal departments and agencies, the provinces and territories, and non-governmental organizations to determine whether existing legislation is in conformity with the international treaty and whether the government may have to enter a reservation[31] or statement of understanding to the treaty to clarify Canada's position on certain issues. Where provincial or territorial legislation is implicated, as a matter of policy, the executive branch does not ratify the treaty until all Canadian jurisdictions have indicated that they support ratification.[32]

## 3.4 Coming into Force

Although Canada may have signed and ratified a treaty, this does not necessarily mean that the treaty is in force. The date that a treaty comes into force, or the terms and conditions necessary for the treaty to come into force, are established in the treaty itself or in an agreement between the parties, and is usually the date on which the ratification instruments are exchanged or tabled. Sometimes, the treaty will establish a deadline for ratification. For example, the *North American Free Trade Agreement* (NAFTA) required the three signatory countries to complete their ratification procedures and exchange ratification instruments by 1 January 1994.[33] In other cases, the effective date is not a specified calendar date; rather, it depends on the accomplishment of formalities specified in the treaty. For example, a treaty may provide that it will come into force once it has been ratified by a specific number of signatories. The *United Nations Convention on the Law of the Sea*[34] had to be ratified by 60 signatory states in order to enter into force. Although it had been signed by 119 states in 1982, it did not enter into force until 16 November 1994, 12 months after the 60th state had ratified it.[35] More recently, CUSMA (Canada–United States–Mexico Agreement Implementation Act) came into force on 1 July 2020, the first day of the third month after the last of the three signatory countries notified the others that it had completed its internal procedures required for entry into force.[36]

It should be noted that the effective coming-into-force date for a specific country may differ from the coming-into-force date of the treaty itself. In some cases, a state may accede to a treaty after the treaty has come into force. In this situation, the effective coming-into-force date for that country follows the state's ratification of the instrument.

# 4 Compliance and Enforcement Mechanisms

## 4.1 Enforcement on an International Scale

Compliance with and the enforceability of international treaties is a broad topic that cannot be covered comprehensively in a few paragraphs. Ultimately, there are multiple forms of international treaties, multiple levels of enforceability and multiple mechanisms for enforcement.

Various bodies may be involved in the enforcement of international treaties and conventions at the international and regional levels. For example, trade treaties may be subject to enforcement through the World Trade Organization,[37] which has various levels of tribunals to ensure compliance with its trade rules, or through bilateral or regional trade agreements that provide for the creation of ad hoc arbitral panels.

By contrast, human rights treaties are often subject to some form of oversight through the United Nations (UN) treaty bodies.[38] The concluding observations[39] issued with respect to country compliance under these UN (United Nations) treaty bodies are not legally binding, but they do carry significant moral suasion.

Breaches of humanitarian law, such as war crimes and crimes against humanity, are dealt with by the International Criminal Court,[40] which has the power to sentence individuals to imprisonment. The International Court of Justice[41] is also charged with settling legal disputes submitted to it by states in accordance with international law generally, and with giving advisory opinions on legal questions referred to it by UN (United Nations) organs and specialized agencies.

- a description of the **objectives** of those negotiations at least 30 days before the negotiations begin; and
- an **economic impact assessment** that will accompany implementing legislation when it is tabled in the House.

## 4.2 Federal Accountability

At the federal level, there are few formal mechanisms to ensure the government's compliance with the international treaties that it has signed. Between 1915 and 1995, the Department of External Affairs was required by statute to report annually to Parliament with an account of Canada's treaty-making activities, including a list of agreements concluded in that year. This practice ended when legislation was passed in 1995 to change the department's name and mandate.

Today, statutory provisions implementing treaties occasionally require the government to table certain reports or documents in Parliament. For example, section 42 of the *Old Age Security Act*[42] requires that orders in council implementing social security agreements that Canada enters into with foreign countries be tabled in Parliament. These documents may subsequently be reviewed by parliamentary committees, which may comment or make recommendations on Canada's compliance with its international treaty obligations.[43] Even without such provisions, parliamentary committees have a monitoring role to play and can choose to study and make recommendations with respect to federal government compliance with international obligations under specific treaties. For example, the April 2007 report of the Standing Senate Committee on Human Rights entitled *Children: The Silenced Citizens* reviewed the government's compliance with the UN (United Nations) *Convention on the Rights of the Child*.

Various non-governmental organizations across the country, from human rights advocacy groups to organizations monitoring Canada's trade with other countries, also regularly comment on government compliance with international obligations. International human rights law itself is evolving in a manner that encourages the creation of monitoring and accountability mechanisms under national law.[44] While no body with a formal mandate to monitor compliance with international treaty obligations has been established in Canada to date, a number of institutions, such as the Canadian Human Rights Commission, do play an important role in holding the government to account.[45]

Finally, Canada's courts are beginning to play a more significant role in terms of ensuring that the federal government respects the terms of the treaties that it has ratified. Courts increasingly rely on the common law interpretive presumption that any legislation adopted in Canada is consistent with Canada's international legal obligations, even if the international obligation has not been explicitly implemented in domestic law. The presumption is that Parliament intended to legislate in a manner consistent with its international obligations.[46]

Cases such as *Baker v. Canada (Minister of Citizenship and Immigration)*[47] are a significant example of this interpretive presumption in action. In *Baker*, an illegal immigrant was ordered deported from Canada. She appealed the decision on humanitarian and compassionate grounds, arguing in part that deporting her would effectively abandon her Canadian-born children in Canada. Citizenship and Immigration Canada then affirmed the deportation decision without providing reasons, and the issue was ultimately appealed to the Supreme Court of Canada. The majority of the Supreme Court ruled that although Canada had not incorporated the *Convention on the Rights of the Child* into domestic law, the convention's guiding principle making the best interests of the child a primary consideration in decision-making concerning children should have played a role in the government's decision-making process in this particular instance. The Court cited the important role of international human rights law as a critical influence on the interpretation of the scope of domestic legislation such as the *Canadian Charter of Rights and Freedoms*.[48]

## 4.3 Cooperation with the Provinces

No discussion of Canada's compliance with its international treaty obligations is complete without an examination of the role of the provinces. Although the federal government has sole authority to negotiate, sign and ratify international treaties, many treaties nonetheless deal with matters that fall under provincial jurisdiction. In Canada, Parliament and the provincial legislative assemblies may pass legislation in areas where they have jurisdiction under the Constitution of Canada. This division of legislative powers is provided for mainly in sections 91 and 92 of the *Constitution Act, 1867*. While provincial consent is not required for ratification, the federal government nonetheless has a policy of consulting with the provinces before signing treaties that touch on matters of provincial jurisdiction.[49]

As well, although the federal government is the only level of government responsible to the international community for compliance with the treaties that it signs, it cannot enforce compliance with international treaties in areas beyond its jurisdiction. In the 1937 Labour Conventions case,[50] the British Judicial Committee of the Privy Council held that the federal government cannot use the need to comply with international treaties as justification for encroaching on areas of provincial jurisdiction. Whenever a treaty concerns an area of provincial jurisdiction, the relevant provisions may be implemented only by the provincial legislative assemblies. Thus, treaty implementation and compliance are an area of federal, provincial and territorial responsibility.

Yet, despite Canada's constitutional arrangement, articles 26 and 27 of the *Vienna Convention on the Law of Treaties* still hold the federal government accountable to the international community for implementing international treaties in Canada.[51] Once a treaty has been ratified, there is a presumption that Canada will comply with it in good faith. One example of the federal government's ongoing obligation to comply with its international obligations arose in *Arieh Hollis Waldman v. Canada*.[52] In this case, a UN (United Nations) treaty body criticized Ontario's funding of a separate Catholic school system but dealt with the federal government for this violation of the equality provision of the *International Covenant on Civil and Political Rights*[53] – even though this preferential treatment is entrenched in section 93 of the *Constitution Act, 1867*.[54] Another more recent example involves NAFTA (North American Free Trade Agreement) and the federal government's settlement agreement to pay compensation to AbitibiBowater, a forest products company, due to actions taken by the Government of Newfoundland and Labrador.[55]

In order to limit Canada's liability where a treaty concerns an area of provincial legislative jurisdiction, Canada may negotiate with other states to include a "federal state clause" in the treaty itself. To varying degrees, depending on the purpose of the treaty and the wording of its articles, the clause informs all the parties that the Government of Canada may have certain difficulties in implementing the treaty because to do so it will have to secure the cooperation of the Canadian provinces. Treaties that include this clause allow the government to consent to be bound by only those international obligations that come within federal jurisdiction and to make best efforts to get provincial compliance. Alternatively, such clauses can be used for the government to declare that the treaty only applies to those provinces that have accepted it.[56]

By contrast, some provinces have implemented legislation specifically intended to give some international treaties effect in provincial law.[57] Another approach has seen international agreements set province- and territory-specific obligations. For example, the *Canada–European Union Comprehensive Economic and Trade Agreement* requires certain provincial and territorial government entities not to discriminate against European suppliers in the public procurement process under certain conditions.[58]

# 5 Conclusion

The way in which Canada negotiates, signs, ratifies and implements international treaties is a constantly evolving process. Very little authority is explicitly set out in the law or the Constitution – much relies on royal prerogative, tradition and policy. Today, the House of Commons has been granted a louder voice prior to official ratification. This enhanced role for Parliament is an important one, although it must be remembered that this is a policy, not law, and can be easily revoked or bypassed when necessary. Parliamentary committees can also play a role when it comes to monitoring compliance with the international treaties and conventions signed by Canada. This role may be carried out by listening to civil society, business, academic, government and international voices, and issuing recommendations to help Canada live up to its international obligations.

## Notes

1. Since 1982, the *British North America Act*, 1867, 30 & 31 Vict., c. 3 (U.K.), passed by the British Parliament, has been entitled ***Constitution Act, 1867*** **(http://laws.justice.gc.ca/eng/Const/page-1.html)**, 30 & 31 Vict., c. 3 (U.K.). [ **Return to text** ]

2. Prior to the early 1990s, Canada traditionally used the term "external affairs" in reference to its foreign affairs. Out of respect for the British Crown, which, within the Empire, reserved the use of the term "foreign affairs" for itself, Canada refrained from using the term "foreign" or its French-language translation ("étranger/étrangère"). See Peter W. Hogg, "Chapter 11: Treaties," *Constitutional Law of Canada*, 5th ed., 2016, pp. 290–291; and J. C. Bonenfant, "Le développement du statut international du Canada," in Paul Painchaud, ed., *Le Canada et le Québec sur la scène internationale*, Centre québécois de relations internationales, 1977, p. 43, note 25. [ **Return to text** ]

3. For more information on the development of Canada's international personality, see J. C. Bonenfant, "Le développement du statut international du Canada," in Paul Painchaud, ed., *Le Canada et le Québec sur la scène internationale*, Centre québécois de relations internationales, 1977, pp. 31–49. See also René Morin, *Le Canada et les traités : notes sur le développement constitutionnel du Canada*, 1926. [ **Return to text** ]

4. The Balfour Declaration was the result of the 1926 Imperial Conference of British Empire leaders in London, which essentially recognized that the United Kingdom and the Dominions are autonomous, equal communities within the British Empire. The Declaration stated that the nations were united by a common allegiance to the Crown and were members of the British Commonwealth. See ***Imperial Conference 1926: Inter-Imperial Relations Committee – Report, Proceedings and Memoranda* (https://www.foundingdocs.gov.au/resources/transcripts/cth11_doc_1926.pdf)** 🔴 (79 KB, 14 pages), p. 3. [ **Return to text** ]

5. United Kingdom, ***Statute of Westminster, 1931* (http://www.legislation.gov.uk/ukpga/1931/4/pdfs/ukpga_19310004_en.pdf)** 🔴 (104 KB, 7 pages), 22 Geo. 5, Ch. 4; and ***Letters Patent Constituting the Office of Governor General and Commander-in-Chief of Canada* (http://www.collectionscanada.gc.ca/obj/001060/f2/1940/cgc_p2-0_v081_n012_t002_000_19471001_p00000.pdf)** 🔴 (399 KB, 5 pages), in *Canada Gazette*, 1 October 1947. [ **Return to text** ]

6. John H. Currie, *Public International Law*, 2nd ed., 2008, pp. 239–240; and Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty-Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, pp. 136–137. [ **Return to text** ]

7. Anne Marie Jacomy Millette, *L'introduction et l'application des traités internationaux au Canada*, 1971, p. 102; A. E. Gotlieb, *Canadian Treaty-Making*, 1968, p. 4; and Peter W. Hogg, "Chapter 11: Treaties," *Constitutional Law of Canada*, 5th ed., 2016. [ **Return to text** ]

8. See ***Capital Cities Comm. v. C.R.T.C.* (https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/2586/index.do)**, [1978] 2 S.C.R. 141; ***Canada (Attorney General) / Ontario (Attorney General)* (https://www.canlii.org/en/ca/ukjcpc/doc/1937/1937canlii362/1937canlii362.html)**, 1937 CanLII 362 (UK JCPC); Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty-Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, p. 125; and Laura Barnett and Sebastian Spano, ***Parliamentary Involvement in Foreign Policy* (https://lop.parl.ca/staticfiles/PublicWebsite/Home/ResearchPublications/InBriefs/PDF/2008-60-e.pdf)** 🔴 (432 KB, 13 pages), Publication no. 2008 60-E, Library of Parliament, 28 August 2013. [ **Return to text** ]

9. ***Department of Foreign Affairs, Trade and Development Act* (https://laws.justice.gc.ca/eng/acts/F-27.5/index.html)**, S.C. 2013, c. 33, s. 174, s. 10(2)(c). [ **Return to text** ]

10. Plurilateral treaties are those signed between more than two states (such as the World Trade Organization's *Agreement on Government Procurement*), whereas a multilateral treaty involves a great number of states. See World Trade Organization, ***Agreement on Government Procurement (as amended on 30 March 2012)* (https://www.wto.org/english/docs_e/legal_e/rev-gpr-94_01_e.htm)**. [ **Return to text** ]

11. For further information, see Government of Canada, "Annex A: The Treaty-Making Process – Departmental Guidelines: 4. Negotiating a Treaty," ***Policy on Tabling of Treaties in Parliament* (http://www.treaty-accord.gc.ca/procedures.aspx)**. [ **Return to text** ]

12. For example, in 2017, the Government of Canada conducted public consultations with respect to a potential Canada–China free trade agreement. See Government of Canada, ***What we heard: Public Consultations on a possible Canada–China free trade agreement* (https://www.international.gc.ca/trade-commerce/consultations/china-chine/what_we_heard-que_nous_entendu.aspx?lang=eng)**. [ **Return to text** ]

13. For example, see House of Commons, Standing Committee on International Trade (CIIT), ***Human Rights, the Environment and Free Trade with Colombia* (http://www.ourcommons.ca/DocumentViewer/en/39-2/CIIT/report-5/)**, Fifth report, June 2008; and CIIT (Standing Committee on International Trade), ***Canada–Europe Comprehensive and Economic Trade Agreement* (http://www.ourcommons.ca/DocumentViewer/en/41-2/CIIT/report-2/)**, Second report, June 2014. See also François-Philippe Champagne, Minister of International Trade, ***Government Response to the Seventh Report of the Senate Standing Committee on Foreign Affairs and International Trade: Free Trade Agreements: A Tool for Economic Prosperity* (https://sencanada.ca/content/sen/committee/421/AEFA/reports/2017-11-09GovResponse_e.pdf)** 🔴 (652 KB, 16 pages), 2017, pp. 6–7. The government response highlights the various ways that parliamentary committees can remain engaged during the negotiation process. [ **Return to text** ]

14. Government of Canada, "Annex A: The Treaty-Making Process – Departmental Guidelines: 5. Signature," ***Policy on Tabling of Treaties in Parliament* (https://www.treaty-accord.gc.ca/procedures.aspx)**. [ **Return to text** ]

15. The importance of a treaty directly affects who is authorized to sign it. Although the treaty may be signed by an official who has received authorization, this is usually the duty of a minister. The most important treaties are signed personally by the Prime Minister. Only the Governor General, the Prime Minister and the Minister of Foreign Affairs have the power to sign a treaty without an Instrument of Full Powers. See Ibid. [ **Return to text** ]

16. John H. Currie, *Public International Law*, 2nd ed., 2008, p. 589; and United Nations (UN), ***Vienna Convention on the Law of Treaties* (http://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf)** 🔴 (157 KB, 31 pages), 1969, art. 18. [ **Return to text** ]

17. Accession is essentially the same as ratification. The main difference is that accession does not require prior signature of the treaty; instead, accession is a one-step process. Canada generally accedes to treaties that are already in force rather than undertaking the two-step ratification process. [ **Return to text** ]

18. For more information, see Government of Canada, "Annex A: The Treaty-Making Process – Departmental Guidelines: 8. Ratification," ***Policy on Tabling of Treaties in Parliament* (https://www.treaty-accord.gc.ca/procedures.aspx)**. [ **Return to text** ]

19. See A. E. Gotlieb, *Canadian Treaty-Making*, 1968, pp. 15–17; Anne Marie Jacomy Millette, *L'introduction et l'application des traités internationaux au Canada*, 1971, pp. 118–128; and Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty-Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, p. 137. Important treaties included peace treaties; defence treaties (including those imposing military sanctions); treaties on the imposition of economic sanctions; treaties on Canada's territorial jurisdiction (land and maritime frontiers, air space and near-Earth space); trade treaties; treaties resulting in public expenditures (economic and technical aid programs, food aid programs, developing country loan programs); and treaties pertaining to international organizations. [ **Return to text** ]

20. See Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, pp. 140–141; and A. E. Gotlieb, *Canadian Treaty-Making*, 1968, pp. 15 17. [ **Return to text** ]

21. See, respectively, Government of Canada, **Canada Announces Policy to Table International Treaties in House of Commons (https://www.canada.ca/en/news/archive/2008/01/canada-announces-policy-table-international-treaties-house-commons.html)**, News release, 25 January 2008; and Government of Canada, **Policy on Tabling of Treaties in Parliament (https://www.treaty-accord.gc.ca/procedures.aspx)**. Details of the updated policy are highlighted in the text box in section 3.3.1 of this HillStudy. [ **Return to text** ]

22. For more information on the application of the Policy of Tabling of Treaties in Parliament, including the use of exemptions, see Charlie Feldman, "Parliamentary Practice and Treaties," *Journal of Parliamentary and Political Law*, Vol. 9, No. 3, December 2015, pp. 585–619; Silvina Lilian Danesi, "Tabling and waiting: a preliminary assessment of Canada's treaty-tabling policy," *Canadian Foreign Policy Journal*, Vol. 20, No. 2, 2014, pp. 189–208; and Ted L. McDorman, "**The Tabling of International Treaties in the Parliament of Canada: The First Four Years (https://digitalcommons.schulichlaw.dal.ca/cgi/viewcontent.cgi? article=2000&context=dlj)**," *Dalhousie Law Journal*, Vol. 35, No. 2, 2012, pp. 358–381. [ **Return to text** ]

23. See *Capital Cities Comm. v. C.R.T.C.* **(https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/2586/index.do)**, [1978] 2 S.C.R. 141; *Canada (Attorney General) / Ontario (Attorney General)* **(https://www.canlii.org/en/ca/ukjcpc/doc/1937/1937canlii362/1937canlii362.html)**, 1937 CanLII 362 (UK JCPC); and Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty-Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, p. 125. [ **Return to text** ]

24. See, for example, the schedules to the following Acts: *Civil International Space Station Agreement Implementation Act* **(http://laws.justice.gc.ca/eng/acts/C-31.3/page-2.html#h-9)**, S.C. 1999, c. 35; *Anti-Personnel Mines Convention Implementation Act* **(http://laws.justice.gc.ca/eng/acts/A-11.5/page-4.html#h-16)**, S.C. 1997, c. 33; and *Bretton Woods and Related Agreements Act* **(http://laws.justice.gc.ca/eng/acts/B-7/index.html)**, R.S.C. 1985, c. B-7. [ **Return to text** ]

25. Marc Bosc and André Gagnon, eds., "**Chapter 16: The Legislative Process – Structure of Bills (https://www.ourcommons.ca/About/ProcedureAndPractice3rdEdition/ch_16_4-e.html)**" and "**Chapter 16: The Legislative Process – Stages in the Legislative Process (https://www.ourcommons.ca/About/ProcedureAndPractice3rdEdition/ch_16_5-e.html)**," *House of Commons Procedure and Practice*, 3rd ed., 2017; and Charlie Feldman, "Parliamentary Practice and Treaties," *Journal of Parliamentary and Political Law*, Vol. 9, No. 3, December 2015, p. 599. [ **Return to text** ]

26. See, for example, *Canada–United States–Mexico Agreement Implementation Act* **(https://laws.justice.gc.ca/eng/acts/C-10.65/index.html)**, S.C. 2020, c. 1, s. 9; and *Geneva Conventions Act* **(http://laws.justice.gc.ca/eng/acts/G-3/index.html)**, R.S.C. 1985, c. G-3, s. 2. [ **Return to text** ]

27. *Customs Tariff* **(http://laws.justice.gc.ca/eng/acts/C-54.011/)**, S.C. 1997, c. 36. [ **Return to text** ]

28. *Crimes Against Humanity and War Crimes Act* **(http://laws.justice.gc.ca/eng/acts/C-45.9/index.html)**, S.C. 2000, c. 24. [ **Return to text** ]

29. *Canada–European Union Comprehensive Economic and Trade Agreement Implementation Act* **(http://laws.justice.gc.ca/eng/acts/C-4.8/index.html)**, S.C. 2017, c. 6. [ **Return to text** ]

30. Library of Parliament, **House of Commons Bills, 33rd Parliament, 2nd Session : C130 = Projets de loi de la Chambre des communes, 33e Législature, 2e Session : C130 (https://parl.canadiana.ca/view/oop.HOC_33_2_C130/5?r=0&s=1)**, Canadian Parliamentary Historical Resources, Database. [ **Return to text** ]

31. The *Vienna Convention on the Law of Treaties* sets out a definition of a "reservation" in article 2(1)(d):

> "reservation" means a unilateral statement, however phrased or named, made by a State, when signing, ratifying, accepting, approving or acceding to a treaty, whereby it purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State.

UN, **Vienna Convention on the Law of Treaties (https://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf)** 🔴 (157 KB, 31 pages), 1969, p. 3. See also the definition of "reservation" in Office of the United Nations High Commissioner for Human Rights (OHCHR), **Human Rights Treaty Bodies – Glossary of technical terms related to the treaty bodies (https://www.ohchr.org/EN/HRBodies/Pages/TBGlossary.aspx#reservation)**:

A reservation is a statement, however phrased or named, made by a State by which it purports to exclude or alter the legal effect of certain provisions of a treaty in their application to that State. A reservation may enable a State to participate in a multilateral treaty in which it would otherwise be unable or unwilling to do so. States can make reservations to a treaty when they sign, ratify, accept, approve or accede to it. When a State makes a reservation upon signing, it must confirm the reservation upon ratification, acceptance or approval.

Reservations are governed by the Vienna Convention on the Law of Treaties, and cannot be contrary to the object and purpose of the treaty. Consequently, when signing, ratifying, accepting, approving or acceding to a treaty, States may make a reservation unless (a) the reservation is prohibited by the treaty; or (b) the treaty provides that only certain reservations may be made and these do not include the reservation in question. Other State parties may lodge objections to a State party's reservations. Reservations may be withdrawn completely or partially by the State party at any time.

[ **Return to text** ]

32. Senate, Standing Committee on Human Rights, **Children: The Silenced Citizens – Effective Implementation of Canada's International Obligations with Respect to the Rights of Children (http://www.parl.gc.ca/Content/SEN/Committee/391/huma/rep/rep10apr07-e.pdf)** 🔴 (1.33 MB, 324 pages), Final report, April 2007, pp. 9–15. For example, Canada was unable to ratify International Labour Organization's *Minimum Age Convention, 1973 (No. 138)* as Canada's Constitution gives each province jurisdiction over labour issues, and some provinces were unwilling to raise the minimum age in accordance with that specified in the convention. See International Labour Organization, NORMLEX, *C138 - Minimum Age Convention, 1973 (No. 138)* **(http://www.ilo.org/dyn/normlex/en/f?**

p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C138), 26 June 1973 (entered into force 19 June 1976). Canada finally ratified the convention in June 2016 with a minimum age of 16 specified. [ **Return to text** ]

33. Organization of American States, Foreign Trade Information System, "**Chapter Twenty-Two: Final Provisions (http://www.sice.oas.org/trade/nafta/chap-22.asp#A2203)**," *North American Free Trade Agreement* (NAFTA), art. 2203 (Entry into Force). [ **Return to text** ]

34. UN, *United Nations Convention on the Law of the Sea* **(http://www.un.org/depts/los/convention_agreements/texts/unclos/unclos_e.pdf)** 📄 (957 KB, 202 pages), 10 December 1982 (entered into force 16 November 1994), art. 308, p. 140. [ **Return to text** ]

35. For the status of the convention, see United Nations Treaty Collection, "**6. United Nations Convention on the Law of the Sea (https://treaties.un.org/Pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXI-6&chapter=21&Temp=mtdsg3&clang=_en)**," *Chapter XXI: Law of the Sea.* [ **Return to text** ]

36. Government of Canada, *Canada–United States–Mexico Agreement (CUSMA) – Protocol replacing the North American Free Trade Agreement with the agreement between Canada, the United States of America, and the United Mexican States* **(https://www.international.gc.ca/trade-commerce/trade-agreements-accords-commerciaux/agr-acc/cusma-aceum/text-texte/protocol-protocole.aspx?lang=eng)**, para. 2. [ **Return to text** ]

37. For more information, see World Trade Organization, *Dispute settlement* **(http://www.wto.org/english/tratop_e/dispu_e/dispu_e.htm)**. [ **Return to text** ]

38. For more information, see OHCHR, *Human Rights Bodies* **(http://www.ohchr.org/EN/HRBodies/Pages/HumanRightsBodies.aspx)**. [ **Return to text** ]

39. "Concluding observations" are the observations and recommendations issued by a UN treaty body after consideration of a state party's report. They refer both to positive aspects of a state's implementation of the treaty and to areas where the treaty body recommends that further action needs to be taken by the state. See OHCHR, *Human Rights Treaty Bodies – Glossary of technical terms related to the treaty bodies* **(https://www.ohchr.org/EN/HRBodies/Pages/TBGlossary.aspx#co)**. 📄 (134 KB, 7 pages). [ **Return to text** ]

40. For more information, see International Criminal Court, *About the Court* **(https://www.icc-cpi.int/about)**. [ **Return to text** ]

41. International Court of Justice, *The Court* **(http://www.icj-cij.org/en/court)**. [ **Return to text** ]

42. *Old Age Security Act* **(https://laws.justice.gc.ca/eng/acts/O-9/index.html)**, R.S.C. 1985, c. O-9, s. 42. [ **Return to text** ]

43. Joanna Harrington, "Scrutiny and Approval: The Role for Westminster-Style Parliaments in Treaty Making," *International & Comparative Law Quarterly*, Vol. 55, No. 1, January 2006, p. 140. [ **Return to text** ]

44. For example, see UN, Department of Economic and Social Affairs, "**Article 33 – National implementation and monitoring (https://www.un.org/development/desa/disabilities/convention-on-the-rights-of-persons-with-disabilities/article-33-national-implementation-and-monitoring.html)**," *Convention on the Rights of Persons with Disabilities (CRPD).* [ **Return to text** ]

45. For a discussion of the role of the Canadian Human Rights Commission as a national human rights institution and its call for enhanced accountability with respect to the implementation of international human rights commitments, see Canadian Human Rights Commission, *Submission to the United Nations Human Rights Council on the Occasion of its Review of Canada During the 3rd Cycle of the Universal Periodic Review* **(https://www.upr-info.org/sites/default/files/document/canada/session_30_-_may_2018/chrc_upr30_can_e_main.pdf)** 📄 (41 KB, 7 pages), October 2017. [ **Return to text** ]

46. See, for example, *R. v. Hape* **(https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/2364/index.do)**, 2007 SCC 26, para. 39. [ **Return to text** ]

47. *Baker v. Canada (Minister of Citizenship and Immigration)* **(https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/1717/index.do)**, [1999] 2 SCR 817. [ **Return to text** ]

48. Ibid., para. 70. [ **Return to text** ]

49. For example, federally negotiated trade agreements often entail a risk of financial liability stemming from provincial government actions. Provincial and territorial governments are regularly consulted during trade negotiations. An information-sharing forum, the Federal-Provincial-Territorial Committee on Trade (C Trade) also serves as a vehicle for consultation between the various levels of government and other stakeholders. For further discussion, see Patrick Fafard and Patrick Leblond, "**Twenty-First Century Trade Agreements: Challenges for Canadian Federalism (https://www.academia.edu/2303449/Twenty_First_Century_Trade_Agreements_Challenges_for_Canadian_Federalism)**," The Federal Idea, September 2012; and Christopher J. Kukucha, *The Provinces and Canadian Foreign Trade Policy*, 2009, pp. 53–58. For a brief discussion of C-Trade activities, see François-Philippe Champagne, Minister of International Trade, *Government Response to the Seventh Report of the Senate Standing Committee on Foreign Affairs and International Trade: Free Trade Agreements: A Tool for Economic Prosperity* **(https://sencanada.ca/content/sen/committee/421/AEFA/reports/2017-11-09GovResponse_e.pdf)** 📄 (652 KB, 16 pages), 2017, p. 4; and Global Affairs Canada, "Negotiating Canada's Trade Agreements: Process and Consultations," *International Trade Agreements and Local Government: A Guide for Canadian Municipalities* **(https://www.international.gc.ca/trade-agreements-accords-commerciaux/ressources/fcm/complete-guide-complet.aspx?lang=eng)**.

Human rights also fall under both federal and provincial jurisdiction. A Continuing Committee of Officials on Human Rights has been established as a means of facilitating consultation among federal, provincial and territorial counterparts with respect to the implementation of and adherence to international human rights treaties. This body is overseen by a Senior Officials Committee Responsible for Human Rights, which is in turn given direction by the Forum of Federal-Provincial-Territorial Ministers Responsible for Human Rights. See Government of Canada, *About human rights* **(https://www.canada.ca/en/canadian-heritage/services/about-human-rights.html)**.

[ **Return to text** ]

50. *Canada (Attorney General) / Ontario (Attorney General)* **(https://www.canlii.org/en/ca/ukjcpc/doc/1937/1937canlii362/1937canlii362.html)**, 1937 CanLII 362 (UK JCPC) (known as the Labour Conventions case). In this case, the Government of Canada had approved three international conventions on labour relations and Parliament had passed statutes in order to implement the conventions in Canada. This legislation was disputed by, among others, some provinces that saw this as an intrusion into their areas of legislative jurisdiction. The British Privy Council ruled that Parliament could not pass such statutes, even to implement Canada's international obligations, because the labour relations field was the exclusive jurisdiction of the provinces. [ **Return to text** ]

51. Article 26 of the *Vienna Convention on the Law of Treaties* states: "Every treaty in force is binding upon the parties to it and must be performed by them in good faith." Article 27 provides that "[a] party may not invoke the provisions of its internal law as justification for its failure to perform a treaty." UN, ***Vienna Convention on the Law of Treaties* (https://legal.un.org/ilc/texts/instruments/english/conventions/1_1_1969.pdf)** 🔴 (157 KB, 31 pages), 1969, p. 11. [ **Return to text** ]

52. UN, Human Rights Committee, ***Arieh Hollis Waldman v. Canada* (http://docstore.ohchr.org/SelfServices/FilesHandler.ashx? enc=6QkG1d%2fPPRiCAqhKb7yhstcNDCvDan1pXU7dsZDBaDUkhIuPvnibm16dT2z5ywDb%2bWg98f3MjAbolbx%2baCs5xseF2tHVaCcUv3jOVN%2bzaaQSqCv**  Communication No. 694/1996, UN Doc. CCPR/C/67/D/694/1996, 67th Session, 18 October to 5 November 1999. [ **Return to text** ]

53. OHCHR, ***International Covenant on Civil and Political Rights* (http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx)**, 16 December 1966 (entered into force 23 March 1976). [ **Return to text** ]

54. See ***Adler v. Ontario* (https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/1446/index.do)**, [1996] 3 S.C.R. 609. [ **Return to text** ]

55. Global Affairs Canada, "**AbitibiBowater Inc. v. Government of Canada (http://www.international.gc.ca/trade-agreements-accords-commerciaux/topics-domaines/disp-diff/AbitibiBowater.aspx?lang=eng)**," *NAFTA (North American Free Trade Agreement)* – *Chapter 11 – Investment*; and Patrick Fafard and Patrick Leblond, "**Twenty-First Century Trade Agreements: Challenges for Canadian Federalism (https://www.academia.edu/2303449/Twenty_First_Century_Trade_Agreements_Challenges_for_Canadian_Federalism)**," The Federal Idea, September 2012, p. 6. [ **Return to text** ]

56. John H. Currie, *Public International Law*, 2nd ed., 2008, p. 244; and Peter H. Pfund, "**F. The Federal State Clause (https://books.google.ca/books? id=Hi5tiy58o6kC&pg=PA71&lpg=PA71&dq=%22federal+state+clause%22+canada&source=bl&ots=rEzjQEUKV6&sig=bCKt7_92mnC8nVPg_cB8UGtO0h4&hl=e**  *Académie de droit international, Recueil des cours: collected courses of the Hague Academy of International Law 1994*, Vol. 249, 1996, p. 71. [ **Return to text** ]

57. See, for example, ***International Conventions Implementation Act* (http://www.qp.alberta.ca/documents/Acts/I06.pdf)** 🔴 (578 KB, 56 pages), R.S.A. 2000, c. I-6 (Alberta); ***Act respecting the implementation of international trade agreements* (http://legisquebec.gouv.qc.ca/en/ShowDoc/cs/M-35.2)**, c. M-35.2 (Quebec); and ***Act respecting the Ministère des Relations internationales* (http://legisquebec.gouv.qc.ca/en/ShowDoc/cs/M-25.1.1)**, c. M 25.1.1 (Quebec). [ **Return to text** ]

58. Government of Canada, ***Text of the Comprehensive Economic and Trade Agreement – Chapter nineteen: Government procurement* (https://www.international.gc.ca/trade-commerce/trade-agreements-accords-commerciaux/agr-acc/ceta-aecg/text-texte/19.aspx?lang=eng)**. [ **Return to text** ]

© Library of Parliament

---

**Related content**

Legislative summaries (/sites/PublicWebsite/default/en_CA/ResearchPublications/LegislativeSummaries)

Trade and investment series (/sites/PublicWebsite/default/en_CA/ResearchPublications/TradeAndInvestment)

HillNotes (https://hillnotes.ca/)

LEGISinfo (https://www.parl.ca/legisinfo/en/overview)

See complete list of research publications (/sites/PublicWebsite/default/en_CA/ResearchPublications/AllPublications)

Publications about Parliament (/sites/Learn/default/en_CA/)

Library Catalogue (https://parl-gc.primo.exlibrisgroup.com/discovery/search?vid=01CALP_INST:01CALP&lang=en)

# EXHIBIT 33



University of the Sunshine Coast Australia

Library Guides

UniSC Library / Guides / International Law / Treaties

# International Law

Search this Guide    [Search]

| Start Here | International Law | Journals | Cases | Treaties | Foreign Law | European Union | United Nations | How to Cite |

## Treaties

Treaties are agreements entered into between States, either **bilaterally** or **multilaterally**. The Commonwealth, and not the States, is Australia's international representative. It is within executive power to negotiate and execute such treaties but international treaties are not self-executing, requiring incorporation by legislation into domestic law (*Encyclopaedic Australian Legal Dictionary*).

Most treaties do not come into force when signed. They have a clause which specifies the requirements of the treaty entering into force. The clause may include a ratification date and a requirement that a certain number of parties have ratified before it can become law.

If you are searching for a **multilateral** treaty, a database such as the Flare Index to Treaties, which contains the most significant treaties from 1856 to the present, is a good place to start. This will help you identify the name of the treaty and provide a link to the text of the treaty. To find the current status information, you will then need to access the site where the material is lodged or deposited, such as the United Nations Treaty Collection.

The Australian Treaty Database (DFAT) and the Australian Treaties Library (AustLII), which contains the Australian Treaty Series, are good resources when looking for Australian treaties. These resources contains all multilateral and bilateral treaties to which Australia is a signatory.

Hein Online Treaties and Agreements Library has United States treaties and the WorldLII International Treaties Collection is a good starting point to locate a range of treaties from other jurisdictions such as the United Kingdom, Canada and New Zealand.

## Treaty Collections

- Australian Treaty Series (AustLII)
  The full-text and status of treaties signed by Australia.

- Australian Treaties Database

- EISIL (Electronic Information System for international Law)
  Treaty information is arranged by topic categories with links provided to full-text, free versions on the Web. Signatories information is usually provided at the relevant websites.

- United Nations Treaty Collection
  Includes all multilateral treaties deposited with the Secretary-General of the United Nations and, those formerly deposited with the League of Nations, their latest status and a link to the full texts.

- WorldLII International Treaties Collection
  Includes a large range of treaty series including the Canadian Treaty Series from 1812, UK Treaties Library from 1824, League of Nation Treaty Series from 1919, New Zealand Treaty Series from 1944, Indian Treaty Series from 1947 and Council of Europe Treaty Series from 1949.

- HeinOnline Treaties and Agreements Library
  Primarily U.S. treaties (United States Treaties and Other International Agreements (UST) and Treaties and International Act Series (TIAS)) but also includes International Legal Materials and a variety of historical resources.

- The Avalon Project
  Historical documents, laws and other materials from 122 B.C. to 2001. Includes American diplomacy 1778 to the present; bilateral and multilateral treaties and agreements, cold war diplomacy; defence treaties of the United States; slavery treaties, agreements and other documents and the laws of war, treaties, conventions, agreements.

- ICRC Treaties and States parties to such Treaties
  From the International Committee of the Red Cross.

## Treaty Research Guides

An Introduction to Sources for Treaty Research

GlobaLex guide by Mark Engsberg and Mary Beth Chappell.

Treaties and International Agreements

by Marci Hoffman  & Michael Lindsey, Berkeley Law Library. Includes a good list of other guides and a list of the general types of sources that might contain treaty texts.

Treaty Research Guide

Amy Burchfield & Rachael Smith, Georgetown Law Library.

## The Law of Treaties

The Vienna Convention on the Law of Treaties is the UN agreement that governs the law relating to treaties.

The 1648 Peace Treaties of Westphalia established the framework for modern treaties and recognised the right of the sovereign to govern free from outside interference. By the 20th century, the subject matter of treaties has been greatly expanded and treaties have become the principal source of Public International Law. Treaties can also include the creation of rights for individuals.

The treaty text may provide for the manner by which it takes effect. Generally, treaties will enter into force when it has been signed and ratified by a certain number of parties. Parties to a treaty may ratify a treaty with reservations or other declarations unless the terms of the treaty place restrictions on those actions. A reservation is a country's attempt to modify certain terms of the treaty, as it applies between itself and other countries.

Multilateral treaties are published in sets such as the United Nations Treaty Series (UNTS). Only treaties deposited with the UN Secretary General become part of the UNTS. Although most multilateral (and many bilateral) treaties are deposited with the UN as a matter of course, states are under no specific obligation to do so. A good source of information on the role of the UN as a treaty depository is the Summary of Practice of the Secretary-General as Depository of Multilateral Treaties on the UN website.

## Treaty Information

- Australian Treaties Library home page (AustLII)
  Provides treaty texts (Australian Treaty Series), indexes, status lists, and explanatory material, including a list of Bilateral Treaties by country and Status lists for multilateral treaties

- The Treaty Process
  Explains the Treaty making process. Information provided by the Department of Foreign Affairs and Trade (Australian Government).

- Trick or Treaty? Commonwealth Power to Make and Implement Treaties
  Report by the Senate Legal and Constitutional References Committee looking at the power of the Commonwealth in relation to the making of treaties and the external affairs power.

- Federal Parliament's Changing Role in Treaty Making and External Affairs
  Parliamentary Library Research Paper 15 1999-2000.

- Review of the Treaty Making Process
  August 1999, Commonwealth of Australia.

<< **Previous:** Cases                                                        **Next:** Foreign Law >>

Librarian Login
Contact the library

Case 5:23-cv-03438-PCP   Document 38-1   Filed 01/12/24   Page 50 of 81

**Subjects:** Law   **Tags:** private international law, public international law

© University of the Sunshine Coast, Queensland, Australia | ABN 28 441 859 157 | CRICOS Provider No. 01595D

# EXHIBIT 34



**[Home] [Databases] [WorldLII] [Search] [Feedback]**

# New Zealand Law Commission

### LAW COMMISSION
### TE AKA MATUA O TE TURE

**You are here:**  NZLII >> Databases >> New Zealand Law Commission >> R34 >> Part I INTERNATIONAL LAW AND THE LAW OF NEW ZEALAND

[Database Search] [Name Search] [Previous] [Next] [Download] [Help]

- 1 Treaties
  - The Sources Of International Law
  - What Is A Treaty?
  - The Law Of Treaties
  - What Do Treaties Do?
  - How Are Treaties Negotiated And Agreed To?
  - How Are Treaties Given Effect To At The International Level?
  - The Character Of The Relationships Under Treaties
- 2 The Implementation Of Treaties Through National Legislation6
  - No Legislation Is Required
  - The Statute Gives Direct Effect To The Treaty Text
  - Some Treaty Wording Is Incorporated Into The Body Of The Law
  - The Substance Of The Treaty Is Incorporated Into The Body Of The Law Without Any Obvious Indication
  - Authority Is Delegated To Implement The Treaty
- 3 The Implementation Of Treaties Through The Courts
  - A Treaty As A Foundation Of The Constitution
  - A Treaty As Relevant To The Determination Of The Common Law
  - A Treaty As A Declaratory Statement Of Customary International Law
  - A Treaty As Evidence Of Public Policy
  - A Treaty As Relevant To The Interpretation Of A Statute

# Part I INTERNATIONAL LAW AND THE LAW OF NEW ZEALAND

## *1 TREATIES*

### The sources of international law

15 THE PRINCIPAL SOURCES OF INTERNATIONAL LAW are

treaties, international custom, judicial decisions, and academic writings. These sources are reflected, for example, in article 38(1) of the Statute of the International Court of Justice (ICJ), which provides:

(1) The Court, whose function is to decide in accordance with inter-national law such disputes as are submitted to it, shall apply:

(a) international conventions, whether general or particular, establishing rules expressly recognised by the contesting States;

(b) international custom, as evidence of a general practice accepted as law;

(c) the general principles of law recognized by civilized nations;

(d) . . . judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

16 International transactions are also in large measure facilitated and regulated by rules and practices which are not directly binding on states and are not issued or formulated by public authorities. The following are examples of ways in which they come about:

• the practice of an industry, a profession or a trade that might be given force, constrained or supplemented by national law;

• standard terms and model contracts such as those of the Inter-national Chamber of Commerce (ICC), which might incorporate some of the practice into a more definite and accessible form;

• restatements of the law by experts such as the International Institute for the Unification of Private Law (UNIDROIT) on international commercial contracts, or successive meetings of the Commonwealth on human rights;

• unilateral recognition of foreign qualifications and standards; and

• model laws and standard practices recommended, by UNCITRAL for instance, for adoption by national authorities.

These rules and practices depend for their authority on a range of matters including acceptance and contract, the authority of the body promulgating them, and appropriate references in national law—for instance, to generally accepted practices.

17 Chapter 4 considers in turn each of the sources listed in article 38(1) of the statute, and how to obtain access to it in New Zealand. But because treaties are of major importance, in part I they are discussed more fully, with particular attention to their nature, their function, and how they are concluded, given effect to and implemented.

## What is a treaty?

18 A treaty is an international agreement between two or more

states or other international persons, governed by international law. ("Other international persons" include bodies such as the United Nations, the World Bank, and the South Pacific Commission.)

19 An international agreement can have a variety of names:

• *Treaty* is the generic term, but is generally confined to major agreements of political importance (eg, treaties of alliance, treaties of friendship and the Antarctic Treaty) but also found elsewhere (as in treaties of extradition).

• *Agreement* is by far the most common title, as in agreements regulating trade, air transport, fisheries, and visa abolition; it features especially in *bilateral* agreements (ie, agreements between two states).

• *Exchanges of notes (or letters) constituting an agreement* make up a large proportion of the agreement category. As the title indicates, there are two documents rather than just one; the second document responds to the agreement proposed in the first and accepts it. They are usually bilateral.

• *Convention* is the word commonly used for *multilateral* treaties

(ie, those which are open to acceptance by a large number or even all states). This usage is especially common in the United Nations and its specialised agencies. A *framework convention* is one which establishes its own institutional and decision-making framework for interpreting, developing and implementing its provisions.[2]

• *Protocol* is commonly used for an agreement supplementary to a principal treaty. It might be drawn up at the same time as the principal instrument or later.

20 Other names are used from time to time, such as *charter* or *constitution* (for major international organisations such as the United Nations, the International Labour Organisation and the Organisation of African Unity); *declaration*; *covenant* (particularly for major documents such as the constitution of the League of Nations and the human rights instruments adopted by the General Assembly of the United Nations in 1966); *instrument*; and *regulations* (particularly for supplementary instruments such as those adopted by the

World Health Assembly or the International Telecommunications Conference).

21 Adjectives are sometimes also added, such as *additional*, *special*, *supplementary* and *intergovernmental*. The name of the place where a treaty is signed might also be a part of the title (as in the Chicago Convention on International Civil Aviation).

## The law of treaties

22 The law of treaties is to a large extent governed by the Vienna Convention on the Law of Treaties which entered into force in 1980, and by the associated Convention of 1986 on treaties between states and international organisations and treaties between international organisations.

23 While the Vienna Convention on the Law of Treaties may not as a whole be "declaratory of general international law",[3] its 85 articles regulate the major questions which arise in disputes concerning treaties between states parties. In addition, several of its provisions have been held by the International Court of Justice to be declaratory of international law: see also para 69. These include the conclusion of treaties, reservations, entry into force, deposit and registration, invalidity, termination and suspension, application and

effects, amendment and modification, and interpretation. (The full text of the Vienna Convention on the Law of Treaties is reproduced in appendix A.)

## What do treaties do?

24 The functions and subject matter of treaties are various. They serve the functions of distinct legal instruments available in national legal systems. Examples are

• *constitutions*, as of the international organisations;

• *legislation*, as with the many conventions which regulate much international and related activity;

• *conveyancing documents*, for land and maritime boundaries and in treaties regulating the status of a particular area (such as the Panama Canal or Antarctica); and

• *contracts*, as in the exchange of promises concerning trade, investment, air transport, taxation or loans (often made in the context of a multilateral system), or to resolve a particular controversy or establish an ongoing political relationship (where the national analogies might be to an accord among government, business and labour, or an agreement between the federal and state authorities in a federal jurisdiction).

Their subject matter is wide-ranging and includes the following:

• *war and peace*, such as the United Nations Charter, treaties of alliance, the Geneva and Hague Conventions relating to warfare and the protection of the victims of armed conflict, armistices, treaties of peace, the Statute of the International Court of Justice, the Hague Convention establishing the Permanent Court of Arbitration, regional and bilateral treaties for the resolution of disputes, the Vienna Conventions on Diplomatic and Consular Relations;

• *disarmament and arms control*, such as the Partial Nuclear Test Ban Treaty, the Non-proliferation Treaty, the Convention on the Comprehensive Prohibition of Chemical Weapons, the Statute of the International Atomic Energy Agency, and regional arms control measures, for instance in Latin America, the South Pacific and Antarctica;

• *international trade*, including the World Trade Organisation (WTO) agreements, regional economic agreements, and a great number of bilateral agreements such as the Australia New Zealand Closer Economic Relations Trade Agreement (CER);

• *international finance*, including the multilateral agreements establishing the World Bank and the related agencies, regional banks (eg, the Asian Development Bank), and numerous bilateral arrangements such as loan agreements and double taxation agreements;

• *international commercial transactions*, concerning both the relationship between states (eg, customs facilitation, common nomenclature for tariffs) and private commercial transactions (including treaties regulating carriage by sea and air, the international sale of goods and international commercial arbitration);

• *international communications*, for example by sea and by air, where many multilateral and bilateral treaties regulate traffic rights, safety and liability; international telecommunications; the recognition of qualifications, for example in respect of piloting ships and aircraft and driving motor vehicles;

• *the law of international spaces*, particularly the long-established law of the sea, the relatively new law of the air, and the much newer law of outer space; and the law relating to specific areas such as Antarctica, international canals, and areas of particular international concern;

• *the law relating to the environment*, which is a matter of relatively recent general concern and includes treaties relating to the protection of whales and other marine life, oil pollution, the ozone layer, wetlands, and methods of warfare threatening environmental destruction—some specific examples being the Framework Convention on Climate Change and the Convention on Biological Diversity (concluded at the United Nations Conference on Environment and Development (UNCED) in 1992), and the Basel Convention on the Control of Transboundary Movements of Hazardous Wastes and their Disposal;

• *human rights and related matters*, including the general instruments drawn up by the United Nations (international covenants on economic, social and cultural rights and on civil and political rights), and on more particular matters (eg, genocide, refugees, prostitution, the political rights of women, discrimination on grounds of race and sex, and the regional instruments drawn up especially in Europe and the Americas);

• *labour conditions and relations*, particularly the 150 or more conventions drawn up by the International Labour Organisation since 1919; and

• *other areas of international economic and social co-operation*, such

as the gathering and dissemination of information (health

and other statistics, and the work of the World Meteorological Organisation), and combating crimes with international ramifications (eg, slavery, drug trafficking, international hostage-taking, and hijacking of aircraft and ships).

25 That is a only brief outline of the subject matter of international treaty-making. It is necessarily incomplete because there is no limit to the matters which states may wish to bring under an international agreement, and over recent decades there has been an explosion of areas of international concern. New Zealand of course participates fully in international treaty-making: it is or has been party to

more than 1500 treaties (including some inherited from the United Kingdom).

26 Although many of the functions of treaties are analogous to those of domestic or municipal laws, their efficacy should not be judged in the same manner as domestic law. Because they operate between parties on an international level, they are more likely to result

in difficulties of interpretation and particularly of enforcement. Nevertheless, many treaties—for example, those regulating international communications—function most successfully.

## How are treaties negotiated and agreed to?

27 International law and practice have established that various representatives of the state (eg, the Head of State, Head of Government, Minister of Foreign Affairs, heads of diplomatic missions, and representatives accredited to international conferences or organisations) have authority to negotiate and adopt or authenticate the text

of a treaty. Other officials may also be given specific authority to negotiate or to agree to a treaty text.

28 These are executive functions, as the Privy Council made clear in a Canadian case (*Attorney-General for Canada v Attorney-General for Ontario* [1937] AC 326, 347–348). On the other hand, the performance of treaty obligations, if they involve changes to the existing domestic law, requires action by the legislature. In practice, the treaty might be negotiated simply between the representatives of the two states immediately concerned, or at a conference of the interested states for the purposes of negotiating that particular text (eg, in

the aftermath of a war), or within an established international framework, which may be regional (eg, the South Pacific Forum) or universal (as within the United Nations and its agencies).

29 In some circumstances, the representatives may be not only those of governments, but also of international organisations or countries which are not yet fully independent. The International Labour Organisation is unique in providing for tripartite representation at its conferences, involving representatives of employers and unions as well as governments.

30 Treaties come into force and take effect at the international level according to their own terms. In some cases that may be simply on *signature*, as is common with more straightforward bilateral agreements (although sometimes the effective date is postponed to enable the appropriate administrative steps to be taken).

31 However, signature often represents no more than a concrete expression of an intention to *ratify* the treaty in the future (although it does imply the obligation to act in good faith). More important or complex treaties, the final acceptance of which may require substantial changes in governmental policy or in national law, may

lead to the text being established by signature but not becoming

binding until the state in question takes the further action most

commonly referred to as *ratification*. Ratification is sometimes known as *acceptance* or *approval* and should not be mistaken for implementation in national law.

32 Treaties create binding obligations only as between signatory parties.[4] Those states which have not signed such a treaty, but which wish to become party to it, may have the right accorded under the treaty to *accede* or *adhere* to the text and thereby become bound by it. A state becoming a party to a multilateral convention may also be able to file *reservations*, indicating that it will not be bound by one or other of the provisions.

33 All the actions just mentioned are actions at the international level. Whether they also make any change to national law is a matter for the national constitutional system. In some countries they do. In others, including New Zealand, they do not—as the Privy Council in *Attorney-General for Canada v Attorney-General for Ontario* [1937] AC 326 made clear. How they become a part of national law is discussed in chapters 2 and 3.

## How are treaties given effect to at the international level?

34 The international methods of implementation are various: diplomatic representation, negotiation, conciliation, mediation, good offices, fact-finding, inspection, arbitration, adjudication, recourse to a relevant regional organisation or specialised agency or universal organisation. These are all peaceful processes of dispute resolution, invoked at the international level. The processes might be bilateral; or they might involve a third party or a regional or universal

body. They might lead to binding third party decisions or recommendations.

35 States may also be able to retaliate, claiming that the breach or an alleged breach by the other party to a treaty frees them of their obligations towards that party. In some cases, they may also be able to take action against individuals who allegedly breach a treaty. Treaties, especially labour and human rights conventions, may require the parties to them to report to an international body or to the other parties on the legislative and other steps they have taken to give effect to their terms. The method of implementation depends a great deal on the character of the treaty and the relationships it establishes.

## The character of the relationships under treaties

36 A treaty might have at least four major effects. It might *(a)* create rights and obligations simply for the parties (usually states, but sometimes extending to individuals). Examples are the provisions of the Charter of the United Nations which place duties on states not to use force and oblige them to settle their disputes in a peaceful manner; or more generally much of the body of the law of friendly relations between states.

37 A treaty might *(b)* have consequences for others (especially individuals) in their dealings with the parties. The law regulating the public aspects of international trade and communications

provides a good example: WTO, customs facilitation, the Chicago Civil Aviation Conventions and bilateral air transport agreements. Those treaties operate on a day-to-day basis between states, but individual traders and airline companies and their customers have very real interests under them, sometimes matched by rights under the relevant national law (eg, to particular tariff treatment or to operate their aircraft in and out of foreign airports).

38 A treaty might *(c)* create rights owed to an individual by a state. The whole body of human rights law, for instance, regulates the relationship between a state and its own nationals and residents. This body of law has developed essentially within the last 50 years, although elements of it are to be found at the very outset of the law of nations. It often attracts the most attention in discussions of the implementation of international law in national legal systems.

By contrast, a treaty might create obligations and prohibitions (as opposed to rights) which affect individuals—for instance, establishing international crimes, as did the Montreal Convention

for the Suppression of Unlawful Acts Against the Safety of Civil Aviation 1971.

39 Finally, a treaty might *(d)* regulate rights between individuals, with the state parties having little immediate interest. Examples are the treaties governing private law relations, arising, for instance,

from international trade and communications and from family and personal matters. Complementing the public law treaties, such

as the General Agreement on Tariffs and Trade (GATT) and the Chicago Conventions (in *(b)* above), are the Vienna Convention on the International Sale of Goods and the Warsaw Conven-

tion for the Unification of Certain Rules Relating to International Carriage by Air. Conventions regulating the choice of law in personal matters (eg, the validity of wills) or providing a uniform law (eg, the European Convention on the Legal Status of Children Born out of Wedlock) are steadily being negotiated and accepted.

40 While these categories are not watertight, they help to highlight the great changes in the role of international law as well as to facilitate thinking about the means of national implementation. For instance, the rights and obligations under *(a)* are for the most part given effect to through the prerogative or other foreign affairs powers of the executive, in the day-to-day relations of states. There are exceptions: for instance, sanctions under Chapter VII of the United Nations Charter will generally require implementation through the national legal system (often including legislative action and possibly the courts), since the rights of individuals (often recognised in the law under *(b)*) will be interfered with. The law of diplomatic immunity may also involve the courts and require legislation. But those exceptions are limited and cover only a small part of the area falling within *(a)*.

41 By contrast, the treaties under *(d)* operate almost solely within the national legal systems (including the courts) of the states that are parties to them (and sometimes of other states as well[5]). Once the relevant legislation (if any) has been enacted and the state has accepted the treaty at the international level, the states parties generally have nothing to do with the treaty, unless there is an international dispute about the adequacy of its implementation, or there is a proposal for amendments (as with the Warsaw Convention at various times since 1929).

42 The treaties under *(c)* contrast with those under *(a)* since they operate within the national legal systems and generally require new legislation (if the present law does not already give effect to them). They also contrast with treaties under *(d)* since they continue

to engage the state as an immediate party to the right-obligation relationship.

## 2 THE IMPLEMENTATION OF TREATIES THROUGH NATIONAL LEGISLATION[6]

43 THERE IS A BASIC CONSTITUTIONAL PRINCIPLE (already

mentioned in paras 28 and 33) that the executive cannot, by entering into a treaty, change the law. In addition to the prerogative steps taken by the executive to become party to the treaty, legislation is in general needed if the treaty is to change the rights and obligations of individuals or to enhance the powers of the state. This chapter considers the means of legislative implementation, while the next chapter considers the role that treaties play in courts.

44 Legislative practice and the relevant commentary indicate five broad approaches to the use of legislation to implement treaties. In four of them it is necessary for the treaty to be enacted somehow in domestic legislation. The reason lies in the concept of the separation of powers: if the treaty affects rights and duties under national law, then the treaty becomes the concern of the legislature and not merely of the executive (which will have negotiated the treaty).[7]

45 The five approaches are as follows:

• no legislation is required;

• the Act gives direct effect to the treaty text, by using a formula to the effect that the treaty provisions "have the force of law" in

New Zealand;

• the Act uses some of the wording of the treaty, incorporated into the body of the relevant area of law, or indicates in some other way its treaty origins;

• the substance of the treaty is incorporated into the body of the law, without any obvious indication of the fact; and

• the Act might authorise the making of subordinate legislation (regulations or rules) which is to give effect to identified treaties or at least take cognizance of them; that subordinate legislation might take any of the second, third and fourth approaches above.

46 Treaties are now discussed according to the five approaches outlined above. Their allocation turns on

• the personal scope of the rights, interests and obligations created by the treaty;

• the nature of the rights, interests and obligations of the treaty states; and

• the importance in terms of policy and principle of the matters involved.

The last is particularly relevant to the choice between primary and secondary legislation. Some legislation will not fall clearly within one of the approaches: much of it for instance combines elements of the second and third approaches in para 45; and Acts often directly implement major treaty provisions while delegating authority (the fifth approach) for detailed implementation.

### No legislation is required

47 If the treaty operates essentially at the international level between states, creating rights and obligations only for them, then gener-

ally no question of national law arises. National law need not be changed; no rights and obligations under it are involved.

48 Examples of treaties which allow this approach are the Convention on International Liability for Damage caused by Space Objects, the Statute of the International Court of Justice, the Vienna Convention on the Law of Treaties, and the Hague Convention on the Pacific Settlement of International Disputes 1899. The second and last provide for exercises of prerogative and foreign affairs powers in the electoral and nomination processes, and in the actual operation of international dispute resolution processes. It is possible (but unlikely) that questions of immunity and privileges of those involved in the processes could arise; and if so, national legislation may be needed, as in s 10 of the Diplomatic Privileges and Immunities Act 1968, which confers, by Order in Council, diplomatic privileges and immunities on judges and registrars of the International Court of

Justice (ICJ).

### The statute gives direct effect to the treaty text

49 Many statutes enacted in New Zealand, as elsewhere in the Commonwealth, set out the treaty text and provide that all or part of it is to "have the force of law". Although the legislation may provide some support (eg, in naming the courts to exercise jurisdiction under

the treaty), essentially the treaty is left to speak for itself.

50 Although formulated for a different purpose, the distinction between *self-executing* and *non-self-executing* treaties is useful here. It has been explained as follows:

Only such provisions of a Convention are self-executing which may be applied by the organs of the State and which can be enforced by the Courts and which create rights for the individuals; they govern or affect directly relations of the internal life between the individual, and the individuals and the State or the public authorities. Provisions which do not create by themselves rights or obligations of persons or interests and which cannot be justiciable or do not refer to acts or omissions of State organs are not self-executing . . . (*Malachtou v Armefti* (1987) 88 ILR 199, 212–213)

If a treaty provision falls within the second, "non-self-executing" category, extensive national practice emphasises that further action must be taken by national, and especially legislative, authorities before the treaty provisions can be given effect to by national courts. Characteristics of the treaties indicating the need for that action include the following:

• The treaty might *empower* the state to take action. Consider for instance those parts of the law of the sea relating to the continental shelf and the exclusive economic zone (and probably the territorial sea as well): international law does not require states to make the claims that they are entitled to make. National action addressed to the acceptance of the treaty is called for; in some cases that action will be executive but usually it is legislative. The Tokyo Convention on Crimes on Board Aircraft and the High Seas Intervention Conventions similarly authorise national action which in some cases will require a legislative basis.

• The treaty itself might create a *duty* to take national legislative action. For instance, article 4 of the International Convention on the Elimination of All Forms of Racial Discrimination requires states parties to declare as an offence punishable by law all dissemination of ideas based on racial superiority or hatred, and incitement to racial discrimination, all acts of violence or incitement to such acts against any race or group of persons of another colour or ethnic origin, and also the provision of any assistance to racist activities, including their financing.

• The treaty might not only create a duty to take that distinct

state legislative action, but it might also give that obligation a *programmatic character*. For instance, the undertaking of each states party under article 2(1) of the International Covenant on Economic, Social and Cultural Rights is to "take steps . . . to the maximum of its available resources, with a view to achieving progressively the full realization of the rights recognized in the present Covenant by all appropriate means, including particularly the adoption of legislative measures".

• The wording of the undertaking might be *so broad as not to provide judicially manageable standards.* Pious declarations are non-self-executing. Some of the condemnatory language in the Racial Discrimination Convention has such a character.

• The obligations may be of a *procedural* rather than a substantive character. Many treaties, for instance in the trade and environment areas, require states to notify affected states and consult about certain matters. These provisions operate essentially

only between the states parties (see paras 47–48). Chief Justice Marshall made an important statement in the first major United States decision on this matter:

. . . when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the court. (*Foster v Neilson* (1828) 27 US 253, 314; (1830) 8 US 108, 121)

51 What kinds of treaties *can* be directly implemented (for instance, by scheduling their text and directly stating that they have the force of law)? Legislative and judicial practice identify several groups of treaties:

• PRIVATE LAW CONVENTIONS. Among these treaties are

the Warsaw Convention on Carriage by Air, the New York Convention on the Recognition and Enforcement of Arbitral Awards, the Hague Rules on Carriage of Goods by Sea, the United Nations Convention on Contracts for the International Sale

of Goods, the UNCITRAL Model Law on International Commercial Arbitration, the International Centre for the Settlement of Investment Disputes (ICSID) Convention, and the Convention on the Civil Aspects of International Child Abduction. With the exception of the last, the relevant statutes do directly implement the scheduled treaty text.

• SAFETY AND REGULATORY CONVENTIONS. The provisions of many conventions in this general category, for instance those adopted by the International Labour Organisation, are often integrated into the body of the relevant law. But at least in the maritime and aviation areas there are instances of direct application—often by means of subordinate legislation—of the conventions and regulations relating to the safety of life at sea, collisions at sea, and the rules of the air.

• PRIVILEGES AND IMMUNITIES. The relevant provisions of the Vienna Conventions on Diplomatic and Consular Relations can similarly be scheduled to the legislation and given the force of law.

• EXTRADITION. Some states also find it convenient to implement some bilateral treaties directly. On the model of the United Kingdom extradition legislation (first enacted in 1870), New Zealand and other Commonwealth legislation provides for the direct application of extradition treaties, most but not all of which are bilateral. In this case, the principal legislation establishes the basic policy, while subordinate legislation gives effect to the treaties. That principal legislation may however place important limits on the treaty negotiators—for instance in respect of the extradition of citizens, or the requirement that the treaty be subject to termination on a year's notice or less, or the categories of offences that might be included. At least those limits exist if the treaty is to be implemented by subordinate legislation.

• DOUBLE TAXATION AGREEMENTS. These are drafted in a standard form which facilitates their direct incorporation into the law. That direct incorporation also facilitates direct reference to the Organisation for Economic Cooperation and Development (OECD) Model Convention with its commentary. Some bilateral social security and health care agreements are also given direct effect.

• INTERNATIONAL CRIME CONVENTIONS. Most of these follow the third and fourth approaches of para 45. But in the case of the Geneva Conventions of 1949 and the 1977 first Additional Protocol, New Zealand along with several other Commonwealth countries has provided directly that contravention of the grave breach provisions in the texts is an offence. The legislation deals separately with matters of procedure and appeal in conformity with national law. The texts of the Conventions and Protocol as a whole are scheduled to the Act.

52 The groups of treaties listed so far are given direct effect to by legislation which takes a *positive* form: the treaty has the force of law in the national legal system. By contrast, the legislation in many cases explicitly *limits its application* by reference to treaties or other international obligations. For instance, a long-standing New Zealand statute authorises the making of regulations prohibiting or restricting foreign vessels from coastal trade on the basis of reciprocity, "so far as treaty obligations binding on Her Majesty's Government of New Zealand permit" (see s 204(1) of the Customs Law Act 1908). As the next chapter shows, courts might also read legislation as limited by relevant treaty provisions even if the treaty is not mentioned, so long as the legislative language allows. Such provisions can

derive both from treaties existing at the time of enactment and from subsequent treaties.

## Some treaty wording is incorporated into the body of the law

53 As already indicated in para 50, there will often be good reason for incorporating the substance of the treaty provision into the body of the law rather than leaving the treaty to speak for itself. Sometimes this will be done relatively conspicuously; sometimes the treaty origin or connection will be obscured. One possible danger of obscurity is mentioned in para 61.

54 The indication of the treaty origin may appear in a number of ways—by the use of treaty wording, by express reference to the treaty, or both, as in the following instances:

• INTERNATIONAL CRIME CONVENTIONS. Legislation implementing conventions concerning crimes relating to international civil aviation and maritime navigation often uses the treaty language in stating the substantive offence. The legislation also frequently refers, in the title, preamble or a purpose provision, to the treaties which it is designed to implement. That might also be the case with the Convention on Crimes against Internationally Protected Persons, the Torture Convention and the Genocide Convention. In the last case, however, New Zealand, like other Commonwealth countries, decided that its regular criminal law deals adequately with the matter and that no further legislation is required.

• REGULATORY MATTERS. Much of the wording included in the conventions relating to marine pollution can be carried directly over into the national legislation, as can much of the

scheduled and often amended technical detail in the Ozone Layer Convention and Protocol. Again, it is possible to refer to the relevant treaties in the legislation.

## The substance of the treaty is incorporated into the body of the law without any obvious indication

55 If the judgment is made before acceptance of a treaty that

national law already implements the treaty (as with the Genocide Convention, para 54), then there will be no sign on the face of the relevant legislation that for the future the legislation will also be implementing the treaty.

56 HUMAN RIGHTS TREATIES generally require this approach. The main human rights treaties—the 1966 International Covenants, and the Racial Discrimination, the Discrimination Against Women, and the Child Conventions—call to a large extent for legislative and other actions by the states parties. Many of their provisions are not self-executing. Further, they are relevant to a very wide range of law and are not confined within a particular topic. Acceptance calls for a broad and detailed review of that wide range of law and practice. That review might lead to particular amendments to the law, but it is unlikely that the treaties will appear in the text as the origin of the

amendment. On the other hand, general bill of rights, human rights or anti-discrimination legislation might refer to the relevant treaties, although such legislation will not be comprehensive.

57 The New Zealand Bill of Rights Act 1990 is a major instance. According to its title, the purpose of this Act is

(a) To affirm, protect, and promote human rights and fundamental freedoms in New Zealand;

(b) To affirm New Zealand's commitment to the International Covenant on Civil and Political Rights.

58 The Bill of Rights Act requires the Attorney-General to report to the House of Representatives any provision of a Bill which appears to be inconsistent with any of the rights and freedoms contained in the Bill of Rights Act; and an administrative procedure has been established in support of that obligation.[8]

59 Those within the executive and the legislature concerned with the enactment of legislation must accordingly address the question of compliance with the Bill of Rights Act, which may require reference to relevant treaty obligations and their interpretation. Such a treaty reference is also required by Cabinet Office rules. Ministers in proposing legislation are to answer the question, *Does the legislation comply with relevant international obligations and standards?* Recent concrete situations in which these questions have been considered include proposed legislation interfering with court proceedings, procedural safeguards controlling the use of public powers affecting the important rights and interests of individuals, and freedom of speech in relation to racial vilification.

60 INTERNATIONAL CRIME CONVENTIONS. The treaty provisions concerning some offences, including those relating to drugs, are not necessarily directly reflected in the relevant criminal law. Where they are incorporated in the criminal law, it may not use the treaty language or refer to the treaties.

61 One danger of not implementing the treaty language is that

those concerned with reviewing and amending the legislation or

with applying and interpreting it may be ignorant of the treaty relationship if the legislation is silent about its international origins or context. Treaty obligations might be breached unknowingly.

Even if the treaty language is not capable of direct use and implementation, the statute might nevertheless be able to indicate its treaty origins by appropriate references in the title, for instance, or the purpose provisions, or provisions empowering the making of regulations and the exercise of public powers. A reference might avoid later problems.

## Authority is delegated to implement the treaty

62 Technical and regulatory treaties can be—and are—implemented in part by the delegation of legislative and executive power: for instance, the Convention on International Civil Aviation, the International Air Services Transit Agreement, and GATT and the agreements associated with the WTO. Aspects of other conven-

tions (eg, those relating to pollution or the ozone layer) are also implemented in this way. One justification of such delegation of power is that changes might be technical and need to be made quite frequently, and Parliament has settled the principle and policy at an earlier stage. Ordinarily, it need not be concerned with the ongoing detailed application of the policy. Indeed, some of

the relevant rules (eg, some adopted under the International Civil Aviation Organisation (ICAO) Convention) might become part of national law automatically, without any national action.

63 That approach is supported by the general doctrine about the delegation of legislative power. In New Zealand the doctrine has been stated as follows:

The line between the primary and the delegated lawmaker should in general be that between principle and detail, between policy and its implementation. Parliament with its representative composition and through its public processes should address and endorse (or not) the policies presented to it by the executive, while recognising that matters of less significance or of a technical character, or requiring rapid adaption or experimentation might be left to subordinate law-

making. Another situation in which lawmaking powers might be and are delegated—and in broader terms—is to deal with emergencies. (Legislation Advisory Committee, *Legislative Change: guidelines on process and content* (2nd ed, Report No 6, 1991), para 113)

64 Some statutes also confer power to list the states parties to the treaties. That might occur by Order in Council or more simply and conveniently by a statement from the Secretary for Foreign Affairs and Trade.

## *3 THE IMPLEMENTATION OF TREATIES THROUGH THE COURTS*

65 ALTHOUGH THE BASIC CONSTITUTIONAL PRINCIPLE is that

the executive cannot, by entering into a treaty, change the law, it does not follow that courts may not have regard to treaties unless Parliament has acted to incorporate their provisions into law. There are at least five ways in which courts might take treaties into account:

• as a foundation of the constitution;

• as relevant to the determination of the common law;

• as a declaratory statement of customary international law which is itself part of the law of the land;

• as evidence of public policy; and

• as relevant to the interpretation of a statute.

The discussion of these matters is brief. The law is evolving, and more extensive discussions are available,[9] particularly of the third and fifth ways, which are of most significance.

### A treaty as a foundation of the constitution

66 An example of the use of a treaty in a constitutional context is found in cases about the power of New Zealand, as well as Australia and South Africa, to legislate for mandated territories brought under their administration when the League of Nations was established. Courts in those countries in the 1920s and 1930s sought the source of that power in a range of documents, including the Treaty of Versailles, which established the mandates system, and the mandates documents themselves.[10]

67 The question of basic constitutional effect has also been raised, but not settled, in respect of the Act of Union of 1707 between England and Scotland, as well as the Treaty of Waitangi. The very broad wording of principal provisions of those treaties raises in addition the issue of their self-executing or justiciable character.[11]

### A treaty as relevant to the determination of the common law

68 English courts have recently decided that local government institutions cannot sue for defamation.[12] The Court of Appeal reached that conclusion principally by reference to article 10 of the European Convention for the Protection of Human Rights and Fundamental Freedoms. The Court considered that it could depend on the Convention since the common law was uncertain and there was no controlling decision of the Court of Appeal or House of Lords. The House of Lords was able to reach the same conclusion without having to rely on the Convention. Lord Keith, with whom the other Law Lords concurred, agreed with the view that in the area of freedom of speech there was no difference in principle between the law of England and the Convention: ". . . I find it satisfactory to be able to conclude that the common law of England is consistent with the obligations assumed by the Crown under the Treaty in this particular field" (551).

### A treaty as a declaratory statement of customary international law

69 Since courts accept that customary international law is part of national law and since the best evidence of customary international law may very often be the relevant codification treaty, courts do refer to such treaties. One important instance is the Vienna Convention on the Law of Treaties.[13] This use of treaties is increasingly important as more and more treaties are concluded. The influence is especially apparent in the area of human rights. Treaties are of course one of the international sources to which a court might refer in determining the current state of customary international law and hence

the common law. They might also refer to decisions of the ICJ,

reports of the International Law Commission (ILC), and academic writings.[14]

### A treaty as evidence of public policy

70 In *Re Drummond Wren* [1945] 4 DLR 644, an Ontario court used the United Nations Charter to strike down a racially restrictive covenant. For Mackay J, in discovering public policy, "first and of profound significance is the recent San Francisco Charter to which Canada was a signatory and which the Dominion Parliament has now ratified". He referred to the stirring references to human rights in the preamble and articles 1 and 55, and mentioned as well the Atlantic Charter and the disapproval of racial discrimination to be found in Ontario statutes prohibiting some but not all acts of racial discrimination. The New Zealand Supreme Court in *Van Gorkom v Attorney-General* [1977] 1 NZLR 535, 542–543 likewise recognised that reference could be made to international documents (in

this case, the Universal Declaration of Human Rights and the Declaration on Elimination of Discrimination Against Women) when it invalidated discriminatory conditions laid down by a Minister under subordinate legislation.

## A treaty as relevant to the interpretation of a statute

71 Courts may be willing to have regard to a treaty in interpreting legislation, even if the treaty has not been incorporated into national law[15] (or even if the treaty did not exist when the statute was enacted). A very common instance now is the interpretation of constitutional documents, including Bills of Rights, by reference to the International Covenant on Civil and Political Rights or regional human rights treaties and then by reference to decisions interpreting those texts.[16] That international material, along with comparative material, may be relevant to determining whether a limit on a right is a reasonable one prescribed by law which can be demonstrably justified in a free and democratic society—the test stated in the Canadian Charter of Rights and Freedoms and the New Zealand Bill of Rights Act 1990.

72 The question of interpretation, like others noted in this chapter, is a complex one which produces different attitudes. Among the issues are the following:

• THE THRESHOLD. Must the legislation be ambiguous or

the likely interpretation unreasonable or absurd, before having recourse to international sources?[17]

• THE SILENT STATUTE. If the legislation makes no reference to the treaty, can courts nevertheless have regard to it?[18]

• THE DIRECT RELEVANCE OF THE TREATY. Reference to the treaty may be reserved to the situation where the legislation was, apparently, designed to give effect to the treaty, or the treaty may be relevant even when there was no such connection. Courts are increasingly willing to consider the treaty in the second situation as well, because they impute to Parliament an intention to legislate consistently with its international obligations.[19] They take this approach in particular when the treaty, especially a human rights treaty, is designed to control state action. By their very nature, statutes which might be read as challenging those protections are not designed to give effect to the relevant treaties.

73 It is possible to find courts in the Commonwealth taking either more restrictive or broader approaches to those questions, and to related ones such as the relevance of the treaty to an administrator's discretion or a court's discretion in granting relief. Differing attitudes on this matter are connected with larger questions of judicial method and with what appears to be a greater willingness of some courts to have regard to a broader range of material in reaching their decisions. More basic constitutional issues might also be relevant. For instance, in the United Kingdom, the European Convention on Human Rights is not only relevant to the interpretation of areas of United Kingdom legislation governed by European Community law, but the Convention might even be the basis for striking the United Kingdom law down.[20]

---

**NZLII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback
URL: *http://www.nzlii.org/nz/other/nzlc/report/R34/R34-Part.html*

# EXHIBIT 35



CANADA

CONSOLIDATION

CODIFICATION

# Copyright Act

# Loi sur le droit d'auteur

R.S.C., 1985, c. C-42

L.R.C. (1985), ch. C-42

Current to November 27, 2023

À jour au 27 novembre 2023

Last amended on April 27, 2023

Dernière modification le 27 avril 2023

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

Copyright
**PART I** Copyright and Moral Rights in Works
Term of Copyright
**Sections 11.1-13**

*Droit d'auteur*
**PARTIE I** Droit d'auteur et droits moraux sur les oeuvres
Durée du droit d'auteur
**Articles 11.1-13**

published before the copyright expires, the copyright continues until the earlier of the end of 75 years following the end of the calendar year in which the first publication occurs and 100 years following the end of the calendar year in which the cinematographic work or the compilation was made.

1993, c. 44, s. 60; 1997, c. 24, s. 9; 2020, c. 1, s. 26.

### Where copyright belongs to Her Majesty

**12** Without prejudice to any rights or privileges of the Crown, where any work is, or has been, prepared or published by or under the direction or control of Her Majesty or any government department, the copyright in the work shall, subject to any agreement with the author, belong to Her Majesty and in that case shall continue for the remainder of the calendar year of the first publication of the work and for a period of fifty years following the end of that calendar year.

R.S., 1985, c. C-42, s. 12; 1993, c. 44, s. 60.

## Ownership of Copyright

### Ownership of copyright

**13 (1)** Subject to this Act, the author of a work shall be the first owner of the copyright therein.

**(2)** [Repealed, 2012, c. 20, s. 7]

### Work made in the course of employment

**(3)** Where the author of a work was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright, but where the work is an article or other contribution to a newspaper, magazine or similar periodical, there shall, in the absence of any agreement to the contrary, be deemed to be reserved to the author a right to restrain the publication of the work, otherwise than as part of a newspaper, magazine or similar periodical.

### Assignments and licences

**(4)** The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

compilation est publiée avant l'expiration du droit d'auteur, celui-ci demeure jusqu'à la fin de la soixante-quinzième année suivant l'année de sa première publication ou, si elle lui est antérieure, la fin de la centième année suivant l'année de sa création.

1993, ch. 44, art. 60; 1997, ch. 24, art. 9; 2020, ch. 1, art. 26.

### Quand le droit d'auteur appartient à Sa Majesté

**12** Sous réserve de tous les droits ou privilèges de la Couronne, le droit d'auteur sur les œuvres préparées ou publiées par l'entremise, sous la direction ou la surveillance de Sa Majesté ou d'un ministère du gouvernement, appartient, sauf stipulation conclue avec l'auteur, à Sa Majesté et, dans ce cas, il subsiste jusqu'à la fin de la cinquantième année suivant celle de la première publication de l'œuvre.

L.R. (1985), ch. C-42, art. 12; 1993, ch. 44, art. 60.

## Possession du droit d'auteur

### Possession du droit d'auteur

**13 (1)** Sous réserve des autres dispositions de la présente loi, l'auteur d'une œuvre est le premier titulaire du droit d'auteur sur cette œuvre.

**(2)** [Abrogé, 2012, ch. 20, art. 7]

### Œuvre exécutée dans l'exercice d'un emploi

**(3)** Lorsque l'auteur est employé par une autre personne en vertu d'un contrat de louage de service ou d'apprentissage, et que l'œuvre est exécutée dans l'exercice de cet emploi, l'employeur est, à moins de stipulation contraire, le premier titulaire du droit d'auteur; mais lorsque l'œuvre est un article ou une autre contribution, à un journal, à une revue ou à un périodique du même genre, l'auteur, en l'absence de convention contraire, est réputé posséder le droit d'interdire la publication de cette œuvre ailleurs que dans un journal, une revue ou un périodique semblable.

### Cession et licences

**(4)** Le titulaire du droit d'auteur sur une œuvre peut céder ce droit, en totalité ou en partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

# EXHIBIT 36

*Changes to legislation:* Copyright, Designs and Patents Act 1988 is up to date with all changes known to be in force on or before 12 October 2023. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes



# Copyright, Designs and Patents Act 1988

## 1988 CHAPTER 48

An Act to restate the law of copyright, with amendments; to make fresh provision as to the rights of performers and others in performances; to confer a design right in original designs; to amend the Registered Designs Act 1949; to make provision with respect to patent agents and trade mark agents; to confer patents and designs jurisdiction on certain county courts; to amend the law of patents; to make provision with respect to devices designed to circumvent copy-protection of works in electronic form; to make fresh provision penalising the fraudulent reception of transmissions; to make the fraudulent application or use of a trade mark an offence; to make provision for the benefit of the Hospital for Sick Children, Great Ormond Street, London; to enable financial assistance to be given to certain international bodies; and for connected purposes. [15th November 1988]

Be it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

**Modifications etc. (not altering text)**

C1     Act amended by Broadcasting Act 1990 (c. 42, SIF 96), s. 176, **Sch. 17 para. 7(1)**

## PART I

### COPYRIGHT

**Modifications etc. (not altering text)**

C2     Pt. I (ss. 1-179) modified by S.I. 1989/988, **art. 2(3)**
C3     Pt. I (ss. 1-179) extended by S.I. 1989/1293, **arts. 2(3)**, 3, 4(4)-(6)
C4     Pt. I (ss. 1-179) applied (with modifications) by S.I. 1993/942, arts. 2(3), 5, **Sch. 4** (with art. 6)

**Changes to legislation:** *Copyright, Designs and Patents Act 1988 is up to date with all changes known to be in force on or before 12 October 2023. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes*

(2) Copyright does not subsist in the typographical arrangement of a published edition if, or to the extent that, it reproduces the typographical arrangement of a previous edition.

*Authorship and ownership of copyright*

**9    Authorship of work.**

(1) In this Part "author", in relation to a work, means the person who creates it.

(2) That person shall be taken to be—

**F26**[**F26**( aa )    in the case of a sound recording, the producer;

**F26**( ab )    in the case of a film, the producer and the principal director;]

(b)    in the case of a broadcast, the person making the broadcast (see section 6(3)) or, in the case of a broadcast which relays another broadcast by reception and immediate re-transmission, the person making that other broadcast;

(c)    **F27** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(d)    in the case of the typographical arrangement of a published edition, the publisher.

(3) In the case of a literary, dramatic, musical or artistic work which is computer-generated, the author shall be taken to be the person by whom the arrangements necessary for the creation of the work are undertaken.

(4) For the purposes of this Part a work is of "unknown authorship" if the identity of the author is unknown or, in the case of a work of joint authorship, if the identity of none of the authors is known.

(5) For the purposes of this Part the identity of an author shall be regarded as unknown if it is not possible for a person to ascertain his identity by reasonable inquiry; but if his identity is once known it shall not subsequently be regarded as unknown.

**Textual Amendments**

**F26**    S. 9(2)(aa)(ab) substituted for s. 9(2)(a) (1.12.1996 with effect in relation to films made on or after 1.7.1994) by S.I. 1996/2967, **regs. 18(1),** 36

**F27**    S. 9(2)(c) repealed (31.10.2003) by The Copyright and Related Rights Regulations 2003 (S.I. 2003/2498), regs. 2(2), 5(4), **Sch. 2** (with regs. 31-40)

**10    Works of joint authorship.**

(1) In this Part a "work of joint authorship" means a work produced by the collaboration of two or more authors in which the contribution of each author is not distinct from that of the other author or authors.

**F28**[( 1A ) A film shall be treated as a work of joint authorship unless the producer and the principal director are the same person.]

(2) A broadcast shall be treated as a work of joint authorship in any case where more than one person is to be taken as making the broadcast (see section 6(3)).

---

*Changes to legislation: Copyright, Designs and Patents Act 1988 is up to date with all changes known to be in force on or before 12 October 2023. There are changes that may be brought into force at a future date. Changes that have been made appear in the content and are referenced with annotations. (See end of Document for details) View outstanding changes*

---

(3) References in this Part to the author of a work shall, except as otherwise provided, be construed in relation to a work of joint authorship as references to all the authors of the work.

**Textual Amendments**

**F28**  S. 10(1A) inserted (1.12.1996 with effet in relation to films made on or after 1.7.1994) by S.I. 1996/2967, **regs. 18(2)**, 36

[F29**10A  Works of co-authorship**

(1) In this Part a "work of co-authorship" means a work produced by the collaboration of the author of a musical work and the author of a literary work where the two works are created in order to be used together.

(2) References in this Part to a work or the author of a work shall, except as otherwise provided, be construed in relation to a work of co-authorship as references to each of the separate musical and literary works comprised in the work of co-authorship and to each of the authors of such works.]

**Textual Amendments**

**F29**  S. 10A inserted (1.11.2013) by The Copyright and Duration of Rights in Performances Regulations 2013 (S.I. 2013/1782), regs. 1, **4** (with regs. 11-27)

**11      First ownership of copyright.**

(1) The author of a work is the first owner of any copyright in it, subject to the following provisions.

(2) Where a literary, dramatic, musical or artistic work [F30, or a film,] is made by an employee in the course of his employment, his employer is the first owner of any copyright in the work subject to any agreement to the contrary.

(3) This section does not apply to Crown copyright or Parliamentary copyright (see sections 163 and 165) or to copyright which subsists by virtue of section 168 (copyright of certain international organisations).

**Textual Amendments**

**F30**  Words in s. 11(2) inserted (1.12.1996 with effect in relation to films made on or after 1.7.1994) by S.I. 1996/2967, **regs. 18(3)**, 36

*Duration of copyright*

[F31**12      Duration of copyright in literary, dramatic, musical or artistic works.**

(1) The following provisions have effect with respect to the duration of copyright in a literary, dramatic, musical or artistic work.

# EXHIBIT 37



# RÉPUBLIQUE FRANÇAISE
*Liberté*
*Égalité*
*Fraternité*

# Légifrance
Le service public de la diffusion du droit

## Code de la propriété intellectuelle

### Article L113-7

#### Version en vigueur depuis le 03 juillet 1992

> Partie législative (Articles L111-1 à L811-6)
> Première partie : La propriété littéraire et artistique (Articles L111-1 à L343-7)
> Livre Ier : Le droit d'auteur (Articles L111-1 à L139-1)
> Titre Ier : Objet du droit d'auteur (Articles L111-1 à L139-10)
> Chapitre III : Titulaires du droit d'auteur (Articles L113-1 à L113-10)

**Article L113-7**

**Version en vigueur depuis le 03 juillet 1992**

Création Loi 92-597 1992-07-01 annexe JORF 3 juillet 1992

Ont la qualité d'auteur d'une oeuvre audiovisuelle la ou les personnes physiques qui réalisent la création intellectuelle de cette oeuvre.

Sont présumés, sauf preuve contraire, coauteurs d'une oeuvre audiovisuelle réalisée en collaboration :

1° L'auteur du scénario ;

2° L'auteur de l'adaptation ;

3° L'auteur du texte parlé ;

4° L'auteur des compositions musicales avec ou sans paroles spécialement réalisées pour l'oeuvre ;

5° Le réalisateur.

Lorsque l'oeuvre audiovisuelle est tirée d'une oeuvre ou d'un scénario préexistants encore protégés, les auteurs de l'oeuvre originaire sont assimilés aux auteurs de l'oeuvre nouvelle.

# EXHIBIT 38

| INTELLECTUAL PROPERTY CODE |
|---|
| **Legislative Part** |

**PART I**
**Literary and Artistic Property**                        **Articles L111-1 to L343-4**

  **BOOK I**
  **Copyright**                                   **Articles L111-1 to L133-4**

    TITLE I
    Subject of Copyright                    Articles L111-1 to L113-9

      CHAPTER I
      Nature of Copyright                Articles L111-1 to L111-5

**Article L111-1**

The author of a work of the mind shall enjoy in that work, by the mere fact of its creation, an exclusive incorporeal property right which shall be enforceable against all persons.

This right shall include attributes of an intellectual and moral nature as well as attributes of an economic nature, as determined by Books I and III of this Code.

The existence or conclusion of a contract for hire or of service by the author of a work of the mind shall in no way derogate from the enjoyment of the right afforded by the first paragraph above.

**Article L111-2**

A work shall be deemed to have been created, irrespective of any public disclosure, by the mere fact of realization of the author's concept, even if incomplete.

**Article L111-3**

The incorporeal property right set out in Article L111-1 shall be independent of any property right in the physical object.

Acquisition of such object shall not vest in the acquirer of the object any of the rights afforded by this Code, except in those cases referred to in the provisions of the second and third paragraphs of Article L123-4. These rights shall subsist in the person of the author or of his successors in title who, nevertheless, may not require the proprietor of the physical object to make such object available to them for the exercise of those rights. However, in the event of manifest abuse by the proprietor preventing exercise of the right of disclosure, the first instance court may take any appropriate measure, in accordance with the provisions of Article L121-3.

**Article L111-4**

Subject to the international conventions to which France is party, in the event that it is ascertained, after consultation with the Minister for Foreign Affairs, that a State does not afford to works disclosed for the first time in France, in any form whatsoever, protection that is adequate and effective, works disclosed for the first time on the territory of such State shall not enjoy the copyright protection afforded by French legislation.

However, neither the integrity nor the authorship of such works may be impaired.

In the cases referred to in the first paragraph above, the royalties shall be paid to general interest bodies designated by decree.

**Article L111-5**

Subject to the international conventions, foreigners shall enjoy in France the rights afforded to authors of software by this Code on condition that the law of the State of which they are nationals or on the territory of which they have their place of residence, their registered offices or an effective establishment affords its protection to software created by French nationals and by persons having in France their place of residence or an effective establishment.

      CHAPTER II
      Protected Work                    Articles L112-1 to L112-4

**Article L112-1**

The provisions of this Code shall protect the rights of authors in all works of the mind, whatever their kind, form of expression, merit or purpose.

**Article L112-2**

INTELLECTUAL PROPERTY CODE

has been disclosed.

The author's rights shall vest in such person.

### Article L113-6

The authors of pseudonymous and anonymous works shall enjoy in such works the rights afforded by Article L111-1.

They shall be represented in the exercise of those rights by the original editor or publisher, until such time as they reveal their true identity and prove their authorship.

The declaration referred to in the preceding paragraph may be made by will; however, any rights previously acquired by other persons shall be maintained.

The provisions in the second and third paragraphs above shall not apply if the pseudonym adopted by the author leaves no doubt as to his true identity.

### Article L113-7

Authorship of an audiovisual work shall belong to the natural person or persons who have carried out the intellectual creation of the work.

Unless proved otherwise, the following are presumed to be the joint authors of an audiovisual work made in collaboration:

1°.the author of the script;
2°.the author of the adaptation;
3°.the author of the dialogue;
4°.the author of the musical compositions, with or without words, specially composed for the work;
5°.the director.

If an audiovisual work is adapted from a preexisting work or script which is still protected, the authors of the original work shall be assimilated to the authors of the new work.

### Article L113-8

Authorship of a radio work shall belong to the natural person or persons who carried out the intellectual creation of the work.

The provisions of the final paragraph of Article L113-7 and those of Article L121-6 shall apply to radio works.

### Article L113-9

*(Act No. 94-361 of 10 May 1994 art. 2 Official Journal of 11 May 1994)*

Unless otherwise provided by statutory provision or stipulation, the economic rights in the software and its documentation created by one or more employees in the execution of their duties or following the instructions given by their employer shall be the property of the employer and he exclusively shall be entitled to exercise them.

Any dispute concerning the application of this Article shall be submitted to the first instance court of the registered place of business of the employer.

The first paragraph of this Article shall also apply to servants of the State, of local authorities and of public establishments of an administrative nature.

TITLE II
Authors' Rights                                                Articles L121-1 to
                                                               L123-12

CHAPTER I
Moral Right                                                    Articles L121-1 to
                                                               L121-9

### Article L121-1

An author shall enjoy the right to respect for his name, his authorship and his work.

This right shall attach to his person.

It shall be perpetual, inalienable and imprescriptible. It may be transmitted mortis causa to the heirs of the author.

Exercise may be conferred on another person under the provisions of a will.

### Article L121-2

The author alone shall have the right to divulge his work. He shall determine the method of disclosure and shall fix the conditions thereof, subject to Article L132-24.

After his death, the right to disclose his posthumous works shall be exercised during their lifetime by the executor or executors designated by the author. If there are none, or after their death, and unless the author has willed otherwise, this right shall be exercised in the following order: by the descendants, by the spouse against whom there exists no final judgment of separation and who has not remarried, by the heirs other than descendants, who inherit all or part of the estate and by the universal legatees or donees of the totality of the future assets.

This right may be exercised even after expiry of the exclusive right of exploitation set out in Article L123-1.

### Article L121-3

In the event of manifest abuse in the exercise or non-exercise of the right of disclosure by the deceased author's representatives referred to in Article L121-2, the first instance court may order any appropriate measure. The same shall

# EXHIBIT 39

**BOE**

## LEGISLACIÓN CONSOLIDADA

Real Decreto Legislativo 1/1996, de 12 de abril, por el que se aprueba el texto refundido de la Ley de Propiedad Intelectual, regularizando, aclarando y armonizando las disposiciones legales vigentes sobre la materia.

———————

Ministerio de Cultura
«BOE» núm. 97, de 22 de abril de 1996
Referencia: BOE-A-1996-8930

———————

## ÍNDICE

*Preámbulo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Artículos* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Disposiciones derogatorias* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Disposiciones finales* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

TEXTO REFUNDIDO DE LA LEY DE PROPIEDAD INTELECTUAL . . . . . . . . . . . . . . . . . . . . . . . . . .  5

LIBRO PRIMERO. De los derechos de autor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

TÍTULO I. Disposiciones generales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

TÍTULO II. Sujeto, objeto y contenido . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

CAPÍTULO I. Sujetos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

CAPÍTULO II. Objeto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

CAPÍTULO III. Contenido . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Sección 1.ª Derecho moral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Sección 2.ª Derechos de explotación. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Sección 3.ª Otros derechos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TÍTULO III. Duración, límites y salvaguardia de otras disposiciones legales. . . . . . . . . . . . . . . . . . 17

CAPÍTULO I. Duración . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CAPÍTULO II. Límites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TEXTO REFUNDIDO DE LA LEY DE PROPIEDAD INTELECTUAL

LIBRO PRIMERO

**De los derechos de autor**

TÍTULO I

**Disposiciones generales**

**Artículo 1.** *Hecho generador.*

La propiedad intelectual de una obra literaria, artística o científica corresponde al autor por el solo hecho de su creación.

**Artículo 2.** *Contenido.*

La propiedad intelectual está integrada por derechos de carácter personal y patrimonial, que atribuyen al autor la plena disposición y el derecho exclusivo a la explotación de la obra, sin más limitaciones que las establecidas en la Ley.

**Artículo 3.** *Características.*

Los derechos de autor son independientes, compatibles y acumulables con:

1.º La propiedad y otros derechos que tengan por objeto la cosa material a la que está incorporada la creación intelectual.
2.º Los derechos de propiedad industrial que puedan existir sobre la obra.
3.º Los otros derechos de propiedad intelectual reconocidos en el Libro II de la presente Ley.

**Artículo 4.** *Divulgación y publicación.*

A efectos de lo dispuesto en la presente Ley, se entiende por divulgación de una obra toda expresión de la misma que, con el consentimiento del autor, la haga accesible por primera vez al público en cualquier forma; y por publicación, la divulgación que se realice mediante la puesta a disposición del público de un número de ejemplares de la obra que satisfaga razonablemente sus necesidades estimadas de acuerdo con la naturaleza y finalidad de la misma.

TÍTULO II

**Sujeto, objeto y contenido**

CAPÍTULO I

**Sujetos**

**Artículo 5.** *Autores y otros beneficiarios.*

1. Se considera autor a la persona natural que crea alguna obra literaria, artística o científica.
2. No obstante, de la protección que esta Ley concede al autor se podrán beneficiar personas jurídicas en los casos expresamente previstos en ella.

**Artículo 6.** *Presunción de autoría, obras anónimas o seudónimas.*

1. Se presumirá autor, salvo prueba en contrario, a quien aparezca como tal en la obra, mediante su nombre, firma o signo que lo identifique.

# EXHIBIT 40




## WIPO

Help ⌄   English ⌄   IP Portal login

Home › WIPO Lex › Database

LAWS   TREATIES   JUDGMENTS   BROWSE BY JURISDICTION

# Spain ES054

## Consolidated Text of the Law on Intellectual Property, Regularizing, Clarifying and Harmonizing the Applicable Statutory Provisions (approved by Royal Legislative Decree No. 1/1996 of April 12, 1996)



🗛 Machine translation   +

*WIPO Database of Intellectual Property Legislative Texts*

ES054EN Copyright, Royal Decree (Revised Text), 12/04/1996, No. 1 page 1/52

**Revised Law on Intellectual Property, regularizing, clarifying and harmonizing the applicable statutory provisions**

**(approved by Royal Legislative Decree 1/1996 of April 12, 1996)\***

Table of Contents

*pages*

PART I AUTHORS' RIGHTS.................................................................. 2 Title I General Provisions ................................................................ 2 Title II Ownership, Subject Matter and Content ........................................ 2

Chapter I Ownership.............................................................. 2 Chapter II Subject matter ........................................................... 4 Chapter III Content.................................................... 5

Section 1 Moral Rights ............................................... 5 Section 2 Exploitation Rights ........................................... 6 Section 3 Other Rights ........................................ 9

Title III Duration and Limitations ............................................ 13 Chapter I Duration ................................................... 13 Chapter II Limitations ................................................ 14

Title IV Public Domain ........................................ 16 Title V Transfer of Rights ................................... 17

Chapter I General provisions ................................................ 17 Chapter II Publishing contracts .......................................... 20 Chapter III Stage and musical performance contracts .................................. 24

Title VI Cinematographic and Other Audiovisual Works.......................... 27 Title VII Computer Programs ................................... 29

PART II OTHER INTELLECTUAL PROPERTY RIGHTS..................... 33 Title I Rights of Performers ........................................... 33 Title II Rights of Phonogram Producers .................................... 35 Title III Rights of Producers of Audiovisual Recordings ...................... 37 Title IV Rights of Broadcasting Organizations.................................. 38 Title V Protection of Ordinary Photographs ........................... 39 Title VI Protection of Specific Editorial Productions ................ 40 Title VII Common Provisions.................................... 40

PART III PROTECTION OF THE RIGHTS RECOGNIZED IN THIS LAW........... 41 Title I Actions and Procedures......................................... 41 Title II Intellectual Property Registry.................................. 43 Title III Symbols or Notices of Reserved Rights.................................... 43 Title IV Entities for the Administration of the Rights Recognized in this Law ......... 44

*WIPO Database of Intellectual Property Legislative Texts*

ES054EN Copyright, Royal Decree (Revised Text), 12/04/1996, No. 1 page 2/52

**PART I AUTHORS' RIGHTS**

**Title I General Provisions**

(Originating Fact)

Art. 1. The intellectual property in a literary, artistic or scientific work shall belong to the author thereof by

virtue of the sole fact of its creation.

(Content)

Art. 2. Intellectual property shall comprise rights of personal and economic character which shall confer on

the author full control over and the exclusive right to the exploitation of the work, without any limitations
other than those specified in the Law.

(Characteristics)

Art. 3. Authors' rights shall be independent, compatible and susceptible of combination with: 1 the
ownership of and other rights pertaining to the physical object in which the intellectual

creation is embodied. 2 any industrial property rights that may exist in relation to the work. 3 the other
intellectual property rights recognized in Part II of this Law.

(Disclosure and Publication)

Art. 4. For the purposes of the provisions of this Law, "disclosure" of a work means any expression thereof

which, with the author's consent, first makes it accessible to the public in whatever form, and "publication"
means the disclosure that is effected by the making available to the public of a sufficient number of copies
of the work for its needs, estimated according to the nature and purpose of the work, to be reasonably
satisfied.

**Title II Ownership, Subject Matter and Content**

*Chapter I Ownership*

(Authors and Other Beneficiaries)

Art. 5. (1) The natural person who creates any literary, artistic or scientific work shall be considered the

author thereof.